21-3360

IN THE

# United States Court of Appeals

## FOR THE THIRD CIRCUIT

◆◆◆

CATHERINE BAKER, Individually and on behalf of all others similarly situated,

*Plaintiff-Appellant,*

—v.—

CRODA INC., f/k/a Croda, Inc.,

*Defendant-Appellee.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

---

## BRIEF FOR PLAINTIFF-APPELLANT AND JOINT APPENDIX
## VOLUME I OF II
### (Pages Appx1 to Appx12)

---

ADAM J. GOMEZ
KELLY L. TUCKER
GRANT & EISENHOFER P.A.
123 Justison Street
Wilmington, Delaware 19801
(302) 622-7000

*Attorneys for Plaintiff-Appellant*

# **TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES ........................................................................ ii

JURISDICTIONAL STATEMENT ............................................................1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ...........................1

STATEMENT OF RELATED CASES AND PROCEEDINGS ............................2

SCOPE AND STANDARD OF REVIEW .....................................................2

STATEMENT OF THE CASE...................................................................2

STATEMENT OF FACTS .......................................................................4

SUMMARY OF ARGUMENT ..................................................................8

ARGUMENT ....................................................................................11

    A.    LEGAL STANDARD FOR MOTIONS TO DISMISS UNDER FED. R. CIV. P. 12(B)(6)..............................................................................11

    B.    ACTUAL EXPOSURE TO TOXIC ETHYLENE OXIDE AND THE RESULTANT PRESENT INCREASED RISK OF DISEASE AND RESULTING ECONOMIC LOSS IS A COGNIZABLE INJURY UNDER DELAWARE LAW....................12

    C.    THE PRINCIPLE THAT MEDICAL MONITORING IS COMPENSABLE UNDER DELAWARE LAW REGARDLESS OF PRESENT PHYSICAL ILLNESS OR DISEASE IS REINFORCED BY DELAWARE'S ADOPTION OF THE RESTATEMENT (SECOND) OF TORTS .....................................................20

    D.    THE DISTRICT COURT'S ERROR CREATED A SPLIT WITHIN THE THIRD CIRCUIT AS TO WHETHER DELAWARE RECOGNIZES MEDICAL MONITORING AS AN INDEPENDENT CAUSE OF ACTION .........................28

CONCLUSION ..................................................................................30

CERTIFICATION OF ADMISSION TO BAR ..............................................32

CERTIFICATE OF COMPLIANCE AND VIRUS SCAN ..................................33

CERTIFICATE OF SERVICE ..................................................................34

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alderman v. Clean Earth, Inc.*,
No. 04C-06-181, 2007 WL 1930664 (Del. Super. Ct. June 26,
2007) .................................................................................................................13

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..........................................................................................11

*Ayers v. Jackson Tp.*,
461 A.2d 184 (N.J. Super. 1983) ...............................................................*passim*

*Bower v. Westinghouse Elec. Corp.*,
522 S.E.2d 424 (W. Va. 1999)........................................................21, 22, 24, 28

*Brzoska v. Olson*,
668 A.2d 1355 (Del. 1995) ...............................................................13, 17, 18, 19

*BTIG, LLC v. Palantir Techs., Inc.*,
No. N19C-08-314, 2020 WL 95660 (Del. Super. Ct. Jan. 3, 2020)...................20

*Burns v. Jaquays Mining Corp.*,
752 P.2d 28 (Az. App. 1987)..............................................................................23

*Exxon Mobil Corp. v. Albright*,
71 A.3d 30 (Md. 2013) .......................................................................................23

*Firestone Tire & Rubber Co. v. Risjord*,
449 U.S. 368 (1981)..............................................................................................1

*Guinan v. A.I. Dupont Hosp. for Children*,
597 F. Supp. 2d 517 (E.D. Pa. 2009).............................................................10, 28

*Hansen v. Mountain Fuel Supply Co.*,
858 P.2d 970 (Utah 1993)...................................................................................27

*Hess v. A.I. DuPont Hosp.*,
No. 08-0229, 2009 WL 595602 (E.D. Pa. Mar. 5, 2009) .............................10, 28

*Johnson v. City of Shelby*,
    574 U.S. 10 (2014) ............................................................................11

*Klotz v. Celentano Stadtmauer & Walentowicz LLP*,
    991 F.3d 458 (3d Cir. 2021) ...........................................................2, 11

*Leach v. E.I. Du Pont de Nemours & Co., et al.*,
    No. 01-C-608, 2002 WL 1270121 (W. Va. Cir. Ct. Apr. 10, 2002) .................23

*Maio v. Aetna, Inc.*,
    221 F.3d 472 (3d Cir. 2000) .............................................................11

*McCracken v. Wilson Beverage*,
    No. 91A-10-004, 1992 WL 301985 (Del. Super. Ct. Oct. 15, 1992) ...........25, 26

*Mergenthaler v. Asbestos Corp. of Am.*,
    480 A.2d 647 (Del. 1984) ............................................................*passim*

*M.G. ex rel. K.G. v. A.I. Dupont Hosp. for Child.*, 393 F. App'x 884
    (3d Cir. 2010)............................................................................. 28-29

*Potter v. Firestone Tire & Rubber Co.*,
    6 Cal. 4th 965 (1993) ......................................................................23

*Rogers v. Christina Sch. Dist.*,
    73 A.3d 1 (Del. 2013) ......................................................................20

*Sheppard v. A.C. & S. Co.*,
    498 A.2d 1126 (Del. Super. Ct. 1985)..................................24, 25, 27

*Spruill v. Gillis*,
    372 F.3d 218 (3d Cir. 2004) .............................................................11

## Statutes

7 *Del. C.* § 6003 .................................................................................6, 7

28 U.S.C. § 1291 ...................................................................................1

Class Action Fairness Act, 28 U.S.C. § 1332(d) ........................................1

## Other Authorities

Fed. R. Civ. P. Rule 12 ...............................................................2, 3, 11, 12

Restatement (Second) of Torts (1965)......................................................9, 20, 23, 25

## JURISDICTIONAL STATEMENT

The United States District Court for the District of Delaware (The Honorable Stephanos Bibas, sitting by designation) (the "District Court") had subject-matter jurisdiction over this class action, toxic tort matter under the Class Action Fairness Act, 28 U.S.C. § 1332(d). Appx24, ¶10. There are more than 100 putative Class members, and at least some Class members have a different citizenship from Defendant-Appellee Croda Inc. f/k/a Croda, Inc. ("Croda" or "Defendant"). *Id.* The District Court entered an Order dismissing Plaintiff-Appellant Catherine Baker's ("Plaintiff") Complaint without prejudice on November 23, 2021 and afforded Plaintiff 30 days to amended the Complaint. Appx7. On December 22, 2021, Plaintiff timely filed her Notice of Appeal. Appx8. On February 17, 2022, Plaintiff filed a Notice of Intent to Stand on the Complaint, and the District Court issued a Final Order dismissing the case with prejudice on February 18, 2022. Appx10-12. Accordingly, this Court has jurisdiction to hear the case under 28 U.S.C. § 1291. *Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 368 (1981).

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

Whether the District Court erred in dismissing the Complaint on the ground that Plaintiff had not alleged a cognizable injury under Delaware law where Plaintiff's actual exposure to toxic ethylene oxide caused a present injury of the

need for ongoing diagnostic testing in the form of a medical monitoring and the accompanying present economic loss associated therewith.

## STATEMENT OF RELATED CASES AND PROCEEDINGS

Plaintiff is not aware of any other related cases or proceedings currently pending in any jurisdiction.

## SCOPE AND STANDARD OF REVIEW

This Court's review of the District Court's dismissal of the Complaint is *de novo. Klotz v. Celentano Stadtmauer & Walentowicz LLP*, 991 F.3d 458, 462 (3d Cir. 2021).

## STATEMENT OF THE CASE

This class action arises from Defendant's emissions of a dangerous amount of ethylene oxide gas from its Atlas Point facility in New Castle, Delaware, and Plaintiff's and putative Class members' resultant injuries. Appx22, ¶1. On August 24, 2020, Plaintiff filed her Class Action Complaint in the United States District Court for the District of Delaware asserting claims for (1) Ultrahazardous Activity/Strict Liability; (2) Public Nuisance; (3) Private Nuisance; (4) Negligence; (5) Willful and Wanton Conduct; (6) and Medical Monitoring. Appx38-46.

On October 13, 2020, Defendant filed a Motion to Dismiss for lack of subject matter jurisdiction. Appx53. After briefing by the parties on the matter, on August 12, 2021, Defendant informed the Court that it would withdraw its Rule

12(b)(1) motion. Appx222-225. The Court allowed the parties to re-brief their Rule 12(b)(6) arguments. Appx284-286.

On August 27, 2021, Defendant filed a Renewed Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6) and argued that Plaintiff failed to state a claim for relief, *inter alia*, because exposure to and inhalation of toxic ethylene oxide gas without present manifestation of physical harm is not a cognizable injury under Delaware law. Appx257, Appx258. On October 1, 2021, Plaintiff filed a timely Brief in Opposition. Appx288. In so doing, Plaintiff argued, *inter alia*, that Defendant misstated Delaware law, and that Delaware courts would recognize as a present, cognizable injury both Plaintiff and putative Class members' exposure to ethylene oxide and the resultant necessary ongoing diagnostic testing for specific diseases linked to ethylene oxide exposure to mitigate latent disease. Appx296. On October 22, 2021, Defendant filed its Reply Brief. Appx321.

On November 5, 2021, the District Court heard oral argument by Zoom. Appx20. On November 23, 2021, the District Court issued a Memorandum Opinion and Order dismissing the Complaint without prejudice, with 30 days leave to amend, holding, "this class cannot recover damages for the risk of diseases that they do not yet have. And because each tort requires an injury, none of [Plaintiff's] torts survives this flaw." Appx1-7, at Appx6. Plaintiff elected not to amend her Complaint, as amendment would not address the fundamental dispute of whether

Delaware law recognizes the present injury of actual exposure to a toxic, carcinogenic, and mutagenic toxin or increased risk of disease and resultant need for, and costs associated with, ongoing testing in the form of a medical monitoring program. Appx10. On December 22, 2021, Plaintiff timely filed a Notice of Appeal. Appx8. On February 17, 2022, Plaintiff filed a Notice of Intent to Stand on the Complaint. Appx10. On February 18, 2022, the District Court issued a Final Order dismissing Plaintiff's Complaint with prejudice. Appx12. This appeal follows.

## STATEMENT OF FACTS

Ethylene oxide is an odorless and colorless toxic, carcinogenic, and mutagenic gas. Appx25, ¶17. For decades, Defendant's ethylene oxide emissions have poisoned one of Delaware's most populous regions. Appx27, ¶27. Defendant's Atlas Point plant produces up to 30,000 metric tons of ethylene oxide annually, which is used in surfactant production and the creation of ethylene glycol. *Id*. Defendant releases huge and dangerous amounts of ethylene oxide gas every year. *Id.* The release of ethylene oxide gas into the air surrounding the Class zone has been ongoing since at least 1988. *Id.*, Appx34-35, ¶62 (defining the Class).

In addition to its continuous and pervasive emissions of ethylene oxide in the ordinary course of business, in 2008, Defendant had a documented unpermitted

release of ethylene oxide. Appx29, ¶35. Since 2008, the Atlas Point plant has violated the State of Delaware Department of Natural Resources and Environmental Control ("DNREC") regulations including the failure to monitor for and record emissions, best management practices violations, failure to make timely permit applications, and excess emissions. *Id.*

In 2015, Defendant announced that it was adding a new facility to the Atlas Point plant, which would provide the ability to produce ethylene oxide directly on site for use in manufacturing surfactants. Appx29, ¶36. The facility was opened in October 2017. *Id.* On November 25, 2018, Atlas Point reported an emissions accident at the new ethylene oxide production plant, which resulted in the release of 2,688 pounds of ethylene oxide into the air surrounding the plant. Appx29-30, ¶37. A call was sent out through the Delaware Emergency Notification System to advise residents in the nearby area to seek shelter. *Id*. The massive release resulted in the closure of the Delaware Memorial Bridge for seven hours. *Id*. In addition to the tons of ethylene oxide released into the air, 700,000 gallons of deluge water, used by Defendant to minimize the ambient air concentration of ethylene oxide and to minimize the risk of explosion or ignition of the released ethylene oxide, overflowed the spill sump and discharged onto the ground and into the wooded area behind the plant. *Id.*

On March 28, 2019, Defendant entered into a settlement agreement with DNREC wherein it was found to have violated, *inter alia*, 7 *Del. C*. § 6003(a)(1), through the unpermitted release of ethylene oxide and 3.38 of Permit APC-2016/0068 - Construction (Amendment 3) by not maintaining and operating its plant in a manner consistent with good air pollution control practice for minimizing emissions, when it used the incorrect gasket that ultimately failed and resulted in the uncontrolled release of ethylene oxide emissions on November 25, 2018. Appx30, ¶38. Defendant had conducted the conditional operation of its plant without the approval of DNREC. *Id*. The federal Occupational Safety and Health Administration, DNREC, and other state agencies ultimately imposed more than $500,000 in fines and penalties on Defendant for operating the plant without proper inspection, failure to train workers adequately, failure to have proper leak-shutdown procedures, and other failures leading up to the leak. Appx30, ¶39.

Throughout Defendant's unsafe emissions of ethylene oxide, government agencies and health organizations have recognized ethylene oxide's toxic effects on humans, publishing studies reporting that the gas is a dangerous, carcinogenic, and mutagenic toxin that is readily taken up by the lungs, efficiently absorbed into the blood stream, and easily distributed throughout the human body. Appx25-34. In 1977, the National Institute of Occupational Safety and Health recommended that ethylene oxide be considered mutagenic and potentially carcinogenic. Appx26,

¶20. In 1994, the World Health Organization categorized ethylene oxide as a "Group 1" human carcinogen—its highest risk classification. Appx27, ¶24. In 2000, the U.S. Department of Health and Human Services classified ethylene oxide as a "known . . . human carcinogen." *Id.* In 2016, the EPA likewise classified ethylene oxide as a human carcinogen. Appx27, ¶26. In short, ethylene oxide is an extremely toxic substance as to which there is no safe level for human exposure. Appx25-34.

All times relevant to the Complaint, Defendant knew that: (1) its manufacturing plant operated without sufficient pollution control systems necessary to reduce or eliminate releases of toxic ethylene oxide; (2) the release of ethylene oxide spread well beyond the property boundaries of the Atlas Point plant and resulted in exposure to residents in the Class zone; and (3) ongoing exposure to ethylene oxide, a known carcinogen, would result in the increase of the risk of illness, disease, or disease process for nearby residents and increased the likelihood that nearby residents would develop cancer. Appx31, ¶46.

Nonetheless, since at least 1988, Defendant has released tens of thousands of tons of ethylene oxide into the air of the surrounding community. Appx27, ¶27, Appx29-30, ¶¶35, 37. Heavier than air, odorless, colorless, and with an atmospheric half-life of 211 days, the ethylene oxide Defendant released lingered at breathing level in communities surrounding the Atlas Point facility for

prolonged periods, continually exposing Plaintiff and putative Class members to an extremely harmful toxin. Appx28, ¶¶28-30. Plaintiff and putative Class members inhaled this toxic gas over a period of at least over one year and, for many Class members, for decades. Appx32-35, ¶¶50-62. As a result, Plaintiff and the putative Class have already acquired some of the highest cancer risks in the nation. Appx23, ¶5, Appx30-31, ¶¶40-42. The EPA estimates that Plaintiff and the putative Class are up to four times more likely to develop cancer than average Americans due to their prolonged, actual exposure to ethylene oxide. Appx23, ¶5. The increased risk of disease was visited upon Plaintiff and Class members because of Defendant's ethylene oxide emissions at its Atlas Point facility. Appx32, ¶49. Consequently, Plaintiff and Class members have *already* suffered *actual, present* injury in the form of exposure to and inhalation of toxic, mutagenic, and carcinogenic ethylene oxide gas emitted by Defendant, as well as the present injury of needing to undergo and pay for reasonably necessary and costly medical testing and monitoring to detect latent cancers and other disease processes, so they might have the opportunity to treat these debilitating conditions early, and, hopefully, successfully.

## SUMMARY OF ARGUMENT

First, Defendant injured Plaintiff and the putative Class members by exposing them to dangerous amounts of toxic ethylene oxide, and causing them to

inhale a toxic, mutagenic, and carcinogenic substance. The exposure itself, and the resultant injuries such exposure causes, are cognizable, appreciable, and compensable under Delaware law. As alleged in the Complaint, the exposure caused a present injury because Plaintiff and the Class members are now several orders of magnitude more likely than the general population to develop certain cancers. This increased risk has necessitated the immediate present need to incur the cost of ongoing diagnostic testing in the form of a medical monitoring program. Delaware law recognizes the right to implement medical monitoring programs as a legal remedy where, as is the case here, a plaintiff can show actual exposure to a toxic substance. Contrary to the District Court's holding, claims for monitoring, absent present physical injury, do not seek recovery for an unquantifiable injury, but instead seek remedy for harm caused by actual exposure to a toxic substance and the resulting present injury of the need to incur the cost of medical surveillance and examinations.

Second, the principle that medical monitoring is compensable under Delaware law without proof of present physical illness or disease is reinforced by Delaware's adoption of the Restatement (Second) of Torts (1965) (the "Restatement"). Examination of Restatement Section 7, which defines harm and injury separately, illustrates that the absence of a present physical illness or disease does not preclude finding that a quantifiable and present injury exists. Courts like

those in Delaware that follow the Restatement Section 7 have consistently held that physical harm is not required to establish a cognizable injury when recognizing claims for medical monitoring or surveillance in similar factual circumstances.

Third, the District Court's decision to dismiss Plaintiff's Complaint is plainly at odds with the only cases within the Third Circuit deciding this issue under Delaware law and has created a split within the Circuit as to whether medical monitoring is available in cases without manifestation of a present physical injury. *See Guinan v. A.I. Dupont Hosp. for Children*, 597 F. Supp. 2d 517 (E.D. Pa. 2009) (holding Delaware recognizes claims for medical monitoring under Delaware law without present physical disease), *overruled on other grounds*, *M.G. ex rel. K.G. v. A.I. Dupont Hosp. for Child.*, 393 F. App'x 884, 891 (3d Cir. 2010); *Hess v. A.I. DuPont Hosp.*, No. 08-0229, 2009 WL 595602 (E.D. Pa. Mar. 5, 2009) (same). Consistent with preexisting Third Circuit precedent, this Court should reverse the decision of the District Court and hold that Plaintiff's allegations of extended actual exposure to hazardous quantities of a known carcinogenic and mutagenic toxin and resultant increased risk of disease, premised on scientific data and well-documented incidents of release, is a cognizable injury under Delaware law, and allow Plaintiff to seek the recognized remedy of medical monitoring for her injuries.

## **ARGUMENT**

### A.    LEGAL STANDARD FOR MOTIONS TO DISMISS UNDER FED. R. CIV. P. 12(B)(6)

Evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) requires the Court to accept as true all material allegations of the complaint. *Spruill v. Gillis*, 372 F.3d 218, 223 (3d Cir. 2004). The Court may grant such a motion to dismiss only if, after "accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief." *Maio v. Aetna, Inc.*, 221 F.3d 472, 481-82 (3d Cir. 2000) (internal quotation marks omitted). A plaintiff must plead facts sufficient to show that a claim has substantive plausibility. *Johnson v. City of Shelby*, 574 U.S. 10 (2014). A complaint may not be dismissed, however, for imperfect statements of the legal theory supporting the claim asserted. *Id.* at 10. A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When reviewing a lower court's decision on a motion to dismiss, the Court of Appeals reviews such determinations *de novo*. *Klotz*, 991 F.3d 458 at 462. In this case, the District Court erred in dismissing Plaintiff's case, as Plaintiff has adequately alleged a compensable injury under Delaware law.

11

**B.    ACTUAL EXPOSURE TO TOXIC ETHYLENE OXIDE AND THE RESULTANT PRESENT INCREASED RISK OF DISEASE AND RESULTING ECONOMIC LOSS IS A COGNIZABLE INJURY UNDER DELAWARE LAW**

Plaintiff alleges that she and the Class members sustained a present injury when they inhaled toxic, mutagenic, and carcinogenic ethylene oxide gas as a result of Defendant's emissions of tens of thousands of tons thereof. Plaintiff and Class members have a present, actual need to pay for medical surveillance and diagnostic testing due to their now fourfold likelihood of developing cancer or other diseases. Their communities were poisoned, silently and invisibly, for decades through Defendant's emissions. The emitted ethylene oxide hung low in the air, at breathing level, ensuring constant inhalation by anyone in the designated census tracts. The immediate impact of this exposure is the scientifically recognized and statistically proven fourfold-increase in risk of various cancers. Ongoing diagnostic testing through a medical monitoring program is currently the only way to prevent identify the resulting latent disease so that those exposed can seek early treatment.

The Complaint contains allegations of injury that are more than sufficient survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), and thus the District Court's dismissal was in error. Indeed, the alleged injuries fit squarely within the traditional paradigm of medical monitoring cases, as Delaware has recognized medical monitoring as a remedy to injury in the form of actual

exposure to a toxic substance. *See Mergenthaler v. Asbestos Corp. of Am.*, 480 A.2d 647 (Del. 1984) (signaling that medical monitoring is an appropriate remedy where there is evidence of exposure to a toxic substance); *Brzoska v. Olson*, 668 A.2d 1355, 1363 (Del. 1995) (adopting an "actual exposure" test for claims based upon fear of contracting disease and seeking medical monitoring as a remedy); *Alderman v. Clean Earth, Inc.*, No. 04C-06-181, 2007 WL 1930664, at *3 (Del. Super. Ct. June 26, 2007) (evaluating a motion for reconsideration on a *Daubert* motion as to whether the plaintiffs' experts planned to proffer reliable testimony to prove the plaintiffs were entitled to medical monitoring for their exposure to toxic substances (citing and distinguishing *Stevenson v. E .I. DuPont De Nemours and Co.*, 327 F.3d 400 (5th Cir. 2003)).

Delaware courts have addressed injury in the form of the present need for medical monitoring over the course of four decades. The first significant case regarding medical monitoring in Delaware was *Mergenthaler*, 480 A.2d 647, in which plaintiffs brought claims that sought to recover for the fear and mental anguish that they would suffer asbestos-related illnesses through their indirect contact with asbestos fibers, as a result of their laundering of their spouses work clothes. *Id.* at 651. The Delaware Supreme Court dismissed those claims—not on the basis that manifestation of physical disease was required to state a claim generally, but instead, holding that when asserting claims on the well-established

basis of *mental anguish or distress*, a plaintiff was required to plead a direct contact with the contaminant and there was no evidence presented that the plaintiffs actually inhaled asbestos fibers. *Id.* That situation is in direct contrast with the well-pleaded facts here, where Plaintiff alleges that she, and putative Class members, actually inhaled toxic ethylene oxide gas continuously and, in some cases, for decades.

Importantly, in affirming dismissal, the Delaware Supreme Court signaled that had the *Mergenthaler* plaintiffs been able to assert that they actually inhaled asbestos fibers, the court may have reached a different conclusion. *See id.* ("there was no direct contact by the plaintiff-spouses with the asbestos, and no evidence was presented to show that they actually inhaled asbestos fibers . . . *on this distinction*, plaintiffs' contention fails") (emphasis added).

Further supporting this contention, the Delaware Supreme Court carefully distinguished the *Mergenthaler* claims from the claims for medical monitoring brought by plaintiffs in *Ayers v. Jackson Tp.*, 461 A.2d 184 (N.J. Super. 1983). The *Ayers* plaintiffs were 325 residents of the Legler section of Jackson Township, New Jersey. *Id.* at 186. They alleged that toxic waste leached through the municipal landfill owned and operated by defendant township and contaminated their well water. *Id.* The residents alleged that the contamination caused them to suffer bodily injury, emotional distress, impairment of quality of life and

14

enhancement of risk of cancer. *Id.* Specifically, the *Ayers* plaintiffs alleged that exposure to known carcinogens ingested by them over a long period of time would require substantial medical surveillance. *Id.*

None of the *Ayers* plaintiffs had a present manifestation of physical disease or cancer at the time of litigation, but the court held that the plaintiffs still had a claim for medical costs for future testing, which they alleged was necessitated by exposure to the chemicals. *Id.* at 190. The Court reasoned:

> *Damages may be recovered for the prospective consequences of a tortious injury. Coll v. Sherry,* 29 N.J. 166, 174, 148 A.2d 481 (1959). It is not the reasonable probability of whether plaintiffs will suffer cancer in the future that should determine whether medical surveillance is necessary. Rather, *it is whether it is necessary, based on medical judgment, that a plaintiff who has been exposed to known carcinogens at various levels should undergo annual medical testing in order to properly diagnose the warning signs of the development of the disease. If it is necessary, then the probability of the need for that medical surveillance is cognizable as part of plaintiffs' claim. Schroeder v. Perkel*, 87 N.J. 53, 69, 432 A.2d 834 (1981).

*Id*. (emphases added). The *Ayers* court reasoned that allowing such claims to proceed in tort where there was evidence of actual exposure to a toxic substance was necessary and supported by public policy, as if plaintiffs were deprived of any necessary diagnostic services in the future because they had no funds available to pay for the testing, the consequences might result in serious, if not fatal, illness or disease. *Id.* The court noted "[p]ublic policy thus supports a conclusion that if such

illness could be prevented by surveillance, then the tortfeasor should bear the costs." *Id.*

> In examining *Ayers*, the *Mergenthaler* court specifically noted:

> While at first blush, this case appears to support plaintiffs' contention, it can be distinguished from the instant case in that there the plaintiffs clearly ingested the water that was contaminated. Stated otherwise, *in Ayers there was a direct contact with the contaminant by the plaintiffs*. Here, there was *no direct contact by the plaintiff-spouses with the asbestos, and no evidence was presented to show that they actually inhaled asbestos fibers. **Based on this distinction**, plaintiffs'* contention fails.

480 A.2d at 651 (emphases added). The Delaware Supreme Court noted that the *Ayers* case recognized that a claim for monitoring, absent present physical injury, does not seek recovery for an unquantifiable injury, but instead seeks remedy for harm caused by actual exposure to a toxic substance and asks for specific monetary damages measured by the cost of medical examinations. *Id*. *Ayers* identifies the significance and extent of exposure to chemicals, the toxicity of the chemicals, the seriousness of the diseases for which individuals are at risk, the relative increase in the chance of onset of disease in those exposed, but not the existence of present physical injury as elements of proof. *Ayers*, 461 A.2d at 190. Like the *Ayers* plaintiffs who ingested contaminated well water without present manifestation of disease, Plaintiff and Class members have inhaled ethylene-oxide contaminated air and presently suffer from an increased risk of disease that necessitates medical

monitoring. Therefore, as *Ayers* and *Mergenthaler* instruct, Plaintiff has alleged a cognizable injury and dismissal was in error.

More recently, in *Brzoska v. Olson*, the Delaware Supreme Court was asked to confront the question of whether a patient may recover damages for treatment by a health care provider afflicted with AIDS absent a showing of a resultant physical injury *or exposure to disease*. 668 A.2d 1355, 1357 (Del. 1995). The *Brzoska* plaintiffs sought recovery for fear associated with receiving treatment from a dentist with AIDS. Plaintiffs were 38 former patients of a Wilmington dentist who died of AIDS in 1991. *Id*. Their causes of action against the defendant—the deceased dentist's estate—were for negligence, battery, and misrepresentation. *Id.* The dentist continued to practice after disease diagnosis, and towards the end of 1990 exhibited open lesions, weakness, and memory loss. *Id.* at 1358.

Shortly after the dentist's death, the Delaware Division of Public Health (the "Division") evaluated the dentist's practice and records, in part to determine patients had been placed at risk through exposure to HIV. *Id.* The Division determined that the practice's equipment, sterilization procedures and precautionary methods were better than average, and that the dentist ceased doing surgery after being diagnosed as HIV-positive. *Id.* Although the Division determined that the risk of patient exposure was "very small," it notified all patients from 1989 until the time of death that their dentist had died from AIDS

and that there was a possibility that they were exposed to HIV. *Brzoska*, 668 A.2d at 1358-59. None of the plaintiffs tested positive for HIV. *Id.* at 1359. Further, the Plaintiffs alleged no injuries from and no actual exposure to HIV. *Id.* at 1362. Instead, plaintiff's alleged injuries that arose solely out of the *fear* that they had been exposed to HIV. *Id.*

The Delaware Supreme Court correctly recognized *Brzoska* as seeking a recovery for the injury of the plaintiffs' *fear* of contracting AIDS as opposed to actual exposure to the human immunodeficiency virus. *Id.* In the context of a claim for battery, the Court found this fear to be unreasonable as there was *no evidence of exposure* to HIV—only evidence that the plaintiffs were treated by a dentist with AIDS. *Id.* at 1362-62. *Brzoska* recognized that without proof of actual exposure (in contrast to this case) to the virus that causes AIDS, the risk of transmission is so minute that any *fear* of contracting disease is *per se* unreasonable. *Id.* at 1363. *Brzoska* reinforced the "actual exposure" test for claims based upon fear of contracting disease, meaning that fear of disease alone is insufficient to obtain relief. *Id.* at 1364. Consistent with Delaware law established in *Mergenthaler* and reinforced in *Brzoska*, the facts presented in this Action satisfy the "actual exposure" test (and do not bring claims for "fear" of future disease, but *actual risk* of future illness and latent disease). The allegations in this case are that Plaintiff and the Class members had *continuous* and *actual* exposure to Defendant's

ethylene oxide while residing near the Atlas Point facility. Thus, this actual exposure is a clearly defined mechanism of injury. Accordingly, the injury alleged is entirely consistent with a finding of actual harm pursuant to the Delaware Supreme Court's holdings in *Brzoska* and *Mergenthaler*.

In error, the District Court found that Delaware law clearly signaled that Plaintiff could not recover absent physical injury. Appx4. Neither *Brzoska* nor *Mergenthaler*, nor any other medical monitoring case applying Delaware law, stand for that proposition. The holdings in both *Mergenthaler* and *Brzoska*, particularly the former's reliance on *Ayers*, make apparent that the Delaware Supreme Court would reach the same conclusion as *Ayers* if presented with a similar fact pattern, which was lacking in both of those cases, as plaintiffs in both cases failed to allege (or prove, as *Brzoska* was decided at summary judgment) that they were exposed to a disease-causing agent. This case, in contrast, presents a nearly identical fact pattern to *Ayers*, which the Delaware Supreme Court in *Mergenthaler* signaled would likely state a claim for relief.

Here, the present injuries caused by Defendant's release of, and the Class's actual exposure to, toxic ethylene oxide are identifiable, appreciable, and cognizable, and are not speculative or mere fear or apprehension. As alleged, ethylene oxide is a carcinogen and powerful mutagen that damages DNA rendering exposure unsafe at any level. Plaintiff and Class members were actually exposed to

19

and did in fact inhale this carcinogenic, disease-causing agent, and this actual inhalation caused significant, present risk of illness and disease. Plaintiff and Class members are injured by the medically necessary need to incur the cost of diagnostic testing caused by significant exposure to toxic ethylene oxide and the resulting increased risk. These allegations exceed Plaintiff's burden at the pleadings stage, and thus the District Court erred in deciding to dismiss the case.

### C. THE PRINCIPLE THAT MEDICAL MONITORING IS COMPENSABLE UNDER DELAWARE LAW REGARDLESS OF PRESENT PHYSICAL ILLNESS OR DISEASE IS REINFORCED BY DELAWARE'S ADOPTION OF THE RESTATEMENT (SECOND) OF TORTS

Delaware follows the Restatement, including the separate and distinct principles of "injury" and "harm" set forth in Section 7. *See, e.g.*, *Rogers v. Christina Sch. Dist.*, 73 A.3d 1, 7 (Del. 2013) ("Generally, to determine whether one party owed another a duty of care, [Delaware] follow[s] the guidance of the Restatement (Second) of Torts."); *BTIG, LLC v. Palantir Techs., Inc.*, No. N19C-08-314, 2020 WL 95660, at *4, n.51 (Del. Super. Ct. Jan. 3, 2020) (noting that Section 7 defines "injury" as "the invasion of any legally protected interest of another"). Examination of Restatement Section 7 illustrates that the absence of physical manifestation of illness or disease does not preclude finding a quantifiable and present injury exists.

In *Sadler v. PacifiCare of Nev.*, the Supreme Court of Nevada examined the Section 7 of the Restatement in evaluating a claim for medical monitoring without

proof of present physical disease. 340 P.3d 1264, 1270-72 (Nev. 2014). The court

noted that the section:

> broadly defines an injury for the purpose of tort law as "the invasion
> of any legally protected interest of another." Not only is this definition
> not limited to physical injury, the same section separately defines
> "harm" as "the existence of loss or detriment in fact of any kind to a
> person resulting from any cause," and "physical harm" as "the
> physical impairment of the human body, or of land or chattels." Thus .
> . . the differing definitions indicate that they are not interchangeable,
> and more, that injury is generally not limited to physical injury.

*Id*. at 1269. That court, rejecting a requirement for proof of present physical injury,

reasoned that "the Restatement separately defines 'physical harm,' indicating that

physical harm is not necessarily implicated by the term 'injury.'" *Id*. at 1270-71.

*Sadler* correctly analyzed foundational tort law as it also exists in Delaware. In

*Meyer ex rel. Coplin v. Fluor Corp.*, citing Restatement Section 7, the Missouri

Supreme Court held that a physical injury requirement is inconsistent with the

theory of recovery in an action seeking medical monitoring. 220 S.W.3d 712, 716

(Mo. 2007). The court noted that such a requirement extinguishes the claim and

bars the plaintiff from a full recovery, as testing is necessary to detect latent

injuries that result from plaintiff's exposure. *Id*. at 718.

   In *Bower v. Westinghouse Elec. Corp.*, 522 S.E.2d 424 (W. Va. 1999),

plaintiffs were exposed to toxic substances released by defendants; none exhibited

symptoms of disease related to the exposure. *Bower*, 522 S.E.2d at 426-27. The

West Virginia Supreme Court concluded:

21

It is difficult to dispute that an individual has an interest in avoiding expensive diagnostic examinations just as he or she has an interest in avoiding physical injury. When a defendant negligently invades this interest, the injury to which is neither speculative nor resistant to proof, it is elementary that the defendant should make the plaintiff whole by paying for the examinations.

*Id*. at 430. *Bower*, recognizing that cognizable injury under the law is not just physical injury, rejected the need to prove present physical injury. *Id*. "The 'injury' that underlies a claim for medical monitoring . . . is 'the invasion of any legally protected interest.'" *Id*. (quoting Restatement § 7(1)). *Friends For All Children v. Lockheed Aircraft Corp*., illustrates the tort principle supporting recovery:

Jones is knocked down by a motorbike which Smith is riding through a red light. Jones lands on his head with some force. . . . Jones enters a hospital where doctors recommend that he undergo a battery of tests to determine whether he has suffered any internal head injuries. The tests prove negative, but Jones sues Smith solely for what turns out to be the substantial cost of the diagnostic examinations.

746 F.2d 816, 825 (D.C. Cir. 1984). Thus:

It is clear that even in the absence of physical injury Jones ought to be able to recover the cost for the various diagnostic examinations proximately caused by Smith's negligent action. . . . The motorbike rider, through his negligence, caused the plaintiff, in the opinion of medical experts, to need specific medical services--a cost that is neither inconsequential nor of a kind the community generally accepts as part of the wear and tear of daily life.

*Id*. By pleading toxic exposure and the need to expend funds in the form of the cost of diagnostic testing, Plaintiff alleged a cognizable injury. Plaintiff's claim is concrete because it is the present need to undergo and incur the costs of diagnostic

testing which can be specified and are actual and imminent. *See Leach v. E.I. Du Pont de Nemours & Co., et al.*, No. 01-C-608, 2002 WL 1270121 at *1 (W. Va. Cir. Ct. Apr. 10, 2002) (providing relief under similar facts).

In *Exxon Mobil Corp.*, the Maryland Supreme Court *Exxon Mobil Corp. v. Albright*, rightfully recognized that the injury giving rise to an alleged need for medical monitoring costs is the *exposure* to toxic substances and that this exposure is an invasion of a legally protected interest. *Exxon Mobil Corp. v. Albright*, 71 A.3d 30, 76, 79 (Md. 2013) (citing *Bower*, 522 S.E.2d at 430) (quoting Restatement Section 7(1)). The *Exxon-Mobil* court rejected a proof of present physical injury requirement. *Id.* at 80; *see also Burns v. Jaquays Mining Corp.*, 752 P.2d 28, 33 (Az. App. 1987) (despite the absence of physical manifestation of any asbestos-related diseases, that the plaintiffs should be entitled to such regular medical testing and evaluation as is reasonably necessary and consistent with contemporary scientific principles applied by physicians experienced in the diagnosis and treatment of these types of injuries); *Potter v. Firestone Tire & Rubber Co.*, 6 Cal. 4th 965, 1006 (1993) (analyzing the Restatement Section 7 and approving recovery for medical monitoring damages without present physical injury).

What these courts uniformly and consistently acknowledge is that significant harm may be inflicted on those exposed to toxic substances, notwithstanding the

fact that the physical harm resulting from such exposure is often latent. *Bower*, 522 S.E.2d at 429. These cases and others recognize that the present medical need to incur diagnostic testing caused by tortious toxic exposure constitutes injury, without a requirement of proof of present physical injury.

The District Court's erroneous reliance on *Sheppard v. A.C. & S. Co.*, 498 A.2d 1126, 1132 (Del. Super. Ct. 1985), *aff'd sub nom. Keene Corp. v. Sheppard*, 503 A.2d 192 (Del. 1986), reasoned that "Delaware tort law presupposes that Plaintiffs will bring suits after they suffer physical symptoms, not before [because] Delaware lets toxic tort plaintiffs bring separate claims for different diseases caused by one exposure." Appx5. While it is true that plaintiffs may bring separate claims for injuries as they occur in the context of toxic tort litigation, nothing in *Sheppard*'s holding exempts surveillance as one of those separate claims or precludes damages for injuries that require medical monitoring. Rather, *Sheppard* discussed the injustice that might occur in latent disease cases:

> The same exposure may lead to separate and distinct diseases and the symptoms of each disease may become manifest years apart. An example of this would be a plaintiff who contracts asbestosis (with an average latency period of 17 years) and later also contracts mesothelioma (with an average latency period of 25–40 years).

*Id.* at 1132. In holding that plaintiff could recover for distinct diseases that manifest years apart, the *Sheppard* Court explained:

> latent disease cases justify a change in our perception and application of the statute of limitations to the end that a plaintiff with the

misfortune of contracting more than one asbestos-related ailment over a long period of time not be without a remedy for the later and generally more serious and inherently unknowable claims.

*Id.* at 1134.

The concept that medical monitoring surveillance or schedules are legally cognizable injuries, as expressed in Restatement Section 7, goes beyond traditional tort law in Delaware. For example, Delaware's Superior Court has recognized that the state's workers' compensation statutory scheme, which replaced the traditional tort regime in workplaces to adequately respond to employment-related accidents, recognizes the need for medical monitoring as compensable injuries. *McCracken v. Wilson Beverage*, No. 91A-10-004, 1992 WL 301985, at *1 (Del. Super. Ct. Oct. 15, 1992).

*McCracken* involved an appeal from the Industrial Accident Board ("The Board"). *McCracken*, at *1. The *McCracken* claimant was driving an automobile in the course of his sales job on December 30, 1981, when the vehicle he was driving ran head-on into another automobile. *Id.* Claimant executed a settlement agreement with his employer and its insurer for neck and back injuries, but later sought additional compensation for unpaid medical bills through a petition to The Board. *Id.* The Board found that the medical bills concerned treatment that was, in fact, a medical monitoring schedule imposed by the claimant's physician. *Id.* The Board found that the treatments were *unrelated* to the claimant's accident, and that

monitoring schedules were not compensable. *Id.* On appeal, the Delaware Superior Court held that, while relatedness of injuries was a finding of fact by The Board not to be overturned absent clear error, whether medical monitoring is compensable is a pure question of law. *McCracken*, at *1. The *McCracken* Court reversed the Board's decision on the issue, expressly holding that medical monitoring is compensable. *Id.* at *3.

The same rationale should apply where it is alleged that presently known injuries—exposure and increased risk of disease—causing the medical necessity for medical monitoring because such injuries are not inherently unknowable claims. Plaintiff knows and has adequately alleged that she has been exposed to toxic ethylene oxide because, *inter alia*, she resided near the Atlas Point facility while it was releasing toxic ethylene oxide, which settled at ground level. Appx23, ¶¶4-6. Plaintiff knows and has adequately alleged that exposure caused an increased risk of symptomatic diseases later in life. Appx25-34. Plaintiff has the present need to incur the cost of medical monitoring to timely identify these injuries—and mitigate further injury through undiagnosed cancer and other diseases—to avoid the worst outcomes of exposure is distinct from any future harm in the form of manifestations of diseases that Plaintiff and the Class members may ultimately sustain. Thus, allowing Plaintiff to pursue a medical monitoring fund to address her current injuries and those of Class members serves to prevent

the injustice that *Sheppard* sought to avoid in two distinct ways: (1) it affords Plaintiff and the Class members the chance to obtain compensation for present injuries that necessitate the cost of ongoing diagnostic testing while they need such testing; and (2) it avoids or lessens the chance of catastrophic future manifestation of disease.

It would be unjust to force Plaintiff and Class members to foot the bill for the present medically necessary diagnostic testing to avoid severe risks of death or catastrophic injury caused by Defendant's emissions of ethylene oxide. It cannot be the law (and, as Delaware courts have held, it is not the law), that when Plaintiff alleges actual exposure to a toxic substance, Plaintiff and Class members have no redress for the present need to incur costs themselves for medical monitoring instead of requiring the culpable Defendant to pay for the same.

Plaintiff and Class members have suffered the present injury of actual exposure to ethylene oxide necessitating payment for diagnostic tests, which they would not have needed *but for* their past injurious exposure to Defendant's toxic ethylene oxide gas. The present burden of the cost of diagnostic testing is no less an invasion of a legally protected interest justifying compensation than is a physical injury. *Hansen v. Mountain Fuel Supply Co.*, 858 P.2d 970, 977 (Utah 1993). Although the obvious manifestations of a toxic exposure may not appear for years, those exposed have suffered legal detriment: the exposure to the toxin itself,

unseen bodily changes, resultant disease risk, and concomitant cost of the needed medical testing constitute an injury. *Bower*, 522 S.E.2d at 430 (the injury in question is the increase in risk that requires one to incur the cost of monitoring).

D.     **THE DISTRICT COURT'S ERROR CREATED A SPLIT WITHIN THE THIRD CIRCUIT AS TO WHETHER DELAWARE RECOGNIZES MEDICAL MONITORING AS AN INDEPENDENT CAUSE OF ACTION**

The District Court's decision in this matter is plainly at odds with recent cases addressing the issue in the Eastern District of Pennsylvania, as well as this Court's commentary in one of those cases. *Guinan*, 597 F. Supp. 2d 517; *Hess*, 2009 WL 595602. In *Guinan*, the United States District Court for the Eastern District of Pennsylvania permitted the plaintiff to proceed to trial on a claim for medical monitoring arising out of the implantation of a stent in her heart that did not receive full Federal Drug Administration approval, where the plaintiff argued not that she had suffered present physical injury as a result of that implantation, but instead that the stent necessitated ongoing medical monitoring and diagnostics to avoid a severe adverse outcome. *Guinan*, 597 F. Supp. 2d at 537-38. When evaluating the defendants' motion for summary judgment, the District Court for the Eastern District of Pennsylvania rightly held that "[w]e predict that the Delaware Supreme Court would permit a claim for medical monitoring . . . ." *Id.* at 538 (analyzing *Mergenthaler*, 480 A.2d at 649). On appeal, the Third Circuit reversed on other grounds, declining to extend medical monitoring "outside of the

'toxic tort' context"—*i.e.* the context at issue in this litigation. *M.G.*, 393 Fed. App'x at 891. More specifically, while this Court reversed the lower court, it expressly declined to predict whether the Delaware Supreme Court would recognize a claim for medical monitoring,[1] and importantly distinguished the plaintiff's claims there from those where a plaintiff's claims arose from "expos[ure]" to a "proven hazardous" substance, or allegations that the plaintiff suffered "such exposure resulted in a significantly increased risk of contracting a serious latent disease" that would require monitoring.[2] *Id*. at 892-93.

In this case, Plaintiff's claims fit squarely within the traditional paradigm of medical monitoring in toxic tort cases. Plaintiff alleges that as a result of Defendant's unlawful and continuous release of dangerous amounts of carcinogenic ethylene oxide in and around Atlas Point facility, she and her fellow Class members face a significantly increased risk of developing certain cancers requiring them to undergo prophylactic diagnostic testing. Indeed, Plaintiff's allegations of her and the other Class members' extended exposure to hazardous

---

[1] The District Court's inquiry concentrated on the question of whether medical monitoring is an independent tort or simply a remedy, as it is in many other jurisdictions. *Id*. at 891. Such a distinction is immaterial here where this appeal concerns only the remedy alleged in the Complaint.

[2] Indeed, this Court considered facts like those at issue here to be the then-existing bounds of medical monitoring in Delaware, criticizing the district court below for taking ". . . several leaps from the current state of the law" regarding "a 'standard' medical monitoring claim . . ." to reach its conclusions.

quantities of this known carcinogen are premised on scientific data and well-documented incidents of release from the Atlas Point facility, including most recently a September 2020 incident that resulted in the Delaware Department of Natural Resources and Environmental Control ("DNREC") issuing Defendant a Notice of Violations on November 11, 2020, for, among other things, "exceeding the annual emission limit for ethylene oxide . . . and operation of an unpermitted source of ethylene oxide . . . ." Appx185. Should Delaware ultimately recognize and independent claim for medical monitoring, these allegations are precisely those that would support the traditional claim adopted by other jurisdictions. It follows naturally that Delaware's recognized remedy of medical monitoring should be available to Plaintiff and the Class members in such a case.

## CONCLUSION

For the reasons set forth herein, this Honorable Court should reverse the District Court's dismissal of Plaintiff's Complaint.

Respectfully submitted,

Dated:  February 22, 2022                          **GRANT & EISENHOFER P.A.**

*s/ Adam J. Gomez*
Adam J. Gomez
Kelly L. Tucker
123 Justison Street
Wilmington, DE  19801
(302) 622-7000

*Attorneys for Plaintiff-Appellant*
*Catherine Baker*

## <u>CERTIFICATION OF ADMISSION TO BAR</u>

I, Adam J. Gomez, certify as follows:

1.      I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

2.      Pursuant to 28 U.S.C. Section 1746, I certify under penalty of perjury that the foregoing is true and correct.


Dated:  February 22, 2022           **GRANT & EISENHOFER P.A.**


                                    *s/ Adam J. Gomez*
                                    Adam J. Gomez

                                    *Attorney for Plaintiff-Appellant Catherine Baker*

## <u>CERTIFICATE OF COMPLIANCE AND VIRUS SCAN</u>

Pursuant to Fed. R. App. P. 32(g)(1), I certify that:

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because it contains 7,173 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

3.      I hereby certify that the electronic copy of this brief is identical to the text of the paper copies being filed. I further certify that the electronic copy of the brief was scanned for viruses using Windows Defender version 1.329.1796.0, and that no virus was detected.

Dated:  February 22, 2022          **GRANT & EISENHOFER P.A.**

*s/ Adam J. Gomez*
Adam J. Gomez

*Attorney for Plaintiff-Appellant Catherine Baker*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 22, 2022, I electronically filed the Brief for Appellant with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated:  February 22, 2022                **GRANT & EISENHOFER P.A.**

*s/ Adam J. Gomez*
Adam J. Gomez

*Attorneys for Plaintiff-Appellant Catherine Baker*

**JOINT APPENDIX
VOLUME I OF II
(Pages Appx1 to Appx12)**

# TABLE OF CONTENTS

PAGE

## Volume I of II
### (Bound with Appellant's Brief)

District Court's Memorandum Opinion, dated November 23, 2021 . . . . . Appx1

District Court's Order Granting Motion to Dismiss the Complaint,
        dated November 23, 2021 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Appx7

Plaintiff's Notice of Appeal, dated December 22, 2021 . . . . . . . . . . . . . . . Appx8

Notice of Intent to Stand on the Complaint with Final Order,
        filed February 18, 2022 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Appx10

## Volume II of II

U.S. District Court for the District of Delaware Docket Entries
        for the Case No. 1:20-cv-01108-SB . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Appx13

Class Action Complaint, dated August 24, 2020 . . . . . . . . . . . . . . . . . . . . Appx22

Civil Cover Sheet to Complaint, dated August 24, 2020 . . . . . . . . . . . . . . Appx50

Stipulation and [Proposed] Order Extending Time
        for Defendant to Answer Complaint, filed September 2, 2020 . . . . Appx51

Defendant's Motion to Dismiss Plaintiff's Complaint,
        dated October 13, 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Appx53

Opening Brief in Support of Croda Inc.'s Motion to Dismiss,
        dated October 13, 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Appx54

Declaration of Christina Manuelli in Support of Croda Inc.'s Motion
        to Dismiss for Lack of Subject Matter Jurisdiction Pursuant
        to Rule 12(B)(1), dated October 13, 2020 . . . . . . . . . . . . . . . . . . . . . . . Appx80

ii

PAGE

Exhibit 1 to Manuelli Declaration —
Certificate from Delaware Secretary of State regarding
Certificates on file for Croda Inc................................. Appx82

Exhibit 2 to Manuelli Declaration —
Certificate of Good Standing from the Delaware
Secretary of State for Croda Inc................................ Appx116

Stipulation and [Proposed] Order Extending Time
for Plaintiff to Respond to Defendant's Motion
to Dismiss, filed October 26, 2020............................ Appx118

Plaintiff's Response Brief in Opposition to Defendant's Motion
to Dismiss Plaintiff's Class Action Complaint,
dated November 17, 2020 ..................................... Appx120

Stipulation and [Proposed] Order Extending Time
for Defendant to File Reply in Support of its Motion to Dismiss,
filed November 17, 2020...................................... Appx149

So Ordered Stipulation to Extend Time for Defendant
to File Reply in Support of its Motion to Dismiss,
dated November 18, 2020 ..................................... Appx152

Reply Brief in Support of Croda Inc.'s Motion to Dismiss,
dated December 9, 2020....................................... Appx153

Plaintiff's Motion for Leave to File Surreply
in Further Opposition to Defendant's Motion to Dismiss,
dated December 16, 2020 ..................................... Appx168

Attachment to Motion for Leave —
[Proposed] Order, filed December 16, 2020 ................... Appx171

Exhibit 1 to Motion for Leave —
Plaintiff's [Proposed] Surreply in Opposition to Defendant's
Motion to Dismiss Plaintiff's Class Action Complaint,
dated December 16, 2020 ..................................... Appx172

iii

PAGE

Exhibit 2 to Motion for Leave —
Statement Pursuant to Local Rule 7.1.1,
dated December 16, 2020 ...................................... Appx194

Opposition to Plaintiff's Motion for Leave to File Sur-Reply,
dated December 30, 2020 ...................................... Appx195

Transcript of Proceedings, dated August 5, 2021.................... Appx200

Letter from Kenneth J. Nachbar to the Honorable Maryellen Noreika,
dated August 12, 2021 ........................................ Appx222

Exhibit A to Nachbar Letter —
Census Tract 154, New Castle, DE ........................... Appx226

Exhibit B to Nachbar Letter —
Census Tract 15502, New Castle, DE .......................... Appx232

Exhibit C to Nachbar Letter —
Census Tract 158.02, New Castle, DE.......................... Appx238

Exhibit D to Nachbar Letter —
Census Report, New Castle County, DE........................ Appx244

Exhibit E to Nachbar Letter —
U.S. Census Tracks Migration Patterns ........................ Appx251

Oral Order Denying Defendant's Motion to Dismiss,
dated August 13, 2021 ........................................ Appx256

Defendant's Renewed Motion to Dismiss Plaintiff's Complaint,
dated August 27, 2021 ........................................ Appx257

Croda Inc.'s Renewed Motion to Dismiss, dated August 27, 2021.... Appx258

Stipulation and [Proposed] Order Setting Briefing Schedule
in Connection with Defendant's Renewed Motion to Dismiss,
filed September 2, 2021........................................ Appx284

iv

PAGE

So Ordered Stipulation Setting Briefing Schedule in Connection
with Defendant's Renewed Motion to Dismiss,
dated September 3, 2021 ...................................... Appx286

Oral Order Referring Case to Magistrate Judge Christopher J. Burke,
dated September 21, 2021 ..................................... Appx287

Answering Brief in Opposition to Defendant's Renewed Motion
to Dismiss, dated October 1, 2021 ............................ Appx288

Designation of Circuit Judge to Hold a District Court Within
the Circuit, dated October 1, 2021 ............................ Appx318

Stipulation and [Proposed] Order Staying Discovery,
filed October 20, 2021 ....................................... Appx319

Reply Brief in Support of Croda Inc.'s Renewed Motion to Dismiss,
dated October 22, 2021 ....................................... Appx321

Defendant's Application for Oral Argument,
dated October 25, 2021 ....................................... Appx336

Stipulation and Order Staying Discovery,
dated October 27, 2021 ....................................... Appx337

Plaintiff's Application for Oral Argument,
dated October 28, 2021 ....................................... Appx339

Plaintiff's Notice of Intent to Stand on the Complaint,
dated February 17, 2022 ...................................... Appx340

Attachment to Notice of Intent—
[Proposed] Final Order, filed February 17, 2022................ Appx342

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CATHERINE BAKER, individually and
on behalf of all others similarly situated

    *Plaintiff,*

     v.        No. 1:20-cv-01108-SB

CRODA INC.

    *Defendant.*

---

Kimberly Ann Evans, Kyle John McGee, Kelly L. Tucker, GRANT & EISENHOFER,
P.A., Wilmington, Delaware; Frank M. Petosa, Marcio W. Valladares, Michael
Ram, Rene F. Rocha, T. Michael Morgan, MORGAN & MORGAN, Fort Lauderdale,
Florida.

                *Counsel for Plaintiff.*

Kenneth J. Nachbar, Miranda N. Gilbert, MORRIS NICHOLS ARSHT & TUNNELL
LLP, Wilmington, Delaware; Zi-Xiang Shen, DELAWARE DEPARTMENT OF JUSTICE,
Wilmington, Delaware; Athena D. Dalton, Stephen A. Swedlow, QUINN EMANUEL
URQUHART & SULLIVAN, LLP, Chicago, Illinois.

              *Counsel for Defendant.*

---

**MEMORANDUM OPINION**

November 23, 2021

---

BIBAS, *Circuit Judge*, sitting by designation.

Every day, many Americans come into contact with chemicals that might harm them. Catherine Baker and her neighbors are among them. They are not sick now but worry that they might be later. Fearing an increased risk of disease is understandable, but it is a legal injury in only a few states. Because Delaware is not one of them, I must dismiss Baker's claims.

## I. Background

Croda Inc. owns a Delaware chemical plant that uses ethylene oxide, a known carcinogen. Compl. ¶¶ 6, 33. In 2018, Croda's plant leaked thousands of pounds of ethylene oxide into the surrounding neighborhood. *Id.* ¶ 37. Although Croda reacted quickly, residents worried that they had inhaled the chemical and now fear they will get cancer. *Id.* ¶¶ 25, 37, 49.

One resident, Baker, brought a class action on behalf of her neighbors, alleging strict liability, public and private nuisance, negligence, willful and wanton conduct, and medical monitoring. *Id.* ¶¶ 62, 73–123. She admits that no neighbor "ha[s] been currently diagnosed with cancer or illness … of the kind caused by [ethylene oxide]." *Id.* ¶ 63. But she says they all suffer "a[n] increased risk of illness." *Id.* ¶¶ 80, 89, 102, 117; *accord id.* ¶¶ 109, 121.

Now Croda moves to dismiss these claims. It says that the mere risk of disease alone is not a compensable tort injury. D.I. 32, at 3. I agree. Delaware law applies here, and it does not recognize this claimed injury. Because this problem disposes of all the tort claims brought by this class, I dismiss them without prejudice.

2

## II. DELAWARE LAW APPLIES

Before addressing the merits, I must decide whether Delaware or New Jersey law applies.

Why does this matter? New Jersey law recognizes independent claims for medical monitoring where Delaware law may not. D.I. 32, at 4. *Compare M.G. ex. rel. K.G. v. A.I. Dupont Hosp. for Children*, 393 F. App'x 884, 892 (3d Cir. 2010), *with Sinclair v. Merck & Co.*, 948 A.2d 587, 591 (N.J. 2008). And New Jersey might have a different view of claims for increased risk of disease. *Compare Sinclair*, 948 A.2d at 592 (noting that plaintiffs can recover for increased risk if they are "more likely than not" to develop a disease), *with United States v. Anderson,* 669 A.2d 73, 78 (Del. 1995) (suggesting the opposite in dicta).

Since I sit in Delaware, I will rely on its choice-of-law rules to decide this issue. In doing so, I ask which state has the "most significant relationship" to the tort. *Pa. Emp., Benefit Tr. Fund v. Zeneca, Inc.*, 710 F. Supp. 2d 458, 467 (D. Del. 2010). Here, that is Delaware. *See State Farm Mut. Auto. Ins. v. Patterson*, 7 A.3d 454, 457–58 (Del. 2010). A corporation incorporated in Delaware and operating a chemical plant in Delaware leaked chemicals into a Delaware neighborhood.

Baker's objections do not convince. Because Croda's headquarters are in New Jersey, she says, "[i]t is entirely reasonable to infer that [Croda] … made the decisions" about using ethylene oxide "from New Jersey." D.I. 37, at 5. Even so, Delaware has a far closer link to these claims. Baker tries to delay this ruling by asking for discovery. She notes that in complex cases, courts sometimes delay choosing the applicable law until the record is more developed. D.I. 37, at 4–5; *see, e.g., Arçelik A.Ş v. E.I. du Pont*

3

*de Nemours & Co.*, 2018 WL 1401327, at *8–9 (D. Del. Mar. 20, 2018) (delaying a ruling in a case involving international companies and worldwide injuries). This is not such a complex case. So I will not delay ruling that Delaware law applies.

### III. INCREASED RISK IS NOT AN INJURY

On to the merits. At this stage, I take all of Baker's factual assertions as true and ask if they state a plausible claim. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). All tort claims require an injury. Restatement (Second) of Torts § 7 (1965). But in Delaware, Croda argues, an increased risk of illness, without more, does not suffice. D.I. 32, at 8.

True, Delaware has not explicitly held that—most cases Croda cites reject the related but distinct claim for fear of disease. *See Brzoska v. Olson*, 668 A.2d 1355, 1362 (Del. 1995) ("[D]amages for claims of emotional distress or mental anguish … are recoverable only if [an] underlying physical injury is shown."); *Mergenthaler v. Asbestos Corp. of Am.*, 480 A.2d 647, 651 (Del. 1984) ("In any claim for *mental anguish*, … an essential element of the claim is that the claimant have a present physical injury." (emphasis added)). But to hold otherwise here would fly in the face of clear signals in Delaware tort law.

For one, the Delaware Supreme Court has said as much in dicta. In *Anderson*, that court held that plaintiffs bringing medical malpractice claims could recover for increased risk when that risk was tied to a physical injury. 669 A.2d at 78. By contrast, no one can recover by "claiming that exposure to toxic substances … has created an increased risk of harm not yet manifested in a physical disease." *Id.* at 77.

4

Plus, Delaware tort law presupposes that plaintiffs will bring suits after they suffer physical symptoms, not before. For one, Delaware lets toxic tort plaintiffs bring separate claims for different diseases caused by one exposure. *See Sheppard v. A.C. & S. Co.*, 498 A.2d 1126, 1134 (Del. Super. Ct. 1985), *aff'd sub nom. Keene Corp. v. Sheppard*, 503 A.2d 192 (Del. 1986). And states that do so generally allow recovery only for manifested disease. 1 Toxic Torts Litig. Guide § 4:12 (2020); *see, e.g., Anderson v. W.R. Grace & Co.*, 628 F. Supp. 1219, 1231 (D. Mass. 1986). Plus, the statute of limitations for toxic-tort claims starts to run when a plaintiff begins to feel physical effects, suggesting that they are needed in every toxic-tort case. *Brown v. E.I. duPont de Nemours & Co., Inc.*, 820 A.2d 362, 368 (Del. 2003). So this putative class cannot recover damages for increased risk.

Baker counters that recovery for increased risk is allowed by several states that, like Delaware, rely on the Second Restatement of Torts. *See* D.I. 37, at 11–14. This is not enough. Most courts reject increased-risk claims. *See* 1 Toxic Torts Litig. Guide § 4:12 (2020). Understandably so. "[T]ens of millions of individuals may have suffered exposure to substances" that might never result in harm. *Metro-North Commuter R. Co. v. Buckley*, 521 U.S. 424, 442 (1997). Allowing lawsuits for any risk of illness would open the floodgates to "limitless and endless" litigation. *Rainer v. Union Carbide Corp.*, 402 F.3d 608, 621 (6th Cir. 2005) (internal quotation marks omitted). Without a contrary directive from the Delaware Supreme Court, I will not open those floodgates here.

5

So this class cannot recover damages for the risk of diseases that they do not yet have. And because each tort requires an injury, none of Baker's torts survives this flaw.

* * * * *

The class cannot show it has suffered any injury under Delaware law, so I dismiss all its claims without prejudice. Baker may amend to show that the class has suffered physical injury.

But I will not certify this question to the Delaware Supreme Court. Del. R. Sup. Ct. 41. Delaware law already points to my holding today, so certification would not be efficient. *See Deutscher Tennis Bund v. ATP Tour, Inc.*, 2013 WL 4478033, at *1 n.1 (D. Del. Aug. 20, 2013).

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CATHERINE BAKER, individually and on
behalf of all others similarly situated

            *Plaintiff,*

                  No. 1:20-cv-01108-SB

       v.

CRODA INC.

            *Defendant.*

### ORDER

November 23, 2021

1. The motion to dismiss [D.I. 31] is **GRANTED**. The complaint [D.I. 1] is **DISMISSED WITHOUT PREJUDICE**.

2. If the plaintiff wishes to file an amended complaint, she must do so within thirty days of this order.

Dated: November 23, 2021

_____
UNITED STATES CIRCUIT JUDGE

Appx7

# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| CATHERINE BAKER, individually and on behalf of all others similarly situated, | |
| Plaintiff, | Civil Action No.  1:20-cv-01108-SB |
| v. | |
| CRODA INC. f/k/a CRODA, INC., | |
| Defendant. | |

## <u>NOTICE OF APPEAL</u>

PLEASE TAKE NOTICE that Plaintiff Catherine Baker, individually and on behalf of all others similarly situated, hereby appeals to the United States Court of Appeals for the Third Circuit from the Memorandum Opinion (ECF No. 46) and Order (ECF No. 47) dismissing the complaint entered on November 23, 2021.

Dated: December 22, 2021

Respectfully submitted,

<u>/s/ Kelly L. Tucker</u>
Kelly L. Tucker (#6382)
GRANT & EISENHOFER P.A.
123 Justison Street
Wilmington, Delaware 19801
ktucker@gelaw.com
P: (302) 622-7000
F: (302) 622-7100

T. Michael Morgan*
MORGAN & MORGAN, P.A.
20 N Orange Ave., Suite 1600
Orlando, FL 32801
mmorgan@ForThePeople.com
P: (407) 418-2031
F: (407) 245-3384

Kevin S. Hannon*
MORGAN & MORGAN, COMPLEX
LITIGATION GROUP
1641 N. Downing Street,
Denver, Colorado 80218
khannon@ForThePeople.com
P: (303) 264-1769
F: (303) 264-1795

Marcio W. Valladares*
MORGAN & MORGAN, COMPLEX
LITIGATION GROUP
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
mram@ForThePeople.com
mvalladares@ForThePeople.com
P: (813) 223-5505
F: (813) 223-5402

Rene F. Rocha*
MORGAN & MORGAN, COMPLEX
LITIGATION GROUP
3530 Magazine St.
New Orleans, LA 70115
rrocha@ForThePeople.com
P:  (954) 318-0268
F:  (954) 327-3018

Frank M. Petosa*
MORGAN & MORGAN, COMPLEX
LITIGATION GROUP
8151 Peters Road
Suite 4000
Plantation, FL 33324
fpetosa@ForThePeople.com
P:  (954) 318-0268
F:  (954) 327-3018

*Pro Hac Vice
Attorneys for the Plaintiff and
the Putative Class

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

CATHERINE BAKER, individually and on
behalf of all others similarly situated,

                    No.  1:20-cv-01108-SB

       *Plaintiff,*

v.

CRODA INC. f/k/a CRODA, INC.,

       *Defendant.*

---

### NOTICE OF INTENT TO STAND ON THE COMPLAINT

Plaintiff, Catherine Baker, having reviewed this Court's November 23, 2021 Order [Docket No. 47] dismissing Plaintiff's Complaint [Docket No. 1] without prejudice and affording Plaintiff 30 days to file an amended complaint, hereby elects to stand on the Complaint.

Accordingly, Plaintiff requests that the Court enter a Final Order of dismissal with prejudice.

            Respectfully submitted,

            */s/ Kelly L. Tucker*
            Kelly L. Tucker (#6382)
            GRANT & EISENHOFER P.A.
            123 Justison Street
            Wilmington, Delaware 19801
            ktucker@gelaw.com
            P: (302) 622-7000
            F: (302) 622-7100

            T. Michael Morgan*
            MORGAN & MORGAN, P.A.
            20 N Orange Ave., Suite 1600
            Orlando, FL 32801
            mmorgan@ForThePeople.com
            P: (407) 418-2031
            F: (407) 245-3384

Kevin S. Hannon*
MORGAN & MORGAN, COMPLEX
LITIGATION GROUP
1641 N. Downing Street,
Denver, Colorado 80218
khannon@ForThePeople.com
P: (303) 264-1769
F: (303) 264-1795

Marcio W. Valladares*
MORGAN & MORGAN, COMPLEX
LITIGATION GROUP
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
mram@ForThePeople.com
mvalladares@ForThePeople.com
P: (813) 223-5505
F: (813) 223-5402

Rene F. Rocha*
MORGAN & MORGAN, COMPLEX
LITIGATION GROUP
3530 Magazine St.
New Orleans, LA 70115
rrocha@ForThePeople.com
P:  (954) 318-0268
F:  (954) 327-3018

Frank M. Petosa*
MORGAN & MORGAN, COMPLEX
LITIGATION GROUP
8151 Peters Road
Suite 4000
Plantation, FL 33324
fpetosa@ForThePeople.com
P:  (954) 318-0268
F:  (954) 327-3018

*Pro Hac Vice
Attorneys for the Plaintiff and
the Putative Class

Date:  February 17, 2022

Appx11

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

CATHERINE BAKER, individually and on
behalf of all others similarly situated,

                                                No.  1:20-cv-01108-SB

                    P

v.

CRODA INC. f/k/a CRODA, INC.,

                    D      d

_____

**FINAL ORDER**

1.       WHEREAS, on November 23, 2021, the Court **GRANTED** Defendant's motion
to dismiss [Docket No. 47];

2.       WHEREAS, the Court's dismissal was without prejudice and afforded Plaintiff 30
days to amend the complaint;

3.       WHEREAS, the 30-day period for amendment has lapsed, and Plaintiff has
noticed her intention to stand on the complaint [Docket No. 1];

It is hereby **ORDERED** this 18th day of February 2022 that, for the reasons set forth in
the Court's November 23, 2021 Memorandum Opinion [Docket No. 46], the Complaint is
**DISMISSED WITH PREJUDICE**.

`

_____

# ADDENDUM

# TABLE OF CONTENTS

PAGE

*Alderman v. Clean Earth, Inc.,*
    No. 04C-06-181-FSS, 2007 WL 1930664
    (Del. Super. Ct. June 26, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Add.1

*BTIG, LLC v. Palantir Techs., Inc.,*
    No. N19C-08-314, 2020 WL 95660
    (Del. Super. Jan. 3, 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Add.4

*Hess v. A.I. DuPont Hospital for Children,*
    No. 08-0229, 2009 WL 595602 (E.D. Pa. Mar. 5, 2009) . . . . . . . . . . Add.11

*Leach v. E.I. Du Pont de Nemours & Co., et al.,*
    No. 01-C-608, 2002 WL 1270121 (W. Va. Cir. Ct. Apr. 10, 2002)  Add.22

*McCracken v. Wilson Beverage,*
    No. 91A-10-004, 1992 WL 301985
    (Del. Super. Ct. Oct. 15, 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Add.36

2007 WL 1930664

2007 WL 1930664
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

Superior Court of Delaware,
New Castle County.

ALDERMAN, et al., Plaintiffs,

v.

CLEAN EARTH, INC., et al., Defendants.

C.A. No. 04C-06-181-FSS.
|
Submitted: May 21, 2007.
|
Decided: June 26, 2007.

Upon Plaintiffs' Motion for Reargument-**_DENIED._**

**MEMORANDUM OPINION**

SILVERMAN, J.

**\*1** Plaintiffs have filed a timely motion to reargue the court's decision knocking out their experts under _Daubert._[1] The two experts, Mulry and Wolfson, would have opined that Defendants injured Plaintiffs by polluting Plaintiffs' land. For the reasons presented in its decision, the court limited the bulk of the experts' testimony, especially their opinions on causation and damages.

Plaintiffs argue that the court misconstrued both Mulry's opinion and _Daubert._ Plaintiffs again argue that Mulry's conclusions are scientifically reliable because he did not hypothesize about the existence of pathways and corroborated his conclusions by site observations and sampling Plaintiffs' soil. Plaintiffs also claim that the court incorrectly applied _Daubert_ because the court stated that certain testing must be done and failed to analyze _Daubert's_ other factors. As to Wolfson, a physician, Plaintiffs argue that he did not need to examine Plaintiffs because he relied on all available soil data, not just Mulry's conclusions, to find that Plaintiffs require medical monitoring.

Plaintiffs misread and misstate much of the decision. For example, although the pathways Mulry identified are "normal, natural avenues for the movement of heavy metals ...," which are known and relied upon by experts in the field, that alone does not lead to the experts' conclusion that Defendants caused Plaintiffs' contamination. Similarly, the court never held that the experts had to perform specific tests. The court held, however, that some testing was necessary to support the experts' conclusions. The court merely identified, by way of example, testing that might have been performed.

Further, Plaintiffs' argument to the contrary notwithstanding, the court did not rely exclusively on Mulry's lack of testing. In its opinion, the court analyzed _Daubert's_ other factors. The court mentioned that the rate of error was unknown in this case without any experiments. And, the only theory subjected to peer review or publication is the known pathways' existence. Mulry's personal beliefs about causation and damages are his alone.

By the same token, the court never implied that Plaintiffs are presenting personal injury claims, but rather expressly stated that those claims were dropped. Plaintiffs' confusion on this point may stem from their continuing demand for medical monitoring, even though they now are only pursuing property damage claims.

Beyond the way Plaintiffs read the opinion, the motion's basic problem is that it just rehashes Plaintiffs' original arguments. Plaintiffs still insist that Mulry's conclusions are adequate and reliable. Plaintiffs argue again that the "known" pathways, Mulry's site observations, and the allegation that Defendants have historically mishandled toxins lead to the conclusion that Defendants caused Plaintiffs' contamination.

As the opinion explains, Mulry's conclusions are only hypotheses, which remain untested. Under the scientific method, first, the expert gathers information, including empirical observations, to form a hypothesis.[2] Forming a hypothesis, however, is only the first step. The next step requires testing the hypothesis by collecting data and performing experiments.[3] Then, the data is analyzed to prove or disprove the hypothesis.[4]

**\*2** As explained in the opinion, Mulry gathered information by briefly visiting Defendants' sites to make limited observations: He saw the wind kick-up dust. He reviewed DNREC tests that showed similar contamination on Plaintiffs' and Defendants' properties. He collected some meteorological

Add.1

2007 WL 1930664

and hydro-geological data about the area, suggesting pathways by which pollutants could have migrated from Defendants' properties to Plaintiffs'. And, he assumed that historically, Defendants mishandled toxins. From those things, he then concluded that Defendants probably caused Plaintiffs' contamination. But Mulry neither compared nor analyzed the pollution by any scientific means, nor did Mulry do anything to establish that pollution actually migrated along the theoretical pathways he identified. Conversely, Mulry did nothing to eliminate other possible sources of contamination, such as nearby interstate truck traffic (lead) or lawn chemicals (arsenic). Mulry simply equated plausible possibilities with proven facts.[5]

Further, the cases that Plaintiffs now cite are either inapplicable or taken out of context. For example, *Stevenson v. E .I. DuPont De Nemours and Co.*[6] is completely different from this case. *Stevenson* is an appeal challenging a jury verdict on sufficiency of evidence grounds, and not a *Daubert* analysis. Even if *Stevenson* were applicable, it cuts against Plaintiffs. In *Stevenson,* the environmental expert evaluated air dispersion reports showing emissions were heavily concentrated over plaintiffs' properties.[7] Another expert then matched the metals found on plaintiffs' and defendant's properties. And, yet another expert found contaminants concentrated on plaintiffs' roofs, proving that the pollution there, in fact, was airborne.[8] Thus, the evidence was sufficient to uphold plaintiffs' verdict.[9] In *Stevenson,* the experts proved their hypothesis about causation through actual testing. Also unlike this case, *Stevenson* did not involve multiple defendants. So, once causation was proved, there was no question about who to blame. Here, even if the jury accepted Plaintiffs' experts' opinions, the jury would have no way to establish each Defendant's liability.

According to Plaintiffs, *Stevenson* is helpful because plaintiffs won there "despite the absence of any 'depositional' tests to determine whether airborne contaminates actually landed on plaintiffs' properties." In other words, no one actually saw particles travel from defendant's property to plaintiffs' properties. *Stevenson* found that plaintiffs did not have to go to that length to prove causation because the air dispersion testing, particle matches, and the finding of particles on plaintiffs' roofs were enough. Had Plaintiffs produced the sort of evidence here that the experts in *Stevenson* produced, the result here would have probably been different. But here, again, no testing was done.

Also, the court understands the point of medical monitoring. The problem, again, is that this is a property damage case. Although it is probably the law, the court is not holding that medical monitoring only relates to personal injury claims. The court did not have to decide that legal question because neither Wolfson nor Mulry can prove that Defendants probably caused any harm to Plaintiffs, much less any justification for medical monitoring. If anything, Mulry's and Wolfson's opinions attributing the need for medical monitoring to Defendants are scientifically less sound than their other opinions. For example, as the decision mentions, Mulry and Wolfson did not address lead paint contamination or smoking.

**\*3** Finally, the motion for reargument's last paragraph provides:

> However, to the extent that the court will premise its ultimate holding on the absence of such further testing, plaintiffs submit that they should be granted additional time for the experts either to demonstrate the futility of additional testing, or to identify and conduct any scientific procedures relevant to the "testing" of their opinions.

There are several, related reasons why the court will not grant Plaintiffs' request for more time. First, the court cannot tell precisely what Plaintiffs propose, much less how long it will take. Beyond that, the court does not know what it means "to identify and conduct any scientific procedures relevant to the 'testing' of [the experts'] opinions." In any event, the time has passed for Plaintiffs' experts "to demonstrate the futility of additional testing." If Plaintiffs believed that testing is futile, they should have explored that during the *Daubert* hearing. Moreover, this case has been pending for over three years. It is the oldest case on my civil docket, not counting one that is in post-trial briefing. The sufficiency of Mulry's and Wolfson's opinions has been under direct attack for at least seven months. The expert discovery deadline passed last year. The court simply cannot take seriously a cryptic, open-ended offer unveiled in the last sentence of a motion for reargument. Plaintiffs' request is too little and too late.

For the foregoing reasons and as presented in the challenged decision, Plaintiffs' Motion for Reargument is ***DENIED.***

### All Citations

Not Reported in A.2d, 2007 WL 1930664

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Alderman v. Clean Earth, Inc., Not Reported in A.2d (2007)

2007 WL 1930664

Footnotes

1    *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993).

2    *See, e.g.,* Hugh G. Gauch, Jr., Scientific Method in Practice (Cambridge Univ. Press, 1st ed.2003) and E. Bright Wilson, An Introduction to Scientific Research (Dover Publications 1991).

3    *Id.*

4    *Id.*

5    *See, e.g., Empire Financial Services, Inc. v. The Bank of New York,* Del.Super., C.A. 00C-09-235, Del Pesco, J. (June 8, 2007) (excluding expert's testimony as too speculative under *Daubert* because expert based conclusion on probabilities as opposed to facts, could not quantify damages, and did not look at other contributing factors).

6    327 F.3d 400 (5th Cir.2003).

7    *Id.* at 403-404.

8    *Id.* at 407.

9    *Id.* at 408.

---

**End of Document**                                                  © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Add.3

BTIG, LLC v. Palantir Technologies, Inc., Not Reported in Atl. Rptr. (2020)

2020 WL 95660

2020 WL 95660
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

Superior Court of Delaware.

BTIG, LLC, Plaintiff,

v.

PALANTIR TECHNOLOGIES,
INC., and Disruptive Technology
Advisers LLC, Defendants.

C.A. No.: N19C-08-314 EMD CCLD
|
January 3, 2020

MEMORANDUM    OPINION    DENYING
DEFENDANT'S MOTION TO DISMISS

Eric M. Davis, Judge

 **\*1**  For the reasons set forth below, the Court **DENIES**
Defendant Palantir Technologies Inc.'s Motion to Dismiss
(the "Motion") filed by Defendant Palantir Technologies Inc.
("Palantir") on September 26, 2019. The Court, in arriving
at this decision, considered the Motion; Plaintiff's Answering
Brief in Opposition to Defendant Palantir Technologies, Inc.'s
Motion to Dismiss (the "Response") filed by BTIG, LLC
("BTIG") on October 30, 2019; the Joinder of Defendant
Disruptive Technology Advisers LLC in Palantir's Motion
to Dismiss and Opening Brief in Support of Its Motion to
Dismiss for Failure to State a Claim filed by Disruptive
Technology Advisers LLC ("DTA") on October 31, 2019;
Palantir's Reply Brief in Support of Its Motion to Dismiss For
Failure to State a Claim (the "Reply") filed by Palantir on
November 15, 2019; the arguments presented on the Motion
to Dismiss, the Response, and the Reply at the hearing on
December 10, 2019 (the "December 10, 2019 Hearing"); the
Complaint filed by BTIG; and the entire record of this civil
action.

I. BACKGROUND[1]

This is a civil action filed and assigned to the Complex
Commercial Litigation Division. The action purports to arise
out of BTIG's attempt to broker a sale of Palantir's stock.[2]
BTIG seeks to recover from Palantir and DTA for their alleged
tortious interference with prospective economic advantage
and civil conspiracy.[3]

According to the Complaint, one of BTIG's clients expressed
to BTIG an interest in selling its shares of Palantir stock.[4]
BTIG then learned that a foreign private equity fund, CDH
Investments ("CDH"), was interested in purchasing $300
million of Palantir stock.[5] Because that was more than its one
client had to sell, BTIG identified other Palantir shareholders
interested in selling, until it had identified a group of sellers
("Selling Group") interested in collectively selling the $300
million of Palantir stock that CDH wanted to purchase.[6]

By December 2015, BTIG, the Selling Group, and CDH were
preparing to close the transaction (the "CDH Transaction").[7]
BTIG requested information from the Selling Group so that
CDH could conduct minimal, pre-closing due diligence.[8] As
required by the Preferred Stock Purchase Agreements, the
Selling Group began the process of informing Palantir of the
CDH Transaction.[9]

On December 7, 2015, a member of the Selling Group
disclosed to a Palantir executive, Colin Anderson, that BTIG
had been working with the Selling Group to coordinate a
sale of shares to a buyer and that the buyer would like
to move forward with due diligence and set up a meeting
with Palantir.[10] Mr. Anderson responded that he "would be
delighted to help" and proposed a call or meeting to get the
process started.[11]

 **\*2**  On December 11, 2015, BTIG scheduled a December 15,
2015 meeting with Palantir regarding the CDH Transaction.[12]
In or about mid-December 2015, a member of the Selling
Group, Rosco Hill, informed a Palantir executive, Kevin
Kawasaki, of: (i) the CDH Transaction, and (ii) CDH's
identity.[13] In his interactions with BTIG, Mr. Kawasaki
indicated to BTIG that he would cooperate and facilitate the
BTIG-brokered CDH Transaction.[14]

On December 14, 2015, Palantir informed BTIG that it had
to postpone the previously scheduled December 15, 2015
meeting.[15] No one—Palantir, DTA and/or CDH—disclosed

Case: 22-1333    Document: 5    Page: 63    Date Filed: 02/22/2022

**BTIG, LLC v. Palantir Technologies, Inc., Not Reported in Atl. Rptr. (2020)**

2020 WL 95660

to BTIG the reason for postponing the meeting, and BTIG alleges that it continued to attempt to reschedule it after the holidays at the beginning of 2016.[16] The meeting was never rescheduled and the CDH Transaction was never consummated.[17]

BTIG filed the Complaint on August 30, 2019. The Complaint contends the CDH Transaction did not close because Palantir and DTA had tortiously interfered with the deal.[18] BTIG claims that it first learned why the CDH Transaction failed to close on August 21, 2019 when documents (the "KT4 documents") based on two recent filings in the *KT4 Partners LLC v. Palantir Technologies. Inc.*, C.A. No. N17C-12-212 EMD CCLD, became publicly available.[19]

Specifically, BTIG alleges it first learned on August 21, 2019 that: (i) by late December 2015, Palantir made a deliberate decision to block any transaction brokered by BTIG and that DTA had indicated that Palantir wanted to "crush" Palantir;[20] (ii) on December 14, 2015, Palantir decided to "shut down" interaction with BTIG;[21] (iii) by December 18, 2015, Palantir informed DTA that it had refused to meet with BTIG and CDH's representatives;[22] (iv) on December 18, 2015, Alexander Fishman indicated that DTA was the only broker allowed to carry out secondary transactions for the sale of Palantir stock and that Palantir would not approve any deals involving BTIG;[23] (v) on or about December 18, 2015, Alexander Davis sent a LinkedIn message to CDH regarding a primary sale;[24] (vi) in February 2016, DTA made further representations to CDH that DTA controlled Palantir's primary and secondary liquidity and that CDH must work with DTA exclusively;[25] and (vii) through May 2016, DTA purportedly continued negotiating with CDH for a potential sale of Palantir stock.[26] BTIG asserts it was "blamelessly ignorant" of all of these facts.[27]

BTIG further claims it reasonably believed that Palantir would cooperate in BTIG's secondary transaction with CDH.[28] BTIG had a pre-existing relationship with Palantir executives, including Mr. Kawasaki, and had previously carried out a transaction involving Palantir. BTIG contends that it received indication from Palantir that Palantir would cooperate with the CDH Transaction.[29] In 2016, BTIG sought Palantir's assistance in carrying out the CDH Transaction, and continued to attempt to meet with CDH and Palantir regarding this deal.[30] BTIG alleges that Palantir misled BTIG by openly

giving BTIG the impression that it would facilitate the BTIG-brokered CDH Transaction.[31]

As a result of CDH's withdrawal from the deal with BTIG and the Selling Group, BTIG alleges it was unable to obtain broker fees.[32] Each member of the Selling Group had agreed, in their respective agreements, to pay BTIG a broker fee equal to 3% of their gross proceeds received from the transaction.[33] BTIG alleges that it suffered an estimated total sum of not less than $9 million dollars as a result of the tortious interference by Palantir and DTA.[34]

**\*3** Palantir filed the Motion on September 26, 2019. On October 30, 2019, BTIG filed the Response. On November 15, 2019, Palantir filed the Reply. At the December 10, 2019 Hearing, the Court heard arguments on the Motion, the Response and the Reply. After the hearing, the Court took the matter under advisement.

## II. PARTIES CONTENTIONS

### A. Palantir's Contentions
Palantir contends that the BTIG's claims are barred by the three-year statute of limitations for tortious interference and civil conspiracy claims. Moreover, Palantir asserts that the statute of limitations is not tolled under any rule, exception or doctrine. Palantir argues that tolling under the "time of discovery" rule should not apply because (1) the injury is not inherently unknowable and (2) BTIG has failed to plead facts with particularity. Palantir further contends that BTIG failed to plead with particularity that fraudulent concealment should apply. Finally, Palantir argues that BTIG was on inquiry notice more than three years before bringing the suit. DTA joins with Palantir in seeking dismissal of the Complaint.

### B. BTIG's Contentions
BTIG claims that it has adequately alleged facts to support tolling of the statute of limitations by the "time of discovery" rule and the fraudulent concealment rule. In addition, BTIG argues that it was not on inquiry notice more than three years before bringing the suit.

## III. STANDARD OF REVIEW

Add.5

Upon a motion to dismiss, the Court (i) accepts all well-pleaded factual allegations as true, (ii) accepts even vague allegations as well-pleaded if they give the opposing party notice of the claim, (iii) draws all reasonable inferences in favor of the non-moving party, and (iv) only dismisses a case where the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances.[35] However, the court must "ignore conclusory allegations that lack specific supporting factual allegations."[36]

## IV. DISCUSSION

Under Delaware law, claims for tortious interference and civil conspiracy are subject to a three-year statute of limitations.[37] Delaware courts apply a three-step analysis to determine whether a claim is time-barred.[38] First, the Court determines when the cause of action accrues.[39] For tort claims, "the wrongful act is a tortious act causing injury, and the cause of action accrues at the time of injury."[40] Second, the Court determines whether the statute of limitations may be tolled so that the cause of action accrues after the time of breach or injury.[41] The plaintiff must plead with specificity why the statute of limitations should be tolled.[42] Third, if a tolling exception applies, the Court determines when the plaintiff received inquiry notice.[43] The statute of limitations begins to run from the date when the plaintiff received inquiry notice.[44]

 **\*4** Where the moment of the wrongful act and the plaintiff's discovery of the injury do not occur within close proximity of each other, Delaware courts have tolled the statute of limitations using the "time of discovery" rule, otherwise known as the doctrine of inherently unknowable injury.[45] The "time of discovery" rule applies where the injury is (a) "inherently unknowable"; and (b) sustained by a "blamelessly ignorant" plaintiff.[46]

In applying the "time of discovery" rule, an important preliminary issue is determining what the "injury" is that was sustained by the plaintiff. In *Brown v. E.I. DuPont de Nemours & Co.,* a number of children were born with severe eye defects.[47] In *Brown,* no one in the medical community had characterized the birth defects as possible tortious injuries at the time of exposure or when the defects were initially observed.[48] Years later, an expert linked the children's eye defects to their mothers' prenatal exposure to a component of a

fungicide produced by E.I. DuPont de Nemours and Company ("DuPont").[49] Within two years of this expert revealing the linkage, the plaintiffs brought suit against DuPont, who in turn moved for summary judgment on the grounds that the actions were time-barred under the applicable statute of limitations. The Delaware Supreme Court found that the "time of discovery" exception applied and differentiated "legal injuries" from the "injuries" that were physically "sustained" by the children in utero.[50] The Delaware Supreme Court ruled that this exception "starts the limitations period running only 'when a legal injury is sustained' " rather than when a physical injury is sustained.[51] The Delaware Supreme Court further found that the "legal injury" was sustained when the parents were on notice that the children's defects may have been tortiously caused by the mothers' exposure to fungicide, as opposed to when the birth defects were first observed.

The Delaware Supreme Court also found that the parents were blamelessly ignorant of the potential claim even after the latent injury revealed itself through physical ailments where "the symptoms are reasonably attributable to another cause and the plaintiff is not on notice of the tortious cause."[52] The plaintiffs suffered a physical condition that could not be attributed to a tortious injury until "someone from the scientific community found and revealed publicly a link between the physical condition and the exposure to the toxic substance."[53]

 **\*5** The Court finds that the reasoning in *Brown* is applicable here.[54] From the factual allegations in the Complaint, the Court can discern that BTIG is making a "time of discovery" tolling argument.[55] In summary, BTIG alleges that the legal injury is tortious interference and civil conspiracy and that they only had notice of these injuries when "the previously secret documents" showed that Palantir and DTA—

> secretly decided that they wanted to 'crush' BTIG and capture the economic benefits of a potential transaction with the buyer for themselves, instructed the buyer that the buyer could purchase Palantir shares exclusively through DTA, and stated that Palantir would refuse to approve any transaction the buyer attempted to pursue through another broker.[56]

The Court also finds *Wal–Mart Stores Inc. v. AIG Life Ins. Co.* to be helpful.[57] In *Wal–Mart Stores,* the Delaware Supreme Court held that Wal-Mart could not be expected to

BTIG, LLC v. Palantir Technologies, Inc., Not Reported in Atl. Rptr. (2020)

2020 WL 95660

discover that the Internal Revenue Service might rule that Wal-Mart's utilization of a tax-avoidance strategy advocated by insurance brokers was improper as the injury was inherently unknowable.[58] The Delaware Chancery Court has commented that the *Wal-Mart Stores* ruling "sets a low threshold for the use of the doctrine of inherently unknowable injury, but one that is hard for a trial court to ignore."[59]

Furthermore, unlike the buyer in *Krahmer v. Christie's Inc.*—who failed to adequately allege facts demonstrating that the "time of discovery" rule should apply to her claims, BTIG has alleged that Palantir had control over the documents that gave rise to its tortious interference claim.[60] The *Krahmer* Court called the issue of "whether the inherently unknowable injury rule applies to where an auction house sells an allegedly fake work of art to one who has no specific reason to question is authenticity until long after the three year statute of limitations has expired" to be one of first impression in Delaware.[61] The *Krahmer* Court rejected the argument that the Krahmers, as amateur art collectors, "reasonably relied on the representations of a reputable auction house that held itself out as an expert in American art" where the auction house's only duty was to the owner of the artwork and not to the Krahmers.[62]

**\*6** Unlike *Krahmer*, the Court finds that—at this very early stage of the litigation—BTIG has *adequately alleged* that it reasonably relied on Palantir's representations in 2015 and 2016. Although not yet addressed in this, or other related litigation, the Preferred Stock Purchase Agreements present a situation that seemingly involves good faith and fair dealing as these agreements purportedly require disclosure of a transaction to Palantir before any sale of stock. The Court finds strange any idea that parties could use this information, with impunity, and negotiate side deals that cut out the disclosing parties. Given the surreptitious nature of the scheme pled by BTIG in the Complaint, the facts support finding that the injury is inherently unknowable.

BTIG also has alleged facts supporting that it is "blamelessly ignorant." The Court in *Brown* found that a plaintiff "may remain blamelessly ignorant of the potential claim even after a latent injury reveals itself through physical ailments."[63] Here, even Palantir acknowledges that "many transactions are contemplated but never consummated."[64]

Like the physical injury suffered by the plaintiffs in *Brown*, BTIG suffered an injury where the link to a tortious cause

became known only where the KT4 documents were revealed publicly. To hold that BTIG would have been alerted to the potential cause of its simply by the fact that transaction was never consummated seems unreasonable. It is possible that BTIG might have been able to discover that there was tortious interference before the KT4 documents were released;[65] however, the Court does not find that the record has been developed enough for that conclusion.

The Court can also discern in the Complaint that BTIG is claiming tolling through fraudulent concealment doctrine.[66] Fraudulent concealment requires a defendant to commit "some 'actual artifice' which prevents a plaintiff from gaining knowledge of the facts, or some misrepresentation which is intended to put the plaintiff off the trail of inquiry."[67] Here, the Court finds the Complaint puts the parties on notice that BTIG is pleading fraudulent concealment. In summary, BTIG has asserted that "[i]n his interactions with BTIG, [Palantir executive Kevin] Kawasaki indicated to BTIG that he would be cooperative in facilitating the BTIG-brokered deal";[68] (2) "Plaintiff received indication from Palantir that Palantir would cooperate with Plaintiff's secondary transaction;"[69] and (3) "[b]y openly giving the impression to BTIG that Palantir would facilitate the BTIG-brokered deal, but secretly working together to 'crush' and 'shut down' any such deal, Palantir and DTA misled BTIG."[70]

The Complaint, therefore, alleges facts that support a "time of discovery" tolling argument and a fraudulent concealment tolling argument. Palantir claims that BTIG should have known that the CDH Transaction was lost due to tortious interference and civil conspiracy. The Complaint alleges a different scenario—a scenario where BTIG relied upon Palantir's assertions that it would assist in carrying out BTIG's transaction. At this stage in the proceedings, the Court must accept the facts as alleged in the Complaint. If the factual discovery demonstrates otherwise, then a dispositive motion may resolve the matter prior to trial.

**\*7** Inquiry notice does not require actual discovery of the reason for injury. Rather, inquiry notice exists when the plaintiff becomes aware of "facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery [of injury]."[71] A plaintiff is expected to act with alacrity once the plaintiff has reason to suspect that the plaintiff's rights have been violated, and that the statute of limitations runs from the point at which

Add.7

BTIG, LLC v. Palantir Technologies, Inc., Not Reported in Atl. Rptr. (2020)

2020 WL 95660

the plaintiff, by exercising reasonable diligence, should have discovered the injury.[72]

In deciding whether a plaintiff was on inquiry notice of the claims on a motion to dismiss, Delaware courts have examined whether a diligent investigation, if pursued, would uncover facts sufficient to enable a plaintiff to discover the basis of a claim.[73] In *Weiss v. Swanson*, the Delaware Chancery Court found it would be inappropriate to infer that the plaintiff was on inquiry notice of his claims simply because he could piece together the alleged practice of timing option grants from publicly available information.[74] "In order to discover the alleged pattern of timing, Weiss would have had to cull through the company's Form 4s each time they were filed, compare the grant dates of the options with the timing of the quarterly earnings releases, and then conduct a statistical analysis in order to uncover the alleged malfeasance. Such an investigation is beyond 'reasonable' diligence.'"[75]

The Court finds it similarly inappropriate to infer that BTIG was on inquiry notice simply because BTIG may have been able to piece together the tortious interference by Palantir and DTA by culling through Palantir's documents. This is especially where it is alleged that Palantir took efforts to keep the documents from becoming public.[76] Furthermore, the very nature of a conspiracy implies that the uncovering of facts is unlikely.[77] The Court, therefore, finds that it is premature to dismiss the complaint on statute of limitations grounds.

**V. CONCLUSION**

For the set forth above, the Court **DENIES** the Motion.

**All Citations**

Not Reported in Atl. Rptr., 2020 WL 95660

Footnotes

1    Unless otherwise indicated, the following are the facts as alleged in the Complaint. For purposes of the Motion, the Court must view all well-pleaded facts alleged in the Complaint as true and in a light most favorable to BTIG. *See, e.g., Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 27 A.3d 531, 536 (Del. 2011); *Doe v. Cedars Acad., LLC*, 2010 WL 5825343, at *3 (Del. Super. Oct. 27, 2010).
2    Compl. ¶ 12.
3    *Id.* ¶ 2.
4    *Id.* ¶ 1
5    *Id.*
6    *Id.*
7    *Id.* ¶ 14.
8    *Id.*
9    *Id.*
10    *Id.*
11    *Id.*
12    *Id.*
13    *Id.*
14    *Id.*
15    *Id.* ¶ 16.
16    *Id.*
17    *Id.* ¶ 1.
18    *Id.*
19    *Id.* at 2 n.1.
20    *Id.* ¶ 19.
21    *Id.* ¶¶ 16, 23.
22    *Id.* ¶ 17.
23    *Id.*

Case: 22-1333     Document: 5     Page: 67     Date Filed: 02/22/2022

BTIG, LLC v. Palantir Technologies, Inc., Not Reported in Atl. Rptr. (2020)

2020 WL 95660

| 24 | *Id.* |
|----|-------|
| 25 | *Id.* ¶ 22. |
| 26 | *Id.* |
| 27 | Id. ¶ 23. |
| 28 | *Id.* ¶ 20. |
| 29 | *Id.* |
| 30 | *Id.* |
| 31 | *Id.* ¶ 24. |
| 32 | *Id.* |
| 33 | *Id.* |
| 34 | *Id.* |
| 35 | *See Central Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC,* 227 A.3d 531, 536 (Del. 2011); *Doe v. Cedars Academy,* No. 09C-09-136, 2010 WL 5825343, at *3 (Del. Super. Oct. 27, 2010). |
| 36 | *Ramunno v. Crawley,* 705 A.2d 1029, 1034 (Del. 1998). |
| 37 | 10 *Del. C.* § 8106. |
| 38 | *Wal–Mart Stores Inc. v. AIG Life Ins. Co.,* 860 A.2d 312 (Del. 2004). |
| 39 | *Id.* |
| 40 | *Certainteed Corp. v. Celotex Corp.,* 2005 WL 217032, at *7 (Del. Ch. Jan. 24, 2005) (citing *Ambase Corp. v. City Investing Co.,* 2001 WL 167698, at *14 n. 4 (Del. Ch. Feb. 7, 2001) and *Kaufman v. C.L. McCabe & Sons, Inc.,* 603 A.2d 831, 834 (Del. 1992). |
| 41 | *Wal–Mart Stores,* 860 A.2d 312 (Del. 2004). |
| 42 | *Young & McPherson Funeral Home, Inc. v. Butler's Home Improvement, LLC,* 2015 WL 4656486, at *1 (Del. Super. Aug. 6, 2015); *Eni Holdings, LLC v. KBR Grp. Holdings, LLC,* 2013 WL 6186326, at *11 (Del. Ch. Nov. 27, 2013). |
| 43 | *Wal–Mart Stores,* 860 A.2d 312. |
| 44 | *Id.* |
| 45 | *Brown,* 820 A.2d 362, 366 (Del. 2003). |
| 46 | *Kaufman v. C.L. McCabe & Sons, Inc.,* 603 A.2d 831, 832 (Del. 1992). |
| 47 | 820 A.2d 362, 364–65 (Del. 2003). |
| 48 | *Id.* at 364–65. |
| 49 | *Id.* |
| 50 | *Brown,* 820 A.2d 362, 366 (Del. 2003). |
| 51 | *Id.* at 368 (citing *Stagg v. Bendix Corp.,* 472 A.2d 40, 43 (Del.Super.1984) *aff'd* 486 A.2d 1150 (Del.1984) and *Layton,* 246 A.2d at 797 (noting that in the typical tort case the physical impact starts the limitations period because the impact "serves to notify the plaintiff of the violation of his rights before the expiration of the period of limitations")). The Delaware Supreme Court in *Brown* also noted that several other authorities make a similar distinction between physical injury and legal injury. *See id.* (citing BLACK'S LAW DICTIONARY 789 (7th ed.1999) (noting that the primary definition of "injury" is "The violation of another's legal right, for which the law provides a remedy"); RESTATEMENT (SECOND) OF TORTS § 7 (1965) (defining "injury" as "the invasion of any legally protected interest of another"); and *Condon v. A.H. Robins Co.,* 217 Neb. 60, 349 N.W.2d 622, 625 (1984) (noting that "injury" for purposes of a statute of limitations must be defined "in the legal sense," and legal injury does not " 'occur' until it has sufficiently manifested itself so that a reasonable person knows, or ... should have discovered, the injury or damage")). |
| 52 | *Id.* |
| 53 | *Id.* |
| 54 | Although the *Brown* court was specifically interpreting the language of Del. Code Ann. tit. 10, § 8119 in deciding when an injury is sustained, the same reasoning applies in interpreting when an injury is sustained under the "time of discovery" rule. Moreover, Delaware courts have expanded the reasoning in § 8119 claims to claims concerning 8106. *See Isaacson, Stolper & Co. v. Artisans' Sav. Bank,* 330 A.2d 130, 132–33 (Del.1974) (applying the "time of discovery" rule to accounting malpractice claims subject to Section 8106, where the taxpayer did not know he suffered an injury until the Internal Revenue Service asserted a claim); *Mulrooney v. Corp. Serv. Co.,* No. CIV.A. 12-163-SLR, 2013 WL 1246769, at *11 (D. Del. Mar. 27, 2013) (applying the *Brown* court's reasoning to determine that the "time of discovery" rule should toll the statute of limitations to where the legal injury was sustained). |

BTIG, LLC v. Palantir Technologies, Inc., Not Reported in Atl. Rptr. (2020)

2020 WL 95660

55  Compl. ¶¶ 1,14,17, 19-20, 23.

56  *Id.* ¶ 1.

57  860 A.2d 312 (Del. 2004).

58  *Id.*

59  *Certainteed Corp.*, No. CIV. A. 471, 2005 WL 217032, at *9 (Del. Ch. Jan. 24, 2005).

60  903 A.2d 773, 780 (Del. Ch. 2006)

61  *Id.*

62  *Id.*

63  *Brown*, 820 A.2d 362, 368 (Del. 2003).

64  Palantir Br. 3–4.

65  Defendants state that the KT4 action was filed in March 2017, two-and-a half years prior to BTIG's complaint. Palantir Br. 5. Even assuming that this filing would have provided BTIG with appropriate notice, the court need not consider this issue because it would have been within the three-year statute of limitations period.

66  Compl. ¶¶ 14, 24.

67  *Halpern v. Barran*, 313 A.2d 139, 143 (Del. Ch. 1973).

68  Compl. ¶ 14.

69  *Id.* ¶ 20.

70  *Id.* ¶ 24.

71  *Becker v. Hamada, Inc.*, 455 A.2d 353, 356 (Del.1982).

72  *Id.*

73  See *Coleman v. Pricewaterhousecoopers, LLC*, 854 A.2d 838, 843 (Del. 2004*); see also Incyte Corp. v. Flexus Biosciences, Inc.,* 2017 WL 7803923, at *6 (Del. Super. Ct. Nov. 1, 2017) (finding no reason to believe that a diligent inquiry would have uncovered facts sufficient to assert a trade libel claim where a competitor's presentation was confidential).

74  948 A.2d 433, 452 (Del. Ch. 2008).

75  *Id.*

76  *Id.* ¶ 1; ¶ 1 n.1.

77  "Conspirators do not voluntarily proclaim their purposes; their methods are clandestine." *Hoffman v. Stamper*, 867 A.2d 276, 291 (Md. 2005) (quoting *Western Maryland Dairy v. Chenworth*, 23 A.2d 660 (Md. 1942)).

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 595602

2009 WL 595602
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

Mark Aaron HESS, by and through his
parent and natural guardian, Mark Hess
v.
A.I. DuPONT HOSPITAL
for Children, et al.

Civil Action No. 08–0229.
|
March 5, 2009.

West KeySummary

1    **Evidence** ⬅ Cause and effect

  **Health** ⬅ Cardiology; circulatory system

  Under Delaware law, patient failed to show
  causation and injury in a medical malpractice
  claim. Patient underwent experimental surgery
  to cure a birth defect that resulted in a heart
  condition and alleged that the surgeon's use of an
  experimental stent was negligent. The patient's
  medical expert did not identify any complication
  or conditions caused by the stent. 18 Del.C. §
  6853.

  2 Cases that cite this headnote

**Attorneys and Law Firms**

Brian E. Appel, Law Office of Brian E. Appel, Esq., Frank M.
McClellan, Eaton & McClellan, Philadelphia, PA, for Mark
Aaron Hess, by and through his parent and natural guardian,
Mark Hess.

R. Nicholas Gimbel, McCarter and English, L.L.P., Sara
Petrosky, Suzanne N. Pritchard, McCann and Geschke, P.C.,
Philadelphia, PA, John M. Hudgins, IV, Weinberg Wheeler
Hudgins Gunn & Dial LLC, Atlanta, GA, for A.I. DuPont
Hospital for Children, et al.

*MEMORANDUM & ORDER*

SURRICK, District Judge.

 **\*1** Presently before the Court are the Motion of Defendant
William I. Norwood, M.D., Ph.D., for Summary Judgment
Pursuant to Rule 56 of the Federal Rules of Civil Procedure
(Doc. No. 10), the Motion for Partial Summary Judgment
to Dismiss the First Cause of Action (Doc. No. 11),
the Motion for Partial Summary Judgment to Dismiss
Count II of the Complaint Alleging Fraud and Intentional
Misrepresentation and Punitive Damages Claim (Doc. No.
12), the Motion of Defendants for Summary Judgment on
Medical Monitoring Claim Set Forth in Count VI (Doc. No.
13), and the Institutional Defendants' Motion for Partial
Summary Judgment (Doc. No. 14). For the following reasons,
Defendants' Motions will be granted in part and denied in part.

**I. BACKGROUND**[1]

  **A. Plaintiff's Medical History**
Plaintiff was born on January 8, 2002, with a congenital
heart defect known as Hypoplastic Left Heart Syndrome
("HLHS").[2] HLHS is characterized by an underdevelopment
of the left side of the heart, preventing circulation of
oxygenated blood to the body. Babies born with HLHS cannot
survive unless they receive a course of treatment that entails
three procedures. The first procedure, called the "Norwood
Procedure," modifies the heart's physiology so that the right
ventricle, which normally pumps deoxygenated blood to the
pulmonary arteries for oxygenation, pumps oxygenated blood
to the body. The second and third procedures, respectively
called the "Hemi–Fontan" and "Fontan Completion," create
a physiology that allows deoxygenated blood to flow to
the lungs without first going to the heart. In the Hemi–
Fontan procedure, the superior vena cava, which receives
deoxygenated blood from the upper body, is redirected to the
pulmonary arteries. In the Fontan Completion, the inferior
vena cava, which receives deoxygenated blood from the lower
body, is redirected to the pulmonary arteries.

Plaintiff was born at a hospital in Tupelo, Mississippi.
When it became apparent that Plaintiff had HLHS, the
doctors informed Plaintiff's parents that Plaintiff had a
"slim chance" of survival. (Doc. No. 11, Ex. D at 54 (M.
Hess Dep.).) The doctors presented Plaintiff's parents with
three options. (*Id.*) They could take no action and allow

Plaintiff to pass away; they could put his name on a heart transplant list and hope that an acceptable transplant became available in time; or they could take him to a hospital at the University of Michigan for the Norwood Procedure. (*Id.* at 54–55.) Plaintiff's parents elected the last option and Plaintiff had the Norwood Procedure performed in Michigan six days after his birth. (Doc. No. 22, Ex. 2 at 2 (hereinafter, "Weber Report").) Following the Norwood Procedure, Plaintiff suffered several complications including seizures and a grade II intraventricular bleed. (*Id.*)

For reasons that are not entirely clear, Plaintiff's parents decided to transfer him to the A.I. duPont Hospital in Wilmington, Delaware. (*See* Doc. No. 11, Ex. E at 62 (hereinafter, "A. Hess Dep.") (implying that Dr. Norwood was the only doctor who would operate on Plaintiff); Doc. No. 18, at 4 (stating that Plaintiff was transferred from the Michigan Hospital to the duPont Hospital because he "experienc[ed] some medical difficulties ...").) On July 10, 2002, Dr. Norwood performed a Hemi–Fontan procedure on Plaintiff. (Weber Report at 2.) Following the Hemi–Fontan procedure, Plaintiff experienced complications including a pneumothorax, brief episodes of supraventricular tachycardia, mild tricuspid and neoarctic valve insufficiency, and atrial flutter. (*Id.*) These complications necessitated at least one additional hospitalization and two follow-up procedures: an ablation procedure and an electrophysiology study. (*Id.*)

**\*2** Sometime during 2002, the Medical Defendants determined that the Fontan Completion procedure could be accomplished by implanting a Cheatham Platinum covered stent ("CP stent") via catheterization. The benefit of such a procedure was that it avoided the risks attendant with a open-heart surgery. According to Dr. Norwood, the catheterization procedure "accomplish[es] the identical physiological and structural result as [the surgical procedure], but avoid[s] open heart surgery in the infant." (Doc. No. 11, Ex. C ¶ 9 (Norwood Aff.).)

On January 13, 2003, Dr. Murphy performed a Fontan Completion on Plaintiff using a catheter and two CP stents. (Weber Report at 2.) Before the procedure, Plaintiff's mother signed two consent forms: one provided by NuMed Inc., the CP stent's manufacturer; and one provided by the Hospital. (*See* Doc. No. 11, Exs. F, G (hereinafter, "NuMed Consent Form" and "duPont Consent Form," respectively).) The NuMed Consent Form informed Plaintiff's parents, *inter alia,* that the CP stent "ha[d] been developed over the past two

years and remains in the investigational stage ..." and that the CP stent "ha[d] not been approved by the United States Food and Drug Administration (FDA) ...." (NuMed Consent Form at 1.) The CP stent is a Class III medical device under the Food, Drug & Cosmetics Act, 21 U.S.C. §§ 301 *et seq.,* and the Medical Device Amendments, 21 U.S.C. §§ 360 *et seq. See* 21 U.S.C. § 360c(a)(1)(C). As a Class III device, the CP stent could not be sold or marketed by NuMed without obtaining premarket approval from the FDA. *See* 21 U.S.C. §§ 331, 351, 360e. The FDA permitted the Medical Defendants to implant the CP stent in Plaintiff on a compassionate use basis. (*See* Doc. No. 19 at 14–15; *id.* Ex. 7.)[3]

After the catheter completion of the Fontan, Plaintiff experienced complications including two small areas of right to left shunting within the stent and a hemothorax (an accumulation of blood in the pleural cavity) that required removal. (Weber Report at 2.) Three days after being discharged from the hospital, Plaintiff was readmitted to treat dehydration and an atrial flutter. (*Id.*) Plaintiff was discharged three days later. (*Id.*) He was readmitted two weeks after that to address a decrease in his blood's oxygen saturation, at which time his doctors observed an additional right to left shunt in the stent. (*Id.*) After several days of observation at the hospital, Plaintiff was discharged. (*Id.*)

Plaintiff currently suffers from a blood platelet disorder known as idiopathic thrombocytopenia purpura ("ITP"). It is not clear whether Plaintiff had ITP at birth, whether he developed it sometime after birth but before his Fontan Completion, or whether he developed it after his Fontan Completion. However, Plaintiff concedes that the ITP is unrelated to the CP stent or treatment he received from the Medical Defendants. (Doc. No. 22 at 6 (acknowledging that Plaintiff "does have an unrelated blood platelet disorder, for which he has had much intense medical care and supervision").) Complications resulting from the ITP have resulted in Plaintiff making numerous hospital visits from November of 2004 through July of 2006. (*Id.*) ITP limits the physical activities in which Plaintiff, who is now seven years old, can engage. For instance, he is not permitted to participate in his school's physical education classes. (A. Hess Dep. at 8.) Despite these limitations, Plaintiff's mother testified that he is doing "amazingly" well. (*Id.* at 94; *see also id.* at 7–8.)

**B. Procedural History**

 **\*3** Plaintiff brought this lawsuit in 2004 as one of three named plaintiffs to a class action. *See* Complaint, *Conway v. A.I. duPont Hosp. for Children,* No. 04–4862 (E.D.Pa. Oct.15, 2004). The Complaint alleged a number of torts arising out of the use of the CP stent. *Id.*

In February of 2007, we dismissed several claims against the Medical Defendants for failure to state claims upon which relief may be granted. *See Conway v. A.I. duPont Hosp. for Children,* No. 04–4862, 2007 WL 560502 (E.D.Pa. Feb.14, 2007) (*Conway I* ). Under the broad scope of negligence alleged in Count I of the Complaint, we dismissed the plaintiffs' failure to warn, failure to perform adequate testing, and negligent marketing and design theories as alleged against the Medical Defendants. *Id.* at \*3–5. We determined that the plaintiffs' failure to warn claim amounted to an informed consent theory. *Id.* at \*4. We also determined that, to the extent that the plaintiffs' failure to warn theory was based on products liability, there was no legal authority "that would require a surgeon to provide his patient with the same warnings prior to surgery that would be required of the manufacturer of a product." *Id.* Similarly, we determined that the Medical Defendants did not have a duties with regard to the testing and design of the CP stent. *Id.* at \*5–6. We dismissed the plaintiffs' assault and battery claim against the Medical Defendants because the Complaint alleged what amounted to an informed consent claim, which in Delaware sounds in negligence and not battery. *Id.* at \*8. Finally, we dismissed the plaintiffs' strict products liability and express and implied warranty claims against the Medical Defendants because professionals are not normally liable under these theories and the plaintiffs alleged no facts that would require a deviation from the normal rule. *Id.* at \*9–10 (citing and discussing *Golt v. Sports Complex, Inc.,* 644 A.2d 989, 993 (Del.Super.Ct.1994) with regard to strict liability and *Coleman v. Garrison,* 349 A.2d 8, 11 (Del.1975), *rev'd on other grounds, Garrison v. Med. Ctr. of Del. Inc.,* 571 A.2d 786 (Del.1989) with regard to express and implied warranties).

On April 13, 2007, a Stipulation was filed dismissing all class action allegations in the Complaint with prejudice. *See* Stipulation and Order, *Conway v. A.I. duPont Hosp. for Children,* No. 04–4862 (E.D.Pa. Apr.13, 2004). On January 11, 2008, we issued an order that the cases of the three named plaintiffs were to be tried separately and issued separate civil action numbers. (*See* Doc. No. 1.) Prior to the plaintiffs' request to have their cases tried separately, it became apparent that Plaintiff's parents disagreed over whether they should

pursue this litigation. On April 12, 2007, Plaintiff's father filed a petition to be appointed Plaintiff's guardian *ad litem. See* Petition of Mark Hess for Appointment of Guardian Ad Litem for Minor Plaintiff, *Conway v. A.I. duPont Hosp. for Children,* No. 04–4862 (E.D.Pa. Apr.12, 2007). Plaintiff's mother had written a letter to Dr. Norwood expressing gratitude to Dr. Norwood for saving Plaintiff's life and disavowing the lawsuit. (*See* Doc. No. 11, Ex. B.) Plaintiff's father believed that pursuing litigation was in Plaintiff's best interest. On April 17, 2007, after a hearing we appointed Plaintiff's father, Mark Hess, as Plaintiff's guardian *ad litem. See* Order, *Conway v. A.I. duPont Hosp. for Children,* No. 04–4862 (E.D.Pa. Apr.17, 2007).

 **\*4** Recently, we have ruled on summary judgment motions in the related cases of Teague Conway and Molly Guinan. On January 6, 2009, we granted summary judgment in favor of the Defendants on all outstanding claims in the Teague Conway case. *See Conway v. A.I. duPont Hosp. for Children,* No. 04–4862, 2009 WL 57016, at \*16–17 (E.D.Pa. Jan.6, 2009) (*Conway II* ). Teague Conway had developed ascites, pleural effusions (conditions characterized by fluid build up in the abdomen and lungs, respectively), and protein losing enteropathy (or "PLE," a condition marked by lose of serum protein through the walls of the intestine) after the completion of the Fontan procedure. *Id.* at \*2–3. Teague Conway's parents moved him from A.I. duPont Hospital in Wilmington, Delaware, to the Children's Hospital of Philadelphia ("CHOP"), where his new physicians performed the take-down of his Fontan, which entailed removing the CP stent. *Id.* at \*3. The physicians observed a thrombus (a blood clot) lodged in the CP stent. *Id.* at \*7. We granted the Defendants' motions for summary judgment because Teague Conway did not provide medical expert testimony establishing a causal connection between the use of the CP stent and the PLE, ascites, or thrombus as required by Delaware law. *See id.* at \*5–7, \*10–12.

One month later, we granted summary judgment in favor of the Defendants on all claims except for the medical monitoring claim in the Molly Guinan case. *See Guinan v. A.I. duPont Hosp. for Children,* No. 08–0228, 2009 WL 307019 (E.D.Pa. Feb.6, 2009) (*Guinan I* ); *Guinan v. A.I. duPont Hosp. for Children,* No. 08–0228, 2009 WL 311113 (E.D.Pa. Feb.6, 2009) (*Guinan II* ). Molly Guinan developed PLE and plastic bronchitis (a condition where protein is lost through the lungs) after the completion of her Fontan. *Guinan I, 2009 WL 307019, at \*2.* We granted the Medical Defendants and Institutional Defendants' summary judgment

motions regarding medical negligence and informed consent for the same reason as in the Teague Conway case: Molly Guinan did not produce medical expert testimony establishing a causal connection between the use of the CP stent and her PLE and plastic bronchitis as required by Delaware law. *Id.* at \*10–15. We denied the Medical Defendants and Institutional Defendants' motion for summary judgment on Molly Guinan's medical monitoring claim (*see* medical monitoring discussion *infra* ).[4] *See id.* at \*16–18. In *Guinan II,* we addressed NuMed's motion for summary judgment, dismissing all outstanding claims against NuMed CEO Allen Tower and dismissing all claims except the medical monitoring claim against NuMed. *See Guinan II,* 2009 WL 311113, at \*25–26.

## II. LEGAL STANDARDS

### A. Summary Judgment

A moving party is entitled to summary judgment when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Fed. Home Loan Mortgage Corp. v. Scottsdale Ins. Co.,* 316 F.3d 431, 443 (3d Cir.2003). Where the non-moving party bears the burden of proof at trial, the moving party may identify an absence of a genuine issue of material fact by "showing" the court that there is no evidence in the record supporting the non-moving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *UPMC Health Sys. v. Metro. Life Ins. Co.,* 391 F.3d 497, 502 (3d Cir.2004). Once the moving party carries this initial burden, the non-moving party must set forth specific facts showing that there is a genuine issue for trial. *See* Fed.R.Civ.P. 56(e)(2) (stating that "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must ... set out specific facts showing a genuine issue for trial"); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (noting that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Watson v. Eastman Kodak Co.,* 235 F.3d 851, 857–58 (3d Cir.2000) (explaining that once the movant has demonstrated an absence of a genuine issue of material fact, the non-movant must then establish the existence of each element on which it bears the burden of proof); *Ridgewood Bd. ofEduc. v. N.E. for M.E.,* 172 F.3d 238, 252 (3d Cir.1999) (noting that

plaintiffs cannot avert summary judgment with speculation or by resting on the allegations in the pleadings). Courts must draw all reasonable inferences from the record in favor of the non-movant. *Knabe v. Boury Corp.,* 114 F.3d 407, 410 n. 4 (3d Cir.1997). Moreover, courts must not resolve factual disputes or make credibility determinations. *Siegel Transfer, Inc. v. Carrier Express, Inc.,* 54 F.3d 1125, 1127 (3d Cir.1995)

### B. Choice of Law

**\*5** Since this is a diversity action, we must determine which state's laws apply. To do this, we apply the choice of law principles of the forum state. *See, e.g., Thabault v. Chait,* 541 F.3d 512, 521 (3d Cir.2008) (*citing Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Pennsylvania v. Brown,* 373 F.2d 771, 777 (3d Cir.1967)); *Warriner v. Stanton,* 475 F.3d 497, 499–500 (3d Cir.2007) (*citing Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)). Pennsylvania courts employ a two-step interest analysis to determine choice of law. *See Grifith v. United Airlines Inc.,* 416 Pa. 1, 203 A.2d 796, 806–07 (Pa.1964); *see also Hanover Ins. Co. v. Ryan,* No. 06–2650, 2007 U.S. Dist. LEXIS 92646, at \*9–12, 2007 WL 4456158 (E.D.Pa. Dec. 17, 2007) (discussing *Griffith* ). Under the first step of the analysis, a court must address whether a conflict exists between the laws of the competing states. *Hanover,* 2007 U.S. Dist. LEXIS 92646, at \*11, 2007 WL 4456158. If a conflict exists, then the court must "weigh the interests of each state in the resolution of the dispute, and determine which state has greater contacts with the dispute." *Id.* at \*12.

The parties agree that Delaware law governs the outcome of this case on all claims except the claim for medical monitoring. (*See, e.g.,* Doc. No. 11 at 8–9; Doc. No. 21 at 3.) When parties agree as to choice of law, courts often do not engage in a choice of law analysis. *See, e.g., USA Mach. Corp. v. CSC, Ltd.,* 184 F.3d 257, 263 (3d Cir.1999) (assuming without deciding that Pennsylvania law governed diversity suit where parties appeared to be in agreement on choice of law); *see also Aubrey v. Sanders,* No. 07–0137, 2008 U.S. Dist. LEXIS 74161, at \*14–15, 2008 WL 4443826 (W.D.Pa. Sept. 26, 2008) (declining to engage in choice of law analysis where there was no apparent dispute between the parties regarding choice of law); *Adani Exps. Ltd. v. AMCI Exp. Corp.,* No. 05–304, 2007 U.S. Dist. LEXIS 88969, at \*23, 2007 WL 4298525 (W.D.Pa. Dec. 4, 2007) ("There is no need for a detailed choice of law analysis ... because the parties agree that Pennsylvania's substantive law governs the issue of contract formation."). In the *Conway* and *Guinan* cases,

we determined that Delaware law applied to the plaintiffs' negligence and fraud claims. *See Conway II,* 2009 WL 57016, at \*4–5; *Guinan I,* 2009 WL 307019, at \*5–8; *Guinan II,* 2009 WL 311113, at \*5–6; *see also* 42 Pa. Cons.Stat. § 5101.1(b) ("[A] medical professional liability action may be brought against a health care provider for a medical professional liability claim only in the county in which the cause of action arose."). Those claims arose out of the same wrongful conduct alleged by Plaintiff in this case. Accordingly, we will apply Delaware law to Plaintiff's fraud and negligence claims.

Like the plaintiff in *Guinan,* Plaintiff is a resident of New Jersey. In *Guinan I,* we determined that a conflict existed between the laws of Delaware, Pennsylvania, and New Jersey with regard to the medical monitoring claim in part because it was unclear whether Delaware recognized a medical monitoring cause of action. *See Guinan I,* 2009 WL 307019, at \*7–8. After determining that Delaware had the greatest interest in having its policies govern the outcome of the action, we predicted that given the unique circumstances of the plaintiffs in these cases, the Delaware Supreme Court would recognize a medical monitoring cause of action. *Id.* at \*16–18. In so doing, the Delaware Supreme Court would necessarily look to other jurisdictions for guidance, including the laws of Pennsylvania and New Jersey. Accordingly, to the extent necessary, we will rely on the laws of all three states for guidance.

## III. LEGAL ANALYSIS

### A. Negligence

 **\*6**  In Delaware, "any tort ... based on health care or professional services rendered, or which should have been rendered, by a health care provider to a patient," 18 Del. C. § 6801(7), is governed by the Health Care Malpractice Insurance and Litigation Act (the "Health Care Act"), 18 Del. C. §§ 6801 *et seq.* Under the Health Care Act, all such torts are "medical negligence" and parties seeking redress must comply with the Act's requirements. *See* 18 Del. C. § 6801(7); *see also* 18 Del. C. §§ 6850–58. Plaintiff's claims clearly fall within the scope of the Health Care Act since they arise from health care services that Plaintiff received from the Medical Defendants. (*See, e.g.,* Doc. No. 19 at 4–5.) In fact, Plaintiff appears to articulate three separate theories of "medical negligence": a theory based upon substandard care as medical negligence, a theory based upon the lack of informed consent, and a theory based upon the increased risk of harm. The gravamen of these theories is that " 'but for' the negligence of the ... Defendants, Plaintiffs [sic] would not

have been subjected to the implantation of the investigational stent" (Doc. No. 21 at 9) and that Plaintiff's "medical future with the stent is unknown" (Doc. No. 22 at 6). In Plaintiff's view, "[h]is claim is about his medical future ...." (*Id.* (emphasis omitted).) We address each of Plaintiff's theories separately below; however, there are certain requirements that apply to all three.

Specifically, the Health Care Act mandates that all medical negligence claims be supported by the testimony of a medical expert. *See* 18 Del. C. § 6853(e); *see also* 18 Del. C. § 6854 (setting competency standard for defendant-experts). The medical expert must opine on two things: (1) how the health care provider deviated from the applicable standard of care and (2) how that deviation caused the alleged personal injury.[5] 18 Del. C. § 6853(e). Plaintiffs who do not satisfy section 6853's expert testimony requirement cannot survive a summary judgment challenge. *See, e.g., O'Donald v. McConnell,* 858 A.2d 960, 960 (Del.2004) (affirming grant of summary judgment in favor of defendant-physician where plaintiff did not provide expert testimony regarding causation); *Burkhart v. Davies,* 602 A.2d 56, 59–60 (Del.1991), *cert. denied,* 504 U.S. 912, 112 S.Ct. 1946, 118 L.Ed.2d 551 (1992) (affirming grant of summary judgment to defendants in medical negligence lawsuit because plaintiff had not satisfied "essential element" of producing medical expert testimony as required by 18 Del. C. § 6853); *see also Russell v. Kanaga,* 571 A.2d 724, 732 (Del.1990) (determining that defendant-physician was entitled to a directed verdict where plaintiff had adduced no expert testimony regarding defendant's deviation from the standard of care); *Wahle v. Med. Ctr. ofDel., Inc.,* 559 A.2d 1228, 1233 (Del.1989) (affirming trial court's dismissal of plaintiff's medical negligence claim for failure to comply with pretrial scheduling orders and her obligation to identify a medical expert pursuant to 18 Del. C. § 6853).

 **\*7**  The Health Care Act's requirement that a medical expert must offer testimony regarding causation has two elements. The first is intrinsic to causation: the medical expert must identify a personal injury that is caused by the medical negligence. Section 6853 specifically provides that plaintiffs must produce medical expert testimony regarding "the caus[e] of the alleged personal injury or death." 18 Del. C. § 6853(e). Without a personal injury there can be no causation and hence no medical negligence claim. The second element is a matter of Delaware policy: a medical expert must testify that the health care provider's deviation from the standard of care was the "but for" cause of the

plaintiff's injuries. *See Spicer v. Osunkoya,* No. 8C–04–218, 2008 WL 2955544, at \*1 (Del.Super.Ct. Jul.25, 2008) ("It is well settled that stating that any breach of the applicable standard of care was a 'substantial contributing factor' of Plaintiff's injuries is insufficient.... [A]n expert witness [must be] 'prepared to meet Delaware's more rigorous "but for" proximate cause standard.' " (*quoting Ellet v. Ramzy,* No. 4C–03–201, 2004 WL 2240153, at \*1 (Del.Super.Ct. Sep.29, 2004))); *Ellet,* 2004 WL 2240153, at \*1 ("It is settled, beyond need for citation, that Delaware rejects the 'substantial factor' causation standard. Delaware steadfastly adheres to the 'but for' standard of causation." (*citing Culver v. Bennett,* 588 A.2d 1094, 1096–97 (Del.1991); *Edwards v. Family Practice Assocs.,* 798 A.2d 1059, 1065 (Del.Super.Ct.2002)). The "but for" cause of an injury is the direct cause without which the injury would not have occurred. *See Culver,* 588 A.2d at 1097.

### *1. Plaintiff's Medical Expert*

Plaintiff has produced the testimony of one medical expert, Dr. Howard S. Weber, a board-certified pediatric cardiologist and professor of pediatrics at Penn State University College of Medicine. Dr. Weber offered his opinions regarding this case in a report dated June 18, 2008. The entirety of Dr. Weber's opinion reads as follows:

> [I]t is my opinion that [Plaintiff] underwent transcatheter completion of the Fontan procedure using two non FDA approved Cheatham Platinum (CP) covered stent [sic] supplied by Numed corporation without appropriate informed consent. It was below the standard of care at the time, for the parents to not have been informed by the [Medical Defendants] that the CP covered stent had not been previously utilized in this fashion in the United States, was not currently being utilized in a clinical protocol for this particular situation and, in fact, was only being utilized on a "compassionate" use basis for patients undergoing treatment of coarctation of the aorta. The consent was also below the standard of care with respect to informing the parents of the alternatives to the stent procedure since surgical Fontan completion has been the standard of care for many years with excellent early (<30) and late (10–20 years) results. It was also inappropriate and below the standard of care to proceed with such an investigational procedure using a non FDA approved device without appropriate [Institutional Review Board] oversight and approval. I hold these opinions to a reasonable degree of medical certainty.

**\*8** (Weber Report at 1–2.)

### *2. Negligence*

Plaintiff contends that the Medical Defendants were negligent when they implanted the CP stent in him and that the Institutional Defendants were negligent for not preventing the Medical Defendants from implanting the CP stent. (*See* Doc. No. 21 at 9; Doc. No. 22 at 12–13.) Although Dr. Weber's report creates a genuine issue of material fact with regard to the question of the Medical Defendants' deviation from the standard of care, it is clear that Dr. Weber's report does not contain even the rudiments of an opinion linking the Defendants' deviation from the standard of care to any current condition or malady, or to a condition or malady that is likely to develop in the future. (*See* Weber Report at 2.) Indeed, Plaintiff's mother has testified that Plaintiff is doing amazingly well (A. Hess Dep. at 94) and Plaintiff concedes in his briefing that he is currently "functioning well." (Doc. No. 22 at 6.) Plaintiff's arguments that his claims should survive Defendants' summary judgment challenge seek to persuade us to disregard the Health Care Act's requirement that Plaintiff must produce medical expert testimony identifying a causal connection between the health care provider's deviation from the standard of care and the patient's personal injury.

As discussed above, Plaintiff's case is the third case to come before us as a result of the use of the CP stent by the Medical Defendants at the A.I. duPont Hospital in the 2002–2003 time-frame. Plaintiff's case presents most clearly the question that underlies all three cases: does the implantation of the CP stent, standing alone, constitute an injury that is sufficient to form the basis of a medical negligence claim under Delaware law? We answered this question in the negative in *Conway* and *Guinan.* However, in *Conway,* the parties focused our attention on the thrombus that necessitated the take-down of the plaintiff's Fontan. *See Conway II,* 2009 WL 57016, at \*10. We determined that the plaintiff's medical expert had not stated an opinion that the CP stent or catheterization procedure caused the thrombus or resulted in the need for the takedown of the plaintiff's Fontan. *Id.* at \*10–11. In *Guinan,* the primary focus was on conditions that the plaintiff had developed after the CP stent was implanted. *Guinan I,* 2009 WL 307019, at \*11–14. We determined in *Guinan* that the plaintiff had failed to produce medical expert testimony that the conditions that she identified were caused by or a result of the CP stent or catheterization procedure. *Id.* at \*13–14.

The result is the same here. Plaintiff's medical expert does not identify any complication or conditions caused by the CP stent. Thus, there is neither causation nor injury, and Plaintiff's medical negligence claim cannot survive summary

judgment. *See, e.g., Brzoska v. Olson,* 668 A.2d 1355, 1362 (Del.1995) (stating that absent physical injury plaintiff "could not recover under a negligence theory"); *see also Svindland v. A.I. DuPont Hosp. for Children of Nemours Found.,* No. 05–0417, 2006 WL 3209953, at *5–6 (E.D.Pa. Nov.3, 2006) (applying Delaware law and granting the defendant's summary judgment motion on the plaintiff's medical negligence claim against defendant-hospital because the plaintiff's medical expert did not opine on causation).

 **\*9** Plaintiff points to evidence of a January 26, 2004 report prepared at NuMed's behest by a company called MedTrials, Inc. (Doc. No. 19, Ex. 5 at 3 (hereinafter, "MedTrials Report").) The MedTrials Report contains a review of the eighty-two patients at seventeen clinical sites who had the CP stent implanted for various reasons, including Fontan completion, in the 1998 to 2003 timeframe. Plaintiff cites to the MedTrials Report for the proposition that "stents implanted by defendants were associated with numerous adverse events experienced by children after the stents were implanted." (Doc. No. 19 at 12.) The MedTrials Report notes that "Fontan patients appear to have an extremely high complication and stent failure rate." (MedTrials Report at 12.) However, it goes on to recommend "comparison of this rate to that of traditional correction procedures designed to generate appropriate rationale for use of the CP stent in this patient population." (*Id.*) No such comparison appears in the report or in any portion of the record brought to our attention by Plaintiff.

Furthermore, the MedTrials Report cannot serve as a substitute for expert testimony. Such a substitution is not permitted by the Health Care Act. *See* 18 Del. C. § 6853(e) (stating that "there shall be no inference or presumption of negligence on the part of a health care provider" absent the testimony of a medical expert or one of the enumerated exceptions listed in section 6853). The Report does not purport to establish causation in Plaintiff's case and Dr. Weber did not rely upon it in preparing his report. (*See* Weber Report at 1.)

#### 3. Informed Consent

Plaintiff contends that the Medical Defendants did not provide him with the information necessary to give his informed consent to the CP stent procedure. (*See* Doc. No. 21 at 9; Doc. No. 22 at12–13.) Informed consent is statutorily defined in Delaware as:

[T]he consent of a patient to the performance of health care services by a health care provider given after the health care provider has informed the patient, to an extent reasonably comprehensible to general lay understanding, of the nature of the proposed procedure or treatment and of the risks and alternatives to treatment or diagnosis which a reasonable patient would consider material to the decision whether or not to undergo the treatment or diagnosis.

18 Del. C. § 6801(6); *see also* 18 Del. C. § 6852 (outlining requirements of an informed consent claim). Informed consent claims in Delaware sound in negligence, not battery. *Brzoska,* 668 A.2d at 1365–66 (noting that informed consent is statutorily defined in the Health Care Act, 18 Del. C. § 6801(6), and is thus a negligence action unless a physician "obtains the consent of the patient to perform one procedure and the physician instead performs a substantially different procedure for which consent was not obtained"). Because informed consent claims sound in negligence, plaintiffs who pursue inform consent claims must satisfy section 6853's expert testimony requirement. *See Valentine v. Mark,* No. 2C–12–244, 2004 WL 2419131, at *3 (Del.Super.Ct. Oct.20, 2004) (noting that because the informed consent statute, 19 Del. C. § 6852, is found in the Health Care Act, informed consent claims require medical expert testimony regarding causation); *Patten v. Freedman,* No. 83C–NO–61, 1989 WL 64116, at *3 (Del.Super.Ct. May 18, 1989) ("An action based on lack of informed consent is an action for malpractice, and malpractice is defined by a negligence standard.... In a negligence action, a plaintiff must show that a negligent act by the defendant proximately caused an injury to the plaintiff.").

 **\*10** Dr. Weber's report contains an opinion regarding Defendants' deviation from the standard of care, satisfying the first requirement of section 6853. He states that Plaintiff underwent the procedure "without appropriate informed consent" and that "[i]t was below the standard of care at the time, for the parents to not have been informed by the physicians at the A.I. Dupont hospital that the CP covered stent had not been previously utilized in this fashion in the United States, [and] was not currently being utilized in a clinical protocol for this particular situation." (Weber Report at 2.) Thus, there is a genuine issue of material fact for a jury to consider regarding the standard of care. However, the report does not offer any opinion regarding causation. Accordingly, there is no issue of fact for a jury to determine and Defendants are entitled to summary judgment.[6]

Plaintiff directs our attention to evidence in the record that Plaintiff may need to undergo a catheterization procedure to expand the diameter of the CP stent to accommodate growth. (Doc. No. 18 5–6, 12–14; Doc. No. 19 at 5; Doc. No. 22 at 6.) While Plaintiff may need to have the CP stent re-dilated in the future, the re-dilation procedure was an intended part of the course of treatment. (*See, e.g.,* Doc. No. 18 at 14 (citing Dr. Murdison's testimony stating that "[p]resumably, when patients reach some size, much greater than their current size at the time of deployment, we would anticipate re-dilating the stents") (*quoting* Dep. of Dr. Kenneth Murdison at 51–53).) Accordingly, the issue is one of informed consent, and the focus is whether Plaintiff's parents were told of the need for this future procedure. At this procedural juncture, Plaintiff must "go beyond the pleadings and by h[is] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Celotex,* 477 U.S. at 324 (*quoting* Fed.R.Civ.P. 56(e)); *see also* Fed.R.Civ.P. 56(e)(2) (prohibiting non-moving party from "rely[ing] merely on allegations or denials in its own pleading"). He has not done so. Plaintiff directs us to no portion of the record that would create an issue of material fact regarding the future catheterization. He cites to no testimony or affidavits from his parents stating that they were not told that a subsequent catheterization procedure to expand the CP stent would be necessary. Indeed, he does not attempt to argue that his parents were not informed. In fact, Plaintiff directs us to testimony in the record that suggests that information regarding the need for a follow-up procedure was conveyed to the families of patients who received the CP stent. (Doc. No. 18 at 14 (citing Dr. Murdison's testimony stating that he "would tell [his patients'] families ... that this stent would go in at a size that was appropriate for the patient's size at the time of deployment, but we would require a re-dilation as the patient grew") (*quoting* Dep. of Dr. Kenneth Murdison at 51–53).)

### 4. Increased Risk

**\*11** Plaintiff appears to argue that Defendants' negligence has placed him at an increased risk of harm. Plaintiff asserts that "[h]is claim is about his medical future." (Doc. No. 22 at 6 (emphasis in original); *see also* Doc. No. 18 at 8 n. 6 (discussing increased risk theory); Doc. No. 19 at 5.) The Delaware Supreme Court has recognized the increased risk doctrine; however it has specifically limited the theory to damages. *See* United States v. Anderson, 669 A.2d 73, 78 (Del.1995) (noting that increased risk is "merely one element of damages when negligence has caused harm"). To apply the increased risk doctrine, there must be "a present injury which

has resulted in an increased risk of future harm." *Id.* at 77 (*quoting* Petriello v. Kalman, 215 Conn. 377, 576 A.2d 474, 484 (Conn.1990)). Plaintiff has identified no present injury, and his claim fails on that basis. Plaintiff's claim also fails because his medical expert has not identified any increased risk to which Plaintiff is now subject.

In *Anderson,* a military doctor failed to timely identify the plaintiff's cancer, which increased the chance of recurrence of the cancer from zero to fifteen percent. *Id.* at 75. The United States District Court for the District of Delaware certified to the Delaware Supreme Court the question of whether the plaintiff's increased risk for cancer was recoverable as damages. *Id.* at 74. For purposes of the certified question, it was undisputed that the doctor's negligence had caused plaintiff's cancer to spread, thus creating a present injury, and had also caused an increased risk of recurrence. *Id.* at 74–75. The requirement of causation and of present injury were necessary preconditions in the court's reasoning. As the court explained, "[t]his approach addresses concerns about speculative claims for future harm. The requirement of a preceding physical injury prohibits plaintiffs from claiming that exposure to toxic substances, for instance, has created an increased risk of harm not yet manifested in a physical disease." *Id.* at 77. Plaintiff's case here is analogous to the court's hypothetical. Plaintiff has the CP stent in his body, but there is no present injury.

Moreover, Plaintiff has not offered evidence that he is subject to an increased risk of injury in the future. In the case of *Kern ex rel. Kern v. Alfred I. Dupont Institute of Nemours Foundation,* the Delaware Superior Court explained the level of detail with which plaintiffs must support their increased risk theories. No. 2C–05–001, 2004 WL 2191036, at \*4 (Del.Super.Ct. Jul.30, 2004). After reviewing a number of increased risk cases, including *Anderson,* the court stated:

> [A] common element of the cases presented above is that every plaintiff proffered expert opinion specifically quantifying the increased risk or loss of chance caused by the medical negligence. Here, no expert will state with reasonable probability and precision what the chances were that the surgery would have worked, much less offer any opinion as to the percentage by which Defendant's alleged negligence reduced the chance of success. The percentages are vital because they form the basis for any damages calculation by the jury. Without them, the jury would be left to speculation.

**\*12** *Id.* Assuming a present injury, Plaintiff's increased risk theory still fails because, like the plaintiff in *Kern,* he has

Add.18

not produced any evidence that he is at an increased risk for anything, let alone medical expert testimony that he is a certain percentage more likely to suffer a certain affliction as a result of the CP stent. *See id.* As we noted in *Guinan I,* an unknown future is not a legally cognizable injury. *See* 2009 WL 307019, at *13 (*citing Laskowski v. Wallis,* 205 A.2d 825, 826 (Del.1964); *Deleski v. RaymarkIndus., Inc.,* 819 F.2d 377, 380 (3d Cir.1987)).

**B. Fraud**

Plaintiff alleges that the Medical Defendants engaged in a series of fraudulent conduct in order to achieve their goal of implanting the CP stent in their patients. (*See generally* Doc. No. 19 at 3–5.) Despite the far-ranging nature of Plaintiff's fraud allegations, they are "based on health care or professional services rendered, or which should have been rendered, by a health care provider to a patient" and are therefore subsumed by the Health Care Act.[7] *See* 18 Del. C. § 6801(7). *Cf. Miller v. Spicer,* 822 F.Supp. 158, 171 (D.Del.1993) (noting that claims of breach of implied contract are prohibited by the Health Care Act). Plaintiff cannot proceed with a fraud theory based on health care services rendered when he cannot point to evidence in the record that creates a genuine issue of material fact regarding causation and injury. Accordingly, Defendants are entitled to summary judgment on Plaintiff's fraud claim.[8]

**C. Medical Monitoring**

Defendants request summary judgment on Plaintiff's medical monitoring claim because "there is no expert opinion that the stent is hazardous, that there is an increased risk of a serious latent disease, or that a reasonable physician would prescribe a monitoring program different than the one that would have been prescribed for him and his underlying heart conditions anyway." (Doc. No. 13 at 1.) In Defendants' Reply Brief in support of their Motion, they emphasize that to support a medical monitoring claim, Plaintiff must demonstrate that he needs a medical monitoring regime different from what he would have needed absent implantation of the CP stent. (*See* Doc. No. 27 at 1, 5.) Defendants do not contest the fact that Plaintiff requires monitoring. In fact, as we noted in *Guinan I,* Defendants actually recommended that patients who had CP stents implanted at the A.I. duPont Hospital join a registry and receive regular medical exams. *See* 2009 WL 307019, at *16– 17. Plaintiff is part of that registry and Dr. Samuel S. Gidding, a cardiologist at the A.I. duPont Hospital, regularly examines Plaintiff. (*See* Doc. No. 27, Ex. B ¶¶ 5–10.)

In *Guinan I,* we predicted that the Delaware Supreme Court would recognize a claim for medical monitoring if presented with the record then before us. 2009 WL 307019, at *17 (discussing *Mergenthaler v. Asbestos Corp. of Am.,* 480 A.2d 647, 651 (Del.1984)). Two considerations greatly influenced our prediction. First, the CP stent was a Class III device that was not approved by the FDA when the Medical Defendants implanted it in the plaintiff. *Id.* at *18 (discussing CP stent's status as an unapproved Class III medical device under 21 U.S.C. § 360c(a)(1)(C)). Second and more importantly, Defendants acknowledged that medical monitoring was necessary. *Id.* (noting that Defendants' suggestion that the plaintiff receive medical monitoring was "compelling, if not conclusive, evidence that medical monitoring is appropriate"; citing *Friends for All Children, Inc., v. Lockheed Aircraft Corp.,* 746 F.2d 816, 824 (D.C.Cir.1983), in which defendant's concession that plaintiffs should receive medical monitoring was a basis for the court's decision to recognize a medical monitoring tort). Both of those considerations are present here.

*13 The only noteworthy distinction between Plaintiff and the plaintiff in *Guinan* is that Plaintiff currently receives monitoring treatment from the A.I. duPont Hospital. This difference does not alter our analysis. We agree with Plaintiff that his "right to medical monitoring is not met or limited by his participation in a registry set up by" Defendants. (Doc. No. 18 at 1.) Accordingly, Defendants are not entitled to summary judgment on Plaintiff's medical monitoring claim.

Our determination that Plaintiff's medical monitoring claim survives summary judgment may appear contradictory to our determination that Plaintiff's negligence claims fail because Plaintiff has not identified evidence in the record that creates a genuine issue of material fact that he has suffered any injury caused by Defendants' conduct. Clearly, Plaintiff's medical monitoring claim is "based on health care or professional services rendered" and should thus be held to the requirements of the Health Care Act, including the Act's expert testimony requirement. *See* 18 Del. C. § 6801(7). Dr. Weber does not address Plaintiff's medical monitoring needs in his report. (*See* Weber Report at 2.) Nevertheless, Defendants have conceded the need for medical monitoring. Therefore, there are issues for a finder of fact to determine, such as whether the monitoring that Plaintiff currently receives is appropriate given his medical history.

As discussed above, the Delaware Supreme Court in *Anderson* voiced concern about the potentially speculative nature of increased risk theories of negligence. *See* 669 A.2d at 77. Moreover, the Delaware Superior Court in *Kern* noted that absent medical expert testimony detailing a patient's increased risks in percentages articulated with "reasonable probability and precision," increased risk theories were too speculative to go before a jury. 2004 WL 2191036, at *4. Based upon these concerns and others, we concluded that the granting of Defendants' motion for summary judgment on Plaintiff's negligence claim was appropriate. However, in the context of this case, there is a difference between a medical monitoring tort and an increased risk theory of negligence. Recognizing a medical monitoring claim here is an effective way to balance the speculative nature of future complications that may be caused by the CP stent with the fairness and efficiency goals that have formed the basis for recognition of a medical monitoring tort by courts across the country. *See, e.g., Barnes v. Am. Tobacco Co.,* 161 F.3d 127, 139–40 (3d Cir.1998) (Scirica, J.) (noting that where " 'other sorts of recovery may prove difficult, immediate compensation for medical monitoring needed as a result of exposure' " may be appropriate (quoting *Redland Soccer Club v. Dep't of the Army,* 548 Pa. 178, 696 A.2d 137 (Pa.1997)); *Sutton v. St. Jude Med. S.C., Inc.,* 419 F.3d 568, 575 (6th Cir.2005) ("[T]here is something to be said for disease prevention, as opposed to disease treatment. Waiting for a plaintiff to suffer physical injury before allowing any redress whatsoever is both overly harsh and economically inefficient."); *see also Friends for All Children,* 746 F.2d at 825 (invoking "commonly shared intuitions of normative justice which underlie the common law of tort" as a basis for recognizing a medical monitoring tort). Concerns about speculation are minimized by the fact that the remedy for a medical monitoring claim is "only the quantifiable costs of periodic medical examinations necessary to detect the onset of physical harm."[9] *In re Paoli R.R. Yard PCB Litig.,* 916 F.2d 829, 850 (3d Cir.1990). *Cf. Friends for All Children,* 746 F.2d at 826 (noting that "[i]n the absence of physical symptoms, emotional distress caused by potential risk may ... be thought too speculative to support recovery"). A jury need not attempt to quantify vague probabilities; it only needs to determine the costs of monitoring.

**D. Counts Three, Four, and Five of the Complaint**

*14 In *Conway I,* we dismissed Plaintiff's Assault and Battery Claim (Count III), Strict Liability Claim (Count IV), and Breach of Express and Implied Warranties Claim (Count V) against the Medical Defendants. 2007 WL 560502, at *12–13. We dismiss Counts III, IV, and V against the Institutional Defendants based on the rationale discussed in *Conway I* for dismissing those claims against the Medical Defendants.

**IV. CONCLUSION**

For the foregoing reasons, Defendants' motions for summary judgment will be granted in part and denied in part.

An appropriate Order follows.

*ORDER*

AND NOW, this *5th* day of March, 2009, upon consideration of the Motion of Defendant William I. Norwood, M.D., Ph.D., for Summary Judgment Pursuant to Rule 56 of the Federal Rules of Civil Procedure (Doc. No. 10), the Motion for Partial Summary Judgment to Dismiss the First Cause of Action (Doc. No. 11), the Motion for Partial Summary Judgment to Dismiss Count II of the Complaint Alleging Fraud and Intentional Misrepresentation and Punitive Damages Claim (Doc. No. 12), the Motion of Defendants for Summary Judgment on Medical Monitoring Claim Set Forth in Count VI (Doc. No. 13), and the Institutional Defendants' Motion for Partial Summary Judgment (Doc. No. 14), and all papers submitted in support thereof and in opposition thereto, it is ORDERED as follows:

1. Motion of Defendant William I. Norwood, M.D., Ph.D., for Summary Judgment is GRANTED as to all claims except the claim for medical monitoring;

2. The Motion for Partial Summary Judgment to Dismiss the First Cause of Action is GRANTED;

3. The Motion for Partial Summary Judgment to Dismiss Count II of the Complaint Alleging Fraud and Intentional Misrepresentation and Punitive Damages Claim is GRANTED;

4. The Joint Motion of Defendants for Summary Judgment or Alternatively for Partial Summary Judgment on Medical Monitoring Claim Set Forth in Count VI is DENIED;

5. The Institutional Defendants' Motion for Partial Summary Judgment is GRANTED.

IT IS SO ORDERED.

2009 WL 595602

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 595602

Footnotes

1    For purposes of this opinion, we refer to Mark Hess as "Plaintiff"; A.I. duPont Hospital for Children, the Nemours Foundation, the Nemours Cardiac Center, and the Nemours Delaware Institutional Review Board as the "Institutional Defendants"; and Dr. William Norwood and Dr. John Murphy as the "Medical Defendants." In August 2008, Plaintiff settled with defendants NuMed and Allen Tower. (*See* Doc. No. 8.) In December of 2004, when this lawsuit existed as a class action (*see* discussion *infra* ), the plaintiffs voluntarily dismissed defendants Dr. Kenneth Murdison and John T. Walsh. *See* Voluntary Dismissal of Action Against Less Than All Parties, *Conway v. A.I. duPont Hosp. for Children,* No. 04–4862 (E.D.Pa. Dec.20, 2004).

2    Definitions of medical terms used in this opinion can be found in any one of several readily accessible sources, such as *Stedman's Medical Dictionary* (28th ed.2006) or Medline Plus, http:// www.nlm.nih.gov/medlineplus/mplusdictionary.html.

3    *See also* 21 C.F.R. § 812.36; Ctr. for Devices and Radiological Health, FDA, Guidance on IDE Policies and Procedures 19–20 (1998) *available at* http://www.fda.gov/cdrh/ode/idepolcy.pdf.

4    The medical monitoring claim in the Teague Conway case was voluntarily dismissed. *See* Stipulation to Dismiss Count VI—Medical Monitoring of Plaintiffs' Complaint, *Conway v. A.I. duPont Hosp. for Children,* No. 04–4862 (E.D.Pa. Sept.8, 2008).

5    The Health Care Act lists four exceptions to the expert testimony requirement. *See* 18 Del. C. § 6853(e). Those exceptions are: (1) a "medical negligence review panel has found negligence to have occurred and to have caused the alleged personal injury or death and the opinion of such panel is admitted into evidence"; (2) a foreign object was left in a patient's body; (3) "[a]n explosion or fire originating in a substance used in treatment occurred in the course of treatment"; and (4) "[a] surgical procedure was performed on the wrong patient or the wrong organ, limb or part of the patient's body." *Id.* Plaintiff's claim for medical negligence does not fit into any of these exceptions.

6    We note that a different result might obtain in a jurisdiction where informed consent sounds in battery.

7    We addressed the viability of fraud claims arising from the provision of medical care at length in *Conway II. See* 2009 WL 57016, at *13–16. We determined that fraud claims are subsumed by the Health Care Act's definition of negligence. *See id. at* *15 & n. 24 (noting that New York and New Jersey have similarly limited fraud claims arising from the provision of medical services and citing *Spinosa v. Weinstein,* 168 A.2d 32 (N.Y.App.Div.1991); *Howard v. Univ. of Med. and Dentistry of N.J.,* 172 N.J. 537, 800 A.2d 73, 81–82 (N.J.2002); *Detwiler v. Bristol–Myers Squibb Co.,* 884 F.Supp. 117, 119 (S.D.N.Y.1995)).

8    Defendants also seek summary judgment on Plaintiff's punitive damages claim. (*See* Doc. No. 12 at 11–12.) Punitive damages are generally not available absent compensatory damages. *See, e.g., Franklin Inv. Co. v. Smith,* 383 A.2d 355, 358 (D.C.1978) ("[P]unitive damages may not be awarded where there is no basis for an award of compensatory damages."). Delaware applies this standard. *Pipher v. Burr,* No. 96C–08–011, 1998 WL 110135, at *4 (Del.Super.Ct. Jan.29, 1998) ("[W]here compensatory damages are not available, punitive damages are also not available."). Accordingly, granting Defendants' summary judgment regarding punitive damages is appropriate.

9    In *Guinan I,* we interpreted this language to mean that punitive damages are not available with medical monitoring claims. 2009 WL 307019, at *18 n. 10.

---

**End of Document**                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by Rowe v. E.I. duPont de Nemours and Co., D.N.J., December 23, 2008

2002 WL 1270121

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

Circuit Court of West Virginia.

Jack W. LEACH, et al., Plaintiffs,

v.

E.I. DU PONT DE NEMOURS AND
COMPANY and LUBECK PUBLIC
SERVICE DISTRICT, Defendants.

No. 01-C-608.
|
April 10, 2002.

**Attorneys and Law Firms**

Larry A. Winter (WVSB # 4094), Winter Johnson & Hill PLLC, R. Edison Hill (WVSB # 1734), Harry G. Deitzler (WVSB# 981), Hill, Peterson, Carper, Bee & Deitzler, P.L.L.C., Charleston, Gerald J. Rapien, Robert A. Bilott, Taft, Stettinius & Hollister, LLP, Cincinnati, OH, Counsel for Plaintiffs.

Charles L. Woody, Esq. (WVSB# 4130), Heather Heiskell Jones, Esq. (WVSB # 4913), Paula L. Durst, Esq. (WVSB# 5805), Spilman Thomas & Battle PLLC, Charleston, Laurence F. Janssen, steptoe & johnson, LLP, Los Angeles, CA, Counsel for E.I. du Pont de Nemours and Company.

Richard E. Holtzapfel, Esq. (WVSB# 7723), John R. McGhee Jr., Esq. (WVSB # 5205), Kay Casto & Chaney PLLC, Charleston, Richard A. Hayhurst, Esq., Parkersburg, Counsel for Lubeck Public Service District.

ORDER ON CLASS CERTIFICATION AND RELATED
MOTIONS

HILL, J.

## I. SUMMARY OF RULINGS

**\*1** This matter came before the Court on the following Motions of the parties: 1) Plaintiffs' Motion for Class Certification; 2) Defendant E.I. duPont de Nemours and Company's ("DuPont's") Motion Seeking Relief From Order Setting Class Certification ("DuPont's Relief Motion"); and 3) Plaintiffs' Motion for Judgment on the Pleadings Against DuPont. Based upon the oral argument of the parties during a hearing on all of these Motions on March 22, 2002, along with careful consideration of all of the filings of the parties on each of these issues, including all submitted affidavits, the Court hereby rules as follows: 1) the Court GRANTS Plaintiffs' Motion For Class Certification and hereby CERTIFIES this case to proceed as a class action on behalf of a class of all persons whose drinking water is or has been contaminated with ammonium perfluorooctanoate (a/k/a/ "C-8") attributable to releases from DuPont's Washington Works plant (hereinafter "the Class") with respect to all issues relating to Defendants' underlying liability and Plaintiffs' claims for equitable, injunctive, and declaratory relief, including liability for punitive damages; all damage issues involving any determination of individual harm of the Class members and the amount of any punitive damages are hereby STAYED and RESERVED for later litigation, pursuant to Rule 23 of the West Virginia Rules of Civil Procedure; 2) the Court DENIES DuPont's Relief Motion; and 3) the Court DENIES Plaintiffs' Motion For Judgment on the Pleadings Against DuPont. The undisputed procedural background, undisputed findings of fact, and the Court's conclusions of law supporting each of these rulings is summarized below.

## II. UNDISPUTED PROCEDURAL BACKGROUND

Plaintiffs' filed their Amended Complaint[1] against DuPont and Defendant Lubeck Public Service District ("LPSD") in Kanawha County Circuit Court on August 30, 2001. In their Amended Complaint, Plaintiffs allege that the Defendants are responsible for contamination of Plaintiffs' drinking water and assert claims against Defendants based upon common law torts and violation of West Virginia's consumer protection statutes for which Plaintiffs claim they are entitled to various forms of relief, including medical monitoring, punitive damages, compensatory damages, and equitable/injunctive relief to abate the water contamination. (See Amended Complaint.) Plaintiffs also request in the Amended Complaint that the Court enter an order "that this is an

appropriate action to be prosecuted as a class action pursuant to Rule 23 and finding that Plaintiffs and their counsel are appropriate representatives and appropriate counsel for the Class and that this action shall proceed as a class action on all common issues of law and fact." (*Id.*, at 18.)

On October 1, 2001, DuPont filed a Motion to Dismiss Counts I, II, III, VI, and VII of Plaintiffs' Amended Complaint for failure to state a claim upon which relief can be granted under Civil Rule 12(b)(6). DuPont also filed on that same day a separate Motion to Dismiss Plaintiffs' Amended Complaint for improper venue, pursuant to Civil Rule 12(b)(3). The LPSD also filed on October 1, 2001, a Motion to Dismiss Plaintiffs' Amended Complaint on various grounds, pursuant to Rule 12(b)(6), including the specific argument that Plaintiffs allegedly had failed to state a claim upon which this case could proceed as a class action under Rule 23.

**\*2** On October 15, 2001, DuPont filed a Motion seeking a protective order to stay all discovery in response to the First Set of Requests for Production of Documents that Plaintiffs had served on DuPont and the LPSD when the Amended Complaint was filed. The LPSD joined DuPont's request for a stay of all discovery in a filing dated October 30, 2001, followed by the filing of its own Motion for a protective order on November 16, 2001. Plaintiffs not only filed memoranda opposing the Defendants' requests for protective orders to stay discovery, but also filed on November 26, 2001, their own Motion seeking an order compelling both Defendants to move forward with their discovery obligations. During a hearing on November 28, 2001, Judge Bloom of the Kanawha County Circuit Court granted Defendants' request to transfer this case to Wood County, but did not address any of the other pending Motions. Judge Bloom's ruling was eventually memorialized in an Order entered December 14, 2001, and the case was then transferred to this Court. Soon thereafter, the LPSD filed on December 21, 2001, another Motion to Dismiss this case, this time asserting several additional arguments.

On Friday, January 11, 2002, after the briefing on all of the then-pending Motions was complete, this Court sent a letter to counsel announcing its rulings on each of those Motions. In that letter, the Court stated that it had denied all of the Defendants' Motions to Dismiss and Motions for Protective Orders, and that the Court had granted Plaintiffs' Motion to Compel discovery responses. On January 14, 2002, DuPont filed another Motion to Stay the case, this time arguing that the entire case should be stayed on primary jurisdiction grounds or, alternatively, that a case management order

should be entered requiring Plaintiffs to prove the substantive merits of their claims for medical monitoring relief before any decision is rendered on whether the case can proceed as a class action under Rule 23. During a hearing on February 1, 2002, the Court entered an Order confirming the Court's January 11, 2002, rulings, which denied DuPont's Motions to Dismiss, including DuPont's request for dismissal of Counts II and VI. After DuPont failed to file any additional answer to Counts II or VI of the Amended Complaint within ten days after that ruling, Plaintiffs filed a Motion for Judgment on the Pleadings against DuPont on both Counts II and VI, arguing that DuPont had not complied with Rule 12(a)(3)(A) of the West Virginia Rules of Civil Procedure.

During the hearing on February 1, 2002, the Court denied DuPont's request to stay this case on primary jurisdiction grounds and denied DuPont's request that the Court issue an order requiring Plaintiffs to prove the substantive merits of their medical monitoring claims before considering whether the case can proceed as a class action under Rule 23. The Court's rulings were memorialized in an Order dated February 27, 2002. The Court specifically rejected DuPont's arguments as "frivolous" and held that Plaintiffs are not required to prove the merits of their claims before the Court can consider class certification issues. In response to Plaintiffs' request for the prompt scheduling of a hearing to resolve class certification issues, the Court rejected DuPont's arguments that no such hearing should be held until after DuPont had been given more time to depose each of the Plaintiffs and to prepare experts witnesses. It was noted that, although the case had been pending for over five months, DuPont had not undertaken the discovery that it claimed it needed, nor were any expert opinions necessary to resolve class certification issues. The Court stated that class certification issues could be resolved on the affidavits of the parties without the need for any expert opinions or live testimony from any witness, and instructed Plaintiffs to serve affidavits from each of the Plaintiffs by no later than February 8, 2002.

**\*3** Plaintiffs served their affidavits on Defendants on February 8, 2002. Although Plaintiffs had agreed to make the named Plaintiffs available for depositions before the class certification hearing, pursuant to notices served by DuPont on February 26, 2002, DuPont voluntarily cancelled those depositions after Plaintiffs served their responses to DuPont's interrogatories and document requests on class certification issues on March 11, 2002. Plaintiffs filed their formal Motion for Class Certification, with a supporting Memorandum of Law, on March 13, 2002. Later in the day on March 13,

2002, DuPont filed its Relief Motion in which it argued that Plaintiffs had not yet served a formal Motion for Class Certification, mandating deferral of the class certification hearing. Plaintiffs filed a Memorandum in Opposition to that Motion on March 15, 2002, pointing out that the formal Motion For Class Certification had, in fact, been filed. On March 20, 2002, DuPont filed a Response in Opposition to Plaintiffs' Motion for Class Certification, which was supported by an attached Affidavit of a medical doctor, Dr. Philip S. Guzelian. The LPSD did not file any documents opposing or joining any of the pending Motions. The Court heard oral argument of all the parties on each of the pending Motions during a hearing on March 22, 2002.

## III. FINDINGS OF FACT

Plaintiffs submitted to the Court a lengthy statement of facts. Neither DuPont nor LPSD submitted any statement of facts for the Court to consider. The Court, therefore, finds the following facts in support of its rulings on the Motions at issue:

This case involves claims arising from the alleged contamination of human drinking water supplies with, among other things,[2] a chemical known as ammonium perfluorooctanoate (a/k/a APFO/PFOA/ FC-143/C-8) (Chemical Abstract Services # 3825-26-1) (hereinafter "C-8"). C-8 is a chemical DuPont has used at its Washington Works facility in Wood County, West Virginia (the "Washington Works") since approximately 1951. Historically, DuPont purchased C-8 from the Minnesota Mining and Manufacturing Company ("3M") for use as a raw material in its various fluoropolymer production processes, including the manufacture of Teflon®. C-8-containing wastes from the Washington Works have been discharged into the air, the Ohio River, various landfills, and soils and groundwater at the Washington Works. Although C-8 is identified and regulated as a toxic or hazardous substance in a number of other jurisdictions, none of the environmental discharge permits ever issued to DuPont for its Washington Works by any Federal or State agency have ever contained any limits on DuPont's releases of C-8 into the environment. Consequently, DuPont has released C-8 into the environment from its Washington Works since the early 1950s without any governmental permit limits or restrictions of any kind. Although 3M announced in May of 2000 that it would stop making C-8 after internal studies raised increasing concerns about the biopersistance[3] and toxicity of the chemical,

DuPont continues to use C-8 and recently announced that it would begin to make its own C-8 at a DuPont plant in North Carolina.

*4 Concerns regarding the toxicity of C-8 had surfaced within DuPont's own employees as early as 1954. In response to such concerns, DuPont began its own internal investigation into the toxicity of C-8 that confirmed by at least 1961 that C-8 was toxic in animals and caused observable changes in certain organ functions, resulting in an internal warning being issued by DuPont's Toxicology Section Chief that the chemical "be handled with extreme care." 3M also pursued its own internal studies and confirmed by 1978 that C-8 was being detected in the blood of 3M's "potentially exposed workers." In response, DuPont authorized an internal program to monitor the health of its employees exposed to C-8 at the Washington Works. DuPont was "disturbed" that this new testing revealed that C-8 might be causing "toxic effects" among some of the Washington Works employees. DuPont decided that this new toxicity information would not, however, be disclosed outside the company except "on a need-to-know basis" and that DuPont would not "be informing the appropriate regulatory agencies of this situation."

After 3M disclosed to DuPont the results of additional internal C-8 studies confirming toxicity among rats and monkeys, DuPont's in-house toxicologist recommended even more testing. DuPont also decided that additional, special personal protective equipment needed to be used by DuPont's workers to minimize their exposure to C-8. When the results of the additional testing were reviewed in 1980, DuPont determined that "C-8 is toxic," "people accumulate C-8," and "continued exposure is not tolerable," prompting DuPont to implement additional medical testing of the Washington Works employees, including new, special sampling of the workers' blood for C-8. 3M also commissioned its own internal medical monitoring program among its potentially exposed employees, including special x-rays, lung function tests, blood counts, and blood chemistries, etc. designed to test for and assess the extent of C-8 exposure.

In response to the mounting internal toxicity data on C-8, DuPont's own Director of Employee Relations recommended to management in 1982 that all "available practical steps be taken to reduce this [C-8] exposure because," among other things, "[a]ll employees, not just Teflon® area workers, are exposed" and "[t]here is obviously great potential for current or future exposure of members of the local community from emissions leaving the Plant perimeter." Soon thereafter,

DuPont commenced an internal investigation to determine the extent to which C-8 was escaping from the Washington Works and getting into community water supplies. In that regard, DuPont began an internal investigation into the extent of human exposure to C-8 from drinking Ohio River water, and collected water samples from several private area taps being supplied by the then-immediately-adjacent Lubeck Public Service District ("LPSD") well field and from the Little Hocking, Ohio water supply located across the Ohio River from the Washington Works. The samples, which were sent to DuPont's own Experimental Station Lab ("ESL") in Delaware for analysis, confirmed by March, 1984 that C-8 was present in both the LPSD water supply (as high as 1.5 parts per billion ("ppb")) and in the Little Hocking water supply (as high as 0.6-0.8 ppb). In response, DuPont prepared internal "standby statements" for its employees to use in case the public found out about the C-8 being detected in the local community water supplies and started asking questions.

**\*5** Additional internal testing by DuPont confirmed C-8 in the local community water supply again in 1987, 1988, and in 1989. DuPont assumed that the C-8 being picked up in the water was being caused by leakage from three old, unlined ponds at the Washington Works that DuPont had used for the disposal of thousands of tons of C-8 waste over the years. In response, DuPont removed thousands of tons of C-8 wastes from the ponds in 1988, worked out a deal with Defendant LPSD to purchase the LPSD well field that was immediately adjacent to the Washington Works at the time for approximately $2 million, and helped facilitate the move of the LPSD well field to a new location approximately two miles further down the Ohio River.

In the meantime, Washington Works employees, after becoming aware that C-8 had been picked up in the local community water supply, asked DuPont's own Haskell Laboratory in 1987 to establish "an acceptable level for C-8 in community drinking water." In April, 1991, DuPont's Washington Works, recognizing that the level of C-8 in local community drinking water at that time was "around 2.7 ppb" asked DuPont's Haskell Lab to specifically "consider the actual health effects to residents adjacent to our Washington Works Plant from exposure to C-8" and asked that the company adopt a "Community Exposure Guideline" (CEG) that is "by definition one that we can expect 'lifetime' exposure of community residents without any expected ill effects." By the summer of 1991, DuPont had agreed to an internal CEG for C-8 in water of 1 ppb. Around the same time, DuPont collected additional water samples and confirmed

through analysis at its own ESL that, not only was C-8 still present in the original LPSD well field (now as high as 3.9 ppb) but that C-8 also was in drinking water supplied by the new LPSD well field two miles further down river as high as 2.4 ppb-more than two times higher than the 1 ppb internal safety standard for C-8 in community drinking water that DuPont had just adopted. DuPont again prepared a "Standby Press Release" in case the public found out about the C-8 in the new LPSD wells but apparently never officially released it.

Soon after receiving the new LPSD C-8 results from ESL, DuPont decided to switch to an outside contractor to take all future C-8 water samples for DuPont, and advised the contractor to collect those future samples in glass containers, as opposed to the plastic containers that DuPont had been using. In response to a reminder by the contractor that C-8 has a tendency to adsorb to glass, which could result in the reporting of "lower concentrations [of C-8] than what may actually exist" in the water, DuPont, nevertheless, instructed the outside contractor to go ahead with using the glass containers. A comparison of DuPont's own C-8 sampling results with the new outside contractor's analysis of the same water indicated lower C-8 readings using the new contractor and new sampling procedure. DuPont then decided to keep using an outside contractor and kept using that new sampling procedure for the next 10 years. It was not until August, 2001, after the USEPA and the State of West Virginia's Department of Environmental Protection ("WVDEP") asked DuPont to begin explaining its C-8 sampling procedures, that DuPont switched back to using plastic sampling containers that had a lower potential for adsorbing the C-8. This new sampling methodology is the sampling methodology that was used by DuPont's new contractor-Exygen-to recently reconfirm the presence of C-8 in the Little Hocking, Ohio water supply, this time as high as 7.7-37 ppb.

**\*6** In the years since DuPont first discovered the potential toxicity of C-8 and its potential impact on its workers, DuPont has provided special medical testing for employees who DuPont believes to have had the potential for exposure to any C-8 on the job. Such special medical testing programs were provided for DuPont's Washington Works employees beginning as early as 1979, with the special medical testing being conducted as frequently as on an annual basis. When DuPont began sending its C-8 wastes from the Washington Works to DuPont's Chambers Works facility in New Jersey for recovery in 1999, all Chambers Works employees who had

"any potential for exposure to C-8" also were provided with special medical testing, including:

"• automated chemistry profile ... SMA-12 (includes HDL, cholesterol, glucose, uric acid, BUN, calcium, phosphorus, total protein, albumin, bilirubin, alkaline phosphatase, LDH, AST (SGOT), total cholesterol, creatinine and ALT (SGPT)

• complete blood count ...

• perflurooctanoic acid (PFOA) in blood ...

• total fluorine in blood."

DuPont even agreed to provide the special medical testing to at least one outside contractor whose employees may have been exposed to C-8 at the Washington Works. DuPont also has provided its employees with potential exposure to C-8 at the workplace with special personal protective equipment, such as gloves, special apparel, and breathing equipment, to try to protect them from exposure to C-8 handled on the job.

DuPont even originally planned to acknowledge its responsibility to provide special medical testing to all members of the local community outside the Washington Works who may have been exposed to drinking water contaminated with any amount of C-8 as recently as the fall of 2000, when DuPont believed that the public would be finding out about the C-8 contamination in their drinking water. It was at that time that plaintiffs' counsel in a case styled *Tennant v. E.I. duPont de Nemours & Co., Inc.,* Case No. CA-6:99-048 (S.D.W.Va.), disclosed to DuPont that they had discovered DuPont's C-8 contamination and began making public filings in court about the problem. DuPont's public relations officials and attorneys coordinated with the LPSD and its attorneys in the co-drafting of an October 31, 2000, letter to be sent on the LPSD's letterhead to all of the LPSD's customers to disclose the existence of the C-8 in the water, while simultaneously assuring everyone that the water was safe. DuPont's public relations staff also drafted another set of approved "standby questions and answers," for its employees to use in responding to any inquiries from the public about the C-8 problem. One of the anticipated questions was: "DuPont monitors employees' blood for PFOA [C-8]. Will DuPont test citizens' blood?" DuPont's "standby" response to the community was:
Yes, as requested by residents of the LPSD area, using established practices; that is, collection at one location and use of the same lab used for analysis of employees' samples.

*7 At the time DuPont prepared this response acknowledging its agreement to provide testing for those who may have been exposed to C-8 in their drinking water, DuPont was claiming that levels of C-8 in the LPSD water system were as low as 0.1 ppb-below the 1 ppb CEG that DuPont has internally adopted and reaffirmed as recently as November of 2001, as the "safe level" for C-8 in community drinking water. DuPont also has acknowledged that "DuPont Washington Works is responsible for the presence of PFOA [C-8] in the [LPSD] wells."

As of today's date, there are thousands of individuals who have been exposed to drinking water contaminated with C-8 from DuPont's Washington Works. As indicated above, C-8 has been detected and confirmed to be present in at least the water supplied by both the LPSD, which currently serves several thousand customers, and in the Little Hocking, Ohio water supply, which currently serves over 12,000 customers. DuPont's own records indicate that C-8 was first detected in these public water supplies by at least 1984, indicating that potentially there are thousands of additional former customers of the LPSD and the Little Hocking, Ohio water supply that also were exposed to C-8 in their drinking water. Based upon the documents produced to date by DuPont, "high C-8" levels also have been confirmed in at least one private residential water well adjacent to the Washington Works, and C-8 has been confirmed in the water supply of the General Electric Plastics plant adjacent to the Washington Works. C-8 also has been present for years in the water supply of the Washington Works itself, which employs "approximately 2,300 persons." The levels of C-8 in the Washington Works drinking water have been as high as at least 3.3 ppb.

Under a November, 2001 Consent Order entered between DuPont and the State of West Virginia (the "Consent Order"), DuPont is working with WVDEP and the West Virginia Department of Health and Human Resources to determine whether additional water supplies have been contaminated with C-8. These efforts confirmed as recently as March 2, 2002, that C-8 now also has been detected in the water supplies for Belpre, Ohio, which serves "about 7,000 people," and in the Tuppers Plains-Chester Water District in Ohio. WVDEP already confirmed, as recently as January 15, 2002, that the levels of C-8 in the human drinking water supplies "presented possible health risks to the public" and that such C-8 "has been linked to possible health problems related to long-term exposure."

During the March 22, 2002, hearing, counsel for Plaintiffs submitted to the Court a copy of a Consent Order entered between DuPont and the United States Environmental Protection Agency (Regions 3 and 5) on March 7, 2002. Under the Consent Order, DuPont has agreed to provide "a temporary alternate drinking water supply for users of any private drinking water well and PWS [public water system] in West Virginia or Ohio where such [validated sampling] results show the level of C-8 exceeds 14[ppb]." There is no requirement in the Consent Order that the impacted water supplies be used for any particular length of time, that any specified quantities of such water first be consumed, or that the precise geographic boundaries of the potentially-impacted water supplies be determined before DuPont is required to provide the alternate drinking water under the Consent Order.

**\*8** The Amended Complaint and the undisputed Affidavits of the Plaintiffs establish that each of the named Plaintiffs are individuals who are using or have used one or more of the water supplies identified above that are or have been contaminated with C-8. These individuals include persons who currently own real property with the contaminated drinking water.

## IV. CONCLUSIONS OF LAW

A. *Plaintiffs' Motion For Class Certification is Granted.*

It is well-settled in West Virginia that, as long as the prerequisites to class certification set forth in Rule 23 are met, a case should be allowed to proceed on behalf of the class proposed by a plaintiff. *See* W. Va. R. Civ. P. 23; *Mitchem v. Melton,* 167 W. Va. 21, 277 S.E.2d 895, 899 (1981) ( "If the requirements of Rule 23 are met, then the Class should be allowed."); *Evans v. Huntington Pub. Co.,* 163 W. Va. 222, 283 S.E.2d 854, 855 (1981). Under Rule 23, the only prerequisites to certifying a case to proceed on behalf of a class are: (1) that the class is so numerous that joinder of all members is impractical (the "numerosity" requirement); (2) that there are questions of law or fact common to the class (the "commonality" requirement); (3) that the claims or defenses of the represented parties are typical of those of the class (the "typicality" requirement); (4) that the represented parties will fairly and adequately protect the interest of the class (the "adequacy" requirement); and that at least one of the three potential bases for seeking class relief set forth in Rule 23(b) exists. *See* W. Va. R. Civ. 23(a), (b). If appropriate, the Court may allow the action to be brought or maintained as a class action with respect to only particular issues or

may allow the class to be divided into subclasses. *Id.* at Rule 23(c)(4). In this regard, the Court has the discretion to enter whatever order it feels will best provide for the orderly conduct and management of issues to be handled in a class action proceeding under Rule 23, including entry of an order reserving any "unmanageable" issues for litigation at a later time. *See* W. Va. R. Civ. P. 16, 23(d); *Gasperoni v. Metabolife Int'l., Inc.,* 2000 WL 33365948, slip. op. at \*4 (E.D.Mich. Sept. 27, 2000) (citing *In re Diet Drugs Prod. Liab. Litig.,* 2000 WL 1222042 (E.D.Pa. Aug. 28, 2000)).

Although the Court is required to perform a "rigorous analysis" in determining whether the prerequisites to class certification exist under Rule 23, *see, e.g., General Tel. Co. v. Falcon,* 457 U.S. 147, 160 (1982), the Court also recognizes that "[t]he recent trend in class certification decisions is to interpret Rule 23 flexibly and give it a liberal construction." *Black v. Rhone-Poulenc, Inc.,* 173 F.R.D. 156, 169 (S.D.W.Va.1996). In performing such a rigorous analysis, a court should not focus on whether a plaintiff will prevail on the actual merits of any substantive aspect of the plaintiff's claims, but should focus, instead, only on whether the procedural requirements of Rule 23 are met. *See Eisen v. Carlisle and Jacequelin,* 417 U.S.156, 177 (1974) ( "nothing in either the language or history of Rule 23 ... gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action"); *Burks v. Wymer,* 172 W. Va. 478, 486, 307 S.E.2d 647, 653 (1983). Allowing any inquiry into the merits of any of the plaintiff's substantive claims during a Rule 23 class certification inquiry would effectively deprive the plaintiff of the right to trial by jury on the claims. *See Guar. Ins. Agency Co. v. Mid-Continental Realty Corp.,* 57 F.R.D. 555, 564 (D.C.Ill.1972). This point was confirmed by this Court in its February 27, 2002, Order. Moreover, the West Virginia Supreme Court of Appeals has recognized "as have other state courts, that the failure to permit the maintenance of a class action by a trial court can have grave procedural consequences to the parties who are denied class participation as if a final judgment has been rendered against them on the merits." *Mitchem,* 277 S.E.2d at 901. Thus, any question as to whether the case should proceed as a class in a doubtful case should be resolved in favor of allowing class certification. *See, e.g., Esplin v. Hirschi* 402 F.2d 94, 101 (10th Cir.1968), *cert. denied,* 394 U.S. 928 (1969)("[t]he interests of justice require that in a doubtful case ... any error, if there is to be one, should be committed in favor of allowing the class action."); *Gasperoni,* slip. op. at \*8.

1. *Certification of the Class is appropriate under Rule 23(a).*

   a. *The proposed Class satisfies the "numerosity" requirement of Rule 23(a)(1).*

**\*9**  The proposed Class, which includes the thousands of individuals whose drinking water has been contaminated with C-8, satisfies the "numerosity" requirement of Rule 23(a)(1). Contrary to DuPont's arguments, it is well-settled that Plaintiffs are not required to establish the exact number of individuals falling within the definition of the proposed Class, as long as there is adequate evidence that the number of potential class members is "large" enough to make joinder of all the potential class members impractical. *See, e.g., Olden v. LaFarge Corp.,* Case No. 99-10176-BC, slip. op., at 23 (E.D.Mich. Oct. 24, 2001) (citing *In re Cons.Power Co. Secur. Litig.,* 105 F.R.D.583, 601 (E.D.Mich.1985) ("Where the exact size of the class in unknown, but general knowledge and common sense indicate that it is large, the numerosity requirement is satisfied." *Orantes-Hernandez v. Smith,* 541 F.Supp. 351, 370 (C.D.Cal.1982)).) Although courts generally have found the "numerosity" requirement satisfied when the proposed class consists of as few as 40 or more members,[4] it is commonly accepted that a proposed class consisting of thousands of members is more than sufficient to satisfy the "numerosity" requirement of Rule 23(a)(1). *See, e.g., State ex rel Miller v. Sencindiver,* 170 W. Va. 288, 294 S.E.2d 90, 93 (1982) (numerosity satisfied with allegations of 1,135 class members); *Mitchem,* 277 S.E.2d at 902 (numerosity satisfied with several thousand members of a proposed class of prisoners).

In this case, it is undisputed that there are many thousands of potential Class members, rendering it impractical to join all the class members. As described in the undisputed facts set forth in Plaintiffs' Motion for Class Certification, C-8 is currently present in at least the water supplied by the LPSD, the Little Hocking Water Association, the City of Belpre, and the Tuppers Plains-Chester Water District, all of which collectively serve thousands of customers. C-8 also is present in the drinking water at the Washington Works, which provides water to thousands of people, and in the drinking water at the adjacent General Electric Plastics plant. It is, therefore, undisputed that there are many thousands of members of the Class proposed by Plaintiffs, which is more than sufficient to satisfy the "numerosity" requirement of Rule 23(a)(1). In addition, DuPont's agreement under its recent Consent Order with the USEPA to provide alternate water to a class of all users of any private drinking water well or public water system anywhere in Ohio or West Virginia where C-8 levels are above a certain level undermines DuPont's argument that it is impossible to deal with a class that is not limited by precise geographic limits, duration of time of exposure, or quantity of water consumed.

   b. *The proposed Class satisfies the "commonality" requirement of Rule 23(a)(2).*

The "commonality" requirement of Rule 23(a)(2) also is satisfied with respect to the Class proposed by Plaintiffs. All that is necessary to satisfy the "commonality" requirement is that "there are questions of law or fact common to the class." W. Va. Civ. P. 23(a)(2). "[T]he existence of significant common, legal, or factual issues is enough to satisfy Rule 23(a)(2)'s threshold commonality requirement." *Boggs v. Divested Atomic Corp.,* 141 F .R.D. 58, 64 (S.D.Ohio 1991). "A common nucleus of operative fact is usually enough to satisfy the commonality requirement." *Rosario v. Livaditis,* 963 F.2d 1013, 1017-18 (7th Cir.1992). *See also In re School Asbestos Litig.,* 789 F.2d 996, 1010 (5th Cir.1986) (the "threshold of commonality is not high"); *Jenkins v. Raymark Indus., Inc.,* 782 F.2d 468, 472 (5th Cir.1986) ("threshold of 'commonality' is not high," it "requires only that resolution of common questions affect all or a substantial number of the class members"). "Not every issue in the case must be common to all class members." *O'Connor v. Boeing North Amer., Inc.,* 184 F.R.D. at 311, 329 (C.D.Cal.1998). "The simple question is whether there are issues common to all class members." *Yslava v. Hughes Aircraft & Co.,* 845 F.Supp. 705, 712 (D.Ark.1993).

**\*10**  In this case, DuPont previously argued to this Court that there are certain key, underlying common issues relating to the "potential toxicity and environmental impact of [C-8] ... and the potential exposure of nearby residents to C-8" that are so pervasive and fundamental to resolution of all of the claims of all of the parties in this case that the entire case should be stayed until there has been a "resolution" of such common issues by State administrative agencies. (*See* DuPont's Memorandum of Law in Support of Motion to Stay or, Alternatively, for Entry of Case Management Order Phasing Discovery, at 1-20.) According to DuPont, all of the claims on behalf of all of the Plaintiffs in this case are nothing more than a single, common "toxic tort" claim that when reduced "to its essence, ... is a 'medical monitoring' case... of a purported class allegedly exposed to a substance." (DuPont's Memorandum of Law in Response to Plaintiffs' Motion to Compel Discovery from Defendants, at 1.) According to DuPont, common issues of "risk of human health and the environment from C-8 exposures or releases"

Add.28

are "central to this lawsuit" and "resolution of the technical issues associated with exposure to and releases of C-8" and all "other such technical and complex issues raised by Plaintiffs' Complaint" are common, fundamental underlying issues affecting resolution of all claims of Plaintiffs and each of the proposed Class members. (*Id.,* at 3, 7, and 13.)

DuPont specifically argued that at least the following common issues affect all of the claims of all Plaintiffs and each proposed Class member in this case: 1) "whether a particular chemical [C-8] poses a risk to human health, and if so, at what doses and through what routes of exposure (*e.g.* ingestion, inhalation, or dermal contact)"; 2) "whether a particular chemical [C-8] has the propensity to accumulate and persist in human populations and the environment"; and 3) "whether a particular chemical [C-8] has been released into the environment at sufficiently high concentrations so as to cause human populations distances away to be exposed above-risk incurring levels." (*Id.,* at 15.) According to DuPont, the jury will have to resolve each of these common issues in order to determine whether any of the Plaintiffs or proposed Class members are entitled to "compensatory damages, medical monitoring, and injunctive relief." (*Id.*) The LPSD has never objected to or in any way disagreed with any of DuPont's arguments in this regard.[5]

After Plaintiffs filed their Motion For Class Certification, DuPont argued that the complexity of various individualized issues involving the individual Class members' medical histories, the individual Class members' lifestyles, individual exposures, and other individualized issues of potential exposure and damages overshadowed all other potentially common issues in this case, precluding any finding of commonality, even though DuPont does not dispute that such common issues exist. In support of this argument, DuPont submitted the Affidavit of Dr. Philip S. Guzelian, a purported medical monitoring "expert" who commented on the nature of the various individualized issues that may arise in this case, particularly with respect to the issue of whether medical monitoring is appropriate for the Class. DuPont did not, however, explain why its previous arguments that common issues relating to the toxicity of C-8 predominated in this case were no longer accurate or should now be ignored. Upon careful consideration of DuPont's arguments and the information submitted through the Affidavit of Dr. Guzelian, the Court is not persuaded that any such individualized issues overshadow the common issues previously identified by DuPont for the Court or that the potential individual differences among the Class members preclude a finding

of commonality in this case. After all, the commonality requirement of Rule 23(a)(2) does not require that the common issues "predominate"-only that they exist. DuPont does not dispute that fundamental common issues exist.

**\*11** The finding of commonality in this case is well-supported in the case law. In cases like this involving claims arising from a chemical release, commonality is readily found, particularly where medical monitoring claims are involved. *See, e.g., O'Connor,* 184 F.R.D. at 331 (commonality exists where key issues relating to defendant's liability and whether the alleged release of chemical placed the medical monitoring class at a potentially increased risk of health problems). *See also Foust v. Southeastern Penn. Transp. Auth.,* 756 A.2d 112, 120-121 (Pa.Commw.Ct.2000) ("While individual issues may arise, including length and extent of exposure, age, gender, medical history, family history, lifestyle, preexisting conditions, intervening factors and the like, these items will be addressed when and if a medical monitoring program is created. Thus, in light of the liberal attitude afforded the grant of class action status, we must affirm the trial court's decision" to certify the class); *Gasperoni,* slip. op. at 120-121; *In re Asbestos School Litig.,* 104 F.R.D. at 422; *In re Three-Mile Island Litig.,* 87 F.R.D. 433 (M.D.Pa.1980); *Yslava,* 845 F.Supp. at 713 (for medical monitoring claims, "proof of an exact or individual amount of exposure or particular risk level is not necessary. The core issues of liability and exposure are common to all class members. Commonality among the members exists notwithstanding certain factual variations."). The Court agrees with these cases that commonality exists in a case like this given common underlying exposure and liability issues, despite potential individualized issues relating to individual damages.

c. *The proposed Class satisfies the "typicality" requirement of Rule 23(a)(3).*

The "typicality" requirement of Rule 23(a)(3) also is satisfied in this case. It is well-settled that the requirements of "commonality" and "typicality" under Rule 23(a) tend to merge in most cases, because both requirements serve as merely guideposts for determining whether the maintenance of a particular class action is economical and whether the plaintiff's claims and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected. *See, e.g., General Telep. Co. v. Falcon,* 457 U.S. 147 (1982); *Olden,* slip. op. at 23 (citing *Rutherford v. City of Cleveland,* 137 F.3d 905 (6th Cir.1998)). A plaintiff's claim is sufficiently "typical," regardless of any factual differences

among the class members, if it "arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory." *Newberg on Class Actions* (3d ed.1992), § 3.15, at 3-78. *See also De La Fuente v. Stokely-Van Camp, Inc.,* 713 F.2d 225, 232 (7th Cir.1983) (the claim of the named plaintiff and the claims of the class at large need only share the "same essential characteristics as the claims of the class at large"). In the assessment of whether the "typicality" requirement of Rule 23(a)(2) is satisfied, the requirement "should be loosely construed ." *Weinberger v. Jackson,* 102 F.R.D. 839, 844 (N.D.Cal.1984).

**\*12** In this case, the claims asserted by the named Plaintiffs are "typical" of the claims of the entire proposed Class. All of the named Plaintiffs' claims arise from the same releases of C-8 into the environment from the Washington Works that give rise to the claim of each of the Class members, and are all based upon the same tortious conduct of the Defendants that gives rise to the named Plaintiffs' claims. (*See* Amended Complaint, at ¶¶ 1-102.) Although the damage claims of individual Plaintiffs may vary to some extent in value, the same actions, practices, and course of conduct by the Defendants that caused the water contamination and torts at issue serves as the basis for all of the proposed Class members' claims. This common factual basis for the Class members' claims, based upon the same underlying legal theories and conduct of the Defendants, is more than sufficient to satisfy the "typicality" requirement of Rule 23(a)(3). *See Olden,* slip. op. at 25 (claims are "typical" where plaintiffs allege chemical emissions as basis for claims, even though "putative class members claims may differ in the amount of damages due to each individual"). Thus, the Court rejects DuPont's argument, as again supported by the Affidavit of Dr. Guzelian, that potential individualized issues, particularly with respect to Plaintiffs' claims for medical monitoring, preclude any finding of typicality.

d. *The proposed Class satisfies the "adequacy" requirement of Rule 23(a)(4).*

The "adequacy" of Rule 23(a)(4) requirement is satisfied as long as the proposed class counsel is qualified, experienced, and generally able to conduct the litigation, and the named class representatives' interests are not shown to be antagonistic to the other class members. *See, e.g., Gasperoni,* slip. op. at \*3; *O'Connor,* 184 F.R.D. at 335; *Olden,* slip. op. at 25. As explained below, the proposed Class counsel is sufficiently qualified to conduct the litigation and the interests

of the named Class representatives are not antagonistic to the other members of the proposed Class.

In this case, neither Defendant has challenged or disputed the adequacy of Plaintiffs' counsel. It is, therefore, undisputed that Plaintiffs' counsel are adequately qualified, experienced, and generally able to conduct litigation on behalf of the proposed Class involving class claims related to C-8 contamination of drinking water.

As indicated in the Affidavits submitted by each of the named Plaintiffs, none of the named Plaintiffs are aware of any interests they would have that are in any way antagonistic to the interests to any of the other members of the proposed Class. As explained above, the claims of each of the named Plaintiffs, are "typical" of the claims of the Class, the merits of which will be determined through resolution of numerous common issues of law and fact. To the extent that any potential conflict may arise between any individual Plaintiff and any member of the proposed Class, the Court retains the discretion to address such potential conflicts later through creation of subclasses or other appropriate case management tools. *See* W. Va. R. Civ. P. 16, 23(c)(4), (d).

2. *Certification of the Class is appropriate under Rule 23(b).*

a. *Certification of the Class is appropriate under Rule 23(b) (1)(A).*

**\*13** Under Rule 23(b)(1) of the West Virginia Rules of Civil Procedure, certification of this case is appropriate to proceed on behalf of the Class if "[t]he prosecution of separate actions by or against individual members of the class would create a risk of ... [i]nconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class." W. Va. R. Civ. P. 23(b)(1)(A). Courts have, therefore, certified cases to proceed on behalf of a class, seeking both monetary damages and medical monitoring, where it is shown that the pursuit of such claims through separate actions could create a risk of inconsistent or varying adjudications for the individual members of the class that could establish incompatible standards or conduct for the defendants. *See, e.g., Boggs,* 141 F.R.D. at 67. Other courts have recognized the appropriateness of certifying a class to proceed pursuant to Rule 12(b)(1)(A), at least with respect to claims for medical monitoring relief. *See, e.g., Burch v. Amer. Home Prod. Corp.,* Civil Action No. 97-C-204 (1-11), slip. op., at 35-38 (Brooke Cty. W. Va. Cir. Ct. Feb. 11, 1999). For

example, in the opinion issued by the Circuit Court of Brooke County, West Virginia, the court noted that:

[T]he issue of defendants' responsibility for financing an equitable medical monitoring fund should be the same for every member of the class. If the plaintiffs and the class members prosecute separate actions for medical monitoring the potential exists for inconsistent or varying adjudications with respect to individual members of the class. The Court FINDS that the potential for inconsistent adjudications would establish incompatible standards of conduct for the defendants both in the decision to create the fund and any particular plaintiffs' entitlement to the benefits of the fund. Several courts have adopted this logic and have certified medical monitoring classes based on Rule 23(b)(1). *See In re Teletronics Pacing Systems, Inc., Accufix Atrial J Leads Products Liability Litigation,* 172 F.R.D. 271, 285 (S.D.Ohio 1997); *Boggs v. Divested Atomic Corp.,* 141 F.R.D. 58, 67 (S.D.Ohio 1991).

The Court is persuaded by these cases and FINDS that the requirements of Rule 23(b)(1)(A) are met. The Court FINDS that the potential for inconsistent adjudications would establish incompatible standards of conduct for the defendants both in the decision to create the fund, the appropriate monitoring to be provided, and the particular requirements for entitlement to the benefits of the fund.

*Burch,* slip. op., at 35-36.

In this case, DuPont already has strenuously argued that the existence of more than one proceeding to consider the common factual and legal issues raised in this case "creates a real danger of inconsistent rulings." (DuPont's Memorandum in Support of Motion to Stay or, Alternatively, For Entry of Case Management Order Phasing Discovery, at 14) According to DuPont, the simultaneous existence of more than one proceeding in which the common "technical issues" regarding the potential toxicity of C-8 and its effect on human health and the environment are addressed "gives rise to a real risk that DuPont could be subjected to inconsistent or even mutually-repugnant determinations." (*Id.*) Thus, DuPont argued to this Court that the claims for which Plaintiffs seek certification under Rule 23 in this case satisfy the conditions for certifying those claims to proceed on behalf of the entire Class, pursuant to Rule 23(b)(1)(A). As of today's date, the LPSD has never objected to or disputed DuPont's characterization of the claims of the Class in this regard. This case is, therefore, appropriately certified under Rule 23(b)(1)(A).

b. *Certification of the Class also is appropriate under Rule 23(b)(2).*

**\*14** Rule 23(b)(2) expressly provides that certification is appropriate when the "party opposing the class has acted or refuses to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." W. Va. R. Civ. P. 23(b)(2). The claims seeking equitable, declaratory, or injunctive relief to force a defendant to abate or cease emissions of chemicals being released from a defendant's operations are the types of claims that are squarely within the boundaries of Rule 23(b)(2). *See, e.g., Olden,* slip. op. at 26 (court certifies class to proceed under Rule 23(b)(2) where plaintiffs seek injunctive relief to order defendant to cease emissions of dust from cement plant). In addition, it is widely-recognized that claims seeking medical monitoring relief on behalf of a class are included within the types of claims that are essentially injunctive and equitable in nature, thereby also falling within the scope of appropriate certification under Rule 23(b)(2). *See, e.g., Gibbs v. E.I. duPont de Nemours & Co., Inc.,* 876 F.Supp. 475, 481 (W.D.N.Y.1995) ("A court-administered fund which goes beyond payment of the cost of monitoring an individual plaintiff's health to establish pooled resources for the early detection of advances in treatment of the disease is injunctive in nature rather than 'predominantly money damages' and therefore is properly certified under Rule 23(b)(2)").[6] The establishment of a court-supervised program through which class members can obtain periodic medical examinations in order to promote early detection of physical harm is recognized as a "paradigmatic request for injunctive relief." *In re Inter-Op Hip Prosthesis Litig.,* 2001 WL 1540546, at 18 (N.D.Ohio Aug. 31, 2001).

Contrary to DuPont's arguments, certification remains appropriate under Rule 23(b)(2), even if claims for monetary damages are included with the plaintiff's claims for equitable or injunctive relief, as long as the overall nature of the case is predominately one for equitable and injunctive relief, as opposed to one seeking exclusively or predominately money damages. *See, e.g., In re School Asbestos Litig.,* 789 F.2d at 1008; *Day,* 851 F.Supp. At 886-87 ("the fact that the Plaintiffs are seeking monetary damages need not disturb our certification under Rule 23(b)(2)"); *Yslava,* 485 F.Supp. at 713 (court confirmed that certification remains appropriate under Rule 23(b)(2) in case where both monetary damages and injunctive relief in the form of medical monitoring is

sought, as along as the claims for monetary relief are not the exclusive or predominate claim); *O'Connor,* 184 F.R.D. at 337 ("Rule 23(b)(2) may include cases seeking monetary damages where such relief is 'merely incidental to their primary claim for injunctive relief' ") (citing *Probe v. State Teachers' Retirement Sys.,* 780 F.2d 776, 780 (9th Cir.1986)); *In re Inter-Op Hip Prosthesis Litig.,* slip. op., at 18 (court certifies case to proceed on behalf of class under Rule 23(b)(2) seeking both damages and medical monitoring where medical monitoring "is more than tangential and is an appropriate element of the redress awarded to the class as a whole.").

  **\*15**  This case also is appropriate for certification under Rule 23(b)(2). Plaintiffs' common claims for equitable, declaratory, and injunctive relief to abate and remediate DuPont's C-8 releases into the environment and Defendants' refusal to do so involve claims where the "party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." W. Va. R. Civ. 23(b)(2). In addition, DuPont has recognized that the law of this State currently authorizes the certification of a class to pursue medical monitoring claims under Rule 23.[7] Moreover, DuPont has vigorously argued to this Court that, regardless of Plaintiffs' assertion of claims seeking monetary damages, the entire case, when reduced "to its essence ... is a 'medical monitoring' case ... of a purported class allegedly exposed to a substance." (DuPont's Memorandum of Law in Response to Plaintiffs' Motion to Compel Discovery from Defendants, at 1.) Thus, DuPont has argued that, regardless of the existence of any claims for monetary damages in this case, Plaintiffs' claims are predominately claims for equitable and/or injunctive relief. The LPSD has never disputed or taken issue with DuPont's position in this regard. Consequently, all of Plaintiffs' claims for relief, including Plaintiffs' claims for medical monitoring and damages, are appropriately certified under either Rule 23(b)(1)(A) or Rule 23(b)(2).

  c. *This case also is appropriate for certification under Rule 23(b)(3).*

Plaintiffs' claims also are appropriately certified under Rule 23(b)(3). Under Rule 23(b)(3), a case may be certified to proceed on behalf of a class if:

The court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient

adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desireability or undesireability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

W. Va. R. Civ. P. 23(b)(3). Thus, certification of a class is appropriate under Rule 23(b)(3), if the Court is persuaded that common issues "predominate" and that handling the claims through a class action is "superior" to other potential methods of adjudicating the claims.

In this case, the Court is persuaded that there are common questions of law or fact that predominate over any individual issues that may arise among the Class members. Despite DuPont's recent arguments that certain individualized exposure and damages issues overshadow all other common issues in this case relating to the toxicity and effects of C-8, the Court agrees with DuPont's earlier argument and the case law cited by Plaintiffs in support that certain allegedly common, underlying issues relating to the potential toxicity of C-8 and its impact on human health and the environment predominate over all other potential issues that may arise in this case. The LPSD has never disputed nor taken any issue with DuPont's arguments in this regard.

  **\*16**  Even if DuPont had not already argued that common issues predominate over individual ones in this case, courts routinely have recognized that tort claims asserted on behalf of a class in connection with widespread environmental contamination or exposure from a common cause ("mass tort claims") traditionally involve basic common issues of the defendant's liability and the common tortious conduct of the defendant that necessarily predominate over any individualized issue of damages that may arise in such cases. For example, in *Sterling v. Velsicol Corp.,* 855 F.2d 1188, 1197 (6th Cir.1988), the Sixth Circuit affirmed class certification under Rule 23(b)(3) for plaintiffs who were injured by water contaminated by chemicals released from a chemical company's landfill, stating that:

In mass tort accidents, the factual and legal issues of a defendant's liability do not differ dramatically from one plaintiff to the next. No matter how individualized the issue of damages may be, these issues may be reserved for individual treatment with the question of liability tried as

a class action. Consequently, the mere fact that questions peculiar to each individual member of the class remain after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible.... [W]here the defendant's liability can be determined on a class-wide basis because the cause of a disaster is a single course of conduct which is identical for each of the plaintiffs, a class action may be the best suited vehicle to resolve such a controversy.

*See also Gasperoni,* slip. op., at *7 (class certified with respect to claims arising from exposure to diet drugs because common issues relating to liability of defendant and nature of claimed relief, including medical monitoring, predominated over any individual issues between class members); *Yslava, 845 F.Supp. at 713* (certifying case involving claims for monetary damages and medical monitoring "because the class involves questions of law and fact that predominate over any individual issues"); *In re School Asbestos Litig., 789 F.2d at 1010* (certifying class for claims related to asbestos damages under Rule 23(b)(3)); *O'Connor, 184 F.R.D. at 342* (certifying class for property damage claims arising from water contamination under Rule 23(b)(3)); *Black, 173 F.R.D. at 160; In re Three Mile Island Litig., 87 F.R.D. at 440* (certifying class for claims relating to exposure to nuclear emissions under Rule 23(b)(3) because "common questions or law and fact predominate over questions affecting only individual members. The common issues will relate to defendant's liability"). These courts routinely reject the argument made by DuPont, as supported with the Affidavit of Dr. Guzelian, that mass tort claims necessarily raise too many idiosyncratic variables requiring individualized proof of damages that overwhelm any common issues that otherwise might "predominate." *See, e.g., Bogosian v. Gulf Oil Corp., 561 F.2d 434, 456 (3rd Cir.1997), cert. denied 434 U.S. 1086 (1978)* ("it has been commonly recognized that the necessity for calculation of damages on an individual basis should not preclude class determination when the common issues which determine liability predominate"); *In re Inter-Op Hip Prosthesis Litig.,* slip. op. at 13 ("the Rule [23(b)(3) ] states that common issues need only predominate, not outnumber individual issues."); *In re Diet Drug Litig.,* slip. op. at 41-42; *Burch,* slip. op. at 41; *Olden,* slip. op. at 26-27.

**\*17** Prosecution of this case as a class action also is superior to the other available methods for adjudicating this controversy. As indicated in this Court's Order of February 27, 2002, allowing any of the common claims that predominate in this case to be resolved by governmental agencies outside

of this action would not be a superior method for adjudicating the claims in this case. More specifically, because Plaintiffs and the Class members are not able to obtain any relief from any of the State administrative agencies that may become involved in evaluating issues relating to the potential toxicity of C-8 and its impact on human health and the environment, allowing their claims to be resolved outside the context of this case would not be preferable to allowing the claims of the parties to proceed before this Court. (*See* Order, dated February 27, 2002.)

In addition, courts routinely have recognized that allowing common tort claims to proceed on behalf of a class under Rule 23(b)(3) is far superior to requiring all of the individual class members to pursue their claims through individual litigation, particularly when requests for medical monitoring relief are involved. *See, e.g., In re Three Mile Island Litig., 87 F.R.D. at 440* (court found certification of mass tort class seeking damages and medical monitoring arising from release of radioactive emissions to be superior form of adjudication under Rule 23(b)(3)); *In re Hip-Op Prosthesis Litig.,* slip. op. at 16 (court found class action for medical monitoring relief was "superior" form of adjudication because the "small monetary amount involved for the medical monitoring claim" makes any individual claim for monitoring "prohibitive in the absence of class treatment" (citing *In re Diet Drug Litig.,* slip. op. at 56) (court found class action seeking damages and medical monitoring for diet drug exposure to be superior method of adjudication because "judicial efficiency will be improved through the class mechanism as opposed to re-litigating these same issues in a series of individual cases")); *Burch,* slip. op. at 41 (in mass tort case seeking monetary damages and medical monitoring, "any difficulties in managing this case as a class action pale in comparison to the difficulties in individually trying these cases 1, 2, or even several at a time. As noted above, the utility of Rule 23, properly used, in the mass tort context benefits the plaintiffs and the defendants in the form of lower litigation costs and the court system in a more efficient use of scarce judicial resources."). *See also O'Connor, 184 F.R.D. at 342* (court found class action under Rule 23(b)(3) for water contamination claims to be a superior method of adjudication because class-wide litigation of common issues would reduce litigation costs and promote greater efficiency among the class members).

In this case, adjudicating the claims of the Class through a class action is far superior to the alternative, which would be litigation of each of the many thousands of individuals

claims through separate litigation, which could overwhelm the courts. This is particularly true in this case, when viewed in connection with the four factors that are "pertinent" to an evaluation as to whether a case should proceed as a class under Rule 23(b)(3). First, there is no indication that any individual members of the Class have expressed any interest in individually controlling the prosecution of any separate actions against either defendant in connection with the matters at issue in this case. *See* W. Va. R. Civ. P. 23(b)(3)(A). Second, on a closely-related matter, no evidence was submitted of any other litigation concerning any of the matters at issue in this case that is already commenced by or against any members of the Class, which could present potential difficulty in allowing this case to proceed on behalf of the entire Class. *See id.* at Rule 23(b)(3)(B). Third, no evidence has been submitted of any challenge having been raised to date to the desireability of handling the claims of the Class in this forum. In fact, both Defendants strenuously argued for the transfer of these claims into this particular forum. (*See* Defendants' Motions to Dismiss for Lack of Venue; W. Va. R. Civ. P. 23(b)(3)(C)). Fourth, no evidence has been submitted of any particular difficulties that are likely to be encountered in the management of this case as a Class, given that all of the prerequisites to the proper maintenance of the Class are established under Rule 23. *See id.,* at Rule 23(b)(3)(D). Consequently, the claims of the Class are appropriate for certification under Rule 23(b)(3).

**\*18** Because certification is appropriate under Rule 23(b)(1)(A), Rule 23(b)(2), and Rule 23(b)(3), the Class is hereby CERTIFIED under Rules 23(b)(1)(A) and 23(b)(2). *See, e.g., Yslava,* 845 F.Supp. at 713 ("when class certification is sought in the alternative under 23(b)(2) and (b)(3), the 23(b)(2) class is preferred")(citing *Cook,* 151 F.R.D. at 388; *Bing v. Roadway Express, Inc.,* 485 F.2d 441, 447 (5th Cir.1973).)

3. All individual damages issues requiring individualized proof will be reserved for later *litigation, pursuant to Rule 23(d)*.

As indicated above, all common fact and legal issues relating to the Defendants' underlying liability for all claims in this case, and all fact and legal issues relating to Plaintiffs' claims for equitable, declaratory, and injunctive relief, including medical monitoring, are appropriate for certification under Rule 23. Plaintiffs proposed, however, and neither Defendant disputed that, in order to advance the orderly and efficient resolution of the Class issues and ultimate resolution of this case, matters requiring individualized proof of damages, including each individual class member's specific personal injuries and/or property damage, should be reserved for litigation after resolution of the common Class issues, pursuant to Rule 23(c)(4), (d). W. Va. R. Civ. P. 23(c)(4), (d) ("when appropriate ... an action may be brought or maintained as a class action with respect to particular issues"). This Court recognizes that it also has the authority to enter orders to bifurcate the litigation in this matter, pursuant to Rule 16. Consequently this Court CERTIFIES this case to proceed on behalf of the Class, pursuant to Rule 23, with respect to all underlying liability claims and Plaintiffs' claims for equitable, injunctive, and declaratory relief, including medical monitoring and liability for punitive damages, while all matters relating to proof of the amount of any punitive damages and calculation of individual damages of the individual Class members, including all individual personal injury and property damage are hereby STAYED and RESERVED for litigation after resolution of the Class claims.

### B. *DuPont's Relief Motion Is Denied.*

In its Relief Motion, DuPont argued, in essence, that the Court should delay the class certification hearing because Plaintiffs had not filed any formal written motion setting forth the factual or legal basis for certification of the Class, and because DuPont had not yet had a chance to take the discovery it believed it needed from the named Class representatives. As mentioned above, however, DuPont's Relief Motion was filed the same day Plaintiffs filed their formal written Motion For Class Certification, along with their Memorandum of Law in Support. Plaintiffs' Motion papers actually were filed before DuPont filed its Relief Motion. In addition, it is undisputed that Plaintiffs had agreed to provide the named Plaintiffs for depositions and had provided answers to DuPont's written discovery on class certification issues before the class certification hearing, but DuPont voluntarily cancelled all of those depositions before the hearing. DuPont's Relief Motion is, therefore, baseless, and is hereby DENIED.

### C. *Plaintiffs' Motion For Judgment On The Pleadings Is Denied.*

**\*19** In their Motion for Judgment on the Pleadings Against Dupont, Plaintiffs argued, in essence, that DuPont's failure to specifically deny the allegations set forth in Counts II and VI of Plaintiffs' Amended Complaint within ten days after the Court denied DuPont's Motion to Dismiss those counts was sufficient to support judgement against DuPont on those counts, as a matter of law. Although the Court rejects DuPont's argument that its catch-all denial of all allegations not specifically admitted in paragraph 104 of its original

Add.34

Answer is sufficient to constitute a specific denial of the facts alleged in Counts II and VI, the Court is not persuaded that DuPont has actually admitted the key factual allegations of both Counts II and VI in its pleadings sufficient to support a judgment against DuPont on the pleadings. Plaintiffs' Motion for such a judgment on the pleadings is, therefore, DENIED.

D. *Purpose of Findings of Fact.*

The Findings of Fact set forth herein are made for the purpose of resolving the Motions and are not intended to be final and binding or usurp the function of the jury.

**All Citations**

Not Reported in S.E.2d, 2002 WL 1270121

Footnotes

1    Plaintiffs' filed an Amended Complaint on the same day of their original Complaint simply to correct a typographical error in the name of Defendant E.I. duPont de Nemours and Company.

2    Discovery is still on-going with respect to the nature of the other chemicals that may be in the water supply. At this time, Plaintiffs asked for certification only with respect to their claims involving C-8 water contamination.

3    DuPont has defined "persistent" in this context as referring to the fact that C-8 "remains in the body and is slow to be metabolized or eliminated from the body."

4    *See, e.g., Robidoux v. Celani,* 987 F.2d 931, 936 (2nd Cir.1993).

5    In addition, a review of the claims set forth in Plaintiffs' Amended Complaint confirms that there are many common issues of law or fact at issue in this case. (*See* Plaintiffs' Amended Complaint, at ¶ 49.)

6    *See also, e.g., Burch,* slip. op. at 5-38; *Day v. NLO, Inc .,* 851 F.Supp. 869, 866-87 (S.D.Ohio 1994) (medical monitoring program is "injunctive relief as required by Rule 23(b)(2)"); *Yslava,* 485 F.Supp. at 705; *O'Connor,* 184 F.R.D. at 311; *Cook v. Rockwell Int'l Corp.,* 151 F.R.D. 378-87 (D.Co.1993); *Boggs,* 141 F.R.D. at 67.

7    In response to a question "How is medical monitoring different in West Virginia from most other states?" DuPont stated as recently as November 2001 that:
Based on West Virginia Supreme Court of Appeals rulings, West Virginia allows: class action status, lump-sum cash payments rather than reimbursement of medical monitoring expenses, fear of exposure to harmful elements as a case of action, medical monitoring when testing is not deemed to be medically necessary, and monitoring even when no beneficial treatment is available.

**End of Document**                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

1992 WL 301985

📁 KeyCite Yellow Flag - Negative Treatment
Declined to Follow by Holden v. State, Del.Super., March 1, 1994

1992 WL 301985
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

Superior Court of Delaware, New Castle County.

Raymond McCRACKEN,

Claimant-Appellant,

v.

WILSON BEVERAGE, Employer-Appellee.

C.A. No. 91A-10-004.
|
Submitted: Sept. 16, 1992.
|
Decided: Oct. 15, 1992.

Upon Appeal from Industrial Accident Board. Reversed.

**Attorneys and Law Firms**

Raymond Otlowski, Wilmington, for claimant-appellant.

R. Stokes Nolte, Wilmington, for employer-below, appellee.

OPINION AND ORDER

GOLDSTEIN, Judge.

 **\*1**  Claimant-Appellant, Raymond McCracken (Appellant) has brought this appeal from the Industrial Accident Board's (Board) decision in favor of Employer-Appellee, Wilson Beverage (Employer), a beverage distributor. Claimant was driving an automobile in the course of his sales job with Employer on December 30, 1981, when the vehicle he was driving ran head-on into another automobile. (Tr. at 57-58.) Under the settlement agreement executed among Claimant, Employer, and Maryland Casualty, Employer's insurer (Insurer), dated August 23, 1984 and approved by the Board on September 6, 1984, Claimant received compensation for a 5% permanent partial disability of the neck and a 5% permanent partial disability of the back. Claimant received additional compensation for these identical injuries pursuant to an agreement approved by the Board on

July 11, 1990, for a total sum of $14,040 between the two agreements.

In a petition filed with the Board on December 18, 1990, Claimant sought additional compensation for medical bills which Claimant alleged were connected with the injuries sustained in the same December 30, 1981 accident.[1] On June 13th, 1991, the Board entered a decision denying Claimant's petition for the payment of these medical expenses. Appellant contends that the Board's findings are not supported by substantial evidence.

The function of this Court in reviewing Board decisions is very limited. I am not to substitute my judgment for that of the Board, see Breeding v. Contractors-One-Inc., Del.Supr., 549 A.2d 1102, 1105-06 (1988); Air Mod Corp. v. Newton, Del.Supr., 215 A.2d 434, 438 (1965), but only to determine whether the Board's decision is based on substantial evidence, see DiSabitino Bros., Inc. v. Wortman, Del.Supr., 453 A.2d 102, 105-06 (1982), and free from errors of law, see Chicago Bridge & Iron Co. v. Walker, Del.Supr., 372 A.2d 185, 188 (1977) (citing General Motors Corp. v. Morgan, Del.Super., 286 A.2d 759, 760 (1971)), overruled on other grounds by Duvall v. Charles Connell Roofing, Del.Supr., 564 A.2d 1132 (1989). The Board, not this Court, is vested with authority to resolve questions of fact. See Johnson v. Chrysler Corp., Del.Supr., 213 A.2d 64, 66 (1965).

"The Board is required to set forth the basis upon which it makes its findings." Hughes v. Catalytic, Inc., Del.Super, C.A. No. 91A-04-1, Taylor, J. (April 23, 1992) (ORDER), at 6. In the case at bar, the Board made the following "Findings of Fact and Conclusions of Law":

1) The Board understands Dr. LeRoy's testimony that he has basically been monitoring the claimant's condition. The Board does not accept this to be necessitated by the work accident the claimant had on December 30, 1981.

2) The Board understands the claimant's testimony as to his work accident and the fact that he worked for ten months before he sought medical attention. The Board understands that he has been seeing Dr. LeRoy since December, 1982 and that he has taken certain therapy and feels better after taking therapy. The Board has also considered the before and after photos of the claimant regarding his therapy.

 **\*2**  3) The Board has considered the testimony of Dr. Case and accepts it in that it shows that the medical treatment was,

in fact, a monitoring schedule and has not been necessitated by the work accident of December 30, 1981.

The Board *DENIES* the claimant's petition for payment of additional compensation in the matter of medical expenses for the reason that the Board finds that such expenses were not the result of the industrial accident of December 30, 1989.

(Bd. dec. at 4.) In this appeal, the arguments raised by the parties point to three different understandings of the logic underlying the Board's decision: (1) the treatment was a "monitoring schedule" which is not a compensable medical expense under 19 *Del.C.* § 2322(a); (2) the treatment, though of a compensable nature, was not "reasonable" under 19 *Del.C.* § 2322(a); and (3) the treatment was not related to the disability suffered in Employer's service to which 19 *Del.C.* § 2322(a) applies. The Board's decision does not make it clear whether it relied upon one or all of these considerations (though its language is more closely suited to a finding that the treatment was not related to the accident). Therefore, I shall consider the adequacy of each.

I. A "MONITORING SCHEDULE" IS COMPENSABLE
The Board states in its findings of fact that "[Dr. LeRoy] has basically been monitoring the claimant's condition" and that "the medical treatment was, in fact, a monitoring schedule and has not been necessitated by the work accident of December 30, 1991." (Bd. decision at 4.) Thus, the Board found that the treatment at issue was a "monitoring schedule." One reasonable reading of the Board's decision is that the treatment is not compensable *because* it is a "monitoring schedule." A monitoring schedule is compensable under 19 *Del.C.* § 2322(a) if it is "reasonable" and related to the disability. *See Marion v. Keil's Wholesale Tire,* Del.Super., C.A. No. 84A-MR-12, Balick, J. (Apr. 22, 1986), Letter Op. at 3-4 (holding that palliative care is compensable if it is not unreasonable), *rev'd on other grounds,* Del.Supr., No. 174, 1986, Moore, J. (Oct. 27, 1986) (ORDER) (wherein "the employer concede[d] that [palliative] treatment is a statutorily compensable service").

The Supreme Court's holding in *Keil* has been characterized as stating that "the issue of whether medical services are 'reasonable' under the statute is wholly factual." *Patterson v. Pappen Farms, Inc.,* C.A. No. 90A-AP-3, Balick, J. (Dec. 26, 1990), Letter Op. at 1. Issues which are purely factual are within the exclusive fact-finding purview of the Board, *see Hughes v. Catalytic, Inc., supra,* at 3, and without the proper appellate review of this Court. *See Johnson,* 213 A.2d

at 66. Also, an appellant "cannot circumvent the applicable standard of review by attempting to transform a plainly factual inquiry into a question of law." *General Motors Corp. v. English,* Del.Supr., No. 213, 1991, Moore, J. (Feb. 25, 1992) (ORDER), at 2 (citing *Oakwood Mobile Homes v. Mosley,* Del.Supr., No. 304, 1991, Moore, J. (Feb. 12, 1992)), *aff'g* C.A. No. 90A-10-2, Golstein, J. (May 10, 1991). However, where the text of the Board decision contains evidence that the Board did not reach its decision based exclusively on the facts, but proceeded through an interim step based on a mistaken understanding of the law, this Court is required to correct that understanding, and is properly within its appellate role to do so.

**\*3** Whereas the ten-page Board decision considered by the Supreme Court in *Keil's Wholesale Tire v. Marion,* Del.Supr., No. 174, 1986, Moore, J. (Oct. 27, 1986) (ORDER), "inartfully" suggested that palliative care is not compensable under the statute, its findings of fact made it "clear that the Board's conclusions [were] supported by substantial evidence." *Id.* at 3. *See* Industrial Accident Board decision dated Feb. 14, 1984, *Keil's Wholesale Tire v. Marion,* Del.Supr., No. 174, 1986, Moore, J. (Oct. 27, 1986) (ORDER). I shall consider hereunder whether substantial evidence supports the Board decision under review. But insofar as the Board decision is based on the legal premise that "monitoring services" are not compensable under § 2322(a), it is hereby reversed.

II. EVIDENCE THAT THE MEDICAL SERVICES ARE NOT REASONABLE
Insofar as the Board reached the factual conclusion that the services at issue were not reasonable under 19 *Del.C.* § 2322(a), this Court is only to inquire whether substantial competent evidence supports that conclusion. *See DiSabitino Bros., Inc. v. Wortman,* Del.Supr., 453 A.2d 102, 105-06 (1982); *Keil's Wholesale Tire v. Marion,* Del.Supr., No. 174, 1986, Moore, J. (Oct. 27, 1986) (ORDER), at 3. In the case at bar, the Board heard testimony from Dr. LeRoy, Claimant's treating physician, that Claimant's injuries grew progressively worse over time, (Tr. at 12-14), and that he prescribed physical therapy for Claimant's disability injuries because other medical problems made surgery unadvisable. (Tr. at 18-20.) The Board heard no testimony from Claimant, Dr. LeRoy, or Employer's expert deposition witness, Dr. Jerry L. Case, that the therapy prescribed for Claimant's injuries was unreasonable.

1992 WL 301985

In fact, Dr. Case's testimony on cross-examination bolstered Claimant's claim that Claimant's treatment was reasonable. (Case Dep. at 20 (quoted *infra* at 15).) While Dr. Case did testify that he could not relate Claimant's "difficulties" to the accident, (Case Dep. at 16-17), he nowhere states that the therapy prescribed was unreasonable for Claimant's diagnosed injuries. His testimony essentially disagreed with the diagnosis, as discussed below. But there was no testimony that the treatment was unreasonable. *Cf. Patterson v. Pappen Farms, Inc., supra,* at 1 (Board decision denying reimbursement under § 2322(a) supported by expert testimony that "course of treatment is potentially harmful and unreasonable"); *Hughes v. Catalytic, Inc., supra,* at 4-5 (Board which denied future expenses for chiropractic services heard expert testimony that to continue treatment would be unnecessary). Having reviewed the four-page Board decision herein, and the entire record below, I find that the Board's conclusion that the medical expenses were unreasonable, if any, was not supported by substantial evidence.[2] Therefore, insofar as the Board's decision is based on a finding that Dr. LeRoy's monitoring program and prescribed therapy were not reasonable under § 2322(a), it is hereby reversed.

## III. NO SUBSTANTIAL EVIDENCE SUPPORTS A FINDING THAT THE INJURIES ARE NOT RELATED TO THE ACCIDENT

A. Substantial evidence supports a finding that the injuries are related to the accident.

**\*4** The Board's decision more likely stems from a finding that Claimant's problems or injuries for which the treatment was given were not caused by the automobile accident in December of 1981. Such a finding would depend upon the sufficiency Dr. Case's testimony that he could not relate Claimant's injuries to the 1981 accident. (Tr. at 15-17.)

Claimant's treating physician, Dr. LeRoy, testified that certain physical therapy was required to treat certain other unrelated health problems that Claimant suffered, including heart disease, cardiac arrhythmias, chronic obstructive pulmonary disease, and excessive body weight. (Tr. at 30.) However, Dr. LeRoy stated, the therapy that he prescribed was directed to the neck and low back injuries that he attributed to Claimant's auto accident. (Tr. at 43-44.) Dr. LeRoy noted that one Dr. Bose, a neurosurgeon, had not only confirmed his diagnosis, but had recommended that Claimant undergo spinal surgery. (Tr. at 42.) However, due to Claimant's heart disease, obesity,

and other health problems which contribute to making him a poor candidate for such surgery, and because of the risks involved in the disc surgery itself, Claimant elected not to undergo the operation. (Tr. at 18-19.) Therefore, Dr. LeRoy initiated the treatment program for which compensation under § 2322(a) is sought.

While admitting that Claimant's discomfort is a product of other problems such as osteoarthritis of the cervical spine, (Tr. at 37-38, 44-45), Dr. LeRoy testified that, but for the accident and the injuries suffered therein, Claimant would require neither Dr. LeRoy's care nor the physical therapy he prescribed. (Tr. at 33, 50.) If believed by the Board, this testimony, along with Claimant's testimony, constitutes substantial evidence which would support a Board decision in Claimant's favor. *See Air Mod Corp. v. Newton,* Del.Supr., 215 A.2d 434, 438 (1965).

### B. The Substantial Evidence Standard and Application

Before considering Employer's deposition witness's testimony, I note the existence of a question about what sort of testimony qualifies as substantial evidence that injuries are not related to an accident where a claimant's treating physician has determined with reasonable medical probability that the injuries are related. Where a physician prescribes treatment for an injury under § 2322, it is compensable absent evidence that the treatment is unreasonable:

Our statute gives a claimant the right to employ a physician of his own choosing. 19 Del.C. § 2323. The reason is obvious. It is important that the patient have confidence in his physician. 2 [Arthur] Larson[, Workmen's Compensation Law,] § 61.12(b) [ (1983) ]. It is inconsistent with this provision to deny compensation for treatment prescribed by the physician chosen by the claimant simply because a physician called by the insurer disagrees with it. ... As long as the treating physician's prescription is not unreasonable, it should be compensable.

**\*5** *Marion v. Keil's Wholesale Tire,* Del.Super., C.A. No. 84A-MR-12, Balick, J. (Apr. 22, 1986), Letter Op. at 3, *rev'd on other grounds,* Del.Supr., No. 174, 1986, Moore, J. (Oct. 27, 1986) (ORDER); *see also Patterson v. Pappen Farms, Inc., supra,* at 1; *Hughes v. Catalytic, Inc., supra,* at 4-5; *Reilly v. Supermarkets General Corp., supra,* at 2-3. It may also be inconsistent with § 2323 to deny compensation to the claimant for injuries diagnosed by the treating physician as

being casually related to a job-related accident simply because a physician called by the insurer disagrees that it is related.

The case at bar provides a fine example of the distinction at issue.[3] Where Claimant's treating physician, Dr. LeRoy, found that the 1981 job-related auto accident constituted a but-for cause of Claimant's neck and lower back disabilities, Employer's medical expert has merely stated that he cannot relate the accident to Claimant's current neck and back problems. Dr. Case has not stated that it is unreasonable for Dr. LeRoy to relate the two problems, or that it is medically impossible to do so.

I have noticed no opinions explicitly considering this particular question, and none have been cited by the parties. I find it to be consistent with (1) the cases addressing the evidence required under the reasonability standard of § 2322, *see Patterson v. Pappen Farms, Inc., supra,* at 1; *Hughes v. Catalytic, Inc., supra,* at 4-5; (2) the cases which have held that injuries are not causally related to particular job-related incidents, *see Reilly v. Supermarkets General Corp.,* Del.Super., C.A. No. 82A-OC-7, Martin, J. (Sep. 1, 1983), Letter Op. at 2-3 (Board decision was based on substantial evidence consisting of expert testimony that "it was inconceivable" that one could relate claimant's symptoms to a particular job-related accident); (3) the purposes of 19 Del.C. § 2322,[4] and (4) the purpose of 19 Del.C. § 2323 to hold that mere disagreement with a treating physician's diagnosis that certain injuries are related to a job-related accident is not substantial evidence supporting a denial of compensation for the treatment of such injuries.[5]

The Board is free to accept the testimony of one medical expert over another. *DiSabitino,* 453 A.2d at 106; *General Motors v. Veasey,* Del.Supr., 371 A.2d 1074, 1076 (1977). However, the Board may not base its decision on insubstantial evidence. Here, substantial evidence is that evidence which shows that the treating physician's care is unreasonable. Not only did Employer's expert fail to meet this standard directly, but he also confirmed the reasonableness of Dr. LeRoy's diagnosis. *See* discussion *supra* at 7. Therefore, insofar as the Board's decision is based on a finding that Claimant's injuries are not causally related to the 1981 job-related automobile accident, it is hereby *reversed.*

**C. Under Any Standard, There Was No Substantial Evidence Which Supported The Board's Decision**

**\*6** My decision here need not rest on the holding that substantial evidence in this case must consist of testimony to the effect that it is medically unreasonable or impossible to relate Claimant's accident to the injuries. Even under the less stringent standard that any medical testimony varying from the treating physician's diagnosis constitutes substantial evidence, standard is implicitly propounded by Employer, the Board's decision is not supported by substantial evidence.

Dr. Case examined Claimant twice, once in August of 1983 and once in April of 1990. Based on these examinations, Dr. Case testified that *he* could not relate the lower back and neck injuries to the accident of 1981.[6] But, as Dr. Case revealed on cross, his inability to relate the two ultimately rests on an assumption that the symptoms which formed the basis of Dr. LeRoy's testimony and to which Claimant testified before the Board were falsified:

Q. Doctor, in your April 1990 report, I believe you indicate that *if you would accept the fact that he had continuous symptoms for the majority of the time after his auto accident,* then [*you would not disagree* with Dr. LeRoy's conclusions that he had a five percent permanent impairment of the cervical spine and five percent permanent impairment of the lumbar spine *caused by the auto accident of 1981;* is that correct?

A. Yes.

(Case Dep. at 20 (emphasis added).) If Employer wishes to allege fraud on the part of Claimant and/or Drs. LeRoy and Bose, then Employer may do so. But Dr. Case admitted that "flare ups of good and bad times" were possible for one with Claimant's "type of condition." (Case Dep. at 19.) Dr. Case further admitted that physical therapy would be appropriate treatment for "an acute flare up." (*Id.* at 20.) The fact that Claimant had such symptoms was documented in Dr. LeRoy's records, (Tr. at 6-8, 11, 12, 14), and was further substantiated by the findings of Dr. Bose, (Tr. at 18), Claimant's testimony, (Tr. at 59, 64-65), and the history taken by Dr. Case in 1989, (Case Dep. at 72). If an expert witness chooses to ignore a person's central and medically documented symptoms in reaching his or her opinion without any substantial reason for ignoring such symptoms, the opinion is necessarily insubstantial. Therefore, Dr. Case's diagnosis, which I find is based on the fact that Claimant did not have symptoms on the

two isolated occasions when he was examined by Dr. Case, is insubstantial as a matter of logic and as a matter of law.

Furthermore, the Board's summary of and findings concerning Claimant's testimony indicate that the Board accepted the existence of his symptoms:

The claimant testified that he had been injured while working on December 30, 1981. He stated that he still sees Dr. LeRoy and for the last two years, he has had shooting pains from his low back down his left leg and has neck problems. He stated that he wears a back brace and has had no accidents or injuries since 1981. He stated that since September, 1982, he has had pain everyday. He stated that in 1985, he had done some housepainting. He stated that in 1983, he quit smoking.

*7 ....

The Board understands that [Claimant] has been seeing Dr. LeRoy since December, 1982 and that he has taken certain therapy and feels better after taking therapy.

(Bd. dec. at 3, 4.) The Board was free to reject Dr. LeRoy's opinion and adopt Dr. Case's *if* it found "from the evidence presented *at the hearing* that claimant's subjective complaints are not credible." *Trader v. L.D. Caulk,* Del.Super., C.A. No. 91A-11-003, Lee, J. (June 10, 1992), Mem.Op. at 4 n. 1. Aside from the fact, however, that no substantial evidence was offered to discredit Claimant's complaints, the Board nowhere

indicated that it did not find Claimant credible. Indeed, its decision indicates that the Board did find Claimant's testimony to be credible.

The Board could not accept both Dr. Case's testimony and Claimant's contradictory testimony that he did in fact experience certain symptoms of neck and lower back injury from 1982 through the present, as the two accounts are necessarily inconsistent. Therefore, insofar as the Board decision was based on a finding that Claimant's injuries are not related to the 1981 accident, it is hereby reversed under this independent analysis.

CONCLUSION

FOR ALL of the foregoing reasons, having found each conceivable ground on which the Board decision in this case might rest to be adequate grounds for reversal, I hereby reverse and remand the entire case to the Board for its disposal consistent with the contents of this Order.

IT IS SO ORDERED.

**All Citations**

Not Reported in A.2d, 1992 WL 301985

---

Footnotes

1    Claimant had been seeing Dr. Pierre LeRoy from December 8, 1982 to date. (Tr. at 6, 59-59.) Dr. LeRoy had prescribed physical therapy for Claimant. Dr. Leroy had an outstanding bill of $210. (Tr. at 2.) Also, Claimant had incurred physical therapy bills totalling $1,608.70. (Tr. at 2, 55-56.)

2    While "it is not the function of this [C]ourt to weigh the evidence [and] determine questions of credibility [for the purpose of] making [ultimate] findings and conclusions," *Hughes, supra,* at 3, the Court must make sufficient inquiry to determine whether the evidence presented is substantial. "Substantial evidence is relevant evidence which a reasonable mind might accept as supporting a conclusion; '[i]t is also defined as more than a scintilla but less than a preponderance of the evidence.' " *Hughes, supra,* at 3 (quoting *Breeding v. Contractors-One-Inc., Del.Super.,* 549 A.2d 1102, 1104 (1988)); *see also Olney v. Cooch.,* Del.Super., 425 A.2d 610, 614 (1981).

3    While the issue was not raised by either party, the "substantial evidence" argument which was raised by Claimant requires a preliminary determination as to what constitutes substantial evidence.

4    The purposes of the statute have been discussed previously by this Court:
    Section 2322(a) of Title 19 has a dual legislative purpose: (1) to insure at all times adequate medical assistance to the employee; and (2) to insure the employer against unreasonable charges and fraudulent claims, *McCormick Transp. Co. v. Barone,* Del.Super., 89 A.2d 160 (1952), *aff'd,* Del.Super., 135 A.2d 140 (1957).
    *Willey v. State,* Del.Super., 85A-AP-16, Bifferato, J. (Nov. 26, 1985). *See also Marion v. Keil's Wholesale Tire, supra,* at 3. There have been no allegations of fraudulent claims here. While Employer's case implicitly alleges that Claimant has been faking his symptoms by its use of the results of Hendler Pain Test, (Tr. at 73; Case Dep. at 11), and through Dr. Case's unwillingness to admit that Claimant has, in fact, suffered the symptoms documented throughout his medical

1992 WL 301985

records, (Case Dep. at 20), no substantial evidence of fraud has been introduced, nor has any explicit theory of fraud been alleged. Employer's implicit inferences are not substantial evidence.

5    I note that this holding is entirely consistent with an understanding that the Supreme Court has found the issue of compensability under § 2322 to be entirely one of fact. *See Patterson v. Pappen Farms, Inc., supra,* at 1. The purpose of appellate review, however, is to ensure that the facts on which the Board relies are both relevant and substantial. It is not transforming a question of fact into a question of law, *see General Motors Corp. v. English,* Del.Supr., No. 213, 1991, Moore, J. (Feb. 25, 1992) (ORDER), at 2, *aff'g* C.A. No. 90A-10-2, Goldstein, J. (May 10, 1991), to recognize this tautology.

6    Relevant portions of Dr. Case's direct examination testimony are as follows:

Q. Doctor, did you have an opinion based on reasonable medical certainty as to the relationship of the 1981 automobile accident to his cervical strain?

A. Well, *he may have had a cervical strain initially* but when I had seen him *in August of 1983 his neck was completely normal.* After that time he gradually developed symptoms in the neck which came and went so I don't think you could *necessarily* relate the cervical strain, ongoing cervical symptoms to this accident that occurred way back in December of 1981.

....

Q. The two disc herniations both of the cervical spine and the lumbar spine, did you relate them to the automobile accident of 1981?

A. No, I *can't definitely* relate them. First of all, as I already said [,] the [first] examination was completely normal. He didn't even seek treatment for ten months after the accident and then he's gone for treatment infrequently for many years until recently when he went in for more frequent therapy.

....

Q. Doctor, do you relate any difficulties with Mr. McCracken's extremities to the 1981 automobile accident?

A. No.

(Case Dep. at 14-15, 15-16, 17 (emphasis added).) On cross, Dr. Case admitted that his 1983 report indicated that Claimant "may well have sustained some muscle ligament strain of the neck and low back at the time of his auto accident." (*Id.* at 18.) A careful reading of the deposition testimony and its well-placed qualifications reveals its insubstantial nature.

Significantly, this Court is under no handicap on appeal nor invading the Board's province of assessing the witness's credibility, as this Court on appeal has before it the identical out-of-court deposition testimony that the Board reviewed.

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.