21-3360

IN THE

# United States Court of Appeals

## FOR THE THIRD CIRCUIT

◆◆◆

CATHERINE BAKER, Individually and on behalf of all others similarly situated,

*Plaintiff-Appellant,*

—v.—

CRODA INC., f/k/a Croda, Inc.,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

## JOINT APPENDIX
## VOLUME II OF II
### (Pages Appx13 to Appx342)

KENNETH J. NACHBAR
MIRANDA N. GILBERT
MORRIS NICHOLS ARSHT
   & TUNNELL, LLP
1201 North Market Street, 16th Floor
Wilmington, Delaware 19899
(302) 658-9200

STEPHEN A. SWEDLOW
ATHENA D. DALTON
QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
191 North Wacker Drive, Suite 2700
Chicago, Illinois 60606
(312) 705-7400

*Attorneys for Defendant-Appellee*

ADAM J. GOMEZ
KELLY L. TUCKER
GRANT & EISENHOFER P.A.
123 Justison Street
Wilmington, Delaware 19801
(302) 622-7000

*Attorneys for Plaintiff-Appellant*

# TABLE OF CONTENTS

PAGE

**Volume I of II**
**(Bound with Appellant's Brief)**

District Court's Memorandum Opinion, dated November 23, 2021 . . . . . Appx1

District Court's Order Granting Motion to Dismiss the Complaint,
    dated November 23, 2021 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Appx7

Plaintiff's Notice of Appeal, dated December 22, 2021 . . . . . . . . . . . . . . . Appx8

Notice of Intent to Stand on the Complaint with Final Order,
    filed February 18, 2022 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Appx10

**Volume II of II**

U.S. District Court for the District of Delaware Docket Entries
    for the Case No. 1:20-cv-01108-SB . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Appx13

Class Action Complaint, dated August 24, 2020 . . . . . . . . . . . . . . . . . . . . . Appx22

Civil Cover Sheet to Complaint, dated August 24, 2020 . . . . . . . . . . . . . . Appx50

Stipulation and [Proposed] Order Extending Time
    for Defendant to Answer Complaint, filed September 2, 2020 . . . . Appx51

Defendant's Motion to Dismiss Plaintiff's Complaint,
    dated October 13, 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Appx53

Opening Brief in Support of Croda Inc.'s Motion to Dismiss,
    dated October 13, 2020 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Appx54

Declaration of Christina Manuelli in Support of Croda Inc.'s Motion
    to Dismiss for Lack of Subject Matter Jurisdiction Pursuant
    to Rule 12(B)(1), dated October 13, 2020 . . . . . . . . . . . . . . . . . . . . . . . Appx80

ii

PAGE

Exhibit 1 to Manuelli Declaration —
Certificate from Delaware Secretary of State regarding
Certificates on file for Croda Inc................................. Appx82

Exhibit 2 to Manuelli Declaration —
Certificate of Good Standing from the Delaware
Secretary of State for Croda Inc................................. Appx116

Stipulation and [Proposed] Order Extending Time
for Plaintiff to Respond to Defendant's Motion
to Dismiss, filed October 26, 2020............................. Appx118

Plaintiff's Response Brief in Opposition to Defendant's Motion
to Dismiss Plaintiff's Class Action Complaint,
dated November 17, 2020 ....................................... Appx120

Stipulation and [Proposed] Order Extending Time
for Defendant to File Reply in Support of its Motion to Dismiss,
filed November 17, 2020........................................ Appx149

So Ordered Stipulation to Extend Time for Defendant
to File Reply in Support of its Motion to Dismiss,
dated November 18, 2020 ....................................... Appx152

Reply Brief in Support of Croda Inc.'s Motion to Dismiss,
dated December 9, 2020......................................... Appx153

Plaintiff's Motion for Leave to File Surreply
in Further Opposition to Defendant's Motion to Dismiss,
dated December 16, 2020 ....................................... Appx168

Attachment to Motion for Leave —
[Proposed] Order, filed December 16, 2020 .................... Appx171

Exhibit 1 to Motion for Leave —
Plaintiff's [Proposed] Surreply in Opposition to Defendant's
Motion to Dismiss Plaintiff's Class Action Complaint,
dated December 16, 2020 ....................................... Appx172

iii

PAGE

Exhibit 2 to Motion for Leave —
Statement Pursuant to Local Rule 7.1.1,
dated December 16, 2020 .................................... Appx194

Opposition to Plaintiff's Motion for Leave to File Sur-Reply,
dated December 30, 2020 .................................... Appx195

Transcript of Proceedings, dated August 5, 2021.................... Appx200

Letter from Kenneth J. Nachbar to the Honorable Maryellen Noreika,
dated August 12, 2021 ....................................... Appx222

Exhibit A to Nachbar Letter —
Census Tract 154, New Castle, DE ........................... Appx226

Exhibit B to Nachbar Letter —
Census Tract 15502, New Castle, DE ......................... Appx232

Exhibit C to Nachbar Letter —
Census Tract 158.02, New Castle, DE......................... Appx238

Exhibit D to Nachbar Letter —
Census Report, New Castle County, DE....................... Appx244

Exhibit E to Nachbar Letter —
U.S. Census Tracks Migration Patterns ....................... Appx251

Oral Order Denying Defendant's Motion to Dismiss,
dated August 13, 2021 ....................................... Appx256

Defendant's Renewed Motion to Dismiss Plaintiff's Complaint,
dated August 27, 2021 ....................................... Appx257

Croda Inc.'s Renewed Motion to Dismiss, dated August 27, 2021.... Appx258

Stipulation and [Proposed] Order Setting Briefing Schedule
in Connection with Defendant's Renewed Motion to Dismiss,
filed September 2, 2021....................................... Appx284

iv

PAGE

So Ordered Stipulation Setting Briefing Schedule in Connection
    with Defendant's Renewed Motion to Dismiss,
        dated September 3, 2021 ...................................... Appx286

Oral Order Referring Case to Magistrate Judge Christopher J. Burke,
        dated September 21, 2021 ..................................... Appx287

Answering Brief in Opposition to Defendant's Renewed Motion
    to Dismiss, dated October 1, 2021 ........................... Appx288

Designation of Circuit Judge to Hold a District Court Within
    the Circuit, dated October 1, 2021 ........................... Appx318

Stipulation and [Proposed] Order Staying Discovery,
        filed October 20, 2021 ....................................... Appx319

Reply Brief in Support of Croda Inc.'s Renewed Motion to Dismiss,
        dated October 22, 2021 ...................................... Appx321

Defendant's Application for Oral Argument,
        dated October 25, 2021 ...................................... Appx336

Stipulation and Order Staying Discovery,
        dated October 27, 2021 ...................................... Appx337

Plaintiff's Application for Oral Argument,
        dated October 28, 2021 ...................................... Appx339

Plaintiff's Notice of Intent to Stand on the Complaint,
        dated February 17, 2022 ..................................... Appx340

        Attachment to Notice of Intent—
        [Proposed] Final Order, filed February 17, 2022 ................ Appx342

CLOSED,APPEAL

# U.S. District Court
## District of Delaware (Wilmington)
## CIVIL DOCKET FOR CASE #: 1:20-cv-01108-SB

Baker v. Croda Inc.                                    Date Filed: 08/24/2020
Assigned to: Judge Stephanos Bibas                     Date Terminated: 02/18/2022
Case in other court: Third Circuit, 21-03360           Jury Demand: Plaintiff
Cause: 28:1331 Fed. Question: Personal Injury          Nature of Suit: 360 P.I.: Other
                                                       Jurisdiction: Federal Question

### Plaintiff

**Catherine Baker**                    represented by   **Kimberly Ann Evans**
*Individually and on behalf of all others*             Grant & Eisenhofer, P.A.
*similarly situated*                                   123 Justison Street
                                                       Wilmington, DE 19801
                                                       (302) 622-7086
                                                       Email: kevans@gelaw.com
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Kyle John McGee**
                                                       Grant & Eisenhofer, P.A.
                                                       123 Justison Street
                                                       Wilmington, DE 19801
                                                       302-622-7126
                                                       Email: kmcgee@gelaw.com
                                                       *TERMINATED: 12/15/2020*
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Frank M. Petosa**
                                                       Email: fpetosa@ForThePeople.com
                                                       *PRO HAC VICE*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Kelly L Tucker**
                                                       Grant & Eisenhofer PA
                                                       123 Justison St.
                                                       Wilmington, DE 19801
                                                       302-622-7000
                                                       Email: ktucker@gelaw.com
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Marcio W. Valladares**
                                                       Email: mvalladares@forthepeople.com
                                                       *PRO HAC VICE*
                                                       *ATTORNEY TO BE NOTICED*

**Michael Ram**
Email: mram@forthepeople.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rene F. Rocha**
Email: rrocha@ForThePeople.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**T. Michael Morgan**
Email: mmorgan@ForThePeople.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**<u>Defendant</u>**

**Croda Inc.**
*formerly known as*
Croda, Inc.

represented by **Kenneth J. Nachbar**
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 351-9294
Fax: (302) 425-3013
Email: knachbar@mnat.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Miranda N. Gilbert**
Morris Nichols Arsht and Tunnell LLP
1201 North Market Street
Wilmington, DE 19801
302-658-9200
Fax: 302-658-3989
Email: mgilbert@morrisnichols.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Zi-Xiang Shen**
Delaware Department of Justice
820 N. French St., 6th Floor
19801
Wilmington, DE 19801
302-577-8400
Email: Zi-Xiang.Shen@delaware.gov
*TERMINATED: 04/15/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Athena D. Dalton**
Email: athenadalton@quinnemanuel.com

PRO HAC VICE
ATTORNEY TO BE NOTICED

**Stephen A. Swedlow**
Email:
stephenswedlow@quinnemanuel.com
PRO HAC VICE
ATTORNEY TO BE NOTICED

| Date Filed | # | Docket Text |
|---|---|---|
| 08/24/2020 | 1 | COMPLAINT filed with Jury Demand against Croda Inc. - Magistrate Consent Notice to Pltf. ( Filing fee $ 400, receipt number ADEDC-3149606.) - filed by Catherine Baker. (Attachments: # 1 Civil Cover Sheet)(sam) (Entered: 08/24/2020) |
| 08/24/2020 | 2 | Notice, Consent and Referral forms re: U.S. Magistrate Judge jurisdiction. (sam) (Entered: 08/24/2020) |
| 08/24/2020 | | No Summons Issued. (sam) (Entered: 08/24/2020) |
| 08/25/2020 | 3 | SUMMONS Returned Executed by Catherine Baker. Croda Inc. served on 8/25/2020, answer due 9/15/2020. (McGee, Kyle) (Entered: 08/25/2020) |
| 08/26/2020 | | Case Assigned to Judge Maryellen Noreika. Please include the initials of the Judge (MN) after the case number on all documents filed. (rjb) (Entered: 08/26/2020) |
| 09/02/2020 | 4 | STIPULATION TO EXTEND TIME time for Defendant to Answer Complaint to October 13, 2020 - filed by Croda Inc.. (Nachbar, Kenneth) (Entered: 09/02/2020) |
| 09/02/2020 | | SO ORDERED re 4 STIPULATION TO EXTEND TIME for Defendant to answer, move, otherwise plead in response to the Complaint to October 13, 2020 (Set/Reset Answer Deadlines: Croda Inc. answer due 10/13/2020). ORDERED by Judge Maryellen Noreika on 9/2/2020. (dlw) (Entered: 09/02/2020) |
| 09/18/2020 | 5 | MOTION for Pro Hac Vice Appearance of Attorney Stephen Swedlow and Athena Dalton - filed by Croda Inc.. (Shen, Zi-Xiang) (Entered: 09/18/2020) |
| 09/18/2020 | | SO ORDERED re 5 MOTION for Pro Hac Vice Appearance of Attorney Stephen Swedlow and Athena Dalton filed by Croda Inc. ORDERED by Judge Maryellen Noreika on 9/18/2020. (dlw) (Entered: 09/18/2020) |
| 09/18/2020 | 6 | MOTION for Pro Hac Vice Appearance of Attorney Marcio W. Valladares and Michael F. Ram - filed by Catherine Baker. (McGee, Kyle) (Entered: 09/18/2020) |
| 09/18/2020 | | SO ORDERED re 6 MOTION for Pro Hac Vice Appearance of Attorney Marcio W. Valladares and Michael F. Ram filed by Catherine Baker. ORDERED by Judge Maryellen Noreika on 9/18/2020. (dlw) (Entered: 09/18/2020) |
| 10/01/2020 | | Pro Hac Vice Attorney Marcio W. Valladares and Michael Ram for Catherine Baker added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. (kmd) (Entered: 10/01/2020) |
| 10/13/2020 | 7 | MOTION to Dismiss for Lack of Jurisdiction Over the Subject Matter and for Failure to State a Claim - filed by Croda Inc. (Shen, Zi-Xiang) Modified on 10/14/2020 (dlw). (Entered: 10/13/2020) |
| 10/13/2020 | 8 | OPENING BRIEF in Support re 7 MOTION to Dismiss for Lack of Jurisdiction Over the |

| | | |
|---|---|---|
| | | Subject Matter and for Failure to State a Claim filed by Croda Inc. Answering Brief/Response due date per Local Rules is 10/27/2020. (Shen, Zi-Xiang) Modified on 10/14/2020 (dlw). (Entered: 10/13/2020) |
| 10/13/2020 | 9 | DECLARATION of Christina Manuelli re 7 MOTION to Dismiss for Lack of Jurisdiction Over the Subject Matter and for Failure to State a Claim, 8 Opening Brief in Support by Croda Inc. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Shen, Zi-Xiang) Modified on 10/14/2020 (dlw). (Entered: 10/13/2020) |
| 10/13/2020 | 10 | Disclosure Statement pursuant to Rule 7.1: identifying Corporate Parent Croda Investments, Inc. for Croda Inc. filed by Croda Inc.. (Shen, Zi-Xiang) (Entered: 10/13/2020) |
| 10/14/2020 | 11 | MOTION for Pro Hac Vice Appearance of Attorney T. Michael Morgan, Rene F. Rocha and Frank M. Petosa - filed by Catherine Baker. (McGee, Kyle) (Entered: 10/14/2020) |
| 10/15/2020 | | SO ORDERED re 11 MOTION for Pro Hac Vice Appearance of Attorney T. Michael Morgan, Rene F. Rocha and Frank M. Petosa filed by Catherine Baker. ORDERED by Judge Maryellen Noreika on 10/15/2020. (dlw) (Entered: 10/15/2020) |
| 10/16/2020 | | Pro Hac Vice Attorneys Stephen A. Swedlow and Athena D. Dalton for Croda Inc. added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. (kmd) (Entered: 10/16/2020) |
| 10/22/2020 | | Pro Hac Vice Attorney T. Michael Morgan for Catherine Baker added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. (myr) (Entered: 10/22/2020) |
| 10/22/2020 | | Pro Hac Vice Attorney Rene F. Rocha for Catherine Baker added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. (myr) (Entered: 10/22/2020) |
| 10/22/2020 | | Pro Hac Vice Attorney Frank M. Petosa for Catherine Baker added for electronic noticing. Pursuant to Local Rule 83.5 (d)., Delaware counsel shall be the registered users of CM/ECF and shall be required to file all papers. (myr) (Entered: 10/22/2020) |
| 10/26/2020 | 12 | STIPULATION TO EXTEND TIME for Plaintiff to Respond to Defendant's Motion to Dismiss to November 10, 2020 - filed by Catherine Baker. (McGee, Kyle) (Entered: 10/26/2020) |
| 10/26/2020 | | SO ORDERED re 12 STIPULATION TO EXTEND TIME for Plaintiff to Respond to Defendant's Motion to Dismiss to November 10, 2020 (Set Briefing Schedule: re 7 MOTION to Dismiss for Lack of Jurisdiction Over the Subject Matter and for Failure to State a Claim - Answering Brief due 11/10/2020). ORDERED by Judge Maryellen Noreika on 10/26/2020. (dlw) (Entered: 10/26/2020) |
| 11/10/2020 | 13 | STIPULATION TO EXTEND TIME to Respond to Defendant's Motion to Dismiss to November 13, 2020 - filed by Catherine Baker. (McGee, Kyle) (Entered: 11/10/2020) |
| 11/10/2020 | | SO ORDERED re 13 STIPULATION TO EXTEND TIME to Respond to Defendant's Motion to Dismiss to November 13, 2020 (Set Briefing Schedule: re 7 MOTION to Dismiss for Lack of Jurisdiction Over the Subject Matter and for Failure to State a Claim - Answering Brief due 11/13/2020). ORDERED by Judge Maryellen Noreika on 11/10/2020. (dlw) (Entered: 11/10/2020) |
| 11/13/2020 | 14 | ANSWERING BRIEF in Opposition re 7 MOTION to Dismiss for Lack of Jurisdiction Over the Subject Matter and for Failure to State a Claim filed by Catherine Baker.Reply |

| | | |
|---|---|---|
| | | Brief due date per Local Rules is 11/20/2020. (McGee, Kyle) (Main Document 14 replaced on 11/17/2020) (dlw) (Entered: 11/13/2020) |
| 11/17/2020 | | CORRECTING ENTRY: D.I. 14 has been replaced on the docket with a version that is compliant with the Local Rules. The brief is now within the pages limits and all text appears in 12 point type. (dlw) (Entered: 11/17/2020) |
| 11/17/2020 | 15 | STIPULATION TO EXTEND TIME for Defendant to File Reply in Support of Its Motion to Dismiss to December 9, 2020 - filed by Croda Inc.. (Shen, Zi-Xiang) (Entered: 11/17/2020) |
| 11/18/2020 | | SO ORDERED re 15 STIPULATION TO EXTEND TIME for Defendant to File Reply in Support of Its Motion to Dismiss to December 9, 2020 (Set Briefing Schedule: re 7 MOTION to Dismiss for Lack of Jurisdiction Over the Subject Matter and for Failure to State a Claim - Reply Brief due 12/9/2020). ORDERED by Judge Maryellen Noreika on 11/18/2020. (dlw) (Entered: 11/18/2020) |
| 12/09/2020 | 16 | REPLY BRIEF re 7 MOTION to Dismiss for Lack of Jurisdiction Over the Subject Matter and for Failure to State a Claim filed by Croda Inc.. (Shen, Zi-Xiang) (Entered: 12/09/2020) |
| 12/11/2020 | 17 | NOTICE of Appearance by Kimberly Ann Evans on behalf of Catherine Baker (Evans, Kimberly) (Entered: 12/11/2020) |
| 12/15/2020 | 18 | NOTICE of Withdrawal of Kyle J. McGee, Esq. of Grant & Eisenhofer P.A. as Counsel for Plaintiff Catherine Baker by Catherine Baker (McGee, Kyle) (Entered: 12/15/2020) |
| 12/15/2020 | 19 | REQUEST for Oral Argument by Catherine Baker re 7 MOTION to Dismiss for Lack of Jurisdiction Over the Subject Matter and for Failure to State a Claim. (Evans, Kimberly) (Entered: 12/15/2020) |
| 12/16/2020 | 20 | MOTION for Leave to File Surreply in Further Opposition to Defendant's Motion to Dismiss - filed by Catherine Baker. (Attachments: # 1 Text of Proposed Order, # 2 Exhibit Plaintiff's [Proposed] Surreply in Opposition to Defendant's Motion to Dismiss Complaint, # 3 Statement Pursuant to Local Rule 7.1.1)(Evans, Kimberly) Modified on 12/17/2020 (dlw). (Entered: 12/16/2020) |
| 12/30/2020 | 21 | RESPONSE to Motion re 20 MOTION for Leave to File Surreply in Further Opposition to Defendant's Motion to Dismiss filed by Croda Inc.. (Shen, Zi-Xiang) (Entered: 12/30/2020) |
| 04/15/2021 | 22 | NOTICE of Withdrawal of Appearance of Zi-Xiang Shen on behalf of Defendant Croda Inc. f/k/a Croda, Inc. by Croda Inc. (Shen, Zi-Xiang) (Entered: 04/15/2021) |
| 07/21/2021 | 23 | ORAL ORDER Setting Telephonic Hearing on 7 MOTION to Dismiss for Lack of Jurisdiction Over the Subject Matter and for Failure to State a Claim; 20 MOTION for Leave to File Surreply in Further Opposition to Defendant's Motion to Dismiss: IT IS HEREBY ORDERED that a telephonic Motion Hearing is set for 7/28/2021 at 11:00 AM before Judge Maryellen Noreika. The Court is setting aside one (1) hour for the hearing with the time split equally between the parties. Any slide presentations the parties wish to use during the hearing shall be emailed (in PDF format) to MN_civil@ded.uscourts.gov no later than 24 hours prior to the hearing. The parties, however, may agree upon a different time to exchange their respective slides. Counsel shall provide a teleconference dial-in number and code for the hearing by emailing this Court's judicial administrator. ORDERED by Judge Maryellen Noreika on 7/21/2021. (dlw) (Entered: 07/21/2021) |
| 07/26/2021 | 24 | Letter to The Honorable Maryellen Noreika from Kimberly A. Evans regarding Request to Continue July 28, 2021 Oral Argument - re 23 Order Setting Hearing on Motion,,,. (Evans, Kimberly) (Entered: 07/26/2021) |

| | | |
|---|---|---|
| 07/27/2021 | 25 | ORAL ORDER RESETTING Telephonic Hearing on 7 MOTION to Dismiss for Lack of Jurisdiction Over the Subject Matter and for Failure to State a Claim; 20 MOTION for Leave to File Surreply in Further Opposition to Defendant's Motion to Dismiss: At the unopposed request of Plaintiff, the 7/28/2021 Telephonic Motion hearing is RESET for 8/5/2021 at 02:00 PM before Judge Maryellen Noreika. All other provisions of the Court's July 21, 2021 Oral Order (D.I. 23) remain in effect. ORDERED by Judge Maryellen Noreika on 7/27/2021. (dlw) (Entered: 07/27/2021) |
| 07/30/2021 | 26 | MOTION for Pro Hac Vice Appearance of Attorney Kevin S. Hannon - filed by Catherine Baker. (Evans, Kimberly) (Entered: 07/30/2021) |
| 08/02/2021 | | SO ORDERED re 26 MOTION for Pro Hac Vice Appearance of Attorney Kevin S. Hannon filed by Catherine Baker. ORDERED by Judge Maryellen Noreika on 8/2/2021. (dlw) (Entered: 08/02/2021) |
| 08/03/2021 | 27 | NOTICE of Appearance by Miranda N. Gilbert on behalf of Croda Inc. (Gilbert, Miranda) (Entered: 08/03/2021) |
| 08/05/2021 | | Minute Entry for proceedings held before Judge Maryellen Noreika - Telephonic Oral Argument held on 8/5/2021. The MOTION to Dismiss for Lack of Jurisdiction Over the Subject Matter and for Failure to State a Claim 7 is DENIED WITHOUT PREJUDICE. The MOTION for Leave to File Surreply in Further Opposition to Defendant's Motion to Dismiss 20 is GRANTED. The parties shall submit a joint proposal for going forward to the court by August 12, 2021. (Court Reporter Dale Hawkins.) (asw) (Entered: 08/05/2021) |
| 08/11/2021 | 28 | Official Transcript of Teleconference held on 08/05/2021 before Judge Maryellen Noreika. Court Reporter/Transcriber Dale C. Hawkins,Email: Dale_Hawkins@ded.uscourts.gov. Transcript may be viewed at the court public terminal or order/purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date, it may be obtained through PACER. Redaction Request due 9/1/2021. Redacted Transcript Deadline set for 9/13/2021. Release of Transcript Restriction set for 11/9/2021. (dh) (Entered: 08/11/2021) |
| 08/12/2021 | 29 | Letter to The Honorable Maryellen Noreika from Kenneth J. Nachbar regarding Follow Up re 8/5/2021 Hearing and CAFA Jurisdiction - re Oral Argument,, Terminate Motions,. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E) (Nachbar, Kenneth) (Entered: 08/12/2021) |
| 08/13/2021 | 30 | ORAL ORDER re 29 Letter - Having reviewed the parties' letter and the Court's prior ruling denying without prejudice 7 defendant's motion to dismiss, IT IS HEREBY ORDERED that should defendant wish to renew its motion to dismiss, on or before 8/27/2021, it shall file a motion stating such or shall file a new motion. ORDERED by Judge Maryellen Noreika on 8/13/2021. (dlw) (Entered: 08/13/2021) |
| 08/27/2021 | 31 | MOTION to Dismiss for Failure to State a Claim - filed by Croda Inc.. (Gilbert, Miranda) (Entered: 08/27/2021) |
| 08/27/2021 | 32 | OPENING BRIEF in Support re 31 MOTION to Dismiss for Failure to State a Claim filed by Croda Inc..Answering Brief/Response due date per Local Rules is 9/10/2021. (Gilbert, Miranda) (Entered: 08/27/2021) |
| 09/02/2021 | 33 | STIPULATION and [Proposed] Order Setting Briefing Schedule in Connection with Defendant's Renewed Motion to Dismiss re 31 MOTION to Dismiss for Failure to State a Claim by Catherine Baker. (Evans, Kimberly) (Entered: 09/02/2021) |
| 09/03/2021 | | SO ORDERED re 33 Stipulation and Order Setting Briefing Schedule in Connection with Defendant's Renewed Motion to Dismiss (Set Briefing Schedule: re 31 MOTION to |

| | | |
|---|---|---|
| | | Dismiss for Failure to State a Claim - Answering Brief due 10/1/2021. Reply Brief due 10/22/2021). ORDERED by Judge Maryellen Noreika on 9/3/2021. (dlw) (Entered: 09/03/2021) |
| 09/21/2021 | 34 | ORAL ORDER REFERRING CASE to Magistrate Judge Christopher J. Burke - IT IS HEREBY ORDERED that this case, including the pending 31 Motion to Dismiss, is referred to Magistrate Judge Christopher J. Burke to hear and resolve all pre-trial matters up to and including expert discovery matters (but not including summary judgment motions, Daubert motions, pre-trial motions in limine or the pre-trial conference), subject to 28 U.S.C. § 636(b) and any further Order of the Court. All subsequent filings in this action shall be captioned as follows: Civil Action No. 20-1108-MN-CJB. ORDERED by Judge Maryellen Noreika on 9/21/2021. Motions referred to Christopher J. Burke.(dlw) (Entered: 09/21/2021) |
| 09/21/2021 | | REMARK: The parties should be aware that the Court encourages the participation of newer attorneys in courtroom proceedings and at oral argument. Please see the Court's Standing Order Regarding Courtroom Opportunities for Newer Attorneys, a link to which is provided here for the parties' convenience:http://www.ded.uscourts.gov/sites/ded/files/forms/StandingOrder2017.pdf (dlb) (Entered: 09/21/2021) |
| 09/21/2021 | | Remark: The parties should follow the Courts Standing Order Regarding Courtesy Copies, a copy of which is found on Judge Burkes portion of the District Courts webpage: https://www.ded.uscourts.gov/judge/magistrate-judge-christopher-j-burke (dlb) (Entered: 09/21/2021) |
| 09/21/2021 | 35 | ORAL ORDER: The Court, having reviewed the case history in light of the September 21, 2021 referral, hereby ORDERS that the parties shall meet and confer and within thirty (30) days from the date of this Order, shall jointly file a proposed Scheduling Order, which is consistent with Judge Burke's "Rule 16 Scheduling Order Non-Patent" up through and including paragraph number 10 (i.e., regarding the portions of the case schedule leading up to but not including summary judgment) and that is consistent with paragraphs 9-14 of Judge Noreika's "Scheduling Order [Non-Patent; Jury Trial]" (i.e., regarding the portions of the case schedule from summary judgment through trial). If there are disputes about the proposed Scheduling Order, the parties may note them in bold in the proposed Order, and may also set out their reasoning as to the disputes in an accompanying joint letter, which should not exceed three single-spaced pages. Both Scheduling Orders can be found on Judge Burke's/Judge Noreika's portions of the District Court's website. Ordered by Judge Christopher J. Burke on 9/21/2021. (dlb) (Entered: 09/21/2021) |
| 09/27/2021 | 36 | NOTICE of Appearance by Kelly L Tucker on behalf of Catherine Baker (Tucker, Kelly) (Entered: 09/27/2021) |
| 10/01/2021 | 37 | ANSWERING BRIEF in Opposition re 31 MOTION to Dismiss for Failure to State a Claim filed by Catherine Baker.Reply Brief due date per Local Rules is 10/8/2021. (Tucker, Kelly) (Entered: 10/01/2021) |
| 10/04/2021 | 38 | ORAL ORDER - IT IS HEREBY ORDERED that this case and the 31 MOTION to Dismiss are no longer referred to Judge Christopher J. Burke. ORDERED by Judge Maryellen Noreika on 10/4/2021. (dlw) (dlw) (Entered: 10/04/2021) |
| 10/04/2021 | 39 | ORDER: DESIGNATION OF CIRCUIT JUDGE TO HOLD A DISTRICT COURT WITHIN THE CIRCUIT, designating and assigning the Honorable Stephanos Bibas of the United States Court of Appeals for the Third Circuit. Signed by Judge D. Brooks Smith, Chief Judge of the United States Court of Appeals for the Third Circuit on 10/1/21. (rjb) (Entered: 10/04/2021) |
| | | |

| 10/04/2021 | | Case Reassigned to Judge Stephanos Bibas of the United States Court of Appeals for the Third Circuit. Please include the initials of the Judge (SB) after the case number on all documents filed. (rjb) (Entered: 10/04/2021) |
|---|---|---|
| 10/20/2021 | 40 | STIPULATION and [Proposed] Order Staying Discovery re 31 MOTION to Dismiss for Failure to State a Claim by Croda Inc.. (Gilbert, Miranda) (Entered: 10/20/2021) |
| 10/22/2021 | 41 | REPLY BRIEF re 31 MOTION to Dismiss for Failure to State a Claim filed by Croda Inc.. (Gilbert, Miranda) (Entered: 10/22/2021) |
| 10/25/2021 | 42 | REQUEST for Oral Argument by Croda Inc. re 31 MOTION to Dismiss for Failure to State a Claim . (Gilbert, Miranda) (Entered: 10/25/2021) |
| 10/27/2021 | 43 | STIPULATION AND ORDER Staying Discovery. Signed by Judge Stephanos Bibas on 10/26/2021. (nmg) (Entered: 10/27/2021) |
| 10/28/2021 | 44 | REQUEST for Oral Argument by Catherine Baker. (Tucker, Kelly) (Entered: 10/28/2021) |
| 10/29/2021 | | ORAL ORDER: By noon on Monday, November 1, the parties are directed to provide the Court with their availability for an oral argument over Zoom on Wednesday, November 3, or Friday, November 5. Entered by Judge Stephanos Bibas on 10/29/2021. (nmg) (Entered: 10/29/2021) |
| 11/01/2021 | 45 | Letter to The Honorable Stephanos Bibas from Kelly L. Tucker regarding the Parties are available on Nov. 5, 2021 for Oral Argument on Defendant's Renewed Motion to Dismiss - re Oral Order. (Tucker, Kelly) (Entered: 11/01/2021) |
| 11/01/2021 | | ORAL ORDER: The Court orders the parties to attend a Zoom hearing on November 5, 2021, at 3:30 p.m. The parties should focus on whether Delaware law recognizes increased risk as a compensable injury. Entered by Judge Stephanos Bibas on 11/1/2021. (nmg) (Entered: 11/01/2021) |
| 11/23/2021 | 46 | MEMORANDUM OPINION. Signed by Judge Stephanos Bibas on 11/23/2021. (nmg) (Entered: 11/23/2021) |
| 11/23/2021 | 47 | ORDER, The motion to dismiss [D.I. 31 ] is GRANTED. The complaint [D.I. 1 ] is DISMISSED WITHOUT PREJUDICE. If the plaintiff wishes to file an amended complaint, she must do so within thirty days of this order. Signed by Judge Stephanos Bibas on 11/23/2021. (nmg) (Entered: 11/23/2021) |
| 12/22/2021 | 48 | NOTICE OF APPEAL of 46 Memorandum Opinion, 47 Order, . Appeal filed by Catherine Baker. (Tucker, Kelly) (Entered: 12/22/2021) |
| 12/22/2021 | | APPEAL - Credit Card Payment of $505.00 received re 48 Notice of Appeal (Third Circuit) filed by Catherine Baker. ( Filing fee $505, receipt number ADEDC-3769396.) (Tucker, Kelly) (Entered: 12/22/2021) |
| 12/28/2021 | 49 | NOTICE of Docketing Record on Appeal from USCA for the Third Circuit re 48 Notice of Appeal (Third Circuit) filed by Catherine Baker. USCA Case Number 21-3360. USCA Case Manager: James (DOCUMENT IS RESTRICTED AND CAN ONLY BE VIEWED BY COURT STAFF) (jk) (Entered: 12/28/2021) |
| 02/17/2022 | 50 | NOTICE of Intent to Stand on the Complaint by Catherine Baker re 1 Complaint, 47 Order, (Attachments: # 1 Text of Proposed Order Proposed Final Order)(Tucker, Kelly) (Entered: 02/17/2022) |
| 02/18/2022 | 51 | ORDER DISMISSING CASE for the reasons set forth in the Court's November 23, 2021 Memorandum Opinion [Docket No. 46 ], the Complaint is DISMISSED WITH PREJUDICE. (CASE CLOSED). Signed by Judge Stephanos Bibas on 2/18/2022. (nmg) (Entered: 02/18/2022) |

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 02/18/2022 10:15:22 | | | |
| PACER Login: | Gran0_559 | Client Code: | 29050 |
| Description: | Docket Report | Search Criteria: | 1:20-cv-01108-SB Start date: 1/1/1973 End date: 2/18/2022 |
| Billable Pages: | 7 | Cost: | 0.70 |

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

CATHERINE BAKER individually and on
behalf of all others similarly situated,

                  Plaintiff,

v.

CRODA INC. f/k/a CRODA, INC.,

                  Defendant.

CIVIL ACTION NO.:

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

       Plaintiff Catherine Baker ("Plaintiff"), individually and on behalf of a putative class of all other similarly situated persons ("Class Members" or the "Class"), sues Defendant Croda Inc. f/k/a Croda, Inc. ("Croda" or "Defendant"), and, based on personal knowledge and on investigation of counsel and review of public documents and information, alleges as follows:

### INTRODUCTION

       1.     Plaintiff brings this class action against Croda, the owner of the Atlas Point manufacturing plant in New Castle, Delaware, for damages resulting from its dangerous and reckless emission of Ethylene Oxide ("EtO").

       2.     EtO is a powerful cancer-causing gas. The United States Environmental Protection Agency ("EPA"), the National Toxicology Program, the World Health Organization ("WHO"), and the International Agency for Research on Cancer ("IARC"), among others, all classify EtO as a known human carcinogen.

       3.     Croda's Atlas Point plant produces surfactants—surface-acting agents—compounds that lower the surface tension between two liquids, between a gas and a liquid, or between a liquid and a solid allowing them to bind. Surfactants may act as detergents, wetting agents, emulsifiers,

foaming agents, and dispersants. The surfactant manufacturing process includes the use of EtO. During the manufacturing process, EtO is emitted into the atmosphere by Defendant in both controlled and uncontrolled releases.

4.       Plaintiff and Class Members have lived within a specified geographic area around the Atlas Point plant of Defendant defined by census tracts, and have been exposed to large amounts of toxic, cancer-causing EtO as a result of releases from the Atlas Point plant. Although EtO is odorless and colorless, and Plaintiff and Class Members can neither see nor smell the gas; it is all around them and in the air they breathe.

5.       As a result of their exposure to the EtO emitted by Defendant, Plaintiff and Class Members' present risk of acquiring disease is among the highest in the United States.  Indeed, the EPA estimates that Class Members are up to 4 times more likely to develop cancer than the average American.  The illness, disease and disease processes that exposure to EtO can cause is often latent, meaning not easily detected without diagnostic testing, particularly in their early stages.

6.       As a result of Croda's irresponsible and reckless conduct, Plaintiff and Class Members have been exposed to EtO, a known carcinogen and toxin. As a result of their exposure Plaintiff and Class Members suffer a present increased risk of illness, disease, and disease process. This present increased risk of illness, disease and disease process has caused Plaintiff and Class Members to have the present medical need for diagnostic testing (also known as medical monitoring) for the early detection of those illnesses, diseases and disease processes, including cancer, that exposure to EtO can cause.  Medical monitoring is reasonably medically necessary for those exposed to ensure that latent disease processes can be immediately identified and aggressively treated. Plaintiff and Class Members have been injured by the present need to incur the costs of diagnostic testing for the early detection of illness, disease or disease process.

2

7.     Plaintiff, individually and on behalf of Class Members, seeks compensatory damages arising out of chemical releases, discharges, and leaks from Croda's Atlas Point plant. These damages include the cost of a medical monitoring program for continual screening and detection of illness, disease, or disease processes necessitated by the exposure to toxic EtO released by the Defendant.

## PARTIES

8.     Plaintiff Catherine Baker is a citizen of Delaware and lives in New Castle County. As a result of Defendant's operations at Atlas Point, Plaintiff has been exposed to, and inhaled, high levels of EtO.

9.     Croda is a Delaware corporation with its principal place of business in New Jersey, 300-A Columbus Circle Edison, New Jersey, 08837. Croda is the sole owner and operator of Atlas Point located at 315 Cherry Lane, New Castle, Delaware, 19720. The Atlas Point plant has been in its current location since 1937 and was purchased by Croda in 2006.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d). The amount in controversy exceeds $5 million, exclusive of interest and costs. There are more than 100 putative Class Members, and at least some Members of the proposed Class have a different citizenship from the Defendant.

11.     This Court has jurisdiction over Croda because it is incorporated in Delaware and because Croda's Atlas Point plant is located in Delaware.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (2) because Defendant's the Atlas Point plant is in this District and because a substantial part of the events and omissions giving rise to this action occurred in this District.

3

## STATEMENT OF FACTS

### A.    ETHYLENE OXIDE

13.    EtO is a colorless, odorless gas used in the manufacture of antifreeze, solvents, detergents, polyurethane foam, adhesives and other products. It is also used to sterilize medical equipment and plastic devices.[1]

14.    Commercial chemical producers process EtO to synthesize Ethylene Glycol, a building block for synthetic fibers (e.g., upholstery, carpet), plastics, PVC pipe and cosmetics and as well as a primary ingredient in antifreeze.[2]

15.    At the end of 2018, EtO was being produced in the U.S. at 15 facilities in 11 locations by 9 companies.[3]

16.    Defendant's Atlas Point plant manufactures, processes and or uses and emits significant amounts of EtO gas every year. Since at least 1988, Atlas Point has emitted multiple tons of EtO gas into the air of the geographic area in which Plaintiff and Class Members reside.[4]

17.    Unfortunately, people cannot see or smell EtO when it is in the air.[5]  As such, Plaintiff and Class Members have unknowingly been exposed to toxic EtO for decades while Croda knew, or should have known, that the EtO it was releasing was dangerous, toxic, carcinogenic, mutagenic, and harmful to local residents.

### B.    HEALTH EFFECTS OF ETHYLENE OXIDE EXPOSURE

18.    EtO is one of 187 pollutants that EPA has classified as "hazardous air pollutants," also called "air toxics."  It is dangerous, toxic, carcinogenic, and mutagenic. EtO is highly reactive,

---

[1] https://www.epa.gov/hazardous-air-pollutants-ethylene-oxide/background-information-ethylene-oxide#what
[2] https://www.epa.gov/il/ethylene-oxide-emissions-frequent-questions
[3] https://www.americanchemistry.com/EO/Ethylene-Oxide-Frequently-Asked-Questions.html
[4] *See e.g.* Air Pollution Report, https://echo.epa.gov/air-pollutant-report?fid=110000338652;
https://enviro.epa.gov/triexplorer/facility_data?tri_facility_id=19720CMRCSCHERR&tri=TRIQ1
[5] https://www.epa.gov/il/ethylene-oxide-emissions-frequent-questions

readily taken up by the lungs, efficiently absorbed into the blood stream, and easily distributed throughout the human body. Its deleterious properties have been widely known for decades.

19.    While acute inhalation exposure to high concentrations of EtO can cause headache, dizziness, nausea, fatigue, respiratory irritation, vomiting and other types of gastrointestinal distress, studies show that exposure to EtO increases the risk of cancers of the white blood cells, including, but not limited to, non-Hodgkin lymphoma, myeloma, and lymphocytic leukemia. Studies also show that long-term exposure to EtO increases the risk of breast cancer in females.[6]

20.    Manufacturers and users of EtO became aware of its carcinogenic effects at least by 1977, when the National Institute of Occupational Safety and Health ("NIOSH") recommended that EtO be considered as mutagenic and potentially carcinogenic to humans, that occupational exposure be minimized, and that alternate sterilization procedures be used.[7]  In 1981, based on additional laboratory studies wherein EtO induced cancer in animals, NIOSH reconfirmed its concerns that EtO was a potential occupational carcinogen.[8]

21.    In 1985, the United States Department of Health and Human Services ("DHHS") published the Fourth Annual Report on Carcinogens and classified EtO as reasonably anticipated to be a human carcinogen.

22.    In 1987, the state of California officially designated EtO a carcinogen.

23.    NIOSH subsequently published an epidemiological study of EtO which analyzed over 18,000 employees working with EtO at 14 different industrial facilities. The study found

---

[6] https://www.epa.gov/hazardous-air-pollutants-ethylene-oxide/frequent-questions-health-information-about-ethylene-oxide
[7] Center for Disease Control & Prevention, Special Occupational Hazard Review With Control Recommendations: Use Of Ethylene Oxide As A Sterilant In Medical Facilities, August 1977, https://www.cdc.gov/niosh/docs/77-200/default.html
[8] Center for Disease Control, Current Intelligence Bulletin 35, May 1981, EtO: Evidence of Carcinogenicity, https://www.cdc.gov/niosh/docs/81-130/default.html

sufficient evidence to support a causal link between exposure to EtO and increased mortality from lymphatic and hematopoietic cancers.[9]

24.    As a result of these findings and others, in 1994 the WHO listed EtO as a Group 1 human carcinogen, the body's highest risk classification. In 2000, the U.S. Department of Health and Human Services revised its classification for EtO as "known to be a human carcinogen."

25.    Exposure to EtO has been widely studied and its negative health effects are well documented.[10]  Presently, there is evidence linking EtO exposure to increased risk of lymphatic and hematopoietic cancer such as lymphomas, myelomas, and leukemias; breast cancer; tumors in the lungs, uterus, and the brain; cancers in connective tissues and bones; and reproductive and developmental impairments including increased rates of miscarriage and infertility.

26.    EPA classified EtO as a human carcinogen in December 2016 and considers any exposure, however small, to create a cancer risk. This is because EtO is a powerful mutagen and can damage DNA.[11]

## C.    CRODA'S ETHYLENE OXIDE EMISSIONS

27.    Croda's Atlas Point plant produces up to 30,000 metric tons of EtO annually, which is used in surfactant production and the creation of ethylene glycol, a liquid used as a raw material in the manufacture of polyester fibers and for antifreeze formulations.[12] In the course of these processes, Defendant releases huge amounts of EtO gas every year. Since at least 1988, the Atlas Point plant has emitted multiple tons of EtO gas into the air in the Class Zone defined below.

---

[9] Steenland, K., *et. al.,* Mortality analyses in a cohort of 18,235 ethylene oxide exposed workers: Follow up extended from 1987 to 1998 (2004), Occup Environ Med 61:2-7, https://www.ncbi.nlm.nih.gov/pubmed/14691266
[10] https://www.epa.gov/sites/production/files/2016-09/documents/ethylene-oxide.pdf
[11] https://www.epa.gov/hazardous-air-pollutants-ethylene-oxide/frequent-questions-health-information-about-ethylene-oxide
[12] What else is at plant where gas leak that shut down Delaware Memorial Bridge occurred?, Delaware online, November 26, 2018, https://www.delawareonline.com/story/news/local/2018/11/26/what-else-delaware-plant-where-dangerous-gas-leak-occurred/2112981002/

6

28.    The EtO emitted by Defendant's Atlas Point plant is carried by ambient air movements throughout the Class Zone defined below. The EtO remains in the air for months, becomes concentrated in atmospheric inversions, and moves through neighboring communities through prevailing winds. Because its half-life in the atmosphere is 211 days, EtO remains in the air that Plaintiff and Class Members breath long after it has been emitted, resulting in inhalation by Plaintiff and Class Members.[13]

29.    In addition, EtO is heavier than air, meaning that it can linger and travel along the ground.[14] Consequently, Defendant's continuing releases of EtO are likely to have lingered at breathing level in the communities around its plant for a considerable time, causing ongoing and prolonged harm to Plaintiff and Class Members.

30.    Unfortunately, people cannot see or smell EtO when it is in the air.[15] As such, Plaintiff and Class Members have unknowingly been exposed to EtO for decades while Defendant knew, or should have known, that the EtO it was releasing was dangerous, toxic, carcinogenic, mutagenic, and harmful to local residents.

**D.    NEW CASTLE AIR QUALITY AND THE HEALTH IMPLICATIONS**

31.    The Atlas Point plant has been in operation since 1937, when it was first used to produce commercial quantities of sorbitol and mannitol.[16]

32.    Shortly thereafter, the Atlas Point plant transitioned to the creation and manufacturing of popular emulsifiers that in turn lead to the development and production of surfactants like Spans® and Tweens®.[17]

---

[13] https://www.ncbi.nlm.nih.gov/books/NBK321408/
[14] https://www.atsdr.cdc.gov/mmg/mmg.asp?id=730&tid=133
[15] https://www.epa.gov/il/ethylene-oxide-emissions-frequent-questions
[16] https://www.adhesivesmag.com/articles/91630-focus-on-marking-a-milestone
[17] *Id.*

Appx28

33.     By the time Croda acquired the Atlas Point plant in 2006 through the purchase of then-owner Uniqema from Imperial Chemical Industries, the facility had been continuously producing surfactants for nearly 70 years.[18]

34.     Upon information and belief, Croda acquired all or substantially all of the Atlas Point plant's manufacturing assets from Uniqema in 2006, and continued to produce surfactants using, among other substances, EtO, in essentially the same manner as all previous owners and operators of the Atlas Point plant including, but not limited to, Uniqema, since at least 1988.

35.     In 2008, the Atlas Point plant had a documented unpermitted release of EtO. Since 2008, the Atlas Point plant has violated the State of Delaware Department of Natural Resources and Environmental Control ("DNREC") regulations including the failure to monitor for and record emissions, best management practices violations, failure to make timely permit applications, and excess emissions.[19]

36.     Indeed, in 2015, Croda announced that it was adding a new facility to the Atlas Point plant, which would provide the ability to produce EtO directly on site for use in manufacturing surfactants.[20] The facility was opened in October 2017.

37.     On  November 25, 2018, Atlas Point reported an emissions accident at the new EtO production plant which resulted in the release of 2,688 pounds of EtO into the air surrounding the plant.[21] A call was sent out through the Delaware Emergency Notification System ("DENS") to advise residents in the nearby area to seek shelter.  The massive release resulted in the closure of the Delaware Memorial Bridge for 7 hours.  In addition to the tons of EtO released into the air,

---

[18] *Id.*
[19] https://www.delawareonline.com/story/news/local/2018/11/26/what-else-delaware-plant-where-dangerous-gas-leak-occurred/2112981002/, last accessed 08.01.20.
[20] https://cen.acs.org/articles/93/i18/Croda-Produce-Bio-Ethylene-Oxide.html
[21] https://dnrec.alpha.delaware.gov/croda-questions-answers/

700,000 gallons of deluge water, used by Croda to minimize the ambient air concentration of EtO and to minimize the risk of explosion or ignition of the released EtO, overflowed the spill sump and discharged onto the ground and into the wooded area behind the plant.

38.    On March 28, 2019, Croda entered into a settlement agreement with DNREC wherein Croda was found to have violated, *inter alia*, 7 Del. C. § 6003(a)(1), through the unpermitted release of EtO and 3.38 of Permit APC-2016/0068 - Construction (Amendment 3) by not maintaining and operating its plant in a manner consistent with good air pollution control practice for minimizing emissions, when it used the incorrect gasket that ultimately failed and resulted in the release of EtO emissions on November 25, 2018.[22]  DNREC stated that the gasket material was unsuitable for EtO processing.[23] The material did not comply with the engineering specifications for the plant.[24] Croda had conducted the conditional operation of its plant without the approval of DNREC. *Id*.

39.    The federal Occupational Safety and Health Administration, DNREC and other state agencies imposed more than $500,000 in fines and penalties on Croda for operating the plant without proper inspection, failure to train workers adequately, and failure to have proper leak-shutdown procedures and other failures leading up to the leak.[25]

40.    The EPA's 2014 National Air Toxics Assessment ("NATA"), a screening tool for state, local and tribal agencies to assist them in identifying pollutants and emissions in their communities, demonstrated severe cancer risks in the area surrounding the Atlas Point plant. The

---

[22] Q & A: Croda Ethylene Oxide Release November 25, 2018, November 19, 2019, https://dnrec.alpha.delaware.gov/croda-questions-answers/
[23] https://www.paintsquare.com/news/?fuseaction=view&id=22088/ last accessed 08.01.20.
[24] http://www.dnrec.delaware.gov/Info/Documents/20190328-croda-settlement-agreement-and-dnrec-secretarys-order-no-2019-a-0014.pdf, last accessed 08.01.20
[25] https://www.inquirer.com/business/croda-delaware-atlas-point-gas-leak-osha-report-20190611.html, last accessed 08.01.20.

2014 NATA places the cancer risks of the census tracts measured in and around Atlas Point as the

highest in Delaware and among the highest in the country. Specifically, the EPA has designated the

geographic area within Delaware census tracts 10003015400, 10003105502 and 10003015802 as

having increased risk for cancer.

     41.     The NATA database also makes clear that the elevated cancer risks in and around

Atlas Point are almost entirely a result of Croda's EtO emissions.

     42.     While the 2014 NATA reveals shockingly high risks of cancer across a large area

near the Atlas Point plant, these risks are likely understated as they do not reflect the totality of

Croda's emissions.

     43.     New Castle County, where the Atlas Point plant is located, is the smallest county in

the state by area, but has the highest population and population density of any county in Delaware.

     44.     Throughout the Class Period, as defined below, the area around the Atlas Point plant

has contained numerous homes and businesses, as well as numerous schools and daycare facilities.

As a result, thousands of residents have been exposed to elevated levels of EtO.

     45.     Defendant operated without sufficient pollution controls to adequately limit and/or

eliminate the emissions of toxic EtO and, as a result, exposed the thousands of residents in the Class

Zone defined below to a carcinogenic, mutagenic chemical that increased their likelihood of

developing cancer.

     46.     Defendant knew that: (1) its manufacturing plant operated without sufficient

pollution control systems necessary to reduce or eliminate releases of toxic EtO; (2) the release of

EtO spread well beyond the property boundaries of the Atlas Point plant and resulted in exposure

to residents in the Class Zone defined below; and (3) on-going exposure to EtO, a known

carcinogen, would result in the increase of the risk of illness, disease or disease process for nearby

residents and an increase the likelihood that nearby residents would develop cancer.

47.    Defendant negligently failed to implement control processes that would eliminate EtO emissions, failed to adopt alternative processes that would eliminate EtO emissions, and failed to warn the Plaintiff and Class Members that the air was materially contaminated with toxic levels of EtO.

48.    Throughout the course of its operation of the Atlas Point plant, Defendant released EtO into the environment.

49.    Defendant's conduct unnecessarily contaminated the air Plaintiff and Class Members breathe every day, and exposed Plaintiff and Class Members to unsafe air. As a result, Plaintiff and Class Members have inhaled toxic EtO released from Defendant's Atlas Point plant.

**E.     PLAINTIFF AND CLASS MEMBERS HAVE ALREADY SUFFERED DAMAGES AND REQUIRE DIAGNOSTIC TESTING**

50.    Plaintiff and Class Members have lived within the vicinity of the Atlas Point plant during the time Defendant and predecessors in interest have been emitting and exposing the residents of nearby areas to toxic levels of EtO.

51.    As a result of Defendant's negligent and reckless emissions of EtO, Plaintiff and Class Members have inhaled toxic EtO, suffering significant exposure to hazardous EtO gases.

52.    EtO is a proven hazardous substance. It is a human carcinogen and is unsafe for humans at any level of exposure.

53.    Plaintiffs and Class Members live in the Class Zone defined by specified census tracts which pose a materially increased risk of developing cancer and other illness, disease and disease processes, as compared to the vast majority of the U.S. population living in other areas.

54.     As a proximate result of Defendant's negligent and reckless conduct, Plaintiff and Class Members are at an increased risk of developing cancer, and other illness, disease and disease processes, resulting in their present medical need for periodic diagnostic medical examinations.

55.     Diagnostic testing for early detection of cancer and other illness, disease and disease processes caused by exposure to EtO is reasonably medically necessary to assure early diagnosis, effective treatment of the disease.

56.     Plaintiff and Class Members have suffered the present harm of the need for the cost of diagnostic testing for the early detection of cancer and other illness, disease and disease processes. As a result of their significant exposure to Defendant's hazardous EtO gases, Plaintiff and Class Members require an award of the cost of a medical monitoring program necessary for early detection of the onset of illnesses, disease processes or disease.

57.     Monitoring procedures exist that make possible the early detection of cancer, the disease processes of cancer, and the progression of biomarker abnormalities, and other illness, disease and disease processes. These monitoring procedures will benefit Plaintiff and Class Members, and they are different from what would normally be recommended in the absence of EtO exposure. Such diagnostic testing is reasonably medically necessary due to the exposure of Plaintiff and Class Members to Defendant's EtO hazardous emissions. Plaintiff and Class Members have been injured by the present need to incur the costs of such diagnostic testing for the early detection of illness, disease or disease process.

58.     Plaintiff's and Class Members' claims are based solely on the amount of exposure to EtO released from Defendant's Atlas Point facility. Therefore, any alleged alternative exposure, or prior medical or family history, is not a basis for Plaintiff's and Class Member's claims in this case.  Exposure greater than the minimum specified in the class definition below only increases the

risk Plaintiff and the Class Members suffer over the baseline risk caused by Defendant's tortious conduct.

59.     As a direct result of Defendant's tortious and reckless conduct, Plaintiff and the Class have a present need to incur the cost of the costly diagnostic testing, and the cost of the monitoring procedures that are reasonably necessary to enable Plaintiff and Class Members to obtain early detection and diagnosis of medical conditions, including abnormalities indicative of cancer.

60.     Plaintiff and Class Members seek as damages the costs of a medical monitoring program for such diagnostic testing for the early detection of onset of illnesses, disease processes or disease and to allow for early treatment beneficial to Plaintiff and Class Members.

61.     Plaintiff and Class Members also seek all other available and necessary relief in connection with this claim.

## CLASS ALLEGATIONS

62.     Plaintiff seeks relief on behalf of herself and as representative of all others who are similarly situated. Pursuant to Fed. R. Civ. P. 23(a), (b)(2), (b)(3) and (c)(4), Plaintiff seeks certification of a class defined as follows:

> All natural persons who have resided within census tracts 10003015400, 10003105502 and 10003015802 (the "Class Zone") for a period of one year or more at any time beginning January 1, 1988 and the present (the "Class Period").

13



Fig. 1: The Class Zone is represented in the dark purple and light blue shaded areas. The green and yellow shaded areas lie outside of the Class Zone. The Atlas Point plant is designated by the brown dot.

63.     Excluded from the Class are Defendant and any of its affiliates, parents or subsidiaries; all employees of Defendant; all persons who have been currently diagnosed with cancer or illness, disease or disease process of the kind caused by EtO; all persons who make a timely election to be excluded from the Class; government entities; and the judges to whom this case is assigned, their immediate families, and court staff.

64.     Plaintiff hereby reserves the right to amend or modify the class definition with greater specificity or division after having had an opportunity to conduct discovery.

65.     The proposed Class meets the criteria for certification under Fed R. Civ. P. 23(a), (b)(2), (b)(3) and (c)(4).

66.    **Numerosity. Fed. R. Civ. P. 23(a)(1).**  Consistent with Rule 23(a)(1), the Members of the Class are so numerous and geographically dispersed that the joinder of all Members is impractical. While the exact number of Class Members is unknown to Plaintiff at this time, the proposed Class includes thousands of current and former residents who were unlawfully exposed to EtO. Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

67.    **Commonality. Rule 23(a)(2) and (b)(3).**  Consistent with Rule 23(a)(2) and with 23(b)(3)'s predominance requirement, this action involves common questions of law and fact that predominate over any questions affecting individual Class Members. The common questions include:

a.    Whether Defendant's conduct was negligent;

b.    Whether Defendant's conduct constitutes a public nuisance;

c.    Whether Defendant's conduct constitutes an abnormally dangerous activity;

d.    Whether Defendant owed a duty of care to Class Members;

e.    Whether the duty of care owed to the Class included the duty to protect against exposures to unsafe and unnecessarily high levels of EtO emissions;

f.    Whether Defendant breached its duty to warn the Class of and protect the Class from the long-term health risks and consequences of exposure to high levels of EtO;

g.    Whether medical monitoring and early detection will provide benefits to Members of the Class; and

h.    Whether Plaintiffs and Class Members are entitled to relief.

68.     **Typicality. Rule 23(a)(3).**   Consistent with Rule 23(a)(3), Plaintiff's claims are typical of those of the putative Class Members. Plaintiff resides in census tract 10003015802, within the Class Zone surrounding the Atlas Point facilities, and has resided in the Class Zone for over one year.  Plaintiff has had exposure to EtO released from the Atlas Point facility as have all Class Members.  That exposure has resulted in an increased risk of illness and disease in Plaintiff as it has in all class members. Plaintiff has the same, reasonably medically necessary, need to incur the cost of diagnostic testing for the early detection of illness and disease as all Class Members. Plaintiff therefore seeks the same relief as Class Members: the cost of a medical monitoring program for the early detection of illness, disease or disease process.

69.     **Adequacy. Rule 23(a)(4).** Consistent with Rule 23(a)(4), Plaintiff is an adequate representative of the Class because Plaintiff is a Member of the Class and is committed to pursuing this matter against Defendant to obtain relief for the Class.   Plaintiff has no conflicts of interest with the Class. Plaintiff's Counsel are competent and experienced in litigating class actions. Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect the interests of Class Members.

70.     **Superiority. Rule 23(b)(3).**   Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The quintessential purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to individual plaintiffs may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiff and the Class are relatively small compared to the burden and expense required to individually litigate their claims against Defendant, and thus, individual litigation to redress Defendant's wrongful conduct would be impracticable. Individual litigation by each Class Member would also strain the court system. Individual litigation creates the potential for

inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

71.    **Injunctive and Declaratory Relief.** Class certification is also appropriate under Rule 23(b)(2) and (c). Defendant, through its uniform conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the Class as a whole.

72.    Likewise, particular issues are appropriate for certification under Rule 23(c)(4) because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

## COUNT I

### ULTRAHAZARDOUS ACTIVITY/STRICT LIABILITY

73.    Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 72 as if fully set forth herein.

74.    As successor and current owner of the Atlas Point plant, Defendant's use and emission of EtO at its Atlas Point plant constitutes an ultrahazardous activity.

75.    Defendant's manufacture, processing and use of EtO is an abnormally dangerous activity and cannot be made safe by the exercise of the utmost care. The procedures utilized at the Atlas Point plant resulted in emissions of EtO to the Class Zone, which poses a high degree of risk to Plaintiff and Class Members.

76.    There is a reasonable likelihood that the emissions of EtO will result in life-threatening cancer and other illness, disease and disease processes. This risk cannot be eliminated as long as EtO is emitted into populated areas. Likewise, it was completely inappropriate for

Defendant to locate and operate their Atlas Point plant in a populated area while at the same time causing large amounts of EtO to be emitted into the atmosphere.

77.    Defendant's emission of EtO created a high degree of risk of harm to those who live in the surrounding area and substantially increased their risk of developing cancer and other illness, disease or disease processes.

78.    The activities conducted by Defendant are exceedingly dangerous and offer little or no value to the surrounding community.

79.    Because these activities are ultrahazardous, Defendant is strictly liable for any injuries proximately resulting therefrom.

80.    As a direct and proximate result of Defendant's ultrahazardous activity and the exposure to EtO resulting therefrom, Plaintiff and the Class Members presently suffer, and will continue to suffer, a present increased risk of illness, disease or disease process, and the resulting present need to incur the cost of reasonably medically necessary diagnostic testing for the early detection of illness, disease or disease process. Plaintiff and Class Members therefore seek as damages the cost of a medical monitoring program for such detection.

## COUNT II

## PUBLIC NUISANCE

81.    Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 80 as if fully set forth herein.

82.    At all times relevant hereto, Defendant, as successor and current owner of the Atlas Point plant, knew EtO to be hazardous and harmful to human beings.

83.    Plaintiff and Class Members have a common right to breathe clean air without dangerous levels of carcinogens such as EtO.

84.    Defendant's unreasonable use and emission of EtO at its Atlas Point plant substantially and unreasonably infringes upon and transgresses this public right.

85.    Defendant knew or should have known that the levels of EtO gas emitted from its plant would have a deleterious effect upon the health, safety, and well-being of people living in the nearby areas.

86.    Defendant's operation of its Atlas Point plant caused those who live in the surrounding area to breathe air containing high levels of EtO on a routine and constant basis, causing a substantially elevated risk of cancer.

87.    As a proximate result of the Defendant's operation of its plant, Plaintiff and the general public's common right to breathe clean air without dangerous levels of carcinogens such as EtO was eliminated and/or severely diminished.

88.    As a proximate result of Defendant's operation of its plant, EtO continuously invaded and contaminated the areas surrounding Plaintiff's and Class Members' residences, thereby exposing them to EtO.

89.    As a direct and proximate result of Defendant's creation of a public nuisance and the exposure to EtO resulting therefrom, Plaintiff and the Class Members presently suffer, and will continue to suffer, a present increased risk of illness, disease or disease process, and the resulting present need to incur the cost of reasonably medically necessary diagnostic testing for the early detection of illness, disease or disease process. Plaintiff and Class Members therefore seek as damages the cost of a medical monitoring program for such detection.

## COUNT III
## PRIVATE NUISANCE

90.    Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 89 as if fully set forth herein.

19

91.    At all times relevant hereto, Defendant, as successor and current owner of the Atlas Point plant, knew EtO to be hazardous and harmful to human beings.

92.    Defendant's unreasonable use and emission of EtO from its Atlas Point plant constituted an unreasonable invasion of Plaintiff's and the Class Members' interests and rights of reasonable use and enjoyment of their properties and their rights to enjoyment of life free from breathing toxic air contaminants.

93.    Defendant's unreasonable use and emission of EtO from its Atlas Point plant constituted negligent or reckless conduct.

94.    Defendant's unreasonable use and emission of EtO from its Atlas Point plant was an ultrahazardous or abnormally dangerous condition or activity and thus constitutes an absolute nuisance, or nuisance per se, for which Defendant is strictly liable.

95.    Defendant's unreasonable use and emission of EtO from its Atlas Point plant violated existing laws intended to protect public health and safety, and thus Defendant's conduct constitutes an absolute nuisance, or nuisance per se, for which Defendant is strictly liable.

96.    For example, Defendant violated 7 Del. C. § 6003(a)(1) through the unpermitted release of ethylene oxide.

97.    Defendant also violated Condition 3.38 of Permit APC-2016/0068-CONSTRUCTION (Amendment 3) by not maintaining and operating its facility in a manner consistent with good air pollution control practice for minimizing emissions.

98.    Defendant also violated 7 Del. C. § 6003(a)(2) and sections 3.2.1 and 3.2.3 of 7 DE Admin. Code 7201, for the unpermitted release of deluge water, used to contain the release of ethylene oxide in the air.

99.    Defendant's operation of its Atlas Point plant caused those who live in the surrounding area to breathe air containing high levels of EtO on a routine and constant basis, causing a substantially elevated risk of cancer.

100.    As a proximate result of the Defendant's operation of its plant, Plaintiff and the Class Members' common rights to breathe clean air without dangerous levels of carcinogens such as EtO were infringed and/or severely diminished.

101.    As a proximate result of Defendant's operation of its plant, EtO continuously invaded and contaminated the areas surrounding Plaintiff's and Class Members' residences, thereby exposing them to EtO.

102.    As a direct and proximate result of Defendant's creation of a private nuisance and the exposure to EtO resulting therefrom, Plaintiff and the Class Members presently suffer, and will continue to suffer, a present increased risk of illness, disease or disease process, and the resulting present need to incur the cost of reasonably medically necessary diagnostic testing for the early detection of illness, disease or disease process.  Plaintiff and Class Members therefore seek as damages the cost of a medical monitoring program for such detection.

## COUNT IV

## NEGLIGENCE

103.    Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 102 as if fully set forth herein.

104.    As successor and current owner of the Atlas Point plant, Defendant owed Plaintiff and Class Members a duty to operate its Atlas Point plant in a manner which would not cause Plaintiff and Class Members injury or harm, and Plaintiff and Class Members were foreseeable victims located within the scope of the risk created by the Defendant's conduct.

105.    Defendant negligently breached its duty of care by releasing and allowing the release of EtO from its Atlas Point plant, by failing to take steps to minimize or eliminate the release of EtO, by failing to utilize alternative procedures that would not result in the release of EtO, failing to use proper materials in constructing the plant, failing to institute proper procedures and training for response to releases of toxic EtO, and by releasing EtO into a heavily populated community.

106.    Defendant owed Plaintiff and Class Members a duty of reasonable care commensurate with the risk of operating the Atlas Point plant.

107.    Given the likelihood of contamination of neighboring areas and exposure to their residents, Defendant had a duty to investigate the extent to which EtO released from the Atlas Point plant was likely contaminating the air at levels to materially increase nearby residents' likelihood and risk of developing cancer and other diseases.

108.    Defendant negligently breached its duty by, *inter alia:*

   a.    Emitting dangerous amounts of EtO into the air;

   b.    Failing to employ safe methods to adequately control or eliminate EtO emissions from the plant;

   c.    Failing to use alternative procedures which would not result in the emission of EtO into neighboring communities;

   d.    Failing to locate its EtO processing to an unpopulated, or at least much less populated, area; and

   e.    Failing to warn neighboring residents that they were being exposed to EtO and of the consequent risks of disease the residents acquired because of that exposure.

109.    As a direct and proximate result of Defendant's negligence and their exposure to EtO, Plaintiff and the Class Members presently suffer, and will continue to suffer, a present

22

increased risk of illness and disease, and the resulting present need to incur the cost of reasonably

medically necessary diagnostic testing for the early detection of illness, disease or disease process.

Plaintiff and Class Members therefore seek as damages the cost of a medical monitoring program

for such detection.

## COUNT V

## WILLFUL AND WANTON CONDUCT

110.   Plaintiff repeats, realleges, and incorporates by reference the allegations contained

in paragraphs 1 through 109 as if fully set forth herein.

111.   At all times relevant, Defendant, as successor and current owner of the Atlas Point

plant, owed a duty to refrain from willful, wanton, reckless and outrageous conduct and/or conduct

which exhibited an utter indifference and/or conscious disregard to the health, safety, and well-

being of Plaintiff and those living in the areas surrounding its plant.

112.   Upon information and belief, Defendant was, at all times relevant, aware that EtO is

highly carcinogenic, mutagenic and/or otherwise harmful to humans.

113.   Upon information and belief, Defendant was, at all times relevant, aware of the

considerable health risks associated with the emission of EtO from the Atlas Point plant, including

the risk of causing various forms of cancer in the surrounding population.

114.   Upon information and belief, Defendant was, at all times relevant, aware that its

processing of EtO and the production of surfactants at the Atlas Point plant actually resulted in the

unreasonably dangerous emission of EtO into the surrounding communities.

115.   Notwithstanding this actual knowledge, Defendant breached its duties by, among

other things:

      a.   Emitting dangerous amounts of EtO into the air;

23

    b.   Failing to employ safe methods to adequately control EtO emissions from its plant;

    c.   Failing to use alternative procedures which would not result in the emission of EtO into neighboring communities;

    d.   Failing to locate its EtO processing facilities in an unpopulated or less populated area;

    e.   Failing to warn neighboring residents that they were being exposed to EtO and of the consequent risks of disease the residents acquired because of that exposure;

    f.   Failing to take steps to minimize or eliminate the release of EtO, by failing to utilize alternative procedures that would not result in the release of EtO

    g.   Failing to use proper materials in constructing the plant; and

    h.   Failing to institute proper procedures and training for response to releases of toxic EtO.

116.    Defendant's failures in these and other respects in the face of actual knowledge regarding the risks of unreasonable EtO emissions constitutes willful, wanton, reckless and outrageous conduct, and demonstrates an utter indifference and/or conscious disregard to the health, safety, and well-being of Plaintiff and those living in the areas surrounding its Atlas Point plant.

117.    As a direct and proximate result of Defendant's willful, wanton, reckless and outrageous conduct, Plaintiff and the Class Members presently suffer, and will continue to suffer, a present increased risk of illness, disease or disease process, and the resulting present need to incur the cost of reasonably medically necessary diagnostic testing for the early detection of illness, disease or disease process. Plaintiff and Class Members therefore seek as damages the cost of a

medical monitoring program for such detection, which has been made reasonably medically necessary as a result of Defendant's conduct.

## COUNT VI

## MEDICAL MONITORING

118.   Plaintiff repeats, realleges, and incorporates by reference the allegations contained in paragraphs 1 through 117 as if fully set forth herein.

119.   Plaintiff and Class Members have been significantly exposed to EtO levels that are far higher than normal background levels. EtO is a dangerous carcinogen that has been proven to cause cancer in humans.

120.   Plaintiff and Class Members came into direct contact with EtO due to Defendant's tortious actions.

121.   As a proximate result of their exposure to EtO, Plaintiff and Class Members have a significantly increased risk of contracting several different types of cancer. This increased risk makes periodic diagnostic medical examinations reasonably necessary.

122.   Monitoring procedures exist that makes early detection of these cancers possible and beneficial. These monitoring procedures are different than those normally recommended in the absence of toxic exposures and are reasonably necessary due to Plaintiff's and Class Members' exposures to EtO.

123.   As a result, Plaintiff and the Class should be awarded the quantifiable costs of such a monitoring regime.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of all Class Members proposed in this Complaint, respectfully request that the Court enter judgment in their favor and against Defendant as follows:

a.    For an Order certifying the Class, as defined herein, and appointing Plaintiff and their Counsel to represent the Class;

b.    For an award of damages, including nominal and compensatory damages, as allowed by law and in an amount to be determined;

c.    For an award to fund a medical monitoring program in an amount determined just and reasonable;

d.    For an award of punitive damages as allowed by law and in an amount to be determined;

e.    For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

f.    For prejudgment interest on all amounts awarded;

g.    For injunctive and declaratory relief, under Rule 23(b)(2) and (c)(4) and as otherwise allowed by law, including,

      i.    Injunctive relief under 23(b)(2) as necessary and appropriate to establish a court-supervised program of medical monitoring for the medically necessary diagnostic testing for the early detection of illness, disease or disease process; and

      ii.    Issue certification under Rule 23(c)(4) as necessary and appropriate to provide declaratory relief as to each element of each cause of action alleged herein (ultrahazardous activity/strict liability, private nuisance, public nuisance, negligence, willful and wanton conduct, and medical monitoring).

h.    Such other and further relief as this Court may deem just and proper.

## **JURY TRIAL DEMAND**

Plaintiff demands a jury trial on all issues so triable.

Date: August 24, 2020

*Attorneys for the Plaintiff and
the Putative Class*

*/s/ Kyle J. McGee*
Kyle J. McGee (DE # 5558)
Thomas V. Ayala (DE # 6629)
M. Elizabeth Graham*
GRANT & EISENHOFER P.A.
123 Justison Street
Wilmington, Delaware 19801
kmcgee@gelaw.com
tayala@gelaw.com
egraham@gelaw.com
P: (302) 622-7000
F: (302) 622-7100

T. Michael Morgan*
MORGAN & MORGAN, P.A.
20 N Orange Ave., Suite 1600
Orlando, FL 32801
mmorgan@ForThePeople.com
P: (407) 418-2031
F: (407) 245-3384

John A. Yanchunis*
Marcio W. Valladares*
MORGAN & MORGAN, COMPLEX
LITIGATION GROUP
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
jyanchunis@ForThePeople.com
mvalladares@ForThePeople.com
P: (813) 223-5505
F: (813) 223-5402

Rene F. Rocha*
MORGAN & MORGAN, COMPLEX
LITIGATION GROUP
3530 Magazine St.
New Orleans, LA 70115
rrocha@ForThePeople.com
P:  (954) 318-0268
F:  (954) 327-3018

Appx48

Frank M. Petosa*
MORGAN & MORGAN, COMPLEX
LITIGATION GROUP
8151 Peters Road
Suite 4000
Plantation, FL 33324
fpetosa@ForThePeople.com
P: (954) 318-0268
F: (954) 327-3018

*Pro Hac Vice forthcoming

*Attorneys for the Plaintiff and
the Putative Class*

JS 44  (Rev. 09/19)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Catherine Baker individually and on behalf of all others similarly situated | Croda Inc. f/k/a Croda, Inc. |

| **(b)** County of Residence of First Listed Plaintiff _____ *(EXCEPT IN U.S. PLAINTIFF CASES)* | County of Residence of First Listed Defendant _____ *(IN U.S. PLAINTIFF CASES ONLY)* <br> NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF <br> THE TRACT OF LAND INVOLVED. |
|---|---|

| **(c)**  Attorneys *(Firm Name, Address, and Telephone Number)* <br> Kyle J. McGee, Esq. <br> Grant & Eisenhofer P.A. <br> 123 Justison St., Wilmington, DE 19801, (302) 622-7000 | Attorneys *(If Known)* |
|---|---|

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
      Plaintiff

☒ 3  Federal Question
      *(U.S. Government Not a Party)*

☐ 2  U.S. Government
      Defendant

☐ 4  Diversity
      *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                  *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance <br> ☐ 120 Marine <br> ☐ 130 Miller Act <br> ☐ 140 Negotiable Instrument <br> ☐ 150 Recovery of Overpayment & Enforcement of Judgment <br> ☐ 151 Medicare Act <br> ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) <br> ☐ 153 Recovery of Overpayment of Veteran's Benefits <br> ☐ 160 Stockholders' Suits <br> ☐ 190 Other Contract <br> ☐ 195 Contract Product Liability <br> ☐ 196 Franchise | **PERSONAL INJURY** <br> ☐ 310 Airplane <br> ☐ 315 Airplane Product Liability <br> ☐ 320 Assault, Libel & Slander <br> ☐ 330 Federal Employers' Liability <br> ☐ 340 Marine <br> ☐ 345 Marine Product Liability <br> ☐ 350 Motor Vehicle <br> ☐ 355 Motor Vehicle Product Liability <br> ☒ 360 Other Personal Injury <br> ☐ 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY** <br> ☐ 365 Personal Injury - Product Liability <br> ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability <br> ☐ 368 Asbestos Personal Injury Product Liability <br> **PERSONAL PROPERTY** <br> ☐ 370 Other Fraud <br> ☐ 371 Truth in Lending <br> ☐ 380 Other Personal Property Damage <br> ☐ 385 Property Damage Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 <br> ☐ 690 Other <br><br> **LABOR** <br> ☐ 710 Fair Labor Standards Act <br> ☐ 720 Labor/Management Relations <br> ☐ 740 Railway Labor Act <br> ☐ 751 Family and Medical Leave Act <br> ☐ 790 Other Labor Litigation <br> ☐ 791 Employee Retirement Income Security Act | ☐ 422 Appeal 28 USC 158 <br> ☐ 423 Withdrawal 28 USC 157 <br><br> **PROPERTY RIGHTS** <br> ☐ 820 Copyrights <br> ☐ 830 Patent <br> ☐ 835 Patent - Abbreviated New Drug Application <br> ☐ 840 Trademark <br><br> **SOCIAL SECURITY** <br> ☐ 861 HIA (1395ff) <br> ☐ 862 Black Lung (923) <br> ☐ 863 DIWC/DIWW (405(g)) <br> ☐ 864 SSID Title XVI <br> ☐ 865 RSI (405(g)) | ☐ 375 False Claims Act <br> ☐ 376 Qui Tam (31 USC 3729(a)) <br> ☐ 400 State Reapportionment <br> ☐ 410 Antitrust <br> ☐ 430 Banks and Banking <br> ☐ 450 Commerce <br> ☐ 460 Deportation <br> ☐ 470 Racketeer Influenced and Corrupt Organizations <br> ☐ 480 Consumer Credit (15 USC 1681 or 1692) <br> ☐ 485 Telephone Consumer Protection Act <br> ☐ 490 Cable/Sat TV <br> ☐ 850 Securities/Commodities/ Exchange <br> ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** <br> ☐ 210 Land Condemnation <br> ☐ 220 Foreclosure <br> ☐ 230 Rent Lease & Ejectment <br> ☐ 240 Torts to Land <br> ☐ 245 Tort Product Liability <br> ☐ 290 All Other Real Property | **CIVIL RIGHTS** <br> ☐ 440 Other Civil Rights <br> ☐ 441 Voting <br> ☐ 442 Employment <br> ☐ 443 Housing/ Accommodations <br> ☐ 445 Amer. w/Disabilities - Employment <br> ☐ 446 Amer. w/Disabilities - Other <br> ☐ 448 Education | **PRISONER PETITIONS** <br> **Habeas Corpus:** <br> ☐ 463 Alien Detainee <br> ☐ 510 Motions to Vacate Sentence <br> ☐ 530 General <br> ☐ 535 Death Penalty <br> **Other:** <br> ☐ 540 Mandamus & Other <br> ☐ 550 Civil Rights <br> ☐ 555 Prison Condition <br> ☐ 560 Civil Detainee - Conditions of Confinement | **FEDERAL TAX SUITS** <br> ☐ 870 Taxes (U.S. Plaintiff or Defendant) <br> ☐ 871 IRS—Third Party 26 USC 7609 <br><br> **IMMIGRATION** <br> ☐ 462 Naturalization Application <br> ☐ 465 Other Immigration Actions | ☐ 891 Agricultural Acts <br> ☐ 893 Environmental Matters <br> ☐ 895 Freedom of Information Act <br> ☐ 896 Arbitration <br> ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision <br> ☐ 950 Constitutionality of State Statutes |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from Another District *(specify)*
☐ 6 Multidistrict Litigation - Transfer
☐ 8 Multidistrict Litigation - Direct File

| VI. CAUSE OF ACTION | Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*: <br> Class Action Fairness Act, 28 U.S.C. § 1332(d) <br> Brief description of cause: <br> Environmental (damages resulting from its dangerous and reckless emission of Ethylene Oxide) |
|---|---|

| VII. REQUESTED IN COMPLAINT: | ☒ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P. | DEMAND $ | CHECK YES only if demanded in complaint: <br> JURY DEMAND:   ☒ Yes   ☐ No |
|---|---|---|---|

| VIII. RELATED CASE(S) IF ANY | *(See instructions):* | JUDGE _____ | DOCKET NUMBER _____ |
|---|---|---|---|

| DATE <br> 08/24/2020 | SIGNATURE OF ATTORNEY OF RECORD <br> /s/ Kyle J. McGee |
|---|---|

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

Appx50

**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| CATHERINE BAKER, individually and on behalf of all others similarly situated | ) ) ) | |
| Plaintiff, | ) ) | Case No. 20-cv-01108-MN |
| v. | ) ) | |
| CRODA INC. f/k/a CRODA, INC., | ) ) | |
| Defendant. | ) | |

**STIPULATION AND [PROPOSED] ORDER EXTENDING TIME
FOR DEFENDANT TO ANSWER COMPLAINT**

WHEREAS, on August 24, 2020, plaintiff Catherine Baker ("Plaintiff") filed her Class Action Complaint (the "Complaint");

IT IS HEREBY STIPULATED AND AGREED, by and among Plaintiff and Defendant, subject to the approval of the Court, that the time for Defendant to answer, move, or otherwise plead in response to the Complaint is extended to and including October 13, 2020.

GRANT & EISENHOFER P.A.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Kyle J. McGee*
Kyle J. McGee (#5558)
Thomas V. Ayala (#6628)
123 Justison Street
Wilmington, Delaware 19801
(302) 622-7000
kmcgee@gelaw.com
tayala@gelaw.com
   *Attorneys for Plaintiff*

*/s/ Kenneth J. Nachbar*
Kenneth J. Nachbar (# 2067)
Zi-Xiang Shen (#6072)
1201 North Market Street
Wilmington, Delaware 19801
(302) 658-9200
knachbar@mnat.com
zshen@mnat.com
   *Attorney for Defendant*


IT IS SO ORDERED this _____ day of September, 2020.


_____
   Judge


2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CATHERINE BAKER, individually and on behalf of all others similarly situated | ) ) ) | |
| Plaintiff, | ) ) | Case No. 20-cv-01108-MN |
| v. | ) ) ) | |
| CRODA INC. f/k/a CRODA, INC., | ) ) | |
| Defendant. | ) ) | |

## DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT

Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), Defendant Croda

Inc. f/k/a Croda, Inc. ("Defendant") moves to dismiss Plaintiff Catherine Baker's Class Action

Complaint.  The grounds for this motion are set forth more fully in the accompanying opening

brief.

MORRIS, NICHOLS, ARSHT &
TUNNELL LLP


/s/ Kenneth J. Nachbar

OF COUNSEL:

Stephen Swedlow
Athena Dalton
QUINN EMANUEL URQUHART &
    SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL  60606
(312) 705-7400
stephenswedlow@quinnemanuel.com
athenadalton@quinnemanuel.com


October 13, 2020

Kenneth J. Nachbar (#2067)
Zi-Xiang Shen (#6072)
1201 North Market Street
Wilmington, DE  19801
(302) 658-9200
knachbar@mnat.com
zshen@mnat.com
    *Attorneys for Defendant*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CATHERINE BAKER, individually and on behalf of all others similarly situated | ) ) ) | |
| Plaintiff, | ) ) | Case No. 20-cv-01108-MN |
| v. | ) ) | |
| CRODA INC. f/k/a CRODA, INC., | ) ) | |
| Defendant. | ) | |

**OPENING BRIEF IN SUPPORT OF**
**CRODA INC.'S MOTION TO DISMISS**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Kenneth J. Nachbar (# 2067)
Zi-Xiang Shen (#6072)
1201 N. Market Street
Wilmington, DE  19801
(302) 658-9200
knachbar@mnat.com
zshen@mnat.com
  *Attorneys for Defendant*

OF COUNSEL:

Stephen A. Swedlow
Athena D. Dalton
QUINN EMANUEL URQUHART &
  SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL  60606
(312) 705-7400
stephenswedlow@quinnemanuel.com
athenadalton@quinnemanuel.com

October 13, 2020

TABLE OF CONTENTS

Page

I.      INTRODUCTION ....................................................................................1

II.     SUMMARY OF ARGUMENT ...............................................................1

III.    FACTUAL BACKGROUND ..................................................................4

IV.     LEGAL STANDARD .............................................................................5

        A.      12(b)(1) Motion to Dismiss for Lack of Subject Matter
                Jurisdiction ..................................................................................5

        B.      12(b)(6) Motion to Dismiss for Failure to State a Claim ............7

V.      ARGUMENT ..........................................................................................7

        A.      This Case Should Be Dismissed Under Rule 12(b)(1)
                Because This Court Does Not Have CAFA Jurisdiction .............7

        B.      All Claims Should Be Dismissed Under Rule 12(b)(6) For
                Failure to State a Claim ..............................................................10

                1.      All Claims Should Be Dismissed Under Rule 12(b)(6)
                        Because Plaintiff Has Not Alleged a Compensable
                        Injury .............................................................................11

                2.      Plaintiff Has Not Stated a Medical Monitoring Claim ..................14

                3.      Plaintiff Has Not Stated a Claim for Ultrahazardous
                        Activity ..........................................................................15

                4.      Plaintiff Has Not Stated a Claim for Public Nuisance
                        and Lacks Standing to Bring the Claim. .......................16

                5.      Plaintiff Has Not Stated a Claim for Private Nuisance ................17

                6.      Plaintiff Has Not Stated a Claim for Negligence ...........19

                7.      Plaintiff Has Not Stated a Claim for Willful or Wanton
                        Conduct ..........................................................................19

VI.     CONCLUSION .....................................................................................20

# TABLE OF AUTHORITIES

**Page**

## Cases

*Adkins v. Rumsfeld,*
    450 F. Supp. 2d 440 (D. Del. 2006) ............................................................. 7

*Alderman v. Clean Earth, Inc.*,
    954 A.2d 909 (Del. 2008) ........................................................................ 14

*Alderman v. Clean Earth*,
    No. CIV.A. 04C-06-181FSS, 2007 WL 1334565 (Del. Super. Ct. Apr. 30, 2007) ................ 14

*Am. Elec. Power Co. v. Connecticut*,
    564 U.S. 410 (2011) ............................................................................... 17

*United States v. Anderson*,
    669 A.2d 73 (Del. 1995) .......................................................................... 12

*In re Asbestos Litig.*,
    No. CIV.A. 87C-09-24, 1994 WL 16805917 (Del. Super. Ct. Aug. 5, 1994) ............ 11, 12

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ...................................................................... 17, 19, 20

*Bair v. Peck*,
    738 F.Supp. 1354 (D. Kan. 1990) ............................................................. 8, 9

*Baldonado v. Avrinmeritor, Inc.*,
    No. 13-833-SLR-CJB, 2014 WL 2116112 (D. Del. May 20, 2014) ....................... 20

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ...................................................................... 7, 15, 17

*Brzoska v. Olsen*,
    No. SN92C-06-142, 1994 WL 233866 (Del. Super. Ct. May 2, 1994) ................... 13

*Brzoska v. Olson*,
    668 A.2d 1355 (Del. 1995) ......................................................... 3, 11, 13, 14

*Christine Baker v. Croda, Inc.*,
    2:19-cv-21234-JMV-JBC (D. N.J.) ........................................................ 4, 5, 9

*Cropper v. Rego Distrib. Ctr., Inc.*,
    542 F. Supp. 1142 (D. Del. 1982) ............................................................. 15

*Dayton v. Collison*,
    No. CV N17C-08-100 CLS, 2019 WL 4668157 (Del. Super. Ct. Sept. 24, 2019) ...... 16, 17, 18

*Gould Elecs. Inc. v. United States*,
    220 F.3d 169 (3d Cir. 2000) ....................................................................... 6

*Hartig Drug Co. v. Senju Pharm. Co.*,
  836 F.3d 261 (3d Cir. 2016) ............................................................................ 6, 7

*Hudson v. Old Guard Ins. Co.*,
  3 A.3d 246 (Del. 2010) ..................................................................................... 19

*State ex rel. Jennings v. Purdue Pharma L.P.*,
  No. CVN18C01223MMJCCLD, 2019 WL 446382 (Del. Super. Ct. Feb. 4, 2019) ............... 16

*Kaufman v. Allstate New Jersey Ins. Co.*,
  561 F.3d 144 (3d Cir. 2009) ................................................................................ 8

*Kitson v. Bank of Edwardsville*,
  No. CIV 06-528-GPM, 2006 WL 3392752 (S.D. Ill. Nov. 22, 2006) ......................... 8

*M.G. ex rel. K.G. v. A.I. Dupont Hosp. for Children*,
  393 F. App'x 884 (3d Cir. 2010) ................................................................. 3, 13, 14

*Mergenthaler v. Asbestos Corp. of Am.*,
  480 A.2d 647 (Del. 1984) ................................................................. 3, 12, 13, 14

*Metro-N. Commuter R.R. Co. v. Buckley*,
  521 U.S. 424 (1997) ........................................................................................... 4

*Moore v. Sharp Gas Inc.*,
  No. CIV. A. 90-504 MMS, 1992 WL 147930 (D. Del. June 11, 1992) ................. 15

*Nutt v. A.C. & S., Inc.*,
  466 A.2d 18 (Del. Super. Ct. 1983) ............................................................. 3, 11

*Patton v. Simone*,
  No. CIV. A. 90C-JA-29, 1993 WL 144361 (Del. Super. Ct. Mar. 9, 1993) ............ 16

*Polanco v. Omnicell, Inc.*,
  988 F. Supp. 2d 451 (D.N.J. 2013) ..................................................................... 6

*Reilly v. Ceridian Corp.*,
  664 F.3d 38 (3d Cir. 2011) ................................................................................ 17

*In re Schering Plough Corp. Intron/Temodar Consumer Class Action Litig.*,
  678 F.3d 235 (3d Cir. 2012) ................................................................................ 6

*Thomas-Fish v. Avborne Accessory Grp., Inc.*,
  No. 18-1195-MN-SRF, 2019 WL 3281273 (D. Del. July 19, 2019) ..................... 19

*Vodenichar v. Halcon Energy Props., Inc.*,
  733 F.3d 497 (3d Cir. 2013) ........................................................................... 6, 8

*Willon v. Werb*,
  No. N17C-03-161 VLM, 2019 WL 6705003 (Del. Super. Ct. Dec. 9, 2019) ......... 19

*Zambelli Fireworks Mfg. Co. v. Wood*,
  592 F.3d 412 (3d Cir. 2010) ................................................................................ 5

**Statutory Authorities**

28 U.S.C. § 1332...................................................................................................*passim*

**Rules and Regulations**

7 Del. C. § 6003(a)(1)............................................................................................. 18

Fed. R. Civ. P. 12(b)(1)..........................................................................................*passim*

Fed. R. Civ. P. 12(b)(6)..........................................................................................*passim*

I.        INTRODUCTION

This Court should dismiss this suit under Rule 12(b)(1) for lack of subject matter jurisdiction and, in the alternative, should dismiss this suit for failure to state a claim under Rule 12(b)(6).  The Plaintiff's sole basis for federal jurisdiction is the Class Action Fairness Act, which grants a district court jurisdiction over class action suits with at least 100 class members and aggregate damages over $5 million.  However, the Class Action Fairness Act requires the Court to decline jurisdiction where at least two-thirds of the class members are members of the same state as the defendant.  Here, the sole defendant is a Delaware corporation defending allegations that it harmed Delaware residents who lived near its New Castle facility.  At least two-thirds of the putative class members are Delaware residents.  As a result, this Court must decline to exercise jurisdiction pursuant to CAFA's "home state" exception in 28 U.S.C. § 1332(d)(4)(B).

This Court should also dismiss this suit under Rule 12(b)(6) because Plaintiff fails to state a claim. Plaintiff alleges that she and members of the putative class are faced with an increased risk of developing a serious disease in the future as a result of exposure to ethylene oxide emitted from Croda's facility.  Neither Plaintiff nor any member of the class has actually been diagnosed with a serious illness—the only injury alleged in the Complaint is an "increased risk" of developing a disease in the future.  Every claim asserted in this action fails because an increased risk of developing a disease in the future, by itself, is not a cognizable injury in Delaware.  Therefore, all of Plaintiff's claims must be dismissed under Rule 12(b)(6).

II.       SUMMARY OF ARGUMENT

1.        Having twice failed to properly plead jurisdiction in the District of New Jersey, Plaintiff has now filed a complaint in this District which similarly fails to establish federal jurisdiction.  The sole basis of federal jurisdiction pled in the Complaint is the Class Action Fairness Act.  (Compl. (D.I. 1) ¶ 10).

- 1 -

2.      Under the Class Action Fairness Act, district courts have jurisdiction over class actions with at least 100 class members, at least $5 million in controversy, and minimal diversity— that is, at least one plaintiff being a citizen of a different state than the defendant.  28 U.S.C. § 1332(d).  However, the Class Action Fairness Act *requires* a district court to decline jurisdiction where at least two-thirds of the class are citizens of the same state as the primary defendant. 28 U.S.C. § 1332(d)(4)(B).

3.      Here, it is more likely than not that at least two-thirds of the putative class are citizens of Delaware, the same state where Croda Inc. is incorporated.  The proposed class is defined to include only persons who have lived within three census tracts immediately surrounding Croda's Atlas Point facility in New Castle, Delaware for at least one year.  It is more likely than not that at least two-thirds of these persons are still citizens of Delaware.

4.      The Class Action Fairness Act also gives a district discretion to decline jurisdiction over a class action in which more than one-third, but fewer than two-thirds, of the class members are citizens of the same state as the primary defendant.  28 U.S.C. § 1332(d)(3).  In making this determination, the court should consider factors including whether the claims involve matters of local interest, will be governed by Delaware law, and whether the action was brought in a forum with a  "district nexus with the class members, the alleged harm, or the defendant[.]"  *Id.*

5.      Here, if the Court does not find that it is required to abstain from exercising jurisdiction, it should voluntarily decline jurisdiction.  This action involves claims arising under Delaware law filed on behalf of persons who have lived in Delaware for at least one year, and *at least* one-third of the class consists of Delaware citizens.  The sole defendant is Croda, a Delaware corporation.  Therefore, the factors set out in Section 1332(d)(3) all weigh in favor of the Court voluntarily declining jurisdiction.

6.      If the Court finds that it does have jurisdiction over this case, it should still dismiss the claims under Rule 12(b)(6) because each one fails to state a claim upon which relief can be granted.

7.      All of Plaintiff's claims fail because they do not state a compensable injury.  Each claim states that Plaintiff and class members have an increased risk of developing a serious illness in the future.  However, in Delaware, increased risk without any underlying physical injury is not a cognizable harm.  *See Brzoska v. Olson*, 668 A.2d 1355, 1362 (Del. 1995); *see also Nutt v. A.C. & S., Inc.*, 466 A.2d 18, 26 (Del. Super. Ct. 1983), *aff'd sub nom. Mergenthaler v. Asbestos Corp. of Am.*, 480 A.2d 647 (Del. 1984).  Since neither Plaintiff nor any class member has alleged a present physical injury or current diagnosis, they have failed to allege a cognizable harm.  As a result, each claim must be dismissed under Rule 12(b)(6).

8.      Plaintiff's medical monitoring claim fails for the independent reason that Delaware does not recognize medical monitoring as an independent cause of action.  *See M.G. ex rel. K.G. v. A.I. Dupont Hosp. for Children*, 393 F. App'x 884, 892 n.6 (3d Cir. 2010) (applying Delaware law).

9.      Plaintiff's other claims fail for the independent reason that Plaintiff has not included sufficient detail to support a cause of action.  Plaintiff has merely recited the bare elements of her claims, without sufficient supporting detail to plead her claims.

10.      Finally, Plaintiff's public nuisance claim fails because Plaintiff lacks standing to bring the claim.

11.      Finally, Plaintiff's public nuisance claim fails because Plaintiff lacks standing to bring the claim.

12.     For these reasons, the Court should either dismiss this suit for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure Rule 12(b)(1), or, in the alternative, it should dismiss all claims for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).

III.    FACTUAL BACKGROUND

Croda Inc. has produced various specialty chemicals at the Atlas Point complex in New Castle, Delaware since 2006.  In 2015, Croda, with all the required state and county approvals, started construction on a new bio-ethylene oxide plant that would be the first facility in the United States to produce ethylene oxide using bioethanol. Croda uses the ethylene oxide it produces onsite to make other products at the Atlas Point facility.  Croda completed construction of its bio-ethylene oxide plant in late 2018, and began operations. Shortly after the plant opened, a gasket installed by a subcontractor that did not meet the engineering specifications failed, resulting in an ethylene oxide leak. Croda and first responders sprayed thousands of gallons of deluge water into the air to quickly dissolve the leaked ethylene oxide which prevented it from negatively impacting the surrounding community.  (Compl. (D.I. 1) ¶ 37).

Plaintiff Christine Baker (a Delaware resident) initially filed suit against Croda (a Delaware corporation) in the District of New Jersey, alleging that the ethylene oxide emitted from Croda's New Castle facility caused her and members of the putative class to be at an increased risk of developing cancer or another serious illness in the future.  *Christine Baker v. Croda, Inc.*, 2:19-cv-21234-JMV-JBC (D. N.J.) at Dkt. 1 (Complaint).   New Jersey, unlike Delaware, allows plaintiffs to recover the expense of medical monitoring even without proof of physical harm or a current diagnosis of a serious illness. *See Metro-N. Commuter R.R. Co. v. Buckley*, 521 U.S. 424, 440-41 (1997) (noting that New Jersey permitted the creation of a "court-supervised fund to administer medical-surveillance payments" in at least one case where plaintiffs had been exposed

- 4 -

to a toxin, but had not developed any injury or disease).  After Croda filed two motions to dismiss on the grounds that the District of New Jersey was not a proper forum, Ms. Christine Baker voluntarily dismissed her own case without prejudice.  *Christine Baker v. Croda, Inc.*, 2:19-cv-21234-JMV-JBC (D. N.J.) at Dkt. 35 (Plaintiff Christine Baker's Notice of Dismissal Without Prejudice).

Plaintiff has filed nearly-identical claims in this District on behalf of Catherine Baker.  In her Complaint, Plaintiff alleges that the emission of ethylene oxide from the Atlas Point facility since 1988 has exposed her and Class Members to a hazardous chemical which increases their risk of developing certain diseases.  (Compl. (D.I. 1) ¶¶ 1-6).  Although Croda has secured all required permits and inspections to operate the Atlas Point facility, including the approval of the Delaware Department of Natural Resources and Environmental Control to restart the bio-ethylene oxide plant after the ethylene oxide leak, Plaintiff has asserted claims for ultrahazardous activity/strict liability, public nuisance, private nuisance, negligence, willful and wanton conduct, and medical monitoring based on alleged emissions from the facility.  (Compl. (D.I. 1) ¶¶ 73-123).  The Class Members include only persons who have not been diagnosed with cancer or an illness, disease, or disease process of the kind caused by ethylene oxide.  (Compl. (D.I. 1) ¶ 63).  However, Plaintiff asserts that both she and Class Members are at "an increased risk of illness and disease," and seek the cost of a medical monitoring program to detect for early signs or symptoms of disease as a remedy for each asserted claim.  (Compl. (D.I. 1) ¶¶ 68).

IV.    LEGAL STANDARD

    A.    12(b)(1) Motion to Dismiss for Lack of Subject Matter Jurisdiction

"Federal courts are courts of limited jurisdiction, and when there is a question as to [their] authority to hear a dispute, 'it is incumbent upon the courts to resolve such doubts, one way or the

- 5 -

other, before proceeding to a disposition on the merits.'" *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 418 (3d Cir. 2010).  In evaluating a Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction, "a court must first determine whether the movant presents a facial or factual attack." *In re Schering Plough Corp. Intron/Temodar Consumer Class Action Litig.*, 678 F.3d 235, 243 (3d Cir. 2012).

"In reviewing a facial attack, the court must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff." *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000). In contrast, "a factual 12(b)(1) challenge attacks allegations underlying the assertion of jurisdiction in the complaint, and it allows the defendant to present competing facts."  *Hartig Drug Co. v. Senju Pharm. Co.*, 836 F.3d 261, 268 (3d Cir. 2016).  In evaluating a factual 12(b)(1) challenge, "the court need not presume the truth of the allegations and is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case, … and can look beyond the pleadings to decide factual matters relating to jurisdiction." *Polanco v. Omnicell, Inc.*, 988 F. Supp. 2d 451, 458 (D.N.J. 2013) (internal citations omitted).

When federal jurisdiction is based on the Class Action Fairness Act ("CAFA"), the party asserting jurisdiction has the burden of showing that its case meets the threshold requirements for federal jurisdiction:  specifically, an amount in controversy over $5 million; at least 100 members in the putative class; and at least one class member who is a citizen of a different state than the defendant.  28 U.S.C. § 1332(d)(2) & (5). The CAFA "statute includes two mandatory exceptions to federal subject matter jurisdiction, known as the 'local controversy' and 'home state' exceptions." *Vodenichar v. Halcon Energy Props., Inc.*, 733 F.3d 497, 503 (3d Cir. 2013).  Once CAFA jurisdiction is established, a "party seeking to invoke an exception [requiring a court to

- 6 -

decline that jurisdiction] bears the burden of proving by a preponderance of the evidence that the exception applies." *Id.*

        B.    <u>12(b)(6) Motion to Dismiss for Failure to State a Claim</u>

To withstand a motion to dismiss under Rule 12(b)(6), the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In deciding a Rule 12(b)(6) motion, a court "must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complaint's claims are based upon these documents." *Hartig Drug Co.*, 836 F.3d 261 at 273 (internal citations and quotations omitted). "The purpose of a motion to dismiss is to test the sufficiency of a complaint[.]" *Adkins v. Rumsfeld*, 450 F. Supp. 2d 440, 444 (D. Del. 2006). "When considering a motion to dismiss, a court must accept as true all allegations in the complaint and must draw all reasonable factual inferences in the light most favorable to the plaintiff." *Id.* The Court should dismiss where it appears "that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief." *Id.*

        V.    <u>ARGUMENT</u>

        A.    <u>This Case Should Be Dismissed Under Rule 12(b)(1) Because This Court Does Not Have CAFA Jurisdiction</u>

This case should be dismissed for lack of subject matter jurisdiction. In the Complaint, Plaintiff asserts that this Court has jurisdiction pursuant to the Class Action Fairness Act. (Compl. (D.I. 1) ¶ 10). However, this Court does not properly have jurisdiction over this case because the "home state" exception to federal jurisdiction under the Class Action Fairness Act (CAFA) applies. Specifically, the home state exception to CAFA jurisdiction, contained in 28 U.S.C. § 1332(d)(4)(B) applies to this action because (1) more than two-thirds of the proposed class

members are citizens of Delaware, and (2) the primary (and only) defendant is a citizen of Delaware.

The Class Action Fairness Act, or "CAFA," provides that "district courts shall have original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which [ ] any member of a class of plaintiffs is a citizen of a State different from any defendant." 28 U.S.C. § 1332(d)(2)(A). CAFA provides two mandatory exceptions to the exercise of federal jurisdiction: the "home state exception" and the "local controversy" exception. *Vodenichar v. Halcon Energy Props., Inc.*, 733 F.3d 497, 503 (3d Cir. 2013) *citing* 28 U.S.C. § 1332(d)(4)(A)–(B). The statute provides that "[a] district court shall decline to exercise jurisdiction . . . over a class action in which . . . two-thirds or more of the members of all proposed plaintiff classes in the aggregate, and the primary defendants, are citizens of the State in which the action was originally filed." 28 U.S.C. § 1332(d)(4)(B). The home state exception is mandatory, so if the Court finds that it applies, it is required to refuse to exercise jurisdiction. *Kaufman v. Allstate New Jersey Ins. Co.*, 561 F.3d 144, 149 (3d Cir. 2009).

The party invoking the exception only needs to show that "it is more likely than not that over two-thirds of the members of the class" are citizens of the same state as the primary defendant." *Kitson v. Bank of Edwardsville*, No. CIV 06-528-GPM, 2006 WL 3392752, at *7 (S.D. Ill. Nov. 22, 2006). Evidence regarding the citizenship of the class "is not required to be perfect." *Id.* For example, courts have "allowed a presumption of domicile upon proof of residency," *Bair v. Peck*, 738 F.Supp. 1354, 1356 (D. Kan. 1990) and have also accepted mailing addresses as "evidence of [ ] citizenship." *Kitson*, 2006 WL 3392752, at *6.

Here, it is undisputed that Croda Inc.—the sole defendant in this case—is incorporated in Delaware. (*See* Compl. (D.I. 1) ¶ 9 (stating that "Croda is a Delaware corporation"); *see also* Decl. of C. Manuelli ¶¶ 5-9 and Exs. 1 and 2 to Manuelli Decl.). Under the Class Action Fairness Act, "[a] corporation shall be deemed to be a citizen of every state … which it has been incorporated and of the State … where it has its principal place of business[.]" 28 U.S.C. § 1332(c)(1). Croda Inc. is incorporated in Delaware. Therefore, Croda is considered a citizen of Delaware for the purposes of CAFA jurisdiction. Since this case has been filed in the District of Delaware, if at least two-thirds of the putative class are Delaware citizens, this Court does not have subject matter jurisdiction over this case.

> The putative Class is defined in the Complaint as follows:
>
> All natural persons who have resided within census tracts 10003015400, 10003105502 and 10003015802 (the "Class Zone") for a period of one year or more at any time beginning January 1, 1988 and the present (the "Class Period").

(Compl. (D.I. 1) ¶ 62). Census tracts 10003015400, 10003105502 and 10003015802 are all located in New Castle County, Delaware. Since the Class is limited to persons who have resided in Delaware for at least a year, and residency in a state can support a presumption of domicile in that same state (*Bair*, 738 F. Supp. at 1356), it follows that a supermajority of the class are likely Delaware citizens. This conclusion is bolstered by the fact that the original class definition in *Christine Baker v. Croda*, 2:19-cv-21234-JMV-JBC (D.N.J.) limited the class to "[a]ll natural persons, **who are currently citizens of Delaware**, and who have resided within census tracts 10003015400, 10003105502 and 10003015802" during the designated period.[1] *See Christine*

---

[1]   In *Christine Baker v. Croda*, 2:19-cv-21234-JMV-JBC (D.N.J.) Plaintiff voluntarily dismissed her own case without prejudice and re-filed nearly identical claims in the above-captioned action.

*Baker v. Croda*, 2:19-cv-21234-JMV-JBC (D.N.J.) at Dkt. 1 ¶ 56.  If the original class definition

proposed by Plaintiff was limited to ***Delaware citizens*** who lived near the Atlas Point facility, it

follows that a nearly-identical class complaint filed in Delaware represents primarily Delaware

citizens.  In short, the "home state" exception to CAFA applies here, and this Court is required to

abstain from exercising federal jurisdiction over this case.[2]

#### B.  All Claims Should Be Dismissed Under Rule 12(b)(6) For Failure to State a Claim

All of Plaintiff's claims should be dismissed under Rule 12(b)(6) because the complaint

fails to allege a single claim upon which relief can be granted.  Plaintiff's Complaint fails to plead

any viable claim because it does not allege that Plaintiff or any Class Member has been diagnosed

with cancer or another serious illness as a result of living near the Atlas Point facility.  In fact, the

putative class specifically excludes "all persons who have been currently diagnosed with cancer

or illness, disease or disease process of the kind caused by EtO[.]"  (Compl. (D.I. 1) ¶ 63).  Injury

is a threshold requirement for each claim, and Plaintiff's only alleged injury is that "Plaintiff and

Class Members suffer a present increased risk of illness, disease and disease process." (*Id.* ¶ 6).

Fear of developing a disease in the future—without any present, underlying physical injury—is

not a compensable injury under Delaware law.

---

[2]  If the Court does not find that at least two-thirds of the class members are Delaware
citizens, the Court "may, in the interests of justice," decline to exercise jurisdiction under
CAFA for a class action "in which greater than one-third but less than two-thirds of the
members of all proposed plaintiff classes" and the defendant are citizens of the State in
which the action was originally filed.  28 U.S.C. § 1332(d)(3).  In making this decision, the
Court should consider whether the claims will be governed by Delaware law, whether the
action was brought in a forum with a "distinct nexus with the class members, the alleged
harm, or the defendants," and whether the number of Delaware citizens in the proposed
class "is substantially larger than the number of citizens from any other State."  *Id.*  This
action is a textbook example of an inherently local dispute between Delaware citizens and
Delaware defendant regarding a Delaware chemical plant.  The court should, in the
interests of justice, decline to exercise federal jurisdiction.

Plaintiff also asserts a claim for medical monitoring (Compl. (D.I. 1) ¶¶ 118-123), which is not recognized as an independent cause of action under Delaware law.  All of Plaintiff's other claims seek an award of the cost of a medical monitoring program as a remedy for various common law torts (*Id*. ¶¶ 73-117), which also fail as a matter of law because a plaintiff cannot recover for the costs of medical monitoring without proof of a physical injury under Delaware law.

1.    All Claims Should Be Dismissed Under Rule 12(b)(6) Because Plaintiff Has Not Alleged a Compensable Injury

Plaintiff has not adequately pled claims for strict liability, public nuisance, private nuisance, negligence, willful and wanton conduct, or medical monitoring because she has not alleged any compensable injury.  Plaintiff alleges that as a result of Defendant's negligence, "Plaintiff and the Class Members presently suffer, and will continue to suffer, a present increased risk of illness, disease or disease process, and the resulting present need to incur the cost of reasonably medically necessary diagnostic testing for the early detection of illness."  (*Id*. ¶ 80 (Claim 1)).  Plaintiff makes nearly-identical allegations of harm for all other claims.  (*See id*. ¶¶ 89, 102, 109, and 117 (identical language for Claims 2 through 5) and *id*. ¶ 121 ("Plaintiff and Class Members have a significantly increased risk of contracting several different types of cancer") (Claim 6)).  In short, the only harm alleged in the Complaint is the "present increased risk of disease."  In Delaware, the increased risk of developing a disease as a result of exposure to a toxin, without more, is not a compensable injury.

The lack of a compensable injury is fatal to Plaintiff's claims.  To prevail on any tort claim, a plaintiff must demonstrate "that the plaintiff has in fact suffered harm of a kind legally compensable by damages."  *In re Asbestos Litig.*, No. CIV.A. 87C-09-24, 1994 WL 16805917, at *1 (Del. Super. Ct. Aug. 5, 1994); *see also Brzoska*, 668 A.2d at 1362 (where plaintiffs "sustained no physical injury . . . they could not recover under a negligence theory.").  Fear of developing a

- 11 -

disease in the future "without a demonstrable physical change in bodily condition . . . is not compensable." *Nutt v. A.C. & S., Inc.*, 466 A.2d 18, 26 (Del. Super. Ct. 1983), *aff'd sub nom. Mergenthaler v. Asbestos Corp. of Am.*, 480 A.2d 647 (Del. 1984). Similarly, under Delaware law, where "plaintiffs do not have a compensable physical injury, plaintiffs may not recover for the expenses of medical surveillance." *In re Asbestos Litig.*, 1994 WL 16805917, at *2 (denying a request for medical surveillance damages in a negligence case). The Delaware Supreme Court has explicitly held that the requirement of a *present* physical injury is an approach adopted to prevent recovery on "speculative claims for future harm." *United States v. Anderson*, 669 A.2d 73, 77 (Del. 1995). "The requirement of a preceding physical injury prohibits plaintiffs from claiming that exposure to toxic substances, for instance, has created an increased risk of harm not yet manifested in a physical disease." *Id.* Thus, Delaware courts has determined—as a matter of public policy—that a present physical injury is a mandatory prerequisite to recovering damages for increased risk of developing a disease in the future.

Plaintiff cannot recover medical surveillance damages by simply alleging that she may have been exposed to a toxin. To recover any damages, she must allege "present physical injury." Plaintiff has not stated a claim upon which relief can be granted because she has not alleged a physical injury resulting from her exposure to ethylene oxide. The Delaware Supreme Court squarely addressed this issue when it affirmed the dismissal of a putative class action seeking medical monitoring for alleged asbestos exposure. *Mergenthaler v. Asbestos Corp. of Am.,* 480 A.2d 647, 649 (Del. 1984). In *Mergenthaler*, the Delaware Supreme Court held that "a claim for the expenses of medically required surveillance and related mental anguish . . . fails to state a claim upon which relief can be granted ***where there is no present physical injury***." *Id.* (emphasis added).

Where plaintiffs "concede that they have suffered no physical injury due to wrongful [toxin] exposure . . . that concession is dispositive." *Id.* at 651.

Delaware courts have continued to apply the *Mergenthaler* holding that physical injury is required to recover medical surveillance damages. In *Brzoska v. Olsen*, a class of plaintiffs sued after learning that they had been treated by a dentist who was infected with HIV. No. SN92C-06-142, 1994 WL 233866, at *1 (Del. Super. Ct. May 2, 1994), *aff'd in part, rev'd in part sub nom. Brzoska v. Olson*, 668 A.2d 1355 (Del. 1995). Although no plaintiff had tested positive for HIV, plaintiffs sued to recover for the costs of medical monitoring under several theories of liability, including negligence. *Id.* at *2. The court ruled that plaintiffs could not "maintain their cause of action for mental distress resulting from fear of disease," and dismissed their negligence claim. *Id.* at *1.

Plaintiff has not alleged that she or any class member has developed cancer or another serious illness as a result of exposure to ethylene oxide—rather, she alleges only that they an increased risk of developing cancer in the future. (Compl. (D.I. 1) ¶ 54). Similarly, the Complaint alleges that the putative class is at "increased risk of developing cancer," but specifically excludes from the class "all persons who have been currently diagnosed with cancer or illness, disease or disease process of the kind caused by EtO" (*id.* ¶¶ 54, 57). In short, the Complaint does not allege that Plaintiff or any Class Member has developed an illness as a result of living near Croda's Atlas Point facility. This bars every claim asserted in this action. "[D]amages for claims of . . . fear of contracting a disease [ ] are recoverable only if the underlying physical injury is shown," *Brzoska*, 668 A.2d at 1362, *citing Mergenthaler*, 480 A.2d at 651. Plaintiffs have failed to plead a cognizable injury for any of their claims.

- 13 -

2.    <u>Plaintiff Has Not Stated a Medical Monitoring Claim</u>

Plaintiff's medical monitoring claim should be dismissed because "[t]he Delaware Supreme Court has not recognized a cause of action for medical monitoring." *M.G. ex rel. K.G. v. A.I. Dupont Hosp. for Children*, 393 F. App'x 884, 892 n.6 (3d Cir. 2010) (applying Delaware law). However, even if the Delaware Supreme Court were to recognize a claim for independent medical monitoring, Plaintiff's claim, as pled, would still fail.

Medical monitoring is not an independent cause of action in Delaware. In some cases, it has been allowed as a remedy for a tort which resulted in a physical injury—such as medical malpractice claim. However, Delaware courts have never "explicitly recognized medical monitoring as a legally cognizable cause of action." *M.G. ex rel. K.G.*, 393 F. App'x at 891. A Court sitting in diversity must "predict how the state's supreme court would resolve the issue" by evaluating the decisions of that state's intermediate courts. *Id.* Neither the Delaware Supreme Court nor any lower court has ever recognized medical monitoring as an independent tort. *See Brzoska,* 668 A.2d at 1359 (dismissing a negligence claim that sought medical surveillance as a remedy); *see also Mergenthaler,* 480 A.2d at 651 (denying recovery of medical monitoring expenses where plaintiffs had failed to demonstrate a physical injury); *Alderman v. Clean Earth*, No. CIV.A. 04C-06-181FSS, 2007 WL 1334565, at *1 (Del. Super. Ct. Apr. 30, 2007), *aff'd sub nom. Alderman v. Clean Earth, Inc.*, 954 A.2d 909 (Del. 2008) (striking a medical monitoring damages theory where residents claimed they were exposed to contaminated water and sought medical monitoring expenses as damages for their negligence and strict liability claims). The Third Circuit recently considered whether "the Delaware Supreme Court [would] recognize a medical monitoring cause of action," and "declin[ed] to predict whether the Delaware Supreme Court might acknowledge some variant of a medical monitoring claim." *M.G. ex rel. K.G.*, 393 F. App'x at 891-893. While Delaware cases recognize medical monitoring as a potential remedy for

- 14 -

an independent tort (in inapplicable circumstances where plaintiff has also alleged present physical injury), it is not a cognizable standalone claim in Delaware.

> 3.   Plaintiff Has Not Stated a Claim for Ultrahazardous Activity

Plaintiff's claim for strict liability/ultrahazardous activity should be dismissed because Plaintiff has failed to state a claim.[3]  "Delaware courts have been hesitant to extend [the] application" of strict liability.  *Cropper*, 542 F. Supp. at 1149.  It is not sufficient to allege that a defendant carried out an activity with risks or "failed to exercise the degree of care commensurate with the danger[]" or the activity."  *Id.*  Delaware courts have applied the strict liability theory narrowly—e.g., to "an activity being conducted in an inappropriate location" or an activity "totally lacking in social utility."  *Id.* (collecting cases).  Delaware courts consider the following factors in determining whether an activity is ultrahazardous:

   (a)   existence of a high degree of risk of some harm to the person, land or chattel of others;

   (b)   likelihood that the harm that results from it will be great;

   (c)   inability to eliminate the risk by the exercise of reasonable care;

   (d)   extent to which the activity is not a matter of common usage;

   (e)   inappropriateness of the activity to the place where it is carried on; and

   (f)   extent to which its value to the community is outweighed by its dangerous attributes.

*Moore v. Sharp Gas Inc.*, No. CIV. A. 90-504 MMS, 1992 WL 147930, at *2 (D. Del. June 11, 1992) (holding that the transmission of natural gas via pipe is not an ultrahazardous activity).

---

[3]   As discussed in Section IV.B.1, Plaintiff's ultrahazardous activity claim fails because Plaintiff has not alleged a cognizable harm.  A plaintiff seeking compensation under an abnormally dangerous activity theory must demonstrate harm.  *Cropper v. Rego Distrib. Ctr., Inc.*, 542 F. Supp. 1142, 1149 (D. Del. 1982).  Fear of developing a disease in the future, without any current physical injury, is not a cognizable harm in Delaware.

- 15 -

Plaintiff's strict liability claim includes only "formulaic recitation[s] of the elements of a cause of action" which are insufficient to state a claim under Rule 12(b)(6). *Twombly*, 550 U.S. at 555. Plaintiff asserts that Croda's ethylene oxide facility is "exceedingly dangerous" and "offer[s] little or no value to the surrounding community." (Compl. (D.I. 1) ¶ 78). However, Plaintiff has not pled that the manufacturing and use of ethylene oxide "is not a matter of common usage" or that "its value to the community is outweighed by its dangerous attributes." Plaintiff has not included facts supporting her bare claim that the risk of ethylene oxide emissions "cannot be eliminated" or that processing ethylene oxide "cannot be made safe by the exercise of the utmost care." (*Id.* ¶¶ 75-76). These are the sort of formulaic allegations which do not meet the pleading standard of Rule 12(b)(6). Plaintiff's ultrahazardous activity claim should be dismissed.

4.    Plaintiff Has Not Stated a Claim for Public Nuisance
and Lacks Standing to Bring the Claim.

Plaintiff has not stated a claim for public nuisance and lacks standing to assert it. In Delaware, "a public nuisance is [an] activity which produces some tangible injury to neighboring property or persons coming into contact with it and which a court considers to be objectionable under the circumstances." *State ex rel. Jennings v. Purdue Pharma L.P.*, No. CVN18C01223MMJCCLD, 2019 WL 446382, at *11 (Del. Super. Ct. Feb. 4, 2019). "To have standing to sue on a public nuisance claim, an individual must (1) be capable of recovering damages and (2) have standing to sue as a representative of the public." *Dayton v. Collison*, No. CV N17C-08-100 CLS, 2019 WL 4668157, at *3 (Del. Super. Ct. Sept. 24, 2019). A private plaintiff only has standing to bring a public nuisance claim where they "suffered injury of a kind different from that suffered by other members of the public." *Patton v. Simone*, No. CIV. A. 90C-JA-29, 1993 WL 144361, at *1 (Del. Super. Ct. Mar. 9, 1993). Here, Plaintiff has not alleged that she has "standing to sue as a representative of the public," or that she has "suffered a harm of a

- 16 -

kind different from that suffered by other members of the public."  Rather, Plaintiff alleges that

she—and thousands of others who have lived in census tracts 10003015400, 10003105502, and

10003015802 over several decades—were exposed to ethylene oxide sometime between 1988 and

2020.  (Compl. (D.I. 1) ¶¶ 50-51 ("Plaintiff and Class Members have lived within the vicinity of

the Atlas Point plant . . . [and] have inhaled toxic EtO")).  Having failed to plead a special or

different kind of injury from other residents, Plaintiff lacks standing to bring a public nuisance

claim.

Plaintiff has also failed to plead a viable public nuisance claim under Delaware law.[4]

Plaintiff has not alleged a "tangible injury" as required by Delaware law, asserting only an

unspecified, future risk of developing a disease.  *See Reilly v. Ceridian Corp.*, 664 F.3d 38, 42 (3d

Cir. 2011) (an indefinite risk of future harm is not a cognizable injury injury).  Plaintiff has also

failed to meet the pleading standards for a public nuisance claim with her bare recitation of the

elements of the claim.  Where, as here, a plaintiff relies on "[t[hreadbare recitals of the elements

of a cause of action, supported by mere conclusory statements," she has failed to state a claim.  *See*

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Twombly*, 550 U.S. at 555.

5.   <u>Plaintiff Has Not Stated a Claim for Private Nuisance</u>

The Complaint does not state a claim for private nuisance.  Delaware recognizes claims for

"a nontrespassory invasion of another's interest in the private use and enjoyment of their land."

*Dayton v. Collison*, No. CV N17C-08-100 CLS, 2019 WL 4668157, at *5 (Del. Super. Ct. Sept.

24, 2019).  The Complaint alleges that the Atlas Point facility "constitutes an absolute nuisance or

nuisance per se."  (Compl. (D.I. 1) ¶ 95).  A claim for nuisance *per se* exists where there has been

---

[4]      To the extent that Plaintiff asserts a public nuisance claim under federal common law, that claim is preempted by the Clean Air Act.  *See Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 429 (2011).

- 17 -

"1) intentional, unreasonable interference with property rights of another; 2) interference resulting from an abnormally hazardous activity conducted on the person's property; and 3) interference in violation of a statute intended to protect public safety." *Dayton*, 2019 WL 4668157, at *5.

Plaintiff has not made out a claim for "intentional, unreasonable . . . interference in violation of a statute intended to protect public safety." The Complaint itself describes the ethylene oxide leak as an "accident," and not an intentional act. (Compl. (D.I. 1) ¶ 8). Further, all of the statutes that Plaintiff identifies to support its negligence *per se* claim were allegedly violated during the November 25, 2018 accident described in the Complaint. (*Id*. ¶¶ 37-39, describing the use of deluge water to disperse leaked ethylene oxide and a subsequent settlement agreement relating to 7 Del. C. § 6003(a)(1)). However, Plaintiff asserts that as a result of operating the Atlas Point facility, "EtO ***continuously*** invaded and contaminated the areas surrounding Plaintiff's and Class Members' residences." (Compl. ¶ 101 (emphasis added)). The statutory violations Plaintiff lists in paragraphs 96, 97, and 98 of the Complaint—including the unpermitted use of deluge water to disperse ethylene oxide in the air—all relate to the November 25, 2018 accident.[5] (Compl. ¶¶ 37-39, describing the use of deluge water to disperse leaked ethylene oxide and a subsequent settlement agreement relating to 7 Del. C. § 6003(a)(1)). By definition, a single incident is not a "continuous" invasion of Plaintiff's property.

The Complaint also fails to provide any support for its bare allegation that the operation of the Atlas Point facility was unreasonable. As explained in Section IV.B.3, *supra*, the Complaint has not established the operation of the Atlas Point facility is an "abnormally hazardous activity,"

---

[5]   To the extent that Plaintiff states a nuisance *per se* claim at all, it applies only to persons who lived near the Atlas Point facility on November 25, 2018.

and failed to weigh any purportedly dangerous attributes of the facility against its value to the community.  The nuisance per se claim has not been properly stated, and should be dismissed.

> 6.     Plaintiff Has Not Stated a Claim for Negligence

Plaintiff has not pled a claim for negligence.  Under Delaware law, a claim for negligence must plead (1) duty, (2) breach, (3) causation, and (4) damages.  *Hudson v. Old Guard Ins. Co.*, 3 A.3d 246, 250 (Del. 2010).  As discussed in Section IV.B.1, Plaintiff has failed to allege a cognizable harm.  In addition, Plaintiff has also failed to meet the pleading standard under *Iqbal* for the elements of duty, breach, and proximate causation.  A "formulaic recitation of the elements of a cause of action" is not sufficient to make out a claim.  *Iqbal*, 556 U.S. at 678.

Here, Plaintiff asserts generally that Croda "owed Plaintiff and Class Members a duty to operate its Atlas Point plant in a manner which would not cause Plaintiff and Class Members injury or harm," then asserts that this duty was breached by emitting ethylene oxide into the air and failing "to take steps to minimize or eliminate the release of EtO."  (Compl. (D.I. 1) ¶¶ 104-05).  This cursory recitation of the duty and breach elements for negligence is not sufficient to state a claim, and Plaintiff's negligence claim should be dismissed.

> 7.     Plaintiff Has Not Stated a Claim for Willful or
>        Wanton Conduct

Plaintiff has not made out a claim for willful or wanton conduct.  In Delaware, "[t]here is a clear distinction between wantonness and negligence, as the former term includes the elements of consciousness of one's conduct, realization of the probability of injury to another, and disregard of the consequences." *Willon v. Werb*, No. N17C-03-161 VLM, 2019 WL 6705003, at *2 (Del. Super. Ct. Dec. 9, 2019).  "In other words, a willful or wanton disregard of a plaintiff's rights—as opposed to negligence—reflects a 'conscious indifference' or an 'I-don't-care attitude.'"  *Id.* Allegations that a defendant acted willfully or with malice must be pled with "factual averments

descriptive of conduct" and not merely recitations of the elements of a claim.  *Thomas-Fish v. Avborne Accessory Grp., Inc.*, No. 18-1195-MN-SRF, 2019 WL 3281273, at *4 (D. Del. July 19, 2019).

Here, Plaintiff has not alleged that Croda acted "with malice" and has not listed any facts demonstrating willful or wanton conduct.  Rather, Plaintiff states only that Croda "owed a duty to refrain from willful and wanton conduct," and that Plaintiff and the class "suffer, and will continue to suffer, a present increased risk of illness" as a "direct and proximate result of Defendant's willful, wanton, reckless and outrageous conduct."  (Compl. (D.I. 1) ¶¶ 111, 117).  "[T]his was 'precisely the type of vague, 'defendant-unlawfully-harmed me accusation' that the Supreme Court [ ] condemned' in *Iqbal*."  *Baldonado v. Avrinmeritor, Inc.*, No. 13-833-SLR-CJB, 2014 WL 2116112, at *5 (D. Del. May 20, 2014).  Plaintiff's claim for willful and wanton conduct is insufficient and should therefore be dismissed.

VI.    <u>CONCLUSION</u>

For these reasons, Croda respectfully requests that the Court enter an order to dismiss this case for lack of subject matter jurisdiction under Rule 12(b)(1) or, in the alternative, enter an order to dismiss for failure to state a claim under Rule 12(b)(6).

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Kenneth J. Nachbar*
Kenneth J. Nachbar (# 2067)
Zi-Xiang Shen (#6072)
1201 N. Market Street
Wilmington, DE  19801
(302) 658-9200
knachbar@mnat.com
zshen@mnat.com
  *Attorneys for Defendant*

OF COUNSEL:

Stephen A. Swedlow
Athena D. Dalton
QUINN EMANUEL URQUHART &
 SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL  60606
(312) 705-7400
stephenswedlow@quinnemanuel.com
athenadalton@quinnemanuel.com

October 13, 2020

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CATHERINE BAKER, individually and on behalf of  )
all others similarly situated  )
      )
           Plaintiff,  )    Case No. 20-cv-01108-MN
      )
     v.  )
      )
CRODA INC. f/k/a CRODA, INC.,  )
      )
           Defendant.  )

**DECLARATION OF CHRISTINA MANUELLI IN SUPPORT OF CRODA INC.'S
MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION
PURSUANT TO RULE 12(B)(1)**

I, CHRISTINA MANUELLI, of full age, do hereby declare as follows:

1.    I am the North American Corporate Counsel for Croda Inc. I have held that position since August 2015. I also serve as Croda Inc.'s Corporate Secretary and one of its directors. As a result, I have personal knowledge of the facts and circumstances set forth in this Declaration.

2.    This Declaration is made in support of Croda Inc.'s Motion to Dismiss for Lack of Subject Matter Jurisdiction Pursuant to Rule 12(b)(1).

**<u>Corporate Name Change</u>**

3.    Attached as Exhibit 1 is a true and correct copy of a certified document from the Delaware Secretary of State listing documents on file with the Delaware Secretary of State relating to Croda Inc. The document attached as Exhibit 1 was retrieved from public databases or other public records maintained by the State of Delaware.

4.    "Croda, Inc." formally changed its name to "Croda Inc." on November 25, 2019. (Ex. 1 at 33). Documents attached to this Declaration that predate November 25, 2019 refer to "Croda, Inc." and documents after that date refer to "Croda Inc."

1

## Croda Inc. Is Incorporated In Delaware

5.      Croda Inc. was first incorporated in Delaware on November 10, 1950. (Ex. 1 at 1, 3-10).

6.      Croda Inc.—formerly known as Croda, Inc.—has been continuously incorporated in the State of Delaware since 1950, up to and including, today. (Ex. 1 at 1-33).

7.      Attached as Exhibit 2 is a true and correct copy of a Certificate of Good Standing from the Delaware Secretary of State for Croda Inc. (Ex. 2). The document attached as Exhibit 2 was retrieved from public databases or other public records maintained by the State of Delaware.

8.      Exhibit 2 certifies that "Croda Inc. is duly incorporated under the laws of the State of Delaware and is in good standing and has a legal corporate existence" as of February 20, 2020. (Ex. 2). Croda Inc. is still incorporated in Delaware as of October 12, 2020.

9.      Exhibit 2 further certifies that all Annual Reports and Franchise Taxes required by Delaware law have been filed and paid to date. (Ex. 2).

Dated: October 13, 2020               By:    _Christina Manuelli_____

                                             CHRISTINA MANUELLI

2

# EXHIBIT 1



# Delaware

Page 1

### The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED ARE TRUE AND CORRECT COPIES OF ALL DOCUMENTS ON FILE OF "CRODA INC." AS RECEIVED AND FILED IN THIS OFFICE.

THE FOLLOWING DOCUMENTS HAVE BEEN CERTIFIED:

CERTIFICATE OF INCORPORATION, FILED THE TENTH DAY OF NOVEMBER, A.D. 1950, AT 9 O`CLOCK A.M.

CERTIFICATE OF MERGER, FILED THE TWENTY-SIXTH DAY OF DECEMBER, A.D. 1974, AT 10 O`CLOCK A.M.

CERTIFICATE OF AMENDMENT, FILED THE TWENTY-THIRD DAY OF AUGUST, A.D. 1979, AT 10 O`CLOCK A.M.

CERTIFICATE OF MERGER, FILED THE TWENTIETH DAY OF DECEMBER, A.D. 1985, AT 10 O`CLOCK A.M.

CERTIFICATE OF OWNERSHIP, FILED THE SEVENTEENTH DAY OF DECEMBER, A.D. 1987, AT 10 O`CLOCK A.M.

CERTIFICATE OF OWNERSHIP, FILED THE TWENTY-SECOND DAY OF DECEMBER, A.D. 1987, AT 10 O`CLOCK A.M.



442428  8100H
SR# 20201338988

Authentication: 202431223
Date: 02-20-20

You may verify this certificate online at corp.delaware.gov/authver.shtml

Appx83



# Delaware

Page 2

### The First State

*CERTIFICATE OF MERGER, FILED THE TWENTY-FIRST DAY OF JUNE, A.D. 1989, AT 10 O`CLOCK A.M.*

*CERTIFICATE OF MERGER, FILED THE TWENTY-FOURTH DAY OF SEPTEMBER, A.D. 2018, AT 8:53 O`CLOCK P.M.*

*AND I DO HEREBY FURTHER CERTIFY THAT THE EFFECTIVE DATE OF THE AFORESAID CERTIFICATE OF MERGER IS THE THIRTIETH DAY OF SEPTEMBER, A.D. 2018 AT 11:59 O'CLOCK P.M.*

*CERTIFICATE OF AMENDMENT, CHANGING ITS NAME FROM "CRODA, INC." TO "CRODA INC.", FILED THE TWENTY-SIXTH DAY OF NOVEMBER, A.D. 2019, AT 2:18 O`CLOCK P.M.*

*AND I DO HEREBY FURTHER CERTIFY THAT THE AFORESAID CERTIFICATES ARE THE ONLY CERTIFICATES ON RECORD OF THE AFORESAID CORPORATION, "CRODA INC.".*



442428  8100H

SR# 20201338988

Authentication: 202431223

Date: 02-20-20

You may verify this certificate online at corp.delaware.gov/authver.shtml

Appx84

CERTIFICATE OF INCORPORATION

OF

CRODA, INC.

FIRST.  The name of the corporation is

CRODA, INC.

SECOND.  Its principal office in the State of
Delaware is located at No. 100 West Tenth Street, in the City
of Wilmington, County of New Castle.  The name and address
of its resident agent is The Corporation Trust Company,
No. 100 West Tenth Street, Wilmington, Delaware.

THIRD.  The nature of the business, or objects or
purposes to be transacted, promoted or carried on are:

To manufacture, purchase, or otherwise acquire wool
wax alcohol, a refined product of wool grease, and to market
and sell the same for its own account and for others.

To manufacture, purchase or otherwise acquire, in-
vest in, own, mortgage, pledge, sell, assign and transfer or
otherwise dispose of, trade, deal in and deal with goods,
wares and merchandise and personal property of every class
and description.

To acquire, and pay for in cash, stock or bonds
of this corporation or otherwise, the good will, rights, assets
and property, and to undertake or assume the whole or any
part of the obligations or liabilities of any person, firm,
association or corporation.

To acquire, hold, use, sell, assign, lease, grant
licenses in respect of, mortgage or otherwise dispose of
letters patent of the United States or any foreign country,

00002

patent rights, licenses and privileges, inventions, improvements and processes, copyrights, trade-marks and trade names, relating to or useful in connection with any business of this corporation

To acquire by purchase, subscription or otherwise, and to receive, hold, own, guarantee, sell, assign, exchange, transfer, mortgage, pledge or otherwise dispose of or deal in and with any of the shares of the capital stock, or any voting trust certificates in respect of the shares of capital stock, script, warrants, rights, bonds, debentures, notes, trust receipts, and other securities, obligations, choses in action and evidences of indebtedness or interest issued or created by any corporations, joint stock companies, syndicates, associations, firms, trusts or persons, public or private, or by the government of the United States of America, or by any foreign government, or by any state, territory, province, municipality or other political subdivision or by any governmental agency, and as owner thereof to possess and exercise all the rights, powers and privileges of ownership, including the right to execute consents and vote thereon, and to do any and all acts and things necessary or advisable for the preservation, protection, improvement and enhancement in value thereof.

To enter into, make and perform contracts of every kind and description with any person, firm, association, corporation, municipality, county, state, body politic or government or colony or dependency thereof.

To borrow or raise moneys for any of the purposes of the corporation and, from time to time, without limit as to amount to draw, make, accept, endorse, execute and issue promissory notes, drafts, bills of exchange, warrants, bonds, debentures and other negotiable or non-negotiable instruments

0003

- 2 -

Case 1:20-cv-01108-MN   Document 9-1   Filed 10/13/20   Page 6 of 19 PageID #: 78

and evidences of indebtedness, and to secure the payment of
any thereof and of the interest thereon by mortgage upon or
pledge, conveyance or assignment in trust of whole or any
part of the property of the corporation, whether at the time
owned or thereafter acquired, and to sell, pledge or other-
wise dispose of such bonds or other obligations of the cor-
poration for its corporate purposes.

      To loan to any person, firm or corporation any
of its surplus funds, either with or without security.

      To purchase, hold, sell and transfer the shares
of its own capital stock; provided it shall not use its funds
or property for the purchase of its own shares of capital
stock when such use would cause any impairment of its capital
except as otherwise permitted by law, and provided further
that shares of its own capital stock belonging to it shall
not be voted upon directly or indirectly.

      To have one or more offices, to carry on all or any
of its operations and business and without restriction or limit
as to amount to purchase or otherwise acquire, hold, own,
mortgage, sell, convey, or otherwise dispose of real and
personal property of every class and description in any of
the States, Districts, Territories or Colonies of the United
States, and in any and all foreign countries, subject to the
laws of such State, District, Territory, Colony and Country.

      In general, to carry on any other business in
connection with the foregoing, and to have and exercise all
the powers conferred by the laws of Delaware upon corporations
formed under the General Corporation Law of the State of
Delaware, and to do any or all of the things hereinbefore set
forth to the same extent as natural persons might or could
do.

      The objects and purposes specified in the foregoing

004

- 3 -

clauses shall, except where otherwise expressed, be in nowise
limited or restricted by reference to, or inference from,
the terms of any other clause in this certificate of in-
corporation, but the objects and purposes specified in each
of the foregoing clauses of this article shall be regarded
as independent objects and purposes.

FOURTH.  The total number of shares of common
stock which the corporation shall have the authority to issue
is One Hundred (100); all of such shares shall be without
par value.

FIFTH.  The minimum amount of capital with which
the corporation will commence business is One Thousand
Dollars ($1,000.00).

SIXTH.  The names and places of residence of the
incorporators are as follows:

| NAMES | RESIDENCES |
|---|---|
| C. S. Peabbles | Wilmington, Delaware |
| S. M. Brown | Wilmington, Delaware |
| W. T. Cunningham | Wilmington, Delaware |

SEVENTH.  The corporation is to have perpetual
existence.

EIGHTH.  The private property of the stockholders
shall not be subject to the payment of corporate debts to any
extent whatever.

NINTH.  In furtherance and not in limitation of the
powers conferred by statute, the board of directors is ex-
pressly authorized:

To make, alter or repeal the by-laws of the cor-
poration.

To authorize and cause to be executed mortgages and
liens upon the real and personal property of the corporation.

00005

- 4 -

To set apart out of any of the funds of the corporation available for dividends a reserve or reserves for any proper purpose and to abolish any such reserve in the manner in which it was created.

By resolution or resolutions passed by a majority of the whole board, to designate one or more committees, each committee to consist of two or more of the directors of the corporation, which, to the extent provided in said resolution or resolutions or in the by-laws of the corporation, shall have and may exercise the powers of the board of directors in the management of the business and affairs of the corporation, and may have power to authorize the seal of the corporation to be affixed to all papers which may require it. Such committee or committees shall have such name or names as may be stated in the by-laws of the corporation or as may be determined from time to time by resolution adopted by the board of directors.

When and as authorized by the affirmative vote of the holders of a majority of the stock issued and outstanding having voting power given at a stockholders' meeting duly called for that purpose, or when authorized by the written consent of the holders of a majority of the voting stock issued and outstanding, to sell, lease or exchange all of the property and assets of the corporation, including its good will and its corporate franchises, upon such terms and conditions and for such consideration, which may be in whole or in part shares of stock in, and/or other securities of, any other corporation or corporations, as its board of directors shall deem expedient, and for the best interests of the corporation.

006

- 5 -

Case 1:20-cv-01108-MN Document 9-1 Filed 10/13/20 Page 9 of 34 PageID #: 81

TENTH. Whenever a compromise or arrangement is proposed between this corporation and its creditors or any class of them and/or between this corporation and its stockholders or any class of them, any court of equitable jurisdiction within the State of Delaware may, on the application in a summary way of this corporation or of any creditor or stockholder thereof, or on the application of any receiver or receivers appointed for this corporation under the provisions of Section 3883 of the Revised Code of 1915 of said State, or on the application of trustees in dissolution or of any receiver or receivers appointed for this corporation under the provisions of Section 43 of the General Corporation Law of the State of Delaware, order a meeting of the creditors or class of creditors, and/or of the stockholders or class of stockholders of this corporation, as the case may be, to be summoned in such manner as the said Court directs. If a majority in number representing three-fourths in value of the creditors or class of creditors, and/or of the stockholders or class of stockholders of this corporation, as the case may be, agree to any compromise or arrangement and to any reorganization of this corporation as consequence of such compromise or arrangement, the said compromise or arrangement and the said reorganization shall, if sanctioned by the Court to which the said application has been made, be binding on all the creditors or class of creditors, and/or on all the stockholders or class of stockholders, of this corporation, as the case may be, and also on this corporation.

ELEVENTH. Meetings of stockholders may be held without the State of Delaware, if the by-laws so provide. The books of the corporation may be kept (subject to any provision contained in the statutes) outside of the State of Delaware at such place or places as may be from time to time

00007

- 6 -

Appx90

Case 1:20-cv-01108-MN   Document 9-1   Filed 10/13/20   Page 19 of 29 PageID #: 82

designated by the board of directors or in the by-laws of
the corporation. Elections of directors need not be by ballot
unless the by-laws of the corporation shall so provide.

TWELFTH. The corporation reserve the right to
amend, alter, change or repeal any provision contained in
this certificate of incorporation, in the manner now or
hereafter prescribed by statute, and all rights conferred
upon stockholders herein are granted subject to this reser-
vation.

WE, THE UNDERSIGNED, being each of the incorporators
hereinbefore named for the purpose of forming a corporation
in pursuance of the General Corporation Law of the State of
Delaware, do make this certificate, hereby declaring and
certifying that the facts herein stated are true, and ac-
cordingly have hereunto set our hands and seals this 9th
day of November A.D. 1950.

0008

STATE OF DELAWARE      }
                       }   ss:
COUNTY OF NEW CASTLE    }

    BE IT REMEMBERED, That on this   9th      day of
November A.D. 1950, personally came before me, a Notary Public
for the State of Delaware, C. S. Peabbles, S. M. Brown
and W. T. Cunningham,        all of the parties to the
foregoing certificate of incorporation, known to me personally
to be such, and severally acknowledged the said certificate
to be the act and deed of the signers respectively and that
the  facts therein stated are truly set forth.

    GIVEN under my hand and seal of office the day
and year aforesaid.

                                 _____
                                    Notary Public

0009

- 8 -

<u>AGREEMENT AND PLAN OF MERGER</u>

AGREEMENT made this 2nd day of December, 1974, between CRODA, INC., a corporation of the State of Delaware, and W. & J. WHITEHEAD, INC., a corporation of the State of New Jersey; and

WHEREAS, W. & J. WHITEHEAD, INC., a corporation of the State of New Jersey, wishes to merge into CRODA, INC., a corporation of the State of Delaware so that CRODA, INC., a corporation of the State of Delaware, will continue the operation previously conducted by W. & J. WHITEHEAD, INC., a corporation of the State of New Jersey, and will become possessed of all of the assets of said corporation;

NOW, THEREFORE, in consideration of One Dollar and other good and valuable consideration, the following plan of merger is herewith adopted:

ARTICLE I. W. & J. WHITEHEAD, INC., a corporation of the State of New Jersey (hereinafter "New Jersey") shall be and is hereby merged into CRODA, INC., a corporation of the State of Delaware (hereinafter "Delaware" and/or "Surviving Corporation") which shall survive the merger and shall be governed by the Laws of the State of Delaware.

ARTICLE 2. The terms and conditions of the merger, and mode of carrying it into effect, are as follows:

1. The merger shall become effective upon the date of the filing of this Agreement and Plan of Merger in the Office of

the Secretary of State of Delaware.  The time when such merger shall become effective is herein sometimes referred to as the "effective date" of the merger.

2. Except as herein otherwise specifically set forth, the identity, existence, purposes, powers, franchises, rights and immunities of Delaware shall continue unaffected and unimpaired by the merger, and the corporate identity, existence, purposes, powers, franchises, rights and immunities of New Jersey shall be merged into Delaware, and Delaware shall be fully vested therewith.

3. The Certificate of Incorporation of Delaware shall remain as  the Certificate of Incorporation of the Surviving Corporation until the same shall be amended in accordance with the provisions thereof, except as noted herein in Article 6.

4. The By-laws of Delaware shall remain and be the By-laws of the Surviving Corporation until the same shall be altered or amended according to the provisions thereof.

5. The Surviving Corporation shall pay all expenses properly attributable to either of the merging corporations in carrying the merger into effect.

6. Upon the merger becoming effective, all rights, privileges, powers, franchises and interests of each of the merging corporations, both of a public and private nature, all of the property, real, personal and mixed, all debts due on whatever account to either of them, as well for stock subscriptions as all other things in action, or belonging to each of the merging corporations, and all and every other interest shall be taken and deemed to be transferred to and vested and shall vest in the Surviving Corporation, without further act or deed, as effectually as they

were vested in the several and respective merging corporations;
and all claims, demands, property and every other interest shall
be as effectually the property of the Surviving Corporation
as they were of the merging corporations; the title to any real
estate, vested in either of the merging corporations by deed or
otherwise, shall not revert or be in any way impaired by reason
of the merger; all rights of creditors and all liens upon the
property of the merging corporations shall be preserved unim-
paired, and all debts, liabilities, restrictions and duties of
the merging corporations shall thenceforth attach to the Sur-
viving Corporation and may be enforced against it to the same
extent as if they had been incurred or contracted by it.

7. If at any time the Surviving Corporation shall consider
or be advised that any further assignments or assurances in law or
any other things are necessary or desirable to vest or to perfect
or confirm, of record or otherwise, in the Surviving Corporation,
according to the terms of this Agreement and Plan of Merger,
the title to any property or rights of New Jersey acquired
or to be acquired by reason of, or as a result of, the merger
provided for by this Agreement and Plan of Merger, New Jersey and
its proper officers and directors shall and will execute and
deliver all such proper deeds, assignments and assurances in law
and do all things necessary or proper to vest, perfect or confirm
title to such property or rights in the Surviving Corporation
and otherwise to carry out the purposes of this Agreement and
Plan of Merger, and the proper officers and directors of New
Jersey and the proper officers of Delaware are fully authorized

13

3

in the name of New Jersey or otherwise to take any and all such action.

8. Upon the merger becoming effective, the assets and liabilities of the merging corporations, including earnings retained for use in the business, shall be taken up or continued on the books of the Surviving Corporation at the amounts in which they respectively shall be carried at that time on the books of the respective merging corporations. The surplus of Delaware resulting from the merger shall be available to be used for any purpose for which surplus may be used.

ARTICLE 3. The name of the Surviving Corporation is and shall be CRODA, INC.

ARTICLE 4. The officers and directors of Delaware shall be the officers and directors of the Surviving Corporation and they shall hold office until the next annual meeting and until their successors are chosen or appointed according to law and the by-laws of Delaware.

ARTICLE 5. The authorized capital stock of Delaware is presently one hundred (100) shares without par value, all of which have been issued and are outstanding, and all of which remain issued and outstanding.

ARTICLE 6. Paragraph "FOURTH" of the Certificate of Incorporation of Delaware presently states:

"FOURTH: The total number of shares of common stock which the corporation shall have the authority to issue is One Hundred (100); all of such shares shall be without par value."

4.

Appx96

Paragraph "FOURTH" is hereby amended as follows:

"FOURTH: The total number of shares of common stock which the corporation shall have the authority to issue is One Hundred Three (103); all of such shares shall be without par value."

ARTICLE 7. The manner and basis of converting the outstanding shares of New Jersey into shares of stock of the Surviving Corporation, to wit: Delaware, are as follows:

1. As set forth in the above ARTICLE 6, Delaware is seeking and will obtain authorization for the issuance of three (3) additional shares of capital stock without par value.

2. The issued and outstanding shares of New Jersey will be exchanged for the additional three (3) shares of capital stock of Delaware to be issued pursuant to this Agreement and Plan of Merger.

IN WITNESS WHEREOF, the parties have hereunto caused this Agreement to be properly executed this 18th day of December, 1974.

Attest:
_____
Secretary

CRODA, INC.
By:
_____
J. Michael Cannon-President

Attest:
T.F.M.
_____
Secretary

W. & J. WHITEHEAD, INC.,
By:
_____
J. Michael Cannon, President

5.

I, MARTIN NOVACK, Secretary of Croda, Inc., do hereby certify that a majority of the outstanding stock of that corporation entitled to vote thereon did vote for the adoption of the aforestated Agreement on December 2, 1974.

Dated: December 18, 1974.

I, T. F. MORRISON, Secretary of W. & J. Whitehead, Inc., do hereby certify that a majority of the outstanding stock of that corporation entitled to vote thereon did vote for the adoption of the aforestated  Agreement on December 2, 1974.

Dated: December 18, 1974.

The above Agreement and Plan of Merger having been executed on behalf of each corporate party thereto, and having been adopted separately by each corporate party thereto, in accordance with the provisions of the General Corporation Law of the State of Delaware and the provisions of N.J.S.14A;10-4 Corporations, General of New Jersey Statutes, the President of each corporate party thereto does now hereby execute the said Agreement of Merger and the Secretary of each corporate party thereto does now hereby attest the said agreement of Merger as the respective act, deed and agreement of each of the corporations this 18th day of December, 1974.

Attest:

Secretary

CRODA, INC.
By:

J. Michael Cannon, President

Attest:

Secretary

W. & J. WHITEHEAD, INC.
By:

J. Michael Cannon, President

CERTIFICATE OF AMENDMENT
of
CERTIFICATE OF INCORPORATION
of

CRODA, INC.

CRODA, INC., a corporation organized and existing

under and by virtue of the General Corporation Law of the

State of Delaware, does hereby certify:

FIRST: That at a meeting of the Board of Directors

of CRODA, INC., resolutions were duly adopted setting forth

a proposed amendment to the Certificate of Incorporation of

said corporation, declaring said amendment to be advisable

and calling a meeting of the stockholders of said corpora-

tion for consideration thereof.  The resolution setting

forth the proposed amendment is as follows:

> "RESOLVED, that the Certificate of Incorporation
> of this corporation be amended by changing
> ARTICLE 'FOURTH' thereof, so that, as amended,
> said Article shall be and read as follows:
>
> > 'FOURTH: The total number of shares of
> > common stock which the corporation shall
> > have the authority to issue is one thousand
> > (1000), all of such shares to be without
> > par value.'"

SECOND: That thereafter, pursuant to resolution of

its Board of Directors, a special meeting of the stock-

holders of said corporation was duly called, and held, upon

notice in accordance with Section 222 of the General

Corporation Law of the State of Delaware, at which meeting

00019

the necessary number of shares as required by statute
were voted in favor of the amendment.

THIRD: That said amendment was duly adopted
in accordance with the provisions of Section 242 of the
General Corporation Law of the State of Delaware.

IN WITNESS WHEREOF, said CRODA, INC., has
caused this certificate to be signed by J. MICHAEL CANNON,
its President, and attested by THOMAS F. MORRISON, its
Assistant Secretary, this 20th day of August, 1979.

CRODA, INC.,
By:

_____
President

ATTEST:
CRODA, INC.
By:

_____
Assistant-Secretary

00020

7253S4648

CERTIFICATE OF MERGER

OF

CRODA COLLOIDS CORPORATION

INTO

CRODA, INC.

\*\*\*\*\*\*\*\*\*\*\*

**FILED**

DEC 20 1985

The undersigned corporation

DOES HEREBY CERTIFY:

FIRST:  That the name and state of incorporation of each of the constituent corporations of the merger is as follows:

| NAME | STATE OF INCORPORATION |
|------|------------------------|
| Croda, Inc. | Delaware |
| Croda Colloids Corporation | New York |

SECOND:  That an agreement of merger between the parties to the merger has been approved, adopted, certified, executed and acknowledged by each of the constituent corporations in accordance with the requirements of subsection (c) of Section 252 of the General Corporation Law of the State of Delaware.

THIRD:  The name of the surviving corporation of the merger is Croda, Inc., a Delaware corporation.

FOURTH:  That the Certificate of Incorporation of Croda, Inc., a Delaware corporation, shall be the Certificate of Incorporation  of the surviving corporation.

FIFTH:  That the executed agreement of merger is on file at the principal place of business of the surviving corporation.  The address of said principal place of business is 183 Madison Avenue, New York, N. Y. 10016.

SIXTH:  That a copy of the agreement of merger will be furnished on request and without cost to any stockholder of any constituent coproration.

SEVENTH:  The authorized capital stock of each foreign corporation which i s a party to the merger is as follows:

| Corporation | Class | Number of Shares | Par value per share or statement that shares are without value |
|---|---|---|---|
| Croda Colloids Corporation | Common | 100 | No Par Value |

Dated:  December /8, 1985

CRODA, INC.

By _____
J. MICHAEL CANNON, President

ATTEST:

By _____
MARTIN NOVACK, Secretary

00003                    -2-

Case 1:20-cv-01108-MN   Document 9-1   Filed 10/13/20   Page 28 of 34 PageID #: 240

877351133

FILED
10 A.M
DEC 17 1987

SECRETARY OF STATE

## CERTIFICATE OF OWNERSHIP AND MERGER

### MERGING

### SYNTHETIC CHEMICALS INC.

### INTO

### CRODA, INC.

CRODA, INC., a corporation organized and existing under the laws of Delaware,

DOES HEREBY CERTIFY:

FIRST:     That this corporation was incorporated on the 10th day of November, 1950, pursuant to the General Corporation Law of the State of Delaware.

SECOND:     That this corporation owns all of the out-standing shares of the stock of SYNTHETIC CHEMICALS INC., a corporation incorporated on the 12th day of October, 1983, pursuant to the General Corporation Law of the State of Delaware.

THIRD:     That this corporation, by the following resolutions of its Board of Directors, duly adopted at a

Case 1:20-cv-01108-MN    Document 9-1    Filed 10/13/20    Page 23 of 34 PageID #: 95

meeting held on the 7th day of December, 1987, determined to

and did merge into itself said SYNTHETIC CHEMICALS INC.

        RESOLVED, that CRODA, INC. merge, and
it hereby does merge into itself said SYNTHETIC
CHEMICALS INC., and assumes all of its
obligations; and

        FURTHER RESOLVED, that the merger
shall be effective upon the date of filing with
the Secretary of State of Delaware; and

        FURTHER RESOLVED, that the proper
officers of this corporation be and they hereby
are directed to make and execute a Certificate
of Ownership and Merger setting forth a copy of
the resolutions to merge said SYNTHETIC
CHEMICALS INC. and assume its liabilities and
obligations, and the date of adoption thereof,
and to cause the same to be filed with the
Secretary of State and a certified copy
recorded in the office of the Recorder of Deeds
of New Castle County and to do all acts and
things whatsoever, whether within or without
the State of Delaware, which may be in anywise
necessary or proper to effect said merger.

    FOURTH:    Anything herein or elsewhere to the

contrary notwithstanding this merger may be amended or

terminated and abandoned by the board of directors of CRODA,

INC. at any time prior to the date of filing the merger with

the Secretary of State.

-2-

Case 1:20-cv-01108-MN   Document 9-1   Filed 10/13/20   Page 31 of 93 PageID #: 96

IN WITNESS WHEREOF, said CRODA, INC. has caused this certificate to be signed by J. Michael Cannon, its President and attested by Martin Novack, its Secretary, this 7*th* day of December, 1987.

CRODA, INC.

By: _____
President

ATTEST:

By: _____
Secretary

-3-

T27356051

**FILED**

DEC 22 1987

CERTIFICATE OF OWNERSHIP AND MERGER

MERGING

CRODA SURFACTANTS, INC.

INTO

CRODA, INC.

CRODA, INC., a corporation organized and existing
under the laws of Delaware,

DOES HEREBY CERTIFY:

FIRST:    That this corporation was incorporated on
the 10th day of November, 1950, pursuant to the General
Corporation Law of the State of Delaware.

SECOND:    That this corporation owns all of the out-
standing shares of the stock of CRODA SURFACTANTS, INC., a
corporation incorporated on the 11th day of October, 1965,
under the name of Bald Eagle Corporation, which name was
changed by merger to Croda Surfactants, Inc. on February 21,
1986, pursuant to the Business Corporation Law of the
Commonwealth of Pennsylvania.

THIRD:    That this corporation, by the following resolutions of its Board of Directors, duly adopted at a meeting held on the 15th day of December, 1987, determined to and did merge into itself said CRODA SURFACTANTS, INC.

        RESOLVED, that CRODA, INC. merge, and it hereby does merge into itself said CRODA SURFACTANTS, INC., and assumes all of its obligations; and

        FURTHER RESOLVED, that the merger shall be effective upon the date of filing with the Secretary of State of Delaware; and

        FURTHER RESOLVED, that the proper officers of this corporation be and they hereby are directed to make and execute a Certificate of Ownership and Merger setting forth a copy of the resolutions to merge said CRODA SURFACTANTS, INC. and assume its liabilities and obligations, and the date of adoption thereof, and to cause the same to be filed with the Secretary of State and a certified copy recorded in the office of the Recorder of Deeds of New Castle County and to do all acts and things whatsoever, whether within or without the State of Delaware, which may be in anywise necessary or proper to effect said merger.

FOURTH:    Anything herein or elsewhere to the contrary notwithstanding this merger may be amended or terminated and abandoned by the board of directors of CRODA, INC. at any time prior to the date of filing the merger with the Secretary of State.

IN WITNESS WHEREOF, said CRODA, INC. has caused this certificate to be signed by J. Michael Cannon, its President and attested by Martin Novack, its Secretary, this 15 day of December, 1987.

CRODA, INC.

By: _____
          President

ATTEST:

By: _____
       Secretary

FILE HEADER

FILE NBR            _0_ _4_ _4_ _2_ _4_ _2_ _8_

FILE NBR.......:   __ __ __ __ __ __ __

SRV NBR........:   _7_ _2_ _9_ _1_ _7_ _2_ _0_ _0_ _1_

SEQ NBR........:   __ __ __ __

DATE FILED.....:   _06_-_21_-_1989_

TIME FILED.....:   _10_:_00_

DOC TYPE.......:   _0_ _2_ _5_ _2_ _A_

SCAN OPERATOR..:   _____

SCAN DATE......:   ____-____-_____

THE CORPORATION TRUST COMPANY

DATE SUBMITTED _____ June 21, 1989 _____

Pursuant to counsel's instructions,
submitted for filing by:

729172001

The Corporation Trust Company _____

_____ M. A. Brzoska:bjw _____

FILE DATE _____ June 21, 1989 _____

TIME _____ 10 a.m. _____

FILER'S NO. _____ 00010 _____

NAME OF COMPANY _____ Croda, Inc. (DE DOM) _____

MERGING: Hummel Lanolin Corporation    (NY DOM) **9119489**
UNDER NAME OF: Croda, Inc. (DE DOM)

FILE NUMBER _____ 04424-28 _____

TYPE OF DOCUMENT _____ Certificate of Merger _____    SECTION NO. _____ 252A _____

CHANGES NAME _____

CHANGES AGENT/OFFICE _____

STOCK $ _____

TO $ _____

_____ FRANCHISE TAX $ _____

RECEIVED

JUN 21 1989

Division of Corporations

Filing Fee Tax  $ _____ 20.00 _____

Receiving and Indexing  $ _____

NO. __2__ Certified Copies  $ _____

NO. _____ PAGES (If prepared
by the Division of Corp.)  $ _____

OTHER _____  $ _____

OTHER _____  $ _____

TOTAL  $ _____

Closed / Invoiced

JUN 22 1989

NY 455 (REV. C) - 15M - 1/88

**FILED**

JUN 21 1989

*SECRETARY OF STATE*

729/72001

CERTIFICATE OF MERGER

OF

HUMMEL LANOLIN CORPORATION

INTO

CRODA, INC.

**\*\*\*\*\*\*\*\*\*\***

The undersigned corporation

DOES HEREBY CERTIFY:

FIRST:  That the name and state of incorporation of each of the constituent corporations of the merger is as follows:

| NAME | STATE OF INCORPORATION |
|------|------------------------|
| Croda, Inc. | Delaware |
| Hummel Lanolin Corporation | New York |

SECOND:  That an agreement of merger between the parties to the merger has been approved, adopted, certified, executed and acknowledged by each of the constituent corporations in accordance with the requirements of subsection (c) of Section 252 of the General Corporation Law of the State of Delaware.

THIRD:  The name of the surviving corporation of the merger is Croda, Inc., a Delaware corporation.

FOURTH:  That the Certificate of Incorporation of Croda, Inc., a Delaware corporation, shall be the Certificate of Incorporation of the surviving corporation.

FIFTH:  That the executed agreement of merger is on file at the principal place of business of the surviving corporation.  The address of said principal place of business is 183 Madison Avenue, New York, New York 10016.

SIXTH:  That a copy of the agreement of merger will be furnished on request and without cost to any stockholder of any constituent corporation.

SEVENTH:  The authorized capital stock of each foreign corporation which is a party to the merger is as follows:

| Corporation | Class | Number of Shares | Par value per share or statement that shares are without value |
|---|---|---|---|
| Hummel Lanolin Corporation | Common | 100 | No par value |

Dated:  May 31, 1989

CRODA, INC.

By _____
   J. MICHAEL CANNON, President

ATTEST:

By _____
   MARTIN NOVACK, Secretary

Certificate of Merger of _____ Hummel Lanolin Corporation _____

a corporation organized and existing under the laws of the State of

_____ New York _____ merging with and into the _____ Croda, Inc. _____

_____ a corporation organized and existing under the laws of

the State of Delaware under the name of _____ Croda, Inc. _____

_____ as received and filed in this office the

_____ 21st _____ day of _____ June _____, A.D. 198_ at _____ 10

o'clock ___ A ___ .M.

And I do hereby further certify that the aforesaid Corporation shall

be governed by the laws of the State of Delaware.

State of Delaware
Secretary of State
Division of Corporations
Delivered 08:53 PM 09/24/2018
FILED 08:53 PM 09/24/2018
SR 20186811930 - File Number 442428

### STATE OF DELAWARE
### CERTIFICATE OF MERGER OF
### DOMESTIC CORPORATIONS

Pursuant to Title 8, Section 251(c) of the Delaware General Corporation Law, the undersigned corporation executed the following Certificate of Merger:

**FIRST:** The name of the surviving corporation is Croda, Inc., a Delaware corporation, and the name of the corporation being merged into this surviving corporation is Plant Impact Inc., a Delaware corporation.

**SECOND:** The Agreement of Merger has been approved, adopted, certified, executed and acknowledged by each of the constituent corporations in accordance with. Section 251(c) of the Delaware General Corporation Law.

**THIRD:** The name of the surviving corporation is Croda, Inc.

**FOURTH:** The Certificate of Incorporation of the surviving corporation shall be its Certificate of Incorporation.

**FIFTH:** The merger is to become effective on September 30, 2018 at 11:59 p.m.

**SIXTH:** The shares of Plant Impact Inc. shall be canceled upon the consummation of the merger.

**SEVENTH:** The Agreement of Merger is on file at 300-A Columbus Circle, Edison, New Jersey 08837, the place of business of the surviving corporation.

**EIGHTH:** A copy of the Agreement of Merger will be furnished by the surviving corporation on request, without cost, to any stockholder of the constituent corporations.

**IN WITNESS WHEREOF,** said surviving corporation has caused this Certificate of Merger to be signed by an authorized officer, the 24th day of September, A.D., 2018.

By: _____

Name: David Shannon

Title: President

Appx114

State of Delaware
Secretary of State
Division of Corporations
Delivered  02:18 PM 11/26/2019
FILED  02:18 PM 11/26/2019
SR 20198314403 - File Number  442428

**STATE OF DELAWARE**
**CERTIFICATE OF AMENDMENT**
**OF CERTIFICATE OF INCORPORATION**
**OF CRODA, INC.**

Croda, Inc., a corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware (hereinafter referred to as the "**corporation**"), does hereby certify:

**FIRST**:  That as permitted by Section 141 (f) of the General Corporation Law of the State of Delaware, the Board of Directors of Croda, Inc., acting by unanimous written consent in lieu of holding a meeting, duly adopted resolutions setting forth a proposed amendment of the Certificate of Incorporation of said corporation, declaring said amendment to be advisable. The resolution setting forth the proposed amendment is as follows:

**RESOLVED**, that the Certificate of Incorporation of this corporation be amended by changing the Article thereof numbered "FIRST" so that, as amended, said Article shall be and read as follows:

> "The name of the corporation is Croda Inc."

**SECOND**:    That said amendment was duly adopted in accordance with the provisions of Section 242 of the General Corporation Law of the State of Delaware.

**IN WITNESS WHEREOF**, said corporation has caused this certificate to be signed this 25th day of November, 2019.

By: _____
Authorized Officer

Title:  President

Name:  David Shannon

# EXHIBIT 2



Page 1

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY "CRODA INC." IS DULY INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL CORPORATE EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF THE TWENTIETH DAY OF FEBRUARY, A.D. 2020.

AND I DO HEREBY FURTHER CERTIFY THAT THE ANNUAL REPORTS HAVE BEEN FILED TO DATE.

AND I DO HEREBY FURTHER CERTIFY THAT THE FRANCHISE TAXES HAVE BEEN PAID TO DATE.

Jeffrey W. Bullock, Secretary of State

442428  8300

SR# 20201328059

You may verify this certificate online at corp.delaware.gov/authver.shtml

Authentication: 202428913

Date: 02-20-20

Appx117

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CATHERINE BAKER, individually and on behalf of all others similarly situated | ) ) ) | |
| Plaintiff, | ) | Case No. 20-cv-01108-MN |
| v. | ) | |
| CRODA INC. f/k/a CRODA, INC., | ) ) | |
| Defendant. | ) ) | |

## STIPULATION AND [PROPOSED] ORDER EXTENDING TIME FOR PLAINTIFF TO RESPOND TO DEFENDANT'S MOTION TO DISMISS

WHEREAS, on October 13, 2020, Defendant, Croda Inc. ("Defendant") filed its Motion to Dismiss (the "Motion");

IT IS HEREBY STIPULATED AND AGREED, by and among Plaintiff and Defendant, subject to the approval of the Court, that the time for Plaintiff to respond to Defendant's Motion is extended to and including November 10, 2020.


GRANT & EISENHOFER P.A.                    MORRIS, NICHOLS, ARSHT & TUNNELL LLP


*/s/ Kyle J. McGee*                          */s/ Zi-Xiang Shen*
Kyle J. McGee (#5558)                       Kenneth J. Nachbar (# 2067)
123 Justison Street                         Zi-Xiang Shen (#6072)
Wilmington, Delaware 19801                  1201 North Market Street
(302) 622-7000                              Wilmington, Delaware 19801
kmcgee@gelaw.com                            (302) 658-9200
Attorney for Plaintiff                      knachbar@mnat.com
*Counsel for the Plaintiff and the*         zshen@mnat.com
*Putative Class*                            *Counsel for Defendant*

_/s/ Frank Petosa_____
Frank Petosa (_Admitted Pro Hac Vice_)
MORGAN & MORGAN,
COMPLEX LITIGATION GROUP
8151 Peters Road Suite 4000
Plantation, FL 33324
(954) 318-0268

Marcio W. Valladares (_Admitted Pro Hac Vice_)
MORGAN & MORGAN,
COMPLEX LITIGATION GROUP
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
(813) 223-5505

Rene F. Rocha (_Admitted Pro Hac Vice_)
MORGAN & MORGAN, ,
COMPLEX LITIGATION GROUP
3530 Magazine St.
New Orleans, LA 70115
(954) 318-0268

_Counsel for the Plaintiff and the Putative
Class_

IT IS SO ORDERED this _____ day of October, 2020.

_____
Judge

# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

|  |  |
|---|---|
| CATHERINE BAKER, individually and on behalf of all others similarly situated, | |
| Plaintiff, | Case No.:  20-cv-01108-MN |
| v. | |
| CRODA INC. f/k/a CRODA, INC., | |
| Defendant. | |

## PLAINTIFF'S RESPONSE BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S CLASS ACTION COMPLAINT

Dated:  November 17, 2020[1]

Kyle J. McGee (#5558)
GRANT & EISENHOFER P.A.
123 Justison Street
Wilmington, Delaware 19801
kmcgee@gelaw.com
P: (302) 622-7000
F: (302) 622-7100

T. Michael Morgan*
MORGAN & MORGAN, P.A.
20 N Orange Ave., Suite 1600
Orlando, FL 32801
mmorgan@ForThePeople.com
P: (407) 418-2031
F: (407) 245-3384

---

[1] Originally November 13, 2020. Re-filed at the direction of the Court's Judicial Administrator.

Marcio W. Valladares*
MORGAN & MORGAN, COMPLEX
LITIGATION GROUP
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
mram@ForThePeople.com
mvalladares@ForThePeople.com
P: (813) 223-5505
F: (813) 223-5402

Rene F. Rocha*
MORGAN & MORGAN, COMPLEX
LITIGATION GROUP
3530 Magazine St.
New Orleans, LA 70115
rrocha@ForThePeople.com
P:  (954) 318-0268
F:  (954) 327-3018

Frank M. Petosa*
MORGAN & MORGAN, COMPLEX
LITIGATION GROUP
8151 Peters Road
Suite 4000
Plantation, FL 33324
fpetosa@ForThePeople.com
P:  (954) 318-0268
F:  (954) 327-3018

*Pro Hac Vice
Attorneys for the Plaintiff and
the Putative Class

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ...................................................................................... iii

INTRODUCTION .................................................................................................1

SUMMARY OF ARGUMENT ...............................................................................1

FACTUAL BACKGROUND, PROCEDURAL HISTORY AND LEGAL ARGUMENT ..........2

A.     Defendant Fails to Meet Its Burden of Establishing that CAFA's Home
State or Local Controversy Exceptions Require the Court's Declination
of Jurisdiction...............................................................................................3

B.     Plaintiffs Have Properly Alleged Their Claims under the Law of New
Jersey and the Law of Delaware. ...............................................................8

       1.     While the Court Need Not Determine Choice of Law at the Motion
to Dismiss Stage, the Law of New Jersey, Where Croda Is
Headquartered and Made the Decisions Which Give Rise to this
Case, Likely Applies. ....................................................................8

       2.     Under Both New Jersey Law and Delaware Law, Plaintiff Has
Properly Alleged a Compensable Injury....................................10

            (a)     Plaintiff has Alleged Compensable Injury under New
Jersey Law. ...................................................................10

            (b)     Plaintiff has Alleged Compensable Injury under
Delaware Law ...............................................................10

       3.     Plaintiff Has Properly Alleged a Claim for Medical Monitoring. .............12

            (a)     Plaintiff Has Alleged a Claim for Medical Monitoring
under New Jersey Law..................................................12

            (b)     Plaintiff has Alleged a Claim for Medical Monitoring
under Delaware Law. ....................................................12

       4.     Plaintiff Has Properly Alleged A Claim For Ultrahazardous Activity......13

            (a)     Plaintiff Has Alleged a Claim for Ultrahazardous Activity
under the Law of New Jersey........................................13

            (b)     Plaintiff Has Alleged a Claim for Ultrahazardous Activity
under Delaware Law. ....................................................15

i

5.  Plaintiff Has Standing And Has Properly Alleged A Claim
    For Public Nuisance. ........................................................................15

    (a)  Plaintiff has alleged a claim for public nuisance under
         New Jersey law. ..........................................................................15

    (b)  Plaintiff has alleged a claim for public nuisance under
         Delaware law. .............................................................................16

6.  Plaintiff Has Properly Alleged a Claim For Private Nuisance. ................16

    (a)  Plaintiff Has Alleged a Claim for Private Nuisance under
         the Law of New Jersey..................................................................16

    (b)  Plaintiff Has Alleged a Claim for Private Nuisance under
         the Law of Delaware......................................................................17

7.  Plaintiff Has Properly Alleged A Claim For Negligence. ........................18

    (a)  Plaintiff Has Alleged a Claim for Negligence under
         New Jersey Law............................................................................18

    (b)  Plaintiff Has Alleged a Claim for Negligence under
         Delaware law. ..............................................................................18

8.  Plaintiff Has Properly Alleged a Claim for Willful or Wanton
    Conduct. ..........................................................................................19

    (a)  Plaintiff Has Alleged a Claim for Willful or Wanton
         Conduct under New Jersey Law. ....................................................19

    (b)  Plaintiff Has Alleged a Claim for Willful or Wanton
         Conduct under Delaware Law. .......................................................20

CONCLUSION..................................................................................................20

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Asbestos Litig.*,
  No. CIV.A. 87C-09-24, 1994 WL 16805917 (Del. Super. Ct. Aug. 5, 1994).........................11

*Ayers v. Jackson Twp.*,
  525 A.2d 287 (1987)...............................................................................................10, 12, 17

*Bahrle v. Exxon Corp.*,
  652 A.2d 178 (App.Div.1995)...............................................................................................14

*Bair v. Peck*,
  738 F. Supp. 1354 (D. Kan 1990)............................................................................................5

*Bell Helicopter Textron, Inc. v. Arteaga*,
  113 A.3d 1045 (Del. 2015).....................................................................................................9

*Biniek v. Exxon Mobil Corp.*,
  818 A.2d 330 (Law. Div. 2002).............................................................................................14

*Brooks v. Culbreath, C.A.*
  No. 07-758-SLR-MPT, 2010 WL 376886 (D. Del. Jan. 28, 2010) ..........................................9

*Brzoska v. Olson*,
  668 A.2d 1355 (Del. 1995) ......................................................................................10, 11, 19

*Cropper v. Rego Distribution Ctr., Inc.*,
  542 F. Supp. 1142 (D. Del. 1982).........................................................................................15

*Dayton v. Collison*,
  No. CV N17C-08-100 CLS, 2019 WL 4668157 (Del. Super. Ct. Sept. 24,
  2019) .......................................................................................................................16, 18

*Eureka Res., LLC v. Range Res.-Appalachia, LLC*,
  62 A.3d 1233 (Del. Super. Ct. 2012) ......................................................................................9

*Evans v. Walter Industries, Inc.*,
  449 F.3d 1159 (11th Cir. 2006) ..............................................................................................7

*Guinan v. A.I. duPont Hosp. for Children*,
  597 F. Supp. 2d 517 (E.D. Pa. 2009) ...............................................................................12, 13

iii

*Gordon v. Nat'l R.R. Passenger Corp.*,
    No. CIV. A. 10753, 1997 WL 298320 (Del. Ch. Mar. 19, 1997) ............................................18

*Hood v. Gilster-Mary Lee Corp.*,
    785 F.3d 263 (8th Cir. 2015) ................................................................................................6

*Hudson v. Old Guard Ins. Co.*,
    3 A.3d 246 (Del. 2010) ........................................................................................................19

*State ex rel. Jennings v. Purdue Pharma L.P.*,
    No. CVN18C01223MMJCCLD, 2019 WL 446382 (Del. Super. Ct. Feb. 4,
    2019) ....................................................................................................................................16

*M.G. ex rel. K.G. v. A.I. Dupont Hosp. for Children*,
    393 F. App'x 884 (3d Cir. 2010) ........................................................................................13

*Kaufman v. Allstate New Jersey Ins. Co.*,
    561 F.3d 144 (3d Cir. 2009)..................................................................................................4

*Kitson v. Bank of Edwardsville*,
    No. CIV 06-528-GPM, 2006 WL 3392752 (S.D. Ill. Nov. 22, 2006) ......................................5

*In re Lead Paint Litig.*,
    924 A.2d 484 (2007) .............................................................................................................15

*Mason v. Lockwood, Andrews & Newman, P.C.*,
    842 F.3d 383 (6th Cir. 2016) ................................................................................................7

*McCurdy v. Wright Med. Tech., Inc.*,
    No. CV 19-1898-CFC, 2020 WL 906329 (D. Del. Feb. 25, 2020) .........................................9

*Mergenthaler v. Asbestos Corp. of Am.*,
    480 A.2d 647 (Del. 1984) ...........................................................................................11, 13

*Metro-N Commuter RR. Co. v. Buckley*,
    521 U.S. 424 .............................................................................................................10, 12

*Mondragon v. Capital One Auto Finance*,
    736 F.3d 880 (9th Cir. 2013) ................................................................................................7

*Moore v. Sharp Gas Inc.*,
    No. CIV. A. 90-504 MMS, 1992 WL 147930 (D. Del. June 11, 1992) .................................15

*New Jersey Div. of Child Prot. & Permanency v. J.D.*,
    148 A.3d 128 (App. Div. 2016) ..........................................................................................19

*Nutt v. A.C. & S., Inc.*,
    466 A.2d 18 (Del. Super. Ct. 1983) ...................................................................................11

iv

*Ortega v. Yokohama Corp. of North America*,
 2010 WL 1534044 (Del. Super. Mar. 31, 2010) ...................................................9, 10

*Patton v. Simone*,
 1992 WL 398478 (Del. Super. Dec. 14, 1992) .......................................................16

*Preston v. Tenet Healthsystem Mem'l Med. Ctr., Inc.*,
 485 F.3d 793 (5th Cir. 2007) .................................................................................6

*Pruett v. Dayton*,
 39 Del. Ch. 537 (1961) ..........................................................................................18

*Quackenbush v. Allstate Ins. Co.*,
 517 U.S. 706 (1996)..................................................................................................7

*Reece v. AES Corp.*,
 638 Fed. App'x 755 (10th Cir. 2016) .......................................................................7

*Reilly v. Ceridian Corp.*,
 664 F.3d 38 (3d Cir. 2011)........................................................................................16

*In re Sprint Nextel Corp.*,
 593 F.3d 669 (7th Cir. 2010) ..............................................................................5, 6

*State Dept. of Envtl. Protection v. Ventron Corp.*,
 468 A.2d 150 (1983)................................................................................................14

*T & E Indus. v. Safety Light Corp.*,
 587 A.2d 1249 (1991)...............................................................................................13

*Townsend v. Pierre*,
 110 A.3d 52 (2015)..................................................................................................18

*United States v. Anderson*,
 669 A.2d 73 (Del. 1995) ..........................................................................................12

*Vichi v. Koninklijke Philips Elecs., N.V.*,
 85 A.3d 725 (Del. Ch. 2014)....................................................................................9

*Vodenichar v. Halcon Energy Prop., Inc.*,
 733 F.3d 497 (3d Cir. 2013)...............................................................................4, 5

*Willon v. Werb*,
 No. CV N17C-03-161 VLM, 2019 WL 6705003 (Del. Super. Ct. Dec. 9,
 2019) ..........................................................................................................................20

**Statutes**

Class Action Fairness Act, 28 U.S.C. § 1332(d)(2)(A) ........................................ *passim*

**Other Authorities**

*Prosser & Keeton on Torts,* § 91 (5th ed.1984)............................................................................16

Restatement (Second) of Conflict of Laws....................................................................................9

Restatement (Second) of Torts.............................................................................................14, 16

vi

## INTRODUCTION

"What you don't know won't hurt you."  Unfortunately for Plaintiff Catherine Baker ("Plaintiff") and others like her ("Class Members" or the "putative class"), this popular aphorism could not be further from the truth.  For decades, Defendant Croda Inc. (f/k/a Croda, Inc.) ("Defendant" or "Croda"), through its Atlas Point facility in New Castle, Delaware, has yearly released multiple tons of EtO gas into the air and surrounding communities.  EtO—a proven human carcinogen that is unsafe for human exposure at any level—is an odorless and colorless substance that is readily taken up by the lungs, efficiently absorbed by the bloodstream, and easily distributed throughout the human body.  Prolonged human exposure to EtO increases the risk of cancer including lymphomas, leukemias, myeloma, and breast cancer.

In this class action, Plaintiff, on behalf of herself and the putative class, alleges that Defendant tortiously emitted large scale volumes of EtO and exposed Plaintiff and members of the putative class who have lived in the vicinity of the Plant to toxic levels of EtO, placing them at a significantly increased risk of developing cancer and requiring that they undergo costly diagnostic testing and medical monitoring.

## SUMMARY OF ARGUMENT

1.     Defendant's Motion should be denied as this Court has subject matter jurisdiction over Plaintiff's class action claims under the Class Action Fairness Act.  Despite arguing that CAFA's "local controversy exception" should apply to defeat jurisdiction, Defendant fails to meet its burden of proof regarding the current citizenship of the proposed class.

2.     Defendant's Motion should be denied insofar as Plaintiff's Complaint states a plausible claim for relief in connection with medical monitoring, ultrahazardous activities, public

1

nuisance, private nuisance and negligence under the substantive law of both New Jersey and Delaware.

3.       Defendant's Motion should be denied insofar as Plaintiff's Complaint alleges sufficient facts to support a claim for willful or wanton conduct under the substantive law of both New Jersey and Delaware.

## FACTUAL BACKGROUND, PROCEDURAL HISTORY AND LEGAL ARGUMENT

Croda's Atlas Point plant produces up to 30,000 metric tons of EtO annually, which is used in surfactant production and the creation of ethylene glycol, a liquid used as a raw material in the manufacture of polyester fibers and antifreeze formulations.  (Complaint, D.I. 1 ("Compl.") ¶ 27). In the course of these processes, Defendant releases huge amounts of EtO gas every year.  (Compl. ¶ 27).  Since at least 1988, the Atlas Point plant has emitted multiple tons of EtO gas into the air in surrounding area, including the Class Zone defined in the Complaint. (Compl. ¶¶ 27, 62). Importantly, however, EtO has long been known to be a dangerous, carcinogenic, and mutagenic toxin that is highly reactive, readily taken up by the lungs, efficiently absorbed into the blood stream, and easily distributed throughout the human body.  (Compl. ¶ 18)

For decades national and international agencies and health organizations have recognized and cautioned against EtO's detrimental effects to humans.  (Compl. ¶¶ 18-49).  For instance, in 1977, the National Institute of Occupational Safety and Health ("NIOSH") recommended that EtO be considered mutagenic and potentially carcinogenic.  (Compl. ¶ 20).  In 1994, the WHO categorized EtO as a "Group 1" human carcinogen—the WHO's highest risk classification. (Compl. ¶ 24).  In 2000, the United States Department of Health and Human Services classified EtO as a "known … human carcinogen."  (Compl. ¶ 24).  In 2016, the EPA classified EtO as a human carcinogen, exposure to which, however slight, creates a cancer risk.  (Compl. ¶ 26).

2

Croda nonetheless released tons of EtO into the air of the surrounding community every year.  (Compl. ¶¶ 16, 27).  Heavier than air, odorless and colorless, and with an atmospheric half-life of 211 days, the EtO released by Defendant lingered at breathing level in communities surrounding the Plant for prolonged periods, continually exposing Plaintiff and the putative class to the extremely harmful toxin without their knowledge.  (Compl. ¶¶ 29-30).  Plaintiff and the putative class have therefore already acquired some of the highest cancer risks in the nation. (Compl. ¶ 40).  The EPA estimates that Plaintiff and the putative class are up to four times more likely to develop cancer than average Americans.  (Compl. ¶ 5).   The increased risk of harm— which is orders of magnitude beyond normal background levels—was visited upon Plaintiff and the putative class almost entirely because of Defendant's EtO emissions at the Atlas Point plant. (Compl. ¶ 41).  Consequently, Plaintiff and the putative class have *already* suffered injury in the form of having to undergo and pay for reasonably necessary and costly medical testing and monitoring to detect cancer and disease processes, so they might have the opportunity to treat the cancer as soon as possible.  (Compl. ¶¶ 50-60).

## A.    Defendant Fails to Meet Its Burden of Establishing that CAFA's Home State or Local Controversy Exceptions Require the Court's Declination of Jurisdiction.

The class definition in this action comprises:

All natural persons who have resided within census tracts 10003015400, 10003105502 and 10003015802 (the "Class Zone") for a period of one year or more at any time beginning January 1, 1988 and the present (the "Class Period").

(Compl. ¶ 62).  Subject matter jurisdiction is grounded on the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2)(A), because: (1) the amount in controversy exceeds $5 million (exclusive of interest and costs); (2) there are more than 100 Class Members; and (3) and at least one Class Member is a citizen of a state different from the citizenship of Defendant, which, in

Croda's case, is Delaware (Croda's state of incorporation) and New Jersey (Croda's principal place of business).  (Compl. ¶ 10).

Croda does not, and cannot, contest that Plaintiff meets her burden of showing the "threshold" requirements for federal jurisdiction under CAFA.  *See* § 1332(d)(2) & (5).  Croda instead argues that the "local controversy" and "home state" exceptions to CAFA jurisdiction apply and require the Court to decline jurisdiction.  *See* § 1334(d)(4)(A) and (d)(4)(B).  Importantly, "once CAFA jurisdiction has been established, the burden shifts to the party objecting to the jurisdiction to show that the local controversy [or home state] exception should apply." *Kaufman v. Allstate New Jersey Ins. Co.*, 561 F.3d 144, 153 (3d Cir. 2009).  Thus, Croda bears the burden of showing, by a preponderance of the evidence, that the exceptions apply.  *Vodenichar v. Halcon Energy Prop., Inc.*, 733 F.3d 497, 503 (3d Cir. 2013).  But Croda cannot avail itself of either exception where:

> [a] party seeking to invoke [the home state] exception must therefore: (1) establish that the citizenship of the members of two-thirds or more of the putative class is the state in which the action was originally filed; (2) establish the citizenship of the defendants; (3) identify the primary defendants; and (4) demonstrate that two-thirds or more of the members of the putative class are citizens of the same state as the primary defendants.

*Vodenichar*, 733 F.3d at 503–04.  Because Croda is currently the sole defendant, factors (2) and (3) are inapplicable.  That said, Croda must prove that two-thirds or more of the members of the putative are *citizens* of Delaware, where the action was brought and of which Croda is a citizen.

As for the local controversy exception:

> [a] party seeking to invoke this exception must therefore show that: (1) greater than two-thirds of the putative class are citizens of the state in which the action was originally filed; (2) at least one defendant is a citizen of the state in which the action was originally filed (the "local defendant"); (3) the local defendant's conduct forms a significant basis for the claims asserted; (4) plaintiffs are seeking significant relief from the local defendant; (5) the principal injuries occurred in the state in which the action was originally filed; and (6) no other class action asserting the same or

4

similar allegations against any of the defendants had been filed in the preceding three years.

*Vodenichar*, 733 F.3d at 506–07.  Assuming satisfaction of the remaining factors, to avail itself of this exception, Croda must, similar to the home state exception, establish that more than two-thirds of the putative class members are *citizens* of Delaware.

As noted above, the class definition here comprises natural persons who have resided within the Class Zone surrounding the Atlas Point plant for a period of one year or more at any time beginning January 1, 1988 to the present.  (Compl. ¶ 62).  Relying wholly on a purportedly permissible presumption of domicile based on "proof of residency" or "mailing addresses" as evidence of "citizenship" based on two district court opinions—*Kitson v. Bank of Edwardsville*, No. CIV 06-528-GPM, 2006 WL 3392752, at * 7 (S.D. Ill. Nov. 22, 2006), and *Bair v. Peck*, 738 F. Supp. 1354, 1356 (D. Kan 1990)—Croda jumps to the conclusion that two thirds or more of the putative class members here are currently citizens of Delaware.  Croda reaches far and speculates.

*Bair*, which predates CAFA and therefore does not address the determination of citizenship for members of a putative class, actually underscores the need to tease out a person's "citizenship" beyond mere generalizations and presumptions, delving instead into questions of the individual's state of residence and proof about his intent, which leads to the question of domicile.  *Id.* at 1357 ("[C]ourts have often looked to objective indicia of intent, such as the place of employment, driver's license, automobile registration, bank accounts, tax payments, location of personal property, and voting practices.").  *Kitson*, an unpublished decision from the Southern District of Illinois in which the court held that it was "entitled to assume" that class members were Illinois citizens on the basis that Illinois mailing addresses are evidence of residence, which in turn is evidence of domicile, was effectively abrogated by the Seventh Circuit in *In re Sprint Nextel Corp.*, 593 F.3d 669, 673-76 (7th Cir. 2010).

5

In *Nextel*, the Seventh Circuit addressed a class alleged to be of "Kansas residents," but that was more specifically defined as limited to those who "(1) had a Kansas cell phone number, [and] (2) received their cell phone bill at a Kansas mailing address." *Id.* at 671. The court considered whether plaintiffs had proved the applicability of a CAFA exception where, even though they "didn't submit any evidence about citizenship," the class definition, "keyed as it is to Kansas cell phone numbers and mailing addresses," made it "more likely than not that two-thirds of the putative class members [we]re Kansas citizens." *Id.* at 673. The court held that the party had not carried its burden, as it invited judicial "guesswork." *Id.* at 674. Classes based only on mailing addresses or property ownership could include, for example, "absentee landlords from other states," "local offices of national corporations," or "out-of-state students at Kansas colleges," none of whom would qualify as "citizens" of Kansas. *Id.* at 671, 674. The court therefore required plaintiffs invoking the CAFA exceptions to "submit[] evidence … going to the citizenship" of class members. *Id.* at 675. Alternatively, the court observed, plaintiffs can simply "define[] their class as all … *citizens*" who meet the remaining conditions of the class, which "guarantee[s]" that a suit will remain in state court. *Id.* at 676.

Including the Seventh Circuit's holding in *Nextel*, six of seven Courts of Appeals having specifically considered the issue require a party invoking CAFA's local-controversy or home-state exceptions to proffer evidence indicating that two-thirds of class members are citizens of the state in which the action was originally filed, thus explicitly or implicitly rejecting the proposition that citizenship can be merely presumed from unproven allegations of residency.  *See, e.g.*, *Hood v. Gilster-Mary Lee Corp.,* 785 F.3d 263 (8th Cir. 2015); *Hargett v. RevClaims, LLC*, 854 F.3d 962, 966, n.6 (8th Cir. 2017) (explicitly rejecting argument by litigant that "presumptions alone may transform a challenged allegation of residency into the establishment of citizenship"); *Preston v.*

*Tenet Healthsystem Mem'l Med. Ctr., Inc.,* 485 F.3d 793, 800 (5th Cir. 2007) (declining to adopt a rebuttable presumption in CAFA context that one's "state of residence and state of citizenship are the same" to establish citizenship.); *Mondragon v. Capital One Auto Finance,* 736 F.3d 880 (9th Cir. 2013) (vacating district court's holding that plaintiff had satisfied local-controversy exception because, despite submitting "no evidence regarding … the citizenship of prospective class members," citizenship could be presumed from residency," and holding that the only time "[a] pure inference regarding the citizenship of prospective class members may be sufficient" is "if the class is defined as limited to citizens of the state in question"; otherwise, "such a finding should not be based on guesswork"); *Reece v. AES Corp.*, 638 Fed. App'x 755, 769–70 (10th Cir. 2016) (same); *Evans v. Walter Industries, Inc.,* 449 F.3d 1159 (11th Cir. 2006) (considering and rejecting affidavit submitted by plaintiffs' counsel that 93.8% of class members were Alabama residents and plaintiffs' argument that "if 93.8% … are Alabama residents, then surely two-thirds of the entire plaintiff class are Alabama citizens, concluding that "plaintiffs have not carried their burden of demonstrating that more than two-thirds of the plaintiff class are Alabama citizens"); *but see Mason v. Lockwood, Andrews & Newman, P.C.*, 842 F.3d 383, 397-99 (6th Cir. 2016).

Croda offers no affirmative, competent proof to carry *its burden* of establishing that at least two-thirds of the putative class members are current *citizens* of Delaware. Croda's reliance on supposition and presumption are insufficient to disrupt the strong mandate of federal courts to exercise jurisdiction conferred on them by Congress. *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996). This is especially so given the location of the Class Zone in the area surrounding the Atlas Point plant in New Castle, Delaware. As the Court is well aware, this uniquely-situated area is a very short distance away from New Jersey, Pennsylvania, Maryland, and the District of Columbia, among other states. It is reasonable and expected that many class members who have

lived in the Class Zone for at least one year since January 1988 have moved to these neighboring states and are citizens of those states.

Finally, in a footnote, Croda argues that, alternatively, the Court should, in the interests of justice and in totality of the circumstances, permissively decline to exercise jurisdiction under Section 1332(d)(3), which enumerates factors for the court to consider in that analysis. But these factors do not support permissive declination. For the reasons just noted, the Class Zone is quite close to neighboring states, and the overall impact on one-time residents of the area are surely being felt outside of Delaware. Given that Croda's nerve-center and principal place of business is in New Jersey, it is quite reasonable to believe that many of the decisions regarding Croda's conduct at issue here will have originated in New Jersey. That is one of the reasons Plaintiff originally filed this action in the district of New Jersey. Thus, the totality of the circumstances suggests that claims asserted here certainly involve matters of "interstate interest." § 1332(d)(3)(A) and (E). Further, as noted below regarding Plaintiff's substantive claims, Plaintiff believes that New Jersey law applies to the extent that the laws of Delaware and New Jersey may conflict. § 1332(d)(3)(B). Both Delaware and New Jersey therefore have a nexus with the class members, the alleged harm, and the Defendant. § 1332(d)(3)(D). The interests of justice, viewed in light of all of these circumstances, do not warrant permissive declination or abstention.

**B.     Plaintiffs Have Properly Alleged Their Claims under the Law of New Jersey and the Law of Delaware.**

**1.     While the Court Need Not Determine Choice of Law at the Motion to Dismiss Stage, the Law of New Jersey, Where Croda Is Headquartered and Made the Decisions Which Give Rise to this Case, Likely Applies.**

In *Travelers Indem. Co. v. Lake*, 594 A.2d 38, 47 (Del. 1991), the Supreme Court of Delaware made clear that Delaware courts shall no longer apply "the lex loci doctrine" when determining choice of law in tort cases. Rather, Delaware courts are to frame the choice of law analysis around the Restatement (Second) of Conflicts' "most significant relationship"

8

doctrine. *Eureka Res., LLC v. Range Res.-Appalachia, LLC*, 62 A.3d 1233, 1236 (Del. Super. Ct. 2012). This approach requires a two-pronged inquiry.  First, the court must "compare the laws of the competing jurisdictions to determine whether the laws actually conflict on a relevant point." *Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 772–73 (Del. Ch. 2014).  If application of the competing laws would yield the same result, then no genuine conflict exists "and the Court should avoid the choice-of-law analysis altogether." *Id.*  Second, if the court finds that an actual conflict exists, then it applies the "most significant relationship test," as set out in the Restatement (Second) of Conflict of Laws, to determine which jurisdiction's laws to apply.  *Id.*  If there is a conflict, the court determines which jurisdiction has the "most significant relationship to the occurrence and the parties" based on the factors (termed "contacts") listed in the Restatement (Second) of Conflict of Laws.  *Bell Helicopter Textron, Inc. v. Arteaga*, 113 A.3d 1045, 1050 (Del. 2015).

When determining which state has the most significant relationship, courts "consider the following contacts and weigh them by their relevance with respect to the issue at hand: (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." *Brooks v. Culbreath, C.A.* No. 07-758-SLR-MPT, 2010 WL 376886, at *3 (D. Del. Jan. 28, 2010); *McCurdy v. Wright Med. Tech., Inc.,* No. CV 19-1898-CFC, 2020 WL 906329, at *4 (D. Del. Feb. 25, 2020).

Thus, in *Ortega v. Yokohama Corp. of North America,* 2010 WL 1534044, at *3 (Del. Super. Mar. 31, 2010), which involved negligence and other claims, Virginia had the most significant relationship to the occurrence because the tire at issue was designed and manufactured in Virginia even though the injuries occurred elsewhere:

> [t]he relationship between the parties in this case is centered in the State of Virginia,
> the place where the [t]ire was designed and manufactured. Although the State of
> California has several contacts, and quantitatively more contacts perhaps than
> Virginia, Section 145 has a qualitative element. [Section 145] clearly states that the
> 'contacts are to be evaluated according to their relative importance with respect to
> the particular issue.'

*Id.*

For many of Plaintiff's claims here, there is no genuine conflict and Plaintiff has properly alleged claims under the laws of New Jersey and Delaware. Where there is a genuine conflict, the Court should apply New Jersey law because Croda likely made all the decisions relevant to this case in New Jersey. While the injury occurred in Delaware, the conduct causing the injury occurred in New Jersey and Croda is headquartered in New Jersey. Thus, while the Court need not decide choice of law now, if it does make such a determination, it should apply New Jersey law.

### 2. Under Both New Jersey Law and Delaware Law, Plaintiff Has Properly Alleged a Compensable Injury.

#### (a) Plaintiff has Alleged Compensable Injury under New Jersey Law.

In its brief, Croda concedes that New Jersey "allows plaintiffs to recover the expense of medical monitoring even without proof of physical harm or a current diagnosis of a serious illness." (D.I. 8, p. 4); *see also Metro-N Commuter RR. Co. v. Buckley*, 521 U.S. 424, 440-41 (New Jersey permits the creation of a court-supervised fund to administer medical-surveillance payments without present disease). "It has long been recognized that damages for inconvenience, annoyance, and discomfort are recoverable in a nuisance action." *Ayers v. Jackson Twp.,* 106 N.J. 557, 571, 525 A.2d 287, 294 (1987). "In our view, an enhanced risk of disease caused by significant exposure to toxic chemicals is clearly an 'injury.'" *Ayers*, 106 N.J. at 592, 525 A.2d at 305.

#### (b) Plaintiff has Alleged Compensable Injury under Delaware Law

In *Brzoska v. Olson*, 668 A.2d 1355, 1357 (Del. 1995), cited by Croda, plaintiffs sued for negligence, battery, and misrepresentation because a dentist who treated them had AIDS. The

court held that summary judgment was improper with respect to the misrepresentation claim.  The Court noted that without actual exposure to HIV, the risk of its transmission is so minute that any fear of contracting AIDS is per se unreasonable.  The court then held that "the incidental touching of a patient by an HIV-infected dentist while performing ordinary, consented-to dental procedures is insufficient to sustain a battery claim in the absence of a channel for HIV infection." *Id*. at 1363–64.  Here, Plaintiff has not alleged a claim for battery or misrepresentation.  The negligence claim in *Brzoska* was for malpractice, which Plaintiff does not allege here. *Id*. at 1359.  Further, the risk of disease is far greater here than in *Brzoska*. In addition, *Brzoska* adopted an "actual exposure" test, "which requires a plaintiff to show 'actual exposure' to a disease-causing agent as a prerequisite to prevail on a claim based upon fear of contracting disease." *Id.* at 1364. Here, Plaintiff has alleged actual inhalation exposure of a disease-causing agent. (Compl. ¶ 51).

*Nutt v. A.C. & S., Inc*., 466 A.2d 18, 25 (Del. Super. Ct. 1983), which Croda cites, involved mental anguish and loss of consortium claims of wives of asbestos workers.  Here there is no claim for loss of consortium or for mental anguish. In *Nutt* the court stated, "there is no assertion by the plaintiff-wives that asbestosis fibers are physically present in their bodies." *Id*. at 25. Also, in *Nutt*, the harm was not reasonably foreseeable. *Id.* at 26.  The Court distinguished a case where "the plaintiffs clearly ingested the water that was contaminated." *Mergenthaler*, 480 A.2d at 65.  Here, Plaintiff alleges that she inhaled the EtO.  (Compl. ¶ 51).

In the unpublished trial court decision in *In re Asbestos Litig*., No. CIV.A. 87C-09-24, 1994 WL 16805917, at *1 (Del. Super. Ct. Aug. 5, 1994), all the plaintiffs alleged was asymptomatic pleural thickening.  In contrast, Plaintiff here has alleged that she inhaled toxic EtO, and so is at a materially increased risk of developing cancer and other illness, disease and disease processes. (Compl. ¶ 51, 53).  As a result, Plaintiff and Class Members have been injured by the present need

11

to incur the costs of such diagnostic testing for the early detection of illness, disease, or disease process. (Compl. ¶ 57).

In *United States v. Anderson*, 669 A.2d 73, 76–77 (Del. 1995), the Court's reference to "speculative harm," which Croda cites, was part of the court's description of a Connecticut decision. *Id.* at 77. It was not an "explicit holding" as Croda claims, and indeed, the court stated that, "plaintiff is not claiming increased risk as an independent cause of action," so declined to rule on that question. *Id.* at 79.

### 3. Plaintiff Has Properly Alleged a Claim for Medical Monitoring.

#### (a) Plaintiff Has Alleged a Claim for Medical Monitoring under New Jersey Law.

Croda admits that New Jersey "allows plaintiffs to recover the expense of medical monitoring even without proof of physical harm or a current diagnosis of a serious illness." (D.I. 8, p. 4); *see also Metron-N Commuter RR. Co. v. Buckley*, 521 U.S. 424, 440-41 (New Jersey permits the creation of a court-supervised fund to administer medical-surveillance payments without present disease). Further, in *Ayers v. Jackson Tp.*, *Ayers v. Jackson Twp.,* 525 A.2d 287 (1987), the plaintiffs ingested contaminated well water. The Court found that there were genuine issues of material fact with respect to the emotional distress claim, thus precluding summary judgment, and that plaintiffs could recover for the costs of future medical surveillance to diagnose warning signals of development of disease. *Ayers*, 525 A 2d. at 312-12.

#### (b) Plaintiff has Alleged a Claim for Medical Monitoring under Delaware Law.

"We predict that the Delaware Supreme Court would permit a claim for medical monitoring if it were confronted with the record currently before us." *Guinan v. A.I. duPont Hosp. for Children*, 597 F. Supp. 2d 517, 538 (E.D. Pa. 2009), *aff'd sub nom.*, *M.G. ex rel. K.G. v. A.I. Dupont Hosp. for Children*, 393 F. App'x 884 (3d Cir. 2010). In allowing a medical monitoring

12

claim under Delaware law, the *Guinan* court stated, "Plaintiff has a Class III medical device in her body … the device did not have premarket approval from the FDA at the time the Medical Defendants implanted it in Plaintiff and was thus considered an 'adulterated' device." *Guinan*, 597 F. Supp. 2d at 539. Here, Plaintiff has alleged that she inhaled toxic EtO and is at a materially increased risk of developing cancer and other illness, disease and disease processes. (Compl. ¶¶ 51, 53). Further, Defendant violated 7 Del. C. § 6003(a)(1) through the unpermitted release of ethylene oxide. (Compl. ¶ 96). Thus, Plaintiff has made out a claim for medical monitoring under Delaware law.

In *Mergenthaler v. Asbestos Corp. of Am.*, 480 A.2d 647, 651 (Del. 1984), cited by Croda, the plaintiffs could not show an increased risk of contracting cancer as "no evidence was presented to show that they actually inhaled asbestos fibers." Similarly, *M.G. ex rel. K.G. v. A.I. Dupont Hosp. for Children*, 393 F. App'x 884, 892 (3d Cir. 2010) was an unpublished medical malpractice case cited by Croda where the court:

> decline[d] to predict whether the Delaware Supreme Court might acknowledge some variant of a medical monitoring claim; moreover, plaintiff could neither 'demonstrate that she has been exposed to a proven hazardous substance, nor… that such exposure resulted in a significantly increased risk of contracting a serious latent disease.'

*See also id*, n. 6 ("The District Court notes that courts in Delaware have 'acknowledged' medical monitoring tacitly"). Neither is the case here, where Plaintiff has alleged that she was exposed to a proven hazardous substance that resulted in a significant increased risk of contracting a serious latent disease. (Compl. ¶¶ 51, 53).

**4.    Plaintiff Has Properly Alleged A Claim For Ultrahazardous Activity.**

**(a)    Plaintiff Has Alleged a Claim for Ultrahazardous Activity under the Law of New Jersey.**

New Jersey imposes liability on those who, despite social utility, introduce an extraordinary risk of harm into the community for their own benefit. *T & E Indus. v. Safety Light*

*Corp.,* 587 A.2d 1249 (1991). "[A] landowner is strictly liable to others for harm caused by toxic

waste that are stored on his property and flow on to the property of others," *State Dept. of Envtl.*

*Protection v. Ventron Corp.,* 468 A.2d 150 (1983). New Jersey has adopted the principles set forth

in Restatement (Second) of Torts, which is guided by the following factors: (a) existence of a high

degree of risk of harm to the person, land or chattels of others; (b) likelihood that great harm would

result therefrom; (c) the inability to eliminate those risks through the exercise of reasonable care;

(d) the common usage of the activity; (e) the appropriateness of the activity; and (f) the value of

the activity to the community. *Bahrle v. Exxon Corp.,* 652 A.2d 178 (App.Div.1995); *Biniek v.*

*Exxon Mobil Corp.*, 818 A.2d 330, 336–37 (Law. Div. 2002).

Plaintiff has sufficiently alleged these elements here.[2] While Croda claims that Plaintiff

has not alleged that its operation "is not a matter of common usage", Plaintiff has alleged that

---

[2] 75. Defendant's manufacture, processing and use of EtO is an abnormally dangerous activity and
cannot be made safe by the exercise of the utmost care. The procedures utilized at the Atlas Point
plant resulted in emissions of EtO to the Class Zone, which poses a high degree of risk to Plaintiff
and Class Members.

76. There is a reasonable likelihood that the emissions of EtO will result in life threatening cancer
and other illness, disease, and disease processes. This risk cannot be eliminated as long as EtO is
emitted into populated areas. Likewise, it was completely inappropriate for Defendant to locate
and operate their Atlas Point plant in a populated area while at the same time causing large amounts
of EtO to be emitted into the atmosphere.

77. Defendant's emission of EtO created a high degree of risk of harm to those who live in the
surrounding area and substantially increased their risk of developing cancer and other illness,
disease, or disease processes.

78. The activities conducted by Defendant are exceedingly dangerous and offer little or no value
to the surrounding community.

Compl. ¶¶ 75-78.

14

Croda's manufacture and use of EtO is "an abnormally dangerous activity."  Croda claims that Plaintiff has not alleged that its value is outweighed by its danger, but Plaintiff has alleged that, "[t]he activities conducted by Defendant are exceedingly dangerous and offer little or no value to the surrounding community."  Croda claims that Plaintiff has not explained why the operation cannot be made safe, but the Complaint is replete with the dangers of EtO in Croda's operation, including allegations that "EtO is a proven hazardous substance … a human carcinogen and is unsafe for humans at any level of exposure." (Compl. ¶ 52).

> **(b)**    **Plaintiff Has Alleged a Claim for Ultrahazardous Activity under Delaware Law.**

"One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm."  *Cropper v. Rego Distribution Ctr., Inc.*, 542 F. Supp. 1142, 1149 (D. Del. 1982).  Similar to New Jersey courts, Delaware courts follow Section 520 of the Restatement (Second). *Moore v. Sharp Gas Inc*., No. CIV. A. 90-504 MMS, 1992 WL 147930, at *2 (D. Del. June 11, 1992).  Plaintiff has alleged those elements as set forth above.

> **5.**    **Plaintiff Has Standing And Has Properly Alleged A Claim For Public Nuisance.**
>
> > **(a)**    **Plaintiff has alleged a claim for public nuisance under New Jersey law.**

The Restatement (Second) defines a public nuisance as "an unreasonable interference with a right common to the general public." Restatement (Second) of Torts, § 821B; *see also In re Lead Paint Litig.*, 924 A.2d 484, 497 (2007) (adopting Section 821B in New Jersey). Here, Plaintiff has alleged these facts[3], and Plaintiff clearly has standing because she has an injury different from that

---

[3] 86. Defendant's operation of its Atlas Point plant caused those who live in the surrounding area to breathe air containing high levels of EtO on a routine and constant basis, causing a substantially elevated risk of cancer.

of the general public at large since she lives close to the contaminating plant, and the general public

does not.  (Compl. ¶¶ 50-51).

> **(b)    Plaintiff has alleged a claim for public nuisance under Delaware law.**

Under Delaware law, a public nuisance is "activity which produces some tangible injury

to neighboring property or persons coming into contact with it and which a court considers to be

objectionable under the circumstances."  *State ex rel. Jennings v. Purdue Pharma L.P.*, No.

CVN18C01223MMJCCLD, 2019 WL 446382, at *11 (Del. Super. Ct. Feb. 4, 2019); *Patton v.*

*Simone*, 1992 WL 398478, at *9 (Del. Super. Dec. 14, 1992) To have standing to sue on a public

nuisance claim, an individual must: (1) be capable of recovering damages; and (2) have standing

to sue as a representative of the public, "as in a citizen's action or class action." *Dayton v. Collison*,

No. CV N17C-08-100 CLS, 2019 WL 4668157, at *3 (Del. Super. Ct. Sept. 24, 2019). Unlike

*Reilly v. Ceridian Corp.*, 664 F.3d 38, 42 (3d Cir. 2011), which was a data breach case where there

was no evidence that the data had been misused and the plaintiff lacked standing, the Plaintiff here

has actually inhaled EtO. (Compl. ¶ 51).

> **6.    Plaintiff Has Properly Alleged a Claim For Private Nuisance.**
>
> **(a)    Plaintiff Has Alleged a Claim for Private Nuisance under the Law of New Jersey.**

"A private nuisance involves interference with another's interest in the private use and

enjoyment of land." Restatement (Second) of Torts, § 822; *Prosser & Keeton on Torts,* § 91 at 652

(5th ed.1984); *James v. Arms Tech., Inc.*, 820 A.2d 27, 50 (App. Div. 2003).  "It has long been

recognized that damages for inconvenience, annoyance, and discomfort are recoverable in a

---

87. As a proximate result of the Defendant's operation of its plant, Plaintiff and the general public's common right to breathe clean air without dangerous levels of carcinogens such as EtO was eliminated and/or severely diminished.

Compl. ¶¶ 86-87.

16

nuisance action." *Ayers*, 525 A.2d 287, 294 (1987). Here Plaintiff has alleged nuisance per se and

in fact.[4]

> **(b)    Plaintiff Has Alleged a Claim for Private Nuisance under the Law of Delaware.**

There are two types of private nuisance recognized in Delaware: nuisance per se and

nuisance-in-fact.  A claim for nuisance per se exists in three types of cases: (1) intentional,

unreasonable interference with property rights of another; (2) interference resulting from an

abnormally hazardous activity conducted on the person's property; and (3) interference in violation

of a statute intended to protect public safety. A claim for nuisance-in-fact exists when the

defendant, although acting lawfully on his own property, permits acts or conditions that "become

---

[4] 94. Defendant's unreasonable use and emission of EtO from its Atlas Point plant was an ultrahazardous or abnormally dangerous condition or activity and thus constitutes an absolute nuisance, or nuisance per se, for which Defendant is strictly liable.

95. Defendant's unreasonable use and emission of EtO from its Atlas Point plant violated existing laws intended to protect public health and safety, and thus Defendant's conduct constitutes an absolute nuisance, or nuisance per se, for which Defendant is strictly liable.

96. For example, Defendant violated 7 Del. C. § 6003(a)(1) through the unpermitted release of ethylene oxide.

97. Defendant also violated Condition 3.38 of Permit APC-2016/0068- CONSTRUCTION (Amendment 3) by not maintaining and operating its facility in a manner consistent with good air pollution control practice for minimizing emissions.

98. Defendant also violated 7 Del. C. § 6003(a)(2) and sections 3.2.1 and 3.2.3 of 7 DE Admin. Code 7201, for the unpermitted release of deluge water, used to contain the release of ethylene oxide in the air.

Compl. ¶¶ 94-97.

17

nuisances due to circumstances or location or manner of operation or performance." *Dayton v. Collison*, No. CV N17C-08-100 CLS, 2019 WL 4668157, at \*5 (Del. Super. Ct. Sept. 24, 2019).

Private nuisance is defined as "a civil wrong arising from an unreasonable, unwarranted or unlawful use of one's property producing material annoyance, inconvenience, discomfort or hurt to another in the use of his property*." Gordon v. Nat'l R.R. Passenger Corp*., No. CIV. A. 10753, 1997 WL 298320, at \*10 (Del. Ch. Mar. 19, 1997). Also, "plaintiffs must clearly establish the nuisance and the injury must not be trivial or temporary." *Pruett v. Dayton*, 39 Del. Ch. 537, 541 (1961). The court in *Gordon* recognized this cause of action under its facts (toxic exposure), and further stated that plaintiff's claims for nuisance, if true, "would warrant an award of equitable relief." *Gordon*, No. CIV. A. 10753, 1997 WL 298320, at \*10 (Del. Ch. Mar. 19, 1997).

    **7.**    **Plaintiff Has Properly Alleged A Claim For Negligence.**

      **(a)**    **Plaintiff Has Alleged a Claim for Negligence under New Jersey Law.**

To sustain a cause of action for negligence, a plaintiff must establish four elements: "(1) a duty of care, (2) a breach of that duty, (3) proximate cause, and (4) actual damages." *Townsend v. Pierre*, 110 A.3d 52, 61 (2015). Here, Plaintiff has made these allegations.[5]

      **(b)**    **Plaintiff Has Alleged a Claim for Negligence under Delaware law.**

---

[5] 108. Defendant negligently breached its duty by, inter alia: a. Emitting dangerous amounts of EtO into the air; b. Failing to employ safe methods to adequately control or eliminate EtO emissions from the plant; c. Failing to use alternative procedures which would not result in the emission of EtO into neighboring communities; d. Failing to locate its EtO processing to an unpopulated, or at least much less populated, area; and e. Failing to warn neighboring residents that they were being exposed to EtO and of the consequent risks of disease the residents acquired because of that exposure.

109. As a direct and proximate result of Defendant's negligence and their exposure to EtO, Plaintiff and the Class Members presently suffer, and will continue to suffer, a present increased risk of illness and disease, and the resulting present need to incur the cost of reasonably medically necessary diagnostic testing for the early detection of illness, disease or disease process.

Compl. ¶¶ 108-109.

18

The elements of negligence are duty, breach, causation, and harm. *Hudson v. Old Guard Ins. Co.*, 3 A.3d 246, 250 (Del. 2010)  The negligence claim in *Brzoska v. Olson*, 668 A.2d 1355 (Del. 1995) was for malpractice, id. at 1359, which Plaintiff does not allege here.   And Brzoska did not appeal with respect to negligence so the court of appeal did not rule on it.  *Id*. at 1360.

### 8.    Plaintiff Has Properly Alleged a Claim for Willful or Wanton Conduct.

#### (a)    Plaintiff Has Alleged a Claim for Willful or Wanton Conduct under New Jersey Law.

The essence of willful or wanton negligence is that it "implies that a person has acted with reckless disregard for the safety of others." *G.S. v. Dept. of Human Services*, 723 A.2d 612 (1999) (citations omitted). Further, willful or wanton conduct is that which is "done with the knowledge that injury is likely to, or probably will, result[,]" and "can apply to situations ranging from 'slight inadvertence to malicious purpose to inflict injury.'" *Id.* at 612 (citations omitted). However, if the act or omission is intentionally done, "whether the actor actually recognizes the highly dangerous character of her conduct is irrelevant," and "[k]nowledge will be imputed to the actor." *Id*.; *New Jersey Div. of Child Prot. & Permanency v. J.D.,* 148 A.3d 128, 136 (App. Div. 2016).  Plaintiffs' Complaint makes these allegations.[6]

---

[6] 113. Upon information and belief, Defendant was, at all times relevant, aware of the considerable health risks associated with the emission of EtO from the Atlas Point plant, including the risk of causing various forms of cancer in the surrounding population.

114. Upon information and belief, Defendant was, at all times relevant, aware that its processing of EtO and the production of surfactants at the Atlas Point plant actually resulted in the unreasonably dangerous emission of EtO into the surrounding communities.

115. Notwithstanding this actual knowledge, Defendant breached its duties by, among other things: a. Emitting dangerous amounts of EtO into the air; b. Failing to employ safe methods to adequately control EtO emissions from its plant; c. Failing to use alternative procedures which would not result in the emission of EtO into neighboring communities; d. Failing to locate its EtO processing facilities in an unpopulated or less populated area; e. Failing to warn neighboring residents that they were being exposed to EtO and of the consequent risks of disease the residents acquired

19

**(b)    Plaintiff Has Alleged a Claim for Willful or Wanton Conduct under Delaware Law.**

The Delaware Supreme Court has stated that "[t]here is a clear distinction between wantonness and negligence, as the former term includes the elements of consciousness of one's conduct, realization of the probability of injury to another, and disregard of the consequences." *Willon v. Werb*, No. CV N17C-03-161 VLM, 2019 WL 6705003, at *2 (Del. Super. Ct. Dec. 9, 2019).  In other words, a "[w]illful or wanton disregard of a plaintiff's rights—as opposed to negligence—reflects a 'conscious indifference' or an 'I-don't-care attitude.'" *Id.*  For the same reasons, Plaintiff articulates a plausible claim.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that this Court deny Defendant's Motion to Dismiss.

Respectfully submitted,

*/s/ Kyle J. McGee*
Kyle J. McGee (#5558)
GRANT & EISENHOFER P.A.
123 Justison Street
Wilmington, Delaware 19801
kmcgee@gelaw.com
P: (302) 622-7000
F: (302) 622-7100

---

because of that exposure; f. Failing to take steps to minimize or eliminate the release of EtO, by failing to utilize alternative procedures that would not result in the release of EtO g. Failing to use proper materials in constructing the plant; and h. Failing to institute proper procedures and training for response to releases of toxic EtO.

116. Defendant's failures in these and other respects in the face of actual knowledge regarding the risks of unreasonable EtO emissions constitutes willful, wanton, reckless and outrageous conduct, and demonstrates an utter indifference and/or conscious disregard to the health, safety, and well-being of Plaintiff and those living in the areas surrounding its Atlas Point plant.

Compl. ¶¶ 113-16.

T. Michael Morgan*
MORGAN & MORGAN, P.A.
20 N Orange Ave., Suite 1600
Orlando, FL 32801
mmorgan@ForThePeople.com
P: (407) 418-2031
F: (407) 245-3384

Marcio W. Valladares*
MORGAN & MORGAN, COMPLEX
LITIGATION GROUP
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
mvalladares@ForThePeople.com
P: (813) 223-5505
F: (813) 223-5402

Rene F. Rocha*
MORGAN & MORGAN, COMPLEX
LITIGATION GROUP
3530 Magazine St.
New Orleans, LA 70115
rrocha@ForThePeople.com
P:  (954) 318-0268
F:  (954) 327-3018

Frank M. Petosa*
MORGAN & MORGAN, COMPLEX
LITIGATION GROUP
8151 Peters Road
Suite 4000
Plantation, FL 33324
fpetosa@ForThePeople.com
P:  (954) 318-0268
F:  (954) 327-3018

*Pro Hac Vice

Attorneys for the Plaintiff and
the Putative Class

Date: November 17, 2020

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

CATHERINE BAKER, individually and )
on behalf of all others similarly situated )
      )
              Plaintiff, )      Case No. 20-cv-01108-MN
      v. )
      )
CRODA INC. f/k/a CRODA, INC., )
      )
              Defendant. )

## STIPULATION AND [PROPOSED] ORDER EXTENDING TIME FOR DEFENDANT TO FILE REPLY IN SUPPORT OF ITS MOTION TO DISMISS

WHEREAS, on October 13, 2020, Defendant, Croda Inc. ("Defendant") filed its Motion to Dismiss (the "Motion"); and

WHEREAS, on November 13, 2020, Plaintiff filed its Opposition to the Motion to Dismiss;

IT IS HEREBY STIPULATED AND AGREED, by and among Plaintiff and Defendant, subject to the approval of the Court, that the time for Defendant to respond to Plaintiff's Opposition to the Motion to is extended to and including December 9, 2020.

GRANT & EISENHOFER P.A.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP


 _/s/ Kyle J. McGee_
Kyle J. McGee (#5558)
123 Justison Street
Wilmington, Delaware 19801
(302) 622-7000
kmcgee@gelaw.com
Attorney for Plaintiff
*Counsel for the Plaintiff and the Putative Class*

 _/s/ Zi-Xiang Shen_
Kenneth J. Nachbar (# 2067)
Zi-Xiang Shen (#6072)
1201 North Market Street
Wilmington, Delaware 19801
(302) 658-9200
knachbar@mnat.com
zshen@mnat.com
*Counsel for Defendant*


Frank Petosa (*Admitted Pro Hac Vice*)
MORGAN & MORGAN,
COMPLEX LITIGATION GROUP
8151 Peters Road Suite 4000
Plantation, FL 33324
(954) 318-0268

Stephen A. Swedlow (*Admitted Pro Hac Vice*)
Athena Dalton (*Admitted Pro Hac Vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
(312) 705-7400
stephenswedloe@quinnemanuel.com
athenadalton@quinnemanuel.com

Marcio W. Valladares (*Admitted Pro Hac Vice*)
 MORGAN & MORGAN,
COMPLEX LITIGATION GROUP
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
(813) 223-5505


Rene F. Rocha (*Admitted Pro Hac Vice*)
MORGAN & MORGAN, ,
COMPLEX LITIGATION GROUP
3530 Magazine St.
New Orleans, LA 70115
(954) 318-0268


*Counsel for the Plaintiff and the Putative Class*

IT IS SO ORDERED this_____day of November, 2020.


_____
Judge

APPEAL

# U.S. District Court
## District of Delaware (Wilmington)
## CIVIL DOCKET FOR CASE #: 1:20-cv-01108-SB

Baker v. Croda Inc.                                  Date Filed: 08/24/2020
Assigned to: Judge Stephanos Bibas               Jury Demand: Plaintiff
Case in other court: Third Circuit, 21-03360     Nature of Suit: 360 P.I.: Other
Cause: 28:1331 Fed. Question: Personal Injury    Jurisdiction: Federal Question

| Date Filed | # | Docket Text |
|---|---|---|
| 11/18/2020 | | SO ORDERED re 15 STIPULATION TO EXTEND TIME for Defendant to File Reply in Support of Its Motion to Dismiss to December 9, 2020 (Set Briefing Schedule: re 7 MOTION to Dismiss for Lack of Jurisdiction Over the Subject Matter and for Failure to State a Claim - Reply Brief due 12/9/2020). ORDERED by Judge Maryellen Noreika on 11/18/2020. (dlw) (Entered: 11/18/2020) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 01/14/2022 12:05:25 | | | |
| **PACER Login:** | Gran0_559 | **Client Code:** | 29050 |
| **Description:** | Docket Report | **Search Criteria:** | 1:20-cv-01108-SB Start date: 11/18/2020 End date: 11/18/2020 |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CATHERINE BAKER, individually and on behalf of all others similarly situated | ) ) ) | |
| Plaintiff, | ) ) | Case No. 20-cv-01108-MN |
| v. | ) ) | |
| CRODA INC. f/k/a CRODA, INC., | ) ) | |
| Defendant. | ) ) | |

## REPLY BRIEF IN SUPPORT OF
## CRODA INC.'S MOTION TO DISMISS

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Kenneth J. Nachbar (# 2067)
Zi-Xiang Shen (#6072)
1201 N. Market Street
Wilmington, DE  19801
(302) 658-9200
knachbar@mnat.com
zshen@mnat.com
  *Attorneys for Defendant*

OF COUNSEL:

Stephen A. Swedlow
Athena D. Dalton
QUINN EMANUEL URQUHART &
 SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL  60606
(312) 705-7400
stephenswedlow@quinnemanuel.com
athenadalton@quinnemanuel.com

December 9, 2020

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.   THIS COURT SHOULD DISMISS THIS SUIT UNDER RULE 12(B)(1) FOR LACK OF SUBJECT MATTER JURISDICTION ............................................................1

    A.   Class Members' Continued Residency in Delaware Creates a Reasonable Presumption of Domicile in Delaware .......................................................................1

    B.   The Court Should Voluntarily Decline the Exercise of Jurisdiction Since This Case Is a Matter of Local Interest .....................................................................3

II.  THIS COURT SHOULD DISMISS THIS SUIT UNDER RULE 12(B)(6) BECAUSE PLAINTIFF FAILED TO STATE A CLAIM UNDER EITHER DELAWARE OR NEW JERSEY LAW .............................................................................6

    A.   Delaware Law Governs Plaintiff's Claims ..............................................................6

    B.   All of Plaintiff's Claims Fail Under Delaware Law for Lack of a Compensable Injury ................................................................................................7

    C.   Plaintiff's Medical Monitoring Claim Fails Because Delaware Does Not Recognize Medical Monitoring as an Independent Cause of Action .......................8

    D.   Plaintiff's Claims Fail Under New Jersey Law Because She Has Not Pled That It Is "More Probable Than Not" that the Class Will Develop a Disease As a Result of Ethylene Oxide Exposure ..................................................................9

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

### Cases

*Aclate, Inc v. Eclipse Mktg. LLC*,
    2020 WL 6158579 (D. Del. Oct. 21, 2020) ................................................................................ 6

*Ayers v. Jackson Twp.*,
    106 N.J. 557 (1987) ...................................................................................................................... 10

*Bendix Corp. v. Stagg*,
    486 A.2d 1150 (Del. 1984) ........................................................................................................... 7

*Clinton v. Enterprise Rent–A–Car Co.*,
    977 A.2d 892 (Del. 2009) .............................................................................................................. 6

*Cook v. S.C. Pub. Serv. Auth.*,
    2020 WL 869741 (D.S.C. Jan. 21, 2020).................................................................................. 1, 2

*Evans v. AMISUB (SFH), Inc.*,
    2017 WL 9807437 (W.D. Tenn. Dec. 8, 2017) ........................................................................... 2

*Evans v. Enter. Prods. Partners, LP*,
    426 F. Supp. 3d 397 (S.D. Tex. 2019) ......................................................................................... 5

*Evans v. Walter Indus., Inc.*,
    449 F.3d 1159 (11th Cir. 2006) ................................................................................................... 2

*Guinan v. A.I.*,
    597 F. Supp. 2d 517 (E.D. Pa. 2009) ........................................................................................... 8

*In re Asbestos Litig.*,
    2017 WL 3600418 (Del. Super. Ct. Aug. 18, 2017) ................................................................. 8, 9

*M.G. ex rel. K.G. v. A.I. DuPont Hosp. for Children*,
    393 F. App'x 884 (3d Cir. 2010) .................................................................................................. 8

*Martinez v. E.I. DuPont De Nemours & Co.*,
    82 A.3d 1 (Del. Super. Ct. 2012) *aff'd*, 86 A.3d 1102 (Del. 2014) ............................................ 7

Mason v. Lockwood,
    Andrews & Newnam, P.C., 842 F.3d 383 (6th Cir. 2016)........................................................... 2

*Mason v. Lockwood, Andrews & Newnam, P.C.—another*,
    842 F.3d 383 (6th Cir. 2016) ............................................................................................... 1, 2, 3

*Mauro v. Raymark Indus., Inc.*,
    561 A.2d 257 (N.J. 1989)............................................................................................................ 10

*Metro-N. Commuter R. Co. v. Buckley*,
    521 U.S. 424 (1997)...................................................................................................................... 9

- ii -

*Millison v. E.I.*,
   545 A.2d 213 (N.J. Super. Ct. App. Div. 1988) ........................................................ 10

*Mondragon Capital One Auto Fin.*,
   736 F.3d 880, 883 (9th Cir. 2013) ............................................................................ 2

*Preston v. Tenet Healthsystem Mem'l Med. Ctr., Inc.*,
   485 F.3d 793 (5th Cir. 2007) ........................................................................... 2, 4, 5

*Reece v. AES Corp.*,
   638 F. App'x 755 (10th Cir. 2016) ............................................................................ 2

*Sinclair v. Merck & Co.*,
   948 A.2d 587 (N.J. 2008) .......................................................................................... 10

*Speed v. JMA Energy Co.*,
   872 F.3d 1122 (10th Cir. 2017) ................................................................................. 5

*Theer v. Philip Carey Co.*,
   628 A.2d 724 (N.J. 1993) .......................................................................................... 10

*Tumlinson v. Advanced Micro Devices, Inc.*,
   2010 WL 8250792 (Del. Super. Ct. July 23, 2010) ............................................. 6, 7

*Vodenichar v. Halcon Energy Props., Inc.*,
   733 F.3d 497 (3d Cir. 2013) ...................................................................................... 1

**Rules**

Rule 12(b)(1) ............................................................................................................... 1, 10
Rule 12(b)(6) ............................................................................................................... 6, 10

**Statutory Authorities**

28 U.S.C. § 1332(d)(3) ................................................................................................. 1, 4
28 U.S.C. § 1332(d)(4)(B) ................................................................................................ 1

I.    THIS COURT SHOULD DISMISS THIS SUIT UNDER RULE 12(B)(1) FOR LACK OF
      SUBJECT MATTER JURISDICTION

The Class Action Fairness Act states that a District Court *must* decline jurisdiction where

two-thirds or more of the proposed class members, and the defendant, are citizens of the state in

which the action was originally filed.  28 U.S.C. § 1332(d)(4)(B).  The statute further provides that

a court may decline to exercise jurisdiction where one-third or more of the class members are

citizens of the same state as the defendant when doing so is "in the interests of justice."  28 U.S.C.

§ 1332(d)(3).  Here, there is no dispute that Croda is a citizen of Delaware.  The Court can make

a reasonable deduction that a substantial majority of the class members are Delaware citizens, and

should therefore dismiss this case for lack of jurisdiction.

    A.    Class Members' Continued Residency in Delaware Creates a Reasonable
          Presumption of Domicile in Delaware

As discussed in Croda's opening brief, it is reasonable to conclude that a substantial portion

of the putative class members are Delaware citizens based on their residency in the state.  (Mot.

(D.I. 8) at 7-10).  Courts can make reasonable deductions about the citizenship of class members

without making an individualized inquiry into the subjective intent of each class member.  *Cook*

*v. S.C. Pub. Serv. Auth.*, 2020 WL 869741, at *8 (D.S.C. Jan. 21, 2020) ("several circuit courts

have recognized that district courts must be allowed room to draw reasonable conclusions on

citizenship when determining whether a CAFA exception applies").  For example, in *Vodenichar*

*v. Halcon Energy Props., Inc.*, a case cited by Plaintiff, the Third Circuit did not analyze the

citizenship of class members or evaluate evidence about their domiciles, since all class members

were landowners in Pennsylvania.  733 F.3d 497, 501 (3d Cir. 2013).  Similarly, in *Mason v.*

*Lockwood, Andrews & Newnam, P.C.*—another case cited in Plaintiff's opposition brief—the

Sixth Circuit held that residency creates a rebuttable presumption of domicile for the purposes of

CAFA's local controversy exception.  842 F.3d 383, 394 (6th Cir. 2016) ("we see no reason to

- 1 -

close our eyes to a centuries-old inference that a person's residence is presumptively his domicile"). The *Mason* Court reasoned that "the residency-domicile presumption fits particularly well in the CAFA exception context, where the moving party is tasked with demonstrating a fact-centered proposition about a mass of individuals, many of whom may be unknown at the time the complaint is filed and the case removed to federal court." *Id.* at 392.

"The party seeking remand can benefit from the 'inference that a person's residence is presumptively his domicile,' but the [party] seeking removal can rebut this presumption with evidence," such as data showing that the area contains a large number of college students, military personnel, or owners of second homes. *Evans v. AMISUB (SFH), Inc.*, 2017 WL 9807437, at *2 (W.D. Tenn. Dec. 8, 2017). In general, the plaintiffs are in the best position to put forward evidence of this nature, since "as master of the complaint with the creative license for defining the putative class, the plaintiffs are in the best position to establish citizenship and produce probative evidence."[1] *Preston v. Tenet Healthsystem Mem'l Med. Ctr., Inc.*, 485 F.3d 793, 801 (5th Cir. 2007). "[T]he evidentiary standard for establishing citizenship must be guided by practicality and reasonableness, particularly in large class actions." *Cook*, 2020 WL 869741, at *8. "As a general proposition, district courts are permitted to make reasonable inferences from facts in evidence, and that is true in applying the local controversy exception under CAFA, as well." *Id.* (declining to

---

[1] Many of the cases Plaintiff cited involved plaintiffs trying to use the local controversy exception to escape federal jurisdiction. For example, in *Preston* (where the Court declined jurisdiction) the class was defined to include persons who sustained injury as a result of Defendants' failure to maintain safe premises during Hurricane Katrina. 485 F.3d 793, 796 (5th Cir. 2007). Most of the other cases Plaintiff relies on similarly involved a plaintiff trying to evade federal jurisdiction. *See Mondragon Capital One Auto Fin.*, 736 F.3d 880, 883 (9th Cir. 2013) (a Plaintiff sought to invoke the two-thirds exception to return to state court); *Reece v. AES Corp.*, 638 F. App'x 755 (10th Cir. 2016) (Plaintiff moved to remand); *Evans v. Walter Indus., Inc.*, 449 F.3d 1159 (11th Cir. 2006) (same); *Mason v. Lockwood, Andrews & Newnam, P.C.*, 842 F.3d 383 (6th Cir. 2016) (same).

(Continued . . .)

exercise jurisdiction under CAFA's discretionary exception based on the presumed citizenship of the class members).  The inquiry Plaintiff suggests would require such an individualized, subjective evaluation of each class member that litigation on a class basis would be inappropriate.[2]

Here, certain features of the class indicate that a substantial portion of its members are residents of, and domiciled in, Delaware.  The fact that the class definition is limited to persons who have lived in Delaware continuously for at least a year (*see* Compl. (D.I. 1) ¶ 62) weighs in favor of finding that class members are domiciled in Delaware.  For example, in *Mason*, the plaintiffs defined their class as "all residents and property owners in the City of Flint who used water from the Flint River" during a specified period.  *Mason*, 842 F.3d at 389.  The court found that the CAFA local exception applied, reasoning that "[i]n addition to the presumptive force of residency, there are other attributes of plaintiffs' proposed class that bolster the inference that the putative class members, as residents of Flint, intend to remain there indefinitely."  *Id.* at 395.  "[A]ccording to plaintiffs' class definition, the class members have continuously resided in Flint, Michigan, for several years."  *Id.*  Similarly, here the class consists of "natural persons who have resided within [three] census tracts [in Delaware] for a period of one year or more."  (Compl. ¶ 62).  The Court can reasonably conclude that the class members' residency in Delaware shows that they are domiciled in Delaware.

   B. <u>The Court Should Voluntarily Decline the Exercise of Jurisdiction Since This Case Is a Matter of Local Interest</u>

Even if the Court finds that the two-thirds threshold for mandatory abstention is not met, it should still voluntarily decline to exercise jurisdiction under Section 1332(d)(3). CAFA's

---

[2] In this case, Defendant Croda has little access to probative evidence and was not able to define the class.  As a result, it will be months or years before Croda can evaluate each class member's subjective future intent about remaining in their current residence indefinitely.  This could result in the Court and the parties discovering that it lacks federal jurisdiction years into this litigation.

discretionary provision provides the District Court with "greater latitude to remand class actions to state court" than under CAFA's mandatory exceptions. *Preston*, 485 F.3d at 810. Under this Section, the Court may decline to exercise jurisdiction if more than one-third (but less than two-thirds) of the putative class are Delaware citizens, if doing so is in the interests of justice. The factors the Court may consider in declining jurisdiction include: "whether the claims asserted involve matters of national or interstate interest," "whether the claims asserted will be governed by laws of the State in which the action was originally filed," and "whether the action was brought in a forum with a distinct nexus with the class members, the alleged harm, or the defendants." 28 U.S.C. § 1332(d)(3).

Here, a review of the factors demonstrates that this is a local controversy most appropriately addressed in state court. The claims at issue do not involve matters of national or interstate interest—rather, the claims involve a dispute between a manufacturing facility and the residents that live in its immediate vicinity. (Compl. ¶¶ 27-37). The entire putative class consists of persons who lived in Delaware for at least a year and who seek damages from Croda, a Delaware corporation, for the air quality near Croda's Delaware facility. (Compl. ¶ 9, 43-46, 62). This is an inherently local issue. *See Preston*, 485 F.3d at 822 (finding that a class action relating to the operation of a Louisiana hospital during Hurricane Katrina was not a matter of "national interest").

This matter is most appropriately addressed by Delaware state courts since the claims at issue in this case are governed by Delaware law. As discussed in Section II.A, *infra*, the choice of law analysis demonstrates that Delaware law should be applied to the substantive claims in this case. Further, since "state-law claims predominate over the case in its entirety," it is appropriate for the Court to decline federal jurisdiction. *See Preston*, 485 F.3d at 822.

The Complaint alleges that Delaware residents living in the immediate vicinity of Croda's

- 4 -

Atlas Point facility were harmed by conduct that occurred in Delaware.  Since these localized events gave rise to the alleged harm at issue in the complaint, there is a distinct nexus between the forum of Delaware and the class members, alleged harm, and defendant Croda.  *See Preston*, 485 F.3d at 823 ("In light of the localized events giving rise to the alleged negligent conduct and the undisputed residency and citizenship information of the patients and the healthcare providers, we conclude that a distinct nexus exists between the forum of Louisiana and the class members, alleged harm, and the defendants.").

In other cases where a group of residents sued a local company for alleged environmental harms in their community, District Courts have similarly declined jurisdiction due to the close nexus between the forum, the alleged harm, and the defendant.  For example, in *Evans v. Enter. Prods. Partners, LP*, the Court remanded a class action where the case "involve[d] Texas Defendants' construction of a local Texas pipeline, which is alleged to have diverted rainwater and caused damages to Texas properties nearby owned mostly by Texas citizens."  426 F. Supp. 3d 397, 407 (S.D. Tex. 2019).  Similarly, in *Speed v. JMA Energy Co.*, the Tenth Circuit affirmed the District Court's decision to remand a class action brought by mineral-interest owners against the operator of an oil and gas well for allegedly underpaying mineral royalties.  872 F.3d 1122, 1129 (10th Cir. 2017) ("The statute does not define 'matters of national or interstate interest.'  But this case is not a close one.  Everything connects to Oklahoma.  All of the subject oil and gas wells are located in Oklahoma, all class members own interests in the subject Oklahoma wells, Plaintiff is an Oklahoma citizen . . . [Defendant] is an Oklahoma citizen . . . the business activities that gave rise to this case occurred in Oklahoma, and the claims are based upon Oklahoma law.").  This case is similar to others where federal courts have declined to exercise jurisdiction due to the inherently local nature of the dispute.  This Court should decline to exercise federal jurisdiction here as well.

II.    THIS COURT SHOULD DISMISS THIS SUIT UNDER RULE 12(B)(6) BECAUSE PLAINTIFF FAILED TO STATE A CLAIM UNDER EITHER DELAWARE OR NEW JERSEY LAW

      A.    <u>Delaware Law Governs Plaintiff's Claims</u>

Although the Court does not need to decide which state's law applies at this juncture,[3] Croda respectfully submits that Delaware law applies. Delaware courts apply the "most significant relationship" test to determine which state's laws govern in a tort case. *Tumlinson v. Advanced Micro Devices, Inc.*, 2010 WL 8250792, at *1 (Del. Super. Ct. July 23, 2010) *citing Clinton v. Enterprise Rent–A–Car Co.*, 977 A.2d 892, 895 (Del. 2009). The contacts that are taken into account include: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." *Tumlinson*, 2010 WL 8250792 at *2. "For personal injury actions, the law of the state where the injury occurred is presumed to control." *Id.*

Here, the alleged injury occurred in Delaware, when individuals who lived near Croda's New Castle facility were exposed to gas emitted from the Atlas Point plant. The conduct "causing the injury" similarly occurred in New Castle, Delaware. (*See* Compl. ¶¶ 43-45). The plaintiffs in this case are all current or former Delaware residents. (*Id*. ¶ 62). Croda is a Delaware corporation and operates the Atlas Point facility in New Castle. (*Id*. ¶ 9). Finally, to the extent that Croda and class members have any relationship, it is centered in Delaware, where the Atlas Point facility is located. (*Id.*) Every factor indicates that Delaware law should apply in this case.

In similar cases, Delaware courts have found that the location of the alleged toxic tort is

---

[3] Delaware courts generally defer a choice-of-law analysis at the motion to dismiss stage, since no discovery has taken place and there is little or no record to reference in making a decision. *Aclate, Inc v. Eclipse Mktg. LLC*, 2020 WL 6158579, at *3 (D. Del. Oct. 21, 2020) (collecting cases).

dispositive.  For example, in *Tumlinson*, the Delaware court found that a Texas citizen's suit

against a manufacturing company for exposure to toxic chemicals at the company's Texas facility

should be governed by Texas law, even though the defendant was incorporated in Delaware.  2010

WL 8250792, at *3.  Similarly, in *Martinez v. E.I. DuPont De Nemours & Co.*, the court found

that the laws of Argentina governed a claim brought by the widow of a worker who died as a result

of asbestos exposure at a textile plant in Argentina, even though the parent company was

incorporated in Delaware.  82 A.3d 1, 33 (Del. Super. Ct. 2012), *aff'd*, 86 A.3d 1102 (Del. 2014).

Plaintiff's only argument to the contrary rests on the assumption that since Croda's

headquarters are located in New Jersey, the "conduct causing the injury" must have occurred in

New Jersey.  (Opp. (D.I. 14) at 10).  This baseless assumption is not sufficient to justify applying

the law of New Jersey to a case involving Delaware residents suing a Delaware corporation for the

operations of a Delaware manufacturing facility.  The alleged harm involves the manufacture of

ethylene oxide, which occurs in Delaware, not New Jersey.   (Compl. ¶ 27). The Complaint

identifies a series of events that occurred in Delaware—not New Jersey.  (*Id.* ¶¶ 16, 27, 34-37).

Delaware has the most significant relationship to this case.  Therefore, Delaware law governs.

B.     All of Plaintiff's Claims Fail Under Delaware Law for Lack of a Compensable
        Injury

Plaintiff did not identify a single case under Delaware law where exposure to a toxic

substance, without more, qualified as a compensable injury.  Plaintiff has not identified any case

where a person exposed to a pollutant was able to recover in tort without any evidence of disease

or physical injury.  In toxic tort cases, "injury is sustained when the harmful effect first manifests

itself and becomes physically ascertainable." *Bendix Corp. v. Stagg*, 486 A.2d 1150, 1154 (Del.

1984).  According to the class definition, every class member is currently in good health.  Delaware

law permits persons who *develop an injury* as a result of exposure to a toxic substance to bring a

claim "when the plaintiff is chargeable with knowledge that his condition is attributable to [toxic] exposure." *In re Asbestos Litig.*, 2017 WL 3600418, at *1 (Del. Super. Ct. Aug. 18, 2017). Since all of Plaintiff's claims require injury as an element, Counts I through VI of the Complaint should be dismissed for failure to state a claim.

      C.     <u>Plaintiff's Medical Monitoring Claim Fails Because Delaware Does Not Recognize Medical Monitoring as an Independent Cause of Action</u>

Plaintiff's sixth claim also fails for the independent reason that Delaware has not recognized medical monitoring as an independent cause of action. In the handful of cases where medical monitoring costs were awarded, they were as part of a *remedy* for an independent tort (most often medical malpractice which resulted in a significant physical injury). Plaintiff has cited no cases where medical monitoring was recognized as an independent cause of action. Therefore, under Delaware law, Claim VI for medical monitoring fails.

*M.G. ex rel. K.G. v. A.I. DuPont Hosp. for Children* is instructive. In that case, the Third Circuit reversed the District Court's ruling[4] that Plaintiff had a claim for medical monitoring. In the underlying case, the plaintiff had undergone surgery to implant a "proven and admittedly hazardous" heart stent which "significantly increased [her] risk of [ ] side effects." 393 F. App'x 884, 891 (3d Cir. 2010). Plaintiff submitted a variety of claims, including an independent claim for medical monitoring. *Id.* Although a Pennsylvania District Court predicted that the Delaware Supreme Court would permit a claim for medical monitoring, the Third Circuit reversed. *Id.* In its opinion, the Third Circuit stated that "[n]either the District Court nor Plaintiff points to any

---

[4] The District Court's ruling, *Guinan v. A.I. duPont Hosp. for Children*, 597 F. Supp. 2d 517 (E.D. Pa. 2009) was reversed on appeal. As a result, Plaintiff's statement that the Eastern District of Pennsylvania "predicte[d] that the Delaware Supreme Court would permit a claim for medical monitoring if it were confronted with the record currently before us" (Opp. at 12) should be evaluated in light of the Third Circuit's opinion reversing that ruling in *M.G. ex rel. K.G. v. A.I. Dupont Hosp. for Children*, 393 F. App'x 884 (3d Cir. 2010).

- 8 -

case in this Circuit, let alone in Delaware, in which a free-standing medical monitoring claim has been allowed to proceed although the plaintiff has not demonstrated significant exposure to a toxic (poisonous) or proven hazardous substance." *Id.* at 892. The Court concluded that "the District Court's prediction that the Delaware Supreme Court would permit a claim for medical monitoring on this record requires several 'leaps' from the current state of the law, generally, let alone Delaware law." *Id.* In sum, Delaware does not recognize medical monitoring as an independent cause of action. Plaintiff's sixth claim should be dismissed.

> D. <u>Plaintiff's Claims Fail Under New Jersey Law Because She Has Not Pled That It Is "More Probable Than Not" that the Class Will Develop a Disease As a Result of Ethylene Oxide Exposure</u>

Medical monitoring may be recovered as a remedy under certain narrow circumstances under New Jersey law—but not under the facts of this case. As explained in *Metro-N. Commuter R. Co. v. Buckley*, a case cited by Plaintiff, "the cases authorizing recovery for medical monitoring in the absence of physical injury do not endorse a full-blown, traditional tort law cause of action for lump-sum damages . . . [r]ather, those courts, while recognizing that medical monitoring costs can amount to a harm that justifies a tort remedy, have suggested, or imposed, special limitations on that remedy." 521 U.S. 424, 440–41 (1997) (applying federal law under the Federal Employers' Liability Act). These limitations are justified in light of the millions of potential claims which "could threaten both a 'flood' of less important cases . . . and the systemic harms that can accompany 'unlimited and unpredictable liability.'" *Id.*[5]

Under New Jersey law, "recovery for enhanced risk of contracting a disease due to exposure to toxic chemicals is only possible upon proof that it is ***more probable than not*** (the rule

---

[5] The Supreme Court in *Metro-North Commuter Rail Co.* declined to award medical monitoring or emotional distress damages to a railroad worker who had been exposed to asbestos at work but who had not yet developed any disease. *Id.* at 444.

of reasonable medical probability) that the plaintiff will develop the disease." *Sinclair v. Merck & Co.*, 948 A.2d 587, 592 (N.J. 2008) (emphasis added); *see also Mauro v. Raymark Indus., Inc.*, 561 A.2d 257, 260 (N.J. 1989) ("[U]nless plaintiff [can] prove to a reasonable degree of medical certainty that cancer was more probable than not, his claim for increased risk of cancer could not be sustained."). This requirement limits recovery for plaintiffs who allege an increased risk of harm from exposure to a toxic substance. As the New Jersey Appellate Court recently explained, "[i]n *Ayers*, the [New Jersey Supreme] court refused to recognize a cause of action for the unquantified enhanced risk of a disease which had not occurred, and which might never occur. In so holding, the court distinguished the problem of quantifying an injury for an intentional tort representing an injury that had occurred and could be proven at trial." *Millison v. E.I. du Pont de Nemours & Co.*, 545 A.2d 213, 222 (N.J. Super. Ct. App. Div. 1988), *aff'd*, 115 N.J. 252 (1989) *citing Ayers v. Jackson Twp.*, 106 N.J. 557, 600 (1987). Further, recovery is limited to persons who have been "directly exposed to hazardous substances." *Theer v. Philip Carey Co.*, 628 A.2d 724, 733 (N.J. 1993) (denying an award of medical monitoring costs for "second-hand" exposure to asbestos). Here, Plaintiff has not alleged that it is "more probable than not" that she and class members will develop a disease as a result of exposure to ethylene oxide. Rather, the Complaint alleges that "Plaintiff and Class Members are at an increased risk of developing cancer, and other illness, disease and disease processes." (Compl. ¶ 54). This is not sufficient under New Jersey law. Therefore, all of Plaintiffs' claims should be dismissed.

CONCLUSION

For these reasons, Croda respectfully requests that the Court enter an order to dismiss this case for lack of subject matter jurisdiction under Rule 12(b)(1) or, in the alternative, enter an order to dismiss for failure to state a claim under Rule 12(b)(6).

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Kenneth J. Nachbar*
Kenneth J. Nachbar (# 2067)
Zi-Xiang Shen (#6072)
1201 N. Market Street
Wilmington, DE  19801
(302) 658-9200
knachbar@mnat.com
zshen@mnat.com
    *Attorneys for Defendant*

OF COUNSEL:

Stephen A. Swedlow
Athena D. Dalton
QUINN EMANUEL URQUHART &
  SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL  60606
(312) 705-7400
stephenswedlow@quinnemanuel.com
athenadalton@quinnemanuel.com


December 9, 2020

**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

|   |   |
|---|---|
| CATHERINE BAKER, individually and on behalf of all others similarly situated, | |
| Plaintiff, | Case No.:  20-cv-01108-MN |
| v. | |
| CRODA INC. f/k/a CRODA, INC., | |
| Defendant. | |

**PLAINTIFF'S MOTION FOR LEAVE TO FILE SURREPLY IN FURTHER**
**OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

Pursuant to Local Rule 7.1.2(b), Plaintiff, Catherine Baker, individually and on behalf of all others similarly situated, hereby respectfully requests leave to file the attached proposed surreply (the "Proposed Surreply") addressing certain mischaracterizations of fact and misinterpretations of law made by Defendant Croda, Inc. ("Croda") in its Reply in Support of its Motion to Dismiss (D.I. 16) (the "Reply").

Plaintiff is compelled to respond to the Reply because it makes material mischaracterizations of fact and misinterpretations of law to which Plaintiff has not had an opportunity to respond.[1]  *See St. Clair Intellectual Prop. Consultants, Inc. v. Samsung Elecs. Co.*, 291 F.R.D. 75, 80 (D. Del. 2013) (stating that "[a] Court may grant leave to file a sur-reply if it responds to new evidence, facts, or arguments" and granting leave to file surreply, observing that the surreply "will allow the Court to more fully and fairly evaluate Defendants' pending motion to dismiss").  Specifically, the Reply:  (1) mischaracterizes the scope of Plaintiff's proposed Class in order to provide the Court a basis from which to infer that the majority of Class Members were

_____

[1] Croda does not consent to Plaintiff's request for leave to file a surreply.

1

citizens of Delaware at the time of filing the Complaint; (2) misinterprets the United States Court of Appeals for the Third Circuit's discussion of the district court's finding that Delaware law acknowledges a claim for medical monitoring; and (3) conflates the heightened standard of proof required in a claim for "enhanced-risk" with that of a claim for medical surveillance under New Jersey law.

Croda will not be prejudiced by the Proposed Surreply, especially since Croda chose to first raise these issues in its Reply. However, Plaintiff will be prejudiced if the record is allowed to stand as is, since she will not have had the opportunity to respond to the material mischaracterizations of fact and misinterpretations of law in Croda's Reply.

For the reasons cited above, Plaintiff respectfully requests that the Court grant the motion and permit her to file the attached Proposed Surreply.

Respectfully submitted,

*/s/ Kimberly A. Evans*
Kimberly A. Evans (#5888)
GRANT & EISENHOFER P.A.
123 Justison Street
Wilmington, Delaware 19801
kevans@gelaw.com
P: (302) 622-7000
F: (302) 622-7100

T. Michael Morgan*
MORGAN & MORGAN, P.A.
20 N Orange Ave., Suite 1600
Orlando, FL 32801
mmorgan@ForThePeople.com
P: (407) 418-2031
F: (407) 245-3384

Marcio W. Valladares*
MORGAN & MORGAN, COMPLEX
LITIGATION GROUP
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
mvalladares@ForThePeople.com

Appx169

P: (813) 223-5505
F: (813) 223-5402

Rene F. Rocha*
MORGAN & MORGAN, COMPLEX
LITIGATION GROUP
3530 Magazine St.
New Orleans, LA 70115
rrocha@ForThePeople.com
P: (954) 318-0268
F: (954) 327-3018

Frank M. Petosa*
MORGAN & MORGAN, COMPLEX
LITIGATION GROUP
8151 Peters Road
Suite 4000
Plantation, FL 33324
fpetosa@ForThePeople.com
P: (954) 318-0268
F: (954) 327-3018
*Pro Hac Vice

*Attorneys for the Plaintiff and
the Putative Class*

Date: December 16, 2020

3

**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| CATHERINE BAKER, individually and on behalf of all others similarly situated,<br><br>                 Plaintiff,<br><br>v.<br><br>CRODA INC. f/k/a CRODA, INC.,<br><br>                 Defendant. | Case No.:  20-cv-01108-MN |

**[PROPOSED] ORDER**

Upon consideration of Plaintiff Catherine Baker's Motion For Leave to File a Surreply, and any responses thereto, and for good cause shown;

**IT IS HEREBY ORDERED** this _____ day of _____, 2020, that the Motion is **GRANTED**.  Plaintiff's proposed surreply is hereby deemed filed and served as of the date of this Order.

_____

**Honorable Maryellen Noreika**

# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

|  |  |
|---|---|
| CATHERINE BAKER, individually and on behalf of all others similarly situated,<br><br>           Plaintiff,<br><br>v.<br><br>CRODA INC. f/k/a CRODA, INC.,<br><br>           Defendant. | Case No.: 20-cv-01108-MN |

## PLAINTIFF'S [PROPOSED] SURREPLY IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S CLASS ACTION COMPLAINT

Dated:  December 16, 2020

Kimberly A. Evans (#5888)
GRANT & EISENHOFER P.A.
123 Justison Street
Wilmington, Delaware 19801
kevans@gelaw.com
P: (302) 622-7000
F: (302) 622-7100

T. Michael Morgan*
MORGAN & MORGAN, P.A.
20 N Orange Ave., Suite 1600
Orlando, FL 32801
mmorgan@ForThePeople.com
P: (407) 418-2031
F: (407) 245-3384

Marcio W. Valladares*
MORGAN & MORGAN, COMPLEX
LITIGATION GROUP
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
mram@ForThePeople.com
mvalladares@ForThePeople.com
P: (813) 223-5505
F: (813) 223-5402

Rene F. Rocha*
MORGAN & MORGAN, COMPLEX
LITIGATION GROUP
3530 Magazine St.
New Orleans, LA 70115
rrocha@ForThePeople.com
P:  (954) 318-0268
F:  (954) 327-3018

Frank M. Petosa*
MORGAN & MORGAN, COMPLEX
LITIGATION GROUP
8151 Peters Road
Suite 4000
Plantation, FL 33324
fpetosa@ForThePeople.com
P:  (954) 318-0268
F:  (954) 327-3018

*Pro Hac Vice
Attorneys for the Plaintiff and
the Putative Class

## **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ……………………………………………………………………..ii

I.  INTRODUCTION ........................................................................................................ 1

II.  LEGAL ARGUMENT ................................................................................................. 1

A.  Croda Mischaracterizes the Class Definition to Support its Argument that
the Court Can Infer More than Two-Thirds of All Class Members Were
Delaware Residents at the Time the Complaint Was Filed. .................................... 1

B.  Croda Misinterprets the Third Circuit's Commentary in *M.G. ex rel.*
*K.G. v. A.I. duPont Hospital for Children* to Imply a Finding that
Delaware Would Not Recognize an Independent Tort for Medical
Monitoring. ............................................................................................................ 3

C.  Croda Conflates the Separate Torts of "Enhanced-Risk" and Medical
Surveillance to Incorrectly Argue Plaintiff Must Plead That it is "More
Probable than Not" She Will Contract a Disease Under New Jersey Law.............. 5

III.  CONCLUSION ............................................................................................................ 7

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Grupo Dataflux v. Atlas Glob. Group, L.P.*,
    541 U.S. 567 (2004) ....................................................................................................2

*Guinan v. A.I. duPont Hospital for Children*,
    597 F. Supp. 2d 517 (E.D. Pa. 2009) .......................................................................3

*M.G. ex rel. K.G. v. A.I duPont Hospital For Children*,
    393 Fed. App'x 884 (3d Cir. 2010) .......................................................................3, 4

*Mauro v. Raymark Indus., Inc.*,
    561 A.2d 257 (1989) ................................................................................................5, 6

*Preston v. Tenet Healthsystem Mem'l Med. Ctr., Inc.*,
    485 F.3d 804 (5th Cir. 2007) ....................................................................................2

*Schmidt v. Skolas*,
    770 F.3d 241 (3d Cir. 2014) ......................................................................................5

*Sinclair v. Merck & Co.*,
    948 A.2d 587 (2008) ................................................................................................5, 6

**Statutes**

Class Action Fairness Act, 28 U.S.C. § 1332(d)(4)(B) ....................................................2

ii

## INTRODUCTION

Plaintiff respectfully submits this brief surreply in order to address certain mischaracterizations of fact and misinterpretations of law set forth by defendant Croda, Inc. ("Croda") in its Reply in Support of its Motion to Dismiss Plaintiff's Complaint (D.I. 16).  As discussed more fully below, Croda: (1) mischaracterizes the scope of Plaintiff's proposed Class in order to provide the Court a basis from which to infer that the majority of Class Members were citizens of Delaware at the time of filing the Complaint; (2) misinterprets the United States Court of Appeals for the Third Circuit's discussion of the district court's finding that Delaware law acknowledges a claim for medical monitoring; and (3) conflates the heightened standard of proof required in a claim for "enhanced-risk" with that of a claim for medical surveillance under New Jersey law.

## LEGAL ARGUMENT

**A.**  **Croda Mischaracterizes the Class Definition to Support its Argument that the Court Can Infer More than Two-Thirds of All Class Members Were Delaware Residents at the Time the Complaint Was Filed.**

In its bid to secure a dismissal on jurisdictional grounds, Croda's Reply invites this Court to speculate regarding the current citizenship of the proposed Class Members, arguing that residency is generally synonymous with citizenship in the Third Circuit.  D.I. 16 at 1.  To reach its desired conclusion, Croda repeatedly mischaracterizes Plaintiff's Complaint by selectively highlighting features of the proposed Class that support its belief that the Class Members are "Delaware residents living in the immediate vicinity of Croda's Atlas Point facility …" or "residents of, or domiciled in, Delaware."  *Id.* at 4-5.  Croda proceeds to improperly suggest that, if the majority of proposed Class Members are presently residents of Delaware, the Court can readily infer that they are also citizens of Delaware for purposes of determining jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(4)(B).

1

As a general matter, "the jurisdiction of the court depends upon the state of things at the time of the action brought[,]" and the trial court must "measure[] all challenges to subject-matter jurisdiction premised upon diversity of citizenship against the state of facts that existed at the time of filing – whether the challenge be brought shortly after filing, after the trial, or even for the first time on appeal." *Grupo Dataflux v. Atlas Glob. Group, L.P.*, 541 U.S. 567, 570-71 (2004). Accordingly, the party challenging jurisdiction under CAFA, not the party seeking federal jurisdiction, "… **bears the burden to establish the domicile … of the class members at the time of filing the lawsuit**." *Preston v. Tenet Healthsystem Mem'l Med. Ctr., Inc.*, 485 F.3d 804, 812 (5th Cir. 2007) (emphasis added); *see also* CAFA, 28 U.S.C. § 1332(d)(7) ("Citizenship of the members of the proposed plaintiff classes shall be determined … as of the date of filing of the complaint or amended complaint …").

Even assuming this Court could draw any conclusions regarding the Class' citizenship from its members' residencies, Croda's jurisdictional arguments would still fail because they are based on pure conjecture that the majority of the Class was actually residing in Delaware at the time of filing. By the plain words of Plaintiff's proposed definition, the Class is not limited to people currently living near the Atlas Point facility or even those who have lived in the area over the past year – rather, it encompasses every natural person who "at any time" lived near the facility for a period of one year or more between "January 1, 1988 and the present …." D.I. 1 at p 62. Croda's assumptions notwithstanding, it is virtually impossible to demonstrate that, of all the people who fit within this definition over a roughly 30-year period, the majority were still living in Delaware in August 2020. Given the scope of the proposed Class – the members of which are all at increased risk of contracting diseases caused by extended exposure to ethylene oxide – Croda is simply unable to provide this Court with any factual basis from which to reasonably infer that

2

the majority of Class Members were citizens of Delaware at the time Plaintiff commenced this action.

**B.      Croda Misinterprets the Third Circuit's Commentary in *M.G. ex rel. K.G. v. A.I. duPont Hospital for Children* to Imply a Finding that Delaware Would Not Recognize an Independent Tort for Medical Monitoring.**

In observing that the Third Circuit reversed *Guinan v. A.I. duPont Hospital for Children*, 597 F. Supp. 2d 517 (E.D. Pa. 2009), Croda's Reply suggests that the Court of Appeals rejected the district court's principal determination that the Supreme Court of Delaware would recognize an independent tort for medical monitoring.  *See* D.I. 16 at 8-9 (citing *M.G. ex rel. K.G. v. A.I duPont Hospital For Children*, 393 Fed. App'x 884 (3d Cir. 2010)).  However, a close inspection of *M.G. ex rel. K.G.* reveals that the Court of Appeals expressly declined to consider that issue, instead focusing its criticism on the contours of the medical monitoring claim adopted by the district court.  *M.G. ex rel. K.G.*, 393 Fed. App'x at 890-93.

In *M.G. ex rel. K.G.*, the district court permitted the plaintiff to proceed to trial on a claim for medical monitoring arising out of the implantation of a stent in her heart.  *Id*. at 886.  On appeal, the defendants argued that:

> the District Court erred in predicting that the Delaware Supreme Court would adopt a stand-alone cause of action for medical monitoring.  **In particular, Defendants contend[ed] that the District Court erred in extending Delaware law beyond the bounds of the recognized medical monitoring claim in which a plaintiff alleges long-term exposure to a proven toxic substance with known tendencies to produce serious future medical injuries.**

*Id*. at 891 (emphasis added).  While ultimately agreeing that Delaware would not recognize medical monitoring "outside of the toxic tort context[,]" the Third Circuit avoided criticism of the district court's premise "… **that the Delaware Supreme Court has acknowledged medical monitoring** …." *Id*. (emphasis added).[1]  Rather, the Third Circuit disapproved of the district

_____

[1] It bears reiterating that the district court's inquiry concentrated on the question of "… whether

court's finding that Delaware law would permit a standalone medical monitoring claim "…
**although the plaintiff has not demonstrated significant exposure to a toxic (poisonous) or
proven hazardous substance**[,]" emphasizing that the plaintiff's claims below did not arise from
exposure to a "toxic or hazardous" substance, nor did plaintiff allege "a risk of contracting a serious
latent disease" that would require monitoring. *Id*. at 392 (emphasis added).  As a result, the only
conclusion reached by the Third Circuit regarding medical monitoring in Delaware was that
permitting such a claim on the record below would "require[] several leaps from the current state
of the law" regarding "a 'standard' medical monitoring claim …."  *Id*. at 392-93.

In this case, Plaintiff's claims for medical monitoring do not require this Court to take the
"leaps" admonished by the Third Circuit in *M.G. ex rel. K.G.*  To the contrary, Plaintiff's claims
fit squarely within the traditional paradigm of medical monitoring in toxic tort cases.  In particular,
Plaintiff alleges that as a result of Croda's unlawful and continuous release of dangerous amounts
of carcinogenic ethylene oxide in and around Atlas Point facility, she and her fellow Class
Members face a significantly increased risk of developing certain cancers requiring them to
undergo prophylactic diagnostic testing.  D.I. 1 at pp. 1-13.  Indeed, Plaintiff's allegations
concerning her and the other Class Members' extended exposure to hazardous quantities of this
known carcinogen are premised on scientific data and well-documented incidents of release from
the Atlas Point facility, including most recently a September 2020 incident that resulted in the
Delaware Department of Natural Resources and Environmental Control ("DNREC") issuing
Croda a Notice of Violations on November 11, 2020 for, among other things, "exceeding the
annual emission limit for ethylene oxide … and operation of an unpermitted source of ethylene

---

medical monitoring is an independent tort or simply a remedy, as it is in many other jurisdictions."
*Id*. at 891.  Such a distinction is immaterial here where the Complaint alleges medical monitoring
as both an independent cause of action and a remedy.

4

oxide ….”  *See* D.I. 1 at pp. 6-11; DNREC November 12, 2020 Press Release Entitled “DNREC

Issues Croda NOV for Air Quality Permit Violations,” attached as **Exhibit A**; DNREC November

11, 2020 Notice of Violations, attached as **Exhibit B**.[2]  These allegations are precisely those that

support a traditional claim for medical monitoring as acknowledged by Delaware and many other

jurisdictions, and Croda’s motion to dismiss should therefore be denied.

**C.     Croda Conflates the Separate Torts of “Enhanced-Risk” and Medical Surveillance to Incorrectly Argue Plaintiff Must Plead That it is “More Probable than Not” She Will Contract a Disease Under New Jersey Law.**

Croda next mischaracterizes the law of New Jersey, citing *Sinclair v. Merck & Co.*, 948

A.2d 587 (2008) and *Mauro v. Raymark Indus., Inc.*, 561 A.2d 257 (1989) for the proposition that

Plaintiff must plead it is “more probable than not” she and the other Class Members will develop

a disease in order to sustain a cause of action for medical monitoring.  D.I. 16 at 9-10.  Croda’s

argument demonstrates a fundamental misunderstanding of New Jersey law, which recognizes

separate torts for “enhanced-risk” and medical surveillance, each with different standards of proof.

*Mauro*, 561 A.2d at 263; *Sinclair*, 948 A.2d at 592.

It is well settled that the Supreme Court of New Jersey has “explained the significant

distinctions between a claim for damages based on enhanced risk of injury and a claim for medical-

surveillance damages.”  *Mauro*, 561 A.2d at 262.  More specifically:

> [t]he enhanced risk claim seeks a damages award, not because of any expenditure of funds, but because plaintiffs contend that the unquantified injury to their health and life expectance should be presently compensable, even though no evidence of disease is manifest … By contrast, the claim for medical surveillance does not seek

---

[2]“To decide a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record.”  *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014).  “Public records” of which the trial court can take judicial notice include “materials like decision letters of government agencies and published reports of administrative bodies.”  *Schmidt*, 770 F.3d at 249 (citations omitted).  The DNREC Press Release and NOV are both publicly available on the State of Delaware’s official website (https://news.delaware.gov/2020/11/12/dnrec-issues-croda-nov-for-air-quality-permit-violations/) and attached here for the Court’s convenience.

> compensation for an unquantifiable injury, but rather seeks specific monetary damages measured by the cost of periodic medical examinations. The invasion for which redress is sought is the fact that plaintiffs have been advised to spend money for medical tests, a cost they would not have incurred absent their exposure to toxic chemicals.

*Id*. at 262-63 (quoting *Ayers v. Jackson Township*, 525 A.2d 287 (1989)). The Supreme Court of New Jersey has further "**distinguished between the plaintiff's enhanced-risk claims and claims for medical surveillance**, and found that recovery for **enhanced risk of contracting a disease** to exposure to toxic chemicals is only possible upon proof that it is more probable than not (the rule of reasonable medical probability) that the plaintiff will develop the disease." *Sinclair*, 948 A.2d at 592 (citing *Mauro*, 561 A.2d at 262-264) (emphasis added). By contrast, a plaintiff who is unable to demonstrate reasonable medical probability may nevertheless recover in a distinct cause of action for medical surveillance provided there is:

> reliable expert testimony predicated upon the significance and extent of exposure to chemicals, the toxicity of the chemicals, the seriousness of the diseases for which individuals are at risk, the relative increase in the chance of onset of disease in those exposed, and the value of early diagnosis, that such surveillance to monitor the effect of exposure to toxic chemicals is reasonable and necessary.

*Id*. at 592 (quoting *Ayers*, 525 A.2d at 287). In other words, "… recognition of the medical surveillance claim is not necessarily dependent on recognition of the enhanced risk claim." *Id*.

In spite of these clear distinctions, Croda's Reply effectively asks this Court to impose upon Plaintiff a heightened standard of proof reserved only for "enhanced-risk" claims that simply does not comport with the law of medical surveillance in New Jersey or the allegations in the Complaint. Even the most cursory reading of the Complaint demonstrates that Plaintiff's claims adequately sound in medical surveillance rather than the separate and distinct tort of "enhanced-risk" under New Jersey law. *See generally* D.I. 1. In particular, Plaintiff alleges that she and her fellow Class Members were consistently exposed to dangerous levels of a known carcinogen,

which increases the risk of developing certain cancers, and now "… seek[s] as damages the costs of a medical monitoring program for such diagnostic testing for the early detection of onset of illness, disease processes or disease and to allow early treatment beneficial to Plaintiff and the Class Members." *Id*. at pp 1-13, 60; *see also* **Exhibits A** and **B**. Taken as true, these allegations are more than sufficient to meet the proper standard of proof required in medical surveillance claims under New Jersey law, and this Court should therefore deny Croda's motion to dismiss.

## **CONCLUSION**

For these reasons, and the reasons set forth more fully in her Answering Brief, Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that this Honorable Court deny Croda's Motion to Dismiss.

Respectfully submitted,

*/s/ Kimberly A. Evans*
Kimberly A. Evans (#5888)
GRANT & EISENHOFER P.A.
123 Justison Street
Wilmington, Delaware 19801
kevans@gelaw.com
P: (302) 622-7000
F: (302) 622-7100

T. Michael Morgan*
MORGAN & MORGAN, P.A.
20 N Orange Ave., Suite 1600
Orlando, FL 32801
mmorgan@ForThePeople.com
P: (407) 418-2031
F: (407) 245-3384

Marcio W. Valladares*
MORGAN & MORGAN, COMPLEX
LITIGATION GROUP
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
mvalladares@ForThePeople.com
P: (813) 223-5505
F: (813) 223-5402

Rene F. Rocha*
MORGAN & MORGAN, COMPLEX
LITIGATION GROUP
3530 Magazine St.
New Orleans, LA 70115
rrocha@ForThePeople.com
P:  (954) 318-0268
F:  (954) 327-3018

Frank M. Petosa*
MORGAN & MORGAN, COMPLEX
LITIGATION GROUP
8151 Peters Road
Suite 4000
Plantation, FL 33324
fpetosa@ForThePeople.com
P:  (954) 318-0268
F:  (954) 327-3018

*Admitted *Pro Hac Vice*

*Attorneys for the Plaintiff and
the Putative Class*

Date: December 16, 2020

# EXHIBIT A

# DNREC Issues Croda NOV for Air Quality Permit Violations

*Information Session on Path Forward for EO Plant Set for Thursday, Nov. 19*

The Delaware Department of Natural Resources and Environmental Control (DNREC) has issued a Notice of Violation (NOV) to Croda, Inc. for air emission and equipment violations associated with the operation of the ethylene oxide (EO) plant at Croda's Cherry Lane Facility near New Castle.

The violations include: connecting and routing an unpermitted source into an air pollution control device (scrubber); exceeding the annual emission limit for ethylene oxide at the scrubber; failure to meet the volatile organic compound (VOC) removal efficiency at the scrubber; and operation of an unpermitted source of ethylene oxide at the hotwell, which collects and condenses vapors from the purification and vacuum distillation of crude ethylene glycol. The violation notice can be found at http://www.dnrec.delaware.gov/Admin/Documents/croda-nov-20201111.pdf.

The violations at the EO plant outlined in the notice were discovered through a source testing event conducted Sept. 17 by the company and observed by DNREC staff. Croda submitted results of the testing to the Department in a report dated Oct. 5. Following receipt of the report, DNREC has been working to accurately quantify Croda's emissions that resulted in the NOV issued by DNREC, as compared to the emissions Croda is allowed under conditions of its air permit for the EO plant. For example, while some fugitive emissions are associated with the hotwell, ethylene oxide was detected there during the stack test, and is not permitted at this location.

The ethylene oxide plant has not operated since the date of the test.

An NOV is the first step in a process that can lead to DNREC taking further enforcement actions. DNREC is currently working from its regulatory purview to determine the path forward for Croda's resuming operations at the EO plant.

DNREC will hold a virtual information session at 6 p.m., Thursday, Nov. 19 to describe the violations and answer questions from the community nearby to the Croda facility. The public may join the video meeting via WebEx at https://stateofdelaware.webex.com/stateofdelaware/onstage/g.php?MTID=e4c89abf0bc79ce0f842c2b6e9d0eb72b with event number 173 655 4144 and password CrodaInfoSession, or to join by audio conference only, by calling 408-418-9388. Questions and comments from the public can also be sent to daqpermittinginfo@delaware.gov.

**About DNREC**

The Delaware Department of Natural Resources and Environmental Control protects and manages the state's natural resources, protects public health, provides outdoor recreational opportunities and educates Delawareans about the environment. The Division of Air Quality monitors and regulates all emissions to the air. For more information, visit the website and connect with DNREC on Facebook, Twitter or LinkedIn.

**Media Contact:** Nikki Lavoie, nikki.lavoie@delaware.gov, Michael Globetti, michael.globetti@delaware.gov

###

# EXHIBIT B

Hand Delivered
11/11/2020



STATE OF DELAWARE
**DEPARTMENT OF NATURAL RESOURCES
AND ENVIRONMENTAL CONTROL**
DIVISION OF AIR QUALITY
STATE STREET COMMONS
100 W. WATER STREET, SUITE 6A
DOVER, DELAWARE 19904

ENGINEERING &
COMPLIANCE

PHONE
(302) 739-9402

November 11, 2020

Croda, Inc.                                             **HAND DELIVERY**
315 Cherry Lane
New Castle, DE 19720

ATTENTION:    Chris Barnett
              Site Director

SUBJECT:    **Notice of Violations
            Croda, Inc. - September 17, 2020 Ethylene Oxide Plant Stack Test
            Permit: AQM-003/00058-Renewal 3 (Rev. 5)
            Construction and Operation of D430 Reflux Drum Vent to T330 Scrubber
            Without a Permit
            F610 Drying Column Hotwell Unpermitted Emissions
            T330 Scrubber Exceeds Emission Limit
            T330 Scrubber Fails Removal Efficiency Requirement**

Dear Mr. Barnett:

The Department reviewed the stack test results for the ethylene oxide storage tanks T330 scrubber and
the F610 drying column hotwell.  The Partial Performance Test was conducted on September 17, 2020, and
the test report dated October 5 was received by the Department on October 6, 2020.  Croda disclosed that
an unpermitted vent line from the D430 reflux drum to the T330 scrubber had been constructed and used
without Department approval.  In addition, emissions from the F610 drying column hotwell ("the hotwell")
included emissions from a chemical that was not permitted.

The annual emissions from the scrubber were calculated using operational records provided by Croda.
These records provided details about the operation both during the stack test and throughout the
operation of the unit beginning on January 15, 2020.  The D430 valve to the scrubber was open to some
degree approximately 30% of all operating time for the plant.  This information was used to calculate the
total emissions from this unpermitted source and in turn, the control efficiency of the T330 scrubber
throughout 2020.  Based on this data, the T330 scrubber exceeded the rolling twelve month volatile
organic compound (VOC) emission limit.  The T330 scrubber also failed to meet the required 95% removal
efficiency requirement.

**Croda, Inc.**
**Notice of Violation**
November 11, 2020
Page 2

Croda, Inc. is found to be in violation of the following statutory requirements, regulatory requirement, and permit conditions for installing and using the D430 reflux drum vent line to the T330 scrubber:

1. In 7 *Del. C.* § 6003(a)(1) it states:

   "*No person shall, without first having obtained a permit from the Secretary, undertake any activity in a way which may cause or contribute to the discharge of an air contaminant.*"

2. In *7 Del. C.* § 6003(b)(1) it states:

   "*No person shall, without first having obtained a permit from the Secretary, construct, install, replace, modify or use any equipment or device or other article which may cause or contribute to the discharge of an air contaminant.*"

3. In Section 2.1 of 7 DE Admin. Code 1102 it states:

   "*Except as exempted in Section 2.2, no person shall initiate construction, install, alter or initiate operation of any equipment or facility or air contaminant control device which will emit or prevent the emission of an air contaminant prior to receiving approval of his application from the Department, or, if eligible, prior to submitting to the Department a completed registration form.*"

4. In Condition 1.2 **of Permit:  APC-2016/0068-CONSTRUCTION(NSPS)(MACT)(VOC RACT)(MNSR)(FE)** it states:

   "*The project shall be constructed in accordance with the information described above.  If changes are necessary, revised plans must be submitted and a supplemental approval issued prior to actual construction.  [Reference 7 DE Admin Code 1102, Section 11 dated 6/1/1997.*"

5. In Condition 2(d) of **Permit: AQM-003/00058-Renewal 3 (Rev. 5)** it states:

   "*The Owner and/or Operator shall not initiate construction, installation, or alteration of any equipment or facility or air contaminant control device which will emit or prevent the emission of an air contaminant prior to submitting an application to the Department under 7 DE Admin. Code 1102, and, when applicable, 7 DE Admin. Code 1125, and receiving approval of such application from the Department; except as exempted in 7 DE Admin. Code 1102 Section 2.2.*"

   Croda installed and used a vent line without Department approval.  Emissions from the D430 reflux drum vent line to the T330 scrubber were not included in the application submitted for the ethylene oxide plant.  Therefore, this vent line was not approved by the Department and was not included in the construction permit (**Permit: APC-2016/0068-CONSTRUCTION (NSPS)(MACT)(VOC RACT) (MNSR)(FE)** issued June 30, 2016) and operation permit (**Permit: AQM-003/00058 (Renewal 3) (Rev. 5)** issued November 18, 2019).

**Croda, Inc.**
**Notice of Violation**
November 11, 2020
Page 3

Croda is found to be in violation of the following statutory and regulatory requirements due to the unpermitted presence of ethylene oxide at the hotwell:

6.  In 7 *Del. C.* § 6003(a)(1) it states:

    "*No person shall, without first having obtained a permit from the Secretary, undertake any activity in a way which may cause or contribute to the discharge of an air contaminant.*"

7.  In Section 2.1 of 7 DE Admin. Code 1102 it states:

    "*Except as exempted in Section 2.2, no person shall initiate construction, install, alter or initiate operation of any equipment or facility or air contaminant control device which will emit or prevent the emission of an air contaminant prior to receiving approval of his application from the Department, or, if eligible, prior to submitting to the Department a completed registration form.*"

Croda, Inc. is found to be in violation of the following regulatory requirement and permit conditions for the EO Storage Tanks Scrubber as a result of the performance testing conducted on September 17, 2020:

8.  In 40 CFR Part 60 Subpart Kb §60.112b(a)(3)(ii) it states:

    "*The control device shall be designed and operated to reduce inlet VOC emissions by 95 percent or greater.  If a flare is used as the control device, it shall meet the specifications described in the general control device requirements (§60.18) of the General Provisions.*"

9.  In Condition 3 Table 1(q)(1)(iii)(A) of **Permit:  AQM-003/00058 (Renewal 3) (Rev. 5)** it states:

    "*The 30,000 gallon ethylene oxide tanks' scrubber shall be designed and operated to reduce inlet VOC emissions by 95 percent or greater.*"

    Based on Department calculations, the weighted average efficiency of the scrubber during the September 17, 2020 stack test was 93.46%.

10. In Condition 3 Table 1(q)(1)(ii)(C) of **Permit:  AQM-003/00058 (Renewal 3) (Rev. 5)** it states:

    "*Air contaminant emission levels from the EO Storage Tanks Scrubber shall not exceed those specified in 7* **DE Admin. Code** *1102 and the following:*
    *1.  Volatile Organic Compound (VOC) Emissions*
        *VOC emissions shall not exceed 0.29 tons per twelve (12) month rolling period.*"

    Department calculations for emissions based on the corrected scrubber efficiency of 93.46% were 1.139 tons of ethylene oxide, 0.014 tons of ethylene and a total of 1.153 tons of VOC per rolling twelve month period as of October 1, 2020.  The emission limit of 0.29 tons per 12 month rolling period was exceeded beginning March 1, 2020.

**Croda, Inc.**
**Notice of Violation**
November 11, 2020
Page 4

**ACTION ITEMS:**

Croda, Inc. will permanently cease the unpermitted emissions caused by the use of the D430 vent valve (PV4206) and any additional source that is vented to the T330 scrubber.  If this is accomplished by applying for and securing a permit covering those emissions and the modification of the device, Croda should be advised that DNREC will require it to demonstrate the safety of the operation and its ability to maintain continuous compliance with its permit conditions and propose and accept requirements to ensure continuous compliance.  If this is accomplished by permanently closing the D430 vent valve (PV4206) that was routing additional emissions to the T330 scrubber, Croda must submit to the Department documentation demonstrating how the shutdown of this valve will not negatively affect operating pressures throughout the process, how excess pressure will be controlled without venting to the atmosphere, and the efficacy of the process given that the valve is purported to have been installed as a safety measure.  A permit application documenting how Croda will maintain continuous compliance with its permit conditions must be submitted.  Croda should be advised that it will be required in that application to propose short term emissions limits and proposed continuous emissions monitoring devices.  Croda must notify the Department when construction to permanently disconnect the line is complete for inspection.  Croda must meet all requirements of the management of change program as overseen by the Accidental Release Prevention Group.

Given the deviation from the permitted amounts and the unpermitted modification to the process, Croda should be advised that DNREC intends to modify the permit to require continuous compliance with the short-term emission rate and to incorporate additional operational conditions.

Croda has stated that the hotwell (monoethylene glycol production line) has been removed from service.  A long-term solution to the noncompliance for the hotwell is due by January 15, 2021 or prior to restarting the hotwell.  Restarting the hotwell is contingent on the Department's approval of the long-term solution, including the issuance of any necessary permits.  Additionally, during the September 17, 2020 performance test, results from Run 1 were 2,402.4 ppmvd VOC at 3% $O_2$ and Run 2 were 3,933.5 ppmvd VOC at 3% $O_2$.  Based on these test results, the Department is concerned that Croda may have exceeded the 0.0034 tons per twelve (12) month rolling period emission limit for VOCs/HAPs.  Total emissions for all chemical species present must be submitted by January 15, 2021.

Further operation, other than 14 days for the purpose of demonstrating compliance with permit limits and with the intent of establishing appropriate operating ranges would be viewed as a flagrant violation.

Please be advised that this Notice of Violation will be made available through the Department's Internet site, which can be found at http://www.dnrec.delaware.gov.  Information concerning your Company's failure to comply with 7 DE Admin. Code 1100 will be posted following hand delivery of this letter.  Upon further review of the violation(s), the Department reserves the right to pursue additional enforcement action.

**<u>Croda, Inc.</u>**
**Notice of Violation**
November 11, 2020
Page 5


If you have any questions, please contact me at (302) 323-4542.

Sincerely,

Angela D. Marconi, P.E., BCEE
Program Manager
Engineering & Compliance Branch

ADM:JLF:MAS
F:\EngAndCompliance\MAS\mams20127.doc

pc:     Dover Title V File
        Joanna French
        Melanie Smith
        Dawn Minor



STATE OF DELAWARE
**DEPARTMENT OF NATURAL RESOURCES AND
ENVIRONMENTAL CONTROL**
DIVISION OF AIR QUALITY
STATE STREET COMMONS
100 W. WATER STREET, SUITE 6A
DOVER, DELAWARE 19904

ENGINEERING &
COMPLIANCE

PHONE
(302) 739-9402

I, ~~LT John Eby  9704~~ , personally served this <u>Notice of Violation</u> upon
(EPO printed name)

~~Derrick Schweitzer~~ by leaving in his/her hands a true and correct
(EPO to write in the name of the person served)

copy, at his/her place of business ~~Croda Inc~~ .
(EPO to write in the name/address of Business/Residence)

_____
EPO Signature

~~11-11-20~~     1048HRS
Date

_____
Signature of Person Served

~~11/11/2020~~
Date

Appx193

## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

CATHERINE BAKER, individually and on
behalf of all others similarly situated,

                 Plaintiff,

v.

CRODA INC. f/k/a CRODA, INC.,

                 Defendant.

Case No.:  20-cv-01108-MN

## <u>STATEMENT PURSUANT TO LOCAL RULE 7.1.1</u>

Pursuant to Local Rule 7.1.1, Plaintiff Catherine Baker has made a reasonable effort to reach agreement with defendant Croda, Inc. ("Croda") on the matters set forth in Plaintiff's Motion for Leave to File a Surreply (the "Motion"). Counsel for Croda has informed Plaintiff that Croda does not consent to the Motion.  Counsel for Plaintiff has not yet been informed whether Croda will file opposition to the relief requested in the Motion.

Respectfully submitted,

*/s/ Kimberly A. Evans*
Kimberly A. Evans (#5888)
GRANT & EISENHOFER P.A.
123 Justison Street
Wilmington, Delaware 19801
kevans@gelaw.com
P: (302) 622-7000
F: (302) 622-7100

*Attorney for the Plaintiff and
the Putative Class*

Date: December 16, 2020

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CATHERINE BAKER, individually and on behalf )
of all others similarly situated )
)
Plaintiff, )          Case No. 20-cv-01108-MN
)
v. )
)
CRODA INC. f/k/a CRODA, INC., )
)
Defendant. )

**OPPOSITION TO PLAINTIFF'S MOTION FOR LEAVE TO FILE SUR-REPLY**

Croda respectfully opposes Plaintiff's request for leave to file a sur-reply in further

opposition to Croda's Motion to Dismiss (D.I. 7).  "Courts in this district disfavor sur-replies."

*EMC Corp. v. Pure Storage, Inc.*, 2016 WL 559881, at *13 (D. Del. Feb. 11, 2016) (citing D. Del.

LR 7.1.2(b)).  Although Plaintiff argues that "[a] Court may grant leave to file a sur-reply if it

responds to new evidence," *St. Clair Intellectual Prop. Consultants, Inc. v. Samsung Elecs. Co.*,

291 F.R.D. 75, 80 (D. Del. 2013), Plaintiff's sur-reply in fact *raises* new evidence that was not

discussed or presented at any time during the parties' briefing on the Motion to Dismiss.

Specifically, Plaintiff's proposed sur-reply submitted at D.I. 20-2 includes multiple pieces of

extrinsic evidence—presented for the first time in Plaintiff's sur-reply—that are not relevant to the

legal issues present in the motion to dismiss the Complaint, including a press release dated

November 12, 2020 and a notice of potential regulatory infractions dated November 11, 2020.  *See*

Exhibits A and B to Plaintiff's Proposed Sur-Reply.  Croda will be prejudiced if the Court grants

Plaintiff's motion for leave to file a sur-reply because it did not have a chance to respond to these

pieces of evidence during the briefing on the motion to dismiss.  Croda will also be prejudiced

because this type of extrinsic evidence should not be considered at the motion to dismiss stage at

- 1 -

all—Croda moved to dismiss the Complaint on the grounds that (1) the Court does not have jurisdiction under the Class Action Fairness Act and (2) Plaintiff has failed to state a claim on which relief can be granted. The exhibits attached to Plaintiff's sur-reply discuss a preliminary government response to a recent emissions test at Croda's Atlas Point facility. These exhibits are not relevant to the legal issues raised in the motion to dismiss. Therefore, the sur-reply—and the exhibits attached to it—should not be considered at this stage.

Plaintiff's alleged reason for needing a sur-reply is that Croda's Reply discussed facts, evidence, and legal arguments that were not raised in its opening brief in support of the Motion to Dismiss. As discussed below, all three of the legal arguments in Croda's Reply that Plaintiff complains of in its Motion for Leave were also discussed in Croda's Motion to Dismiss. Plaintiff's sur-reply is an improper attempt to bring new pieces of extrinsic evidence before the Court at the motion to dismiss stage, and should be denied.

Plaintiff asserts that Croda's reply "mischaracterizes the scope of Plaintiff's proposed class." (Mot. for Leave, D.I. 20 at 1). The proposed class definition in the Complaint is not in dispute at the motion to dismiss stage—rather, the parties submitted arguments about what reasonable inferences can be made based on the class definition in the Complaint. The Court can evaluate the defined class and make any reasonable inferences about its scope based on the existing record.

Plaintiff states in its Motion for Leave that the Reply brief mischaracterizes the Third Circuit's decision in *M.G. ex rel. K.G. v. A.I. Dupont Hosp. for Children*, 393 F. App'x 884 (3d Cir. 2010). This case was cited and discussed at length in Croda's opening brief (D.I. 8 at 3, 13-14) and in Plaintiff's Opposition brief (D.I. 14 at 13), so Croda's discussion of this case in its Reply cannot have prejudiced Plaintiff.

- 2 -

Finally, Plaintiff asserts that the standard of proof for a medical surveillance claim in New Jersey is different than the "enhanced risk" standard of proof, based on Plaintiff's interpretation of *Ayers v. Jackson Township*, 525 A.2d 287 (1989), and subsequent decisions analyzing *Ayers*. Although there is "limited authority for medical monitoring" in New Jersey, both parties discussed the relevant cases in their briefs. *See Sinclair v. Merck & Co.*, 195 N.J. 51, 58, 948 A.2d 587, 591 (2008) (noting the lack of authority on this topic and reviewing the three relevant cases—*Ayers*, *Mauro*, and *Theer*).

In *Ayers*, the class members lived for two years without running water after their local water source was contaminated with toxic chemicals by a government entity. *Ayers v. Jackson Twp.*, 106 N.J. 557, 570, 525 A.2d 287, 293 (1987). On appeal, the court affirmed the jury awards for "qualify of life" damages for the class members' time and effort spent transporting water to their homes, and further stated that the evidence presented at trial was adequate to support the jury's award of medical monitoring damages. Subsequent opinions analyzing *Ayers* have applied the 1987 ruling in a narrow fashion. In *Theer v. Philip Carey Co.*, 133 N.J. 610, 627, 628 A.2d 724, 733 (1993) the New Jersey Supreme Court found that plaintiffs "who have suffered increased risk of cancer when directly exposed to a defective or hazardous product like asbestos, when they have already suffered a manifest injury or condition caused by that exposure, and whose risk of cancer is attributable to the exposure" may recover medical monitoring damages based in part on an analysis of *Ayers*. In *Mauro*, the New Jersey Supreme Court affirmed the lower court's decision to withdraw from the jury's consideration claims for damages based on the plaintiff's enhanced risk for developing cancer since plaintiff's expert "was unable to testify that it was *probable* that plaintiff would *contract* cancer" and could instead only testify about plaintiff's present injury (bilateral thickening of both chest walls) and his *increased risk* of developing cancer in his lifetime.

*Mauro v. Raymark Indus., Inc.*, 116 N.J. 126, 128, 561 A.2d 257, 258 (1989). Finally, in *Sinclair*, the New Jersey Supreme Court affirmed the dismissal of a claim for medical surveillance damages under the Tort Claims Act since "it [was] not disputed that plaintiffs do not allege a personal physical injury" and therefore "we conclude that because plaintiffs cannot satisfy the definition of harm to state a product liability claim under the PLA, plaintiffs' claim for medical monitoring damages must fail." *Sinclair v. Merck & Co.*, 195 N.J. 51, 65, 948 A.2d 587, 595 (2008).

Both parties discussed *Ayers* case and the handful of New Jersey decisions interpreting it in their briefing on the Motion to Dismiss, and the Court can independently review *Ayers* to resolve any disputes about the scope of the ruling. For the foregoing reasons, Croda respectfully requests that the Court deny the motion for leave to file a sur-reply.

- 4 -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Kenneth J. Nachbar*
Kenneth J. Nachbar (# 2067)
Zi-Xiang Shen (#6072)
1201 N. Market Street
Wilmington, DE  19801
(302) 658-9200
knachbar@mnat.com
zshen@mnat.com
    *Attorneys for Defendant*

OF COUNSEL:

Stephen A. Swedlow
Athena D. Dalton
QUINN EMANUEL URQUHART &
  SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL  60606
(312) 705-7400
stephenswedlow@quinnemanuel.com
athenadalton@quinnemanuel.com

December 30, 2020

Appx199

13:12:40

                IN THE UNITED STATES DISTRICT COURT

                 FOR THE DISTRICT OF DELAWARE


     CATHERINE BAKER, individually  )
     and on behalf of all others    )
     similarly situated,            )
                                    )
               Plaintiffs,          )
                                    ) C.A. No. 20-1108(MN)
     v.                             )
                                    )
     CRODA, INC. f/k/a CRODA, INC., )
                                    )
               Defendants.          )


                  Thursday, August 5, 2021
                  2:00 p.m.
                  Teleconference


                  844 King Street
                  Wilmington, Delaware


     BEFORE:  THE HONORABLE MARYELLEN NOREIKA
              United States District Court Judge



     APPEARANCES:


              GRANT & EISENHOFER, P.A.
              BY:  KIM EVANS, ESQ.

              -and-

              MORGAN & MORGAN
              BY:  MARCIO VALLADARES, ESQ.
              BY:  KEVIN HANNON, ESQ.
              BY:  FRANK PETOSA, ESQ.


                    Counsel for the Plaintiffs

1    APPEARANCES CONTINUED:

2

3              MORRIS NICHOLS ARSHT & TUNNELL LLP
               BY:  MIRANDA GILBERT, ESQ.

4              -and-

5              QUINN EMANUEL URQUHART & SULLIVAN, LLP
               BY:  STEPHEN SWEDLOW, ESQ.

6                       Counsel for the Defendants

7

8                   _ _ _ _ _ _ _ _

13:53:02  9

13:53:23 10          THE COURT:  Good afternoon.  Who is there,

13:53:26 11    please?

14:02:34 12          MR. VALLADARES:  May it please the Court, Your

14:02:37 13    Honor, my name is Marcio Valladares on behalf of plaintiffs.

14:02:42 14          THE COURT:  All right.  Good afternoon.

14:02:48 15          MS. EVANS:  Good afternoon, Your Honor.  This is

14:02:50 16    Kim Evans from Grant & Eisenhofer on behalf of plaintiffs.

14:02:54 17    Also on behalf of plaintiffs is Kevin Hannon and Marcio

14:02:57 18    Valladares.  And with the Court's permission, Mr. Valladares

14:02:59 19    will be arguing today on behalf of plaintiff.

14:03:01 20          THE COURT:  Thank you.

14:03:02 21          For defendants?

14:03:02 22          MR. PETOSA:  Your Honor, Frank Petosa from

14:03:08 23    Morgan & Morgan for plaintiffs is also on the line.

14:03:10 24          THE COURT:  Good afternoon to you as well.

14:03:11 25          Now defense.

14:03:12  1          MS. GILBERT:  Good afternoon, Your Honor.  This

14:03:13  2    is Miranda Gilbert from Morris Nichols on behalf of

14:03:17  3    defendant, Croda, Inc.  My colleague, Stephen Swedlow from

14:03:22  4    Quinn Emanuel will be doing the argument today with Your

14:03:25  5    Honor's permission and has been admitted pro hac.

14:03:27  6          THE COURT:  Good afternoon to you as well.

14:03:30  7          We have two motions pending, defendant's motion

14:03:32  8    to dismiss and plaintiff's motion for leave to file a

14:03:36  9    sur-reply.  I'm going to grant the motion to file a

14:03:39 10    sur-reply.  The proposed sur-reply raises issues, we're

14:03:44 11    having enough of a hearing or argument today to the extent

14:03:47 12    defendant needs to address anything raised it has an

14:03:50 13    opportunity to do so.

14:03:51 14          So with that, I want to hear arguments on the

14:03:54 15    motion to dismiss.  Let me start by saying we're doing this

14:03:59 16    by telephone.  I have the complaint and briefing in front of

14:04:03 17    me and I ask that if you refer me to something in the

14:04:06 18    documents you give me a minute or two to get to the correct

14:04:10 19    page so that I can follow your argument.  One of the

14:04:12 20    challenges of doing this remotely is that it's harder for me

14:04:17 21    to ask questions.  I'm on the phone and there is often a

14:04:20 22    delay when I start talking such that the attorneys keep

14:04:23 23    talking until I say "wait, wait" a few times before the

14:04:26 24    system clicks over.  So I'll just ask you to be mindful to

14:04:32 25    listen for questions or maybe just stop every once in a

14:04:34 1     while and take a breath.  If I have a question I will jump

14:04:37 2     in.

14:04:38 3           Also, when we're on the phone, you can't see

14:04:40 4     visual cues that clue in that I understand your arguments

14:04:44 5     and you can stop speaking.  And I find that lawyers often

14:04:47 6     keep talking much longer than necessary and I find myself

14:04:50 7     saying "stop talking" on occasion, and if I do that, I don't

14:04:54 8     mean to be impolite, I'm just trying to let you know that I

14:04:59 9     don't need to hear anymore.

14:05:00 10           I will ask you that each time you begin speaking

14:05:03 11     after someone else has spoken that you identify yourself.

14:05:07 12     My court reporter is also remote and that will help us have

14:05:11 13     a clear record.  I will ask that if you are not speaking

14:05:13 14     that you keep your phone muted so that we can get rid of

14:05:18 15     extraneous noises and echos.

14:05:21 16           And finally, I will remind everyone on the phone

14:05:24 17     that recording or broadcasting these proceedings is

14:05:27 18     prohibited.

14:05:28 19           Are there any questions?  All right.  So with

14:05:33 20     that, I will hear from the defendant.

14:05:38 21           MR. SWEDLOW:  Good afternoon, Your Honor.  This

14:05:42 22     is Steve Swedlow for defendant, Croda.  Our motion to

14:05:47 23     dismiss I think breaks into two parts for logical division.

14:05:51 24     The first part is the subject matter jurisdiction arguments.

14:05:56 25     I will pause periodically and would rather just answer your

14:06:00  1    questions than give you a long speech because frankly I want

14:06:04  2    to win and what you are having trouble with is what I would

14:06:06  3    like to address.

14:06:08  4              THE COURT:  Okay.  Here is what I'm having

14:06:11  5    trouble with, Mr. Swedlow.  It seems to me that -- so as I

14:06:17  6    read the case law, you have the burden of proof to show by a

14:06:22  7    preponderance of the evidence that either we need the

14:06:27  8    two-thirds of the class being Delaware citizens for the

14:06:32  9    exceptions to apply where I must, you know, I must dismiss

14:06:38 10    for failure to have subject matter jurisdiction, or the

14:06:42 11    one-third.  And my problem with your argument is I think, I

14:06:47 12    get it, and it seems likely if not more than likely that you

14:06:51 13    would at least meet the one-third if not the two-thirds, but

14:07:01 14    in all the cases, it gave some facts, and I'm supposed to

14:07:07 15    make a factual determination, and I don't have any facts

14:07:11 16    because we're talking about a period of time that goes back,

14:07:17 17    you know, thirty years.  So how am I supposed to -- I mean,

14:07:23 18    I just don't know what you expect me to make a finding of

14:07:27 19    fact based on.

14:07:28 20              MR. SWEDLOW:  So, I think I'm going to say

14:07:32 21    that's a good question, but all your questions are good

14:07:32 22    because you're the decision maker here.  You're right that

14:07:37 23    it says two-thirds and one-third mandatory and

14:07:41 24    discretionary.  I'll first note if I may that the original

14:07:42 25    complaint filed in New Jersey --

14:07:47 1          THE COURT:  Yeah, I got that.  I saw the

14:07:50 2    original complaint said Delaware residents, and if they

14:07:54 3    hadn't changed that, I would be with you, but they did

14:07:57 4    change it, they did change it and that's what I am -- okay.

14:08:01 5    They did change it.

14:08:03 6          MR. SWEDLOW:  Here is -- the original complaint

14:08:05 7    I think that Delaware citizens which is what is required,

14:08:10 8    they changed -- they're masters of their own complaint, but

14:08:14 9    the plaintiffs now allege Delaware residents who resided in

14:08:18 10   Delaware for a period of time, at least a year, dating back

14:08:22 11   to 1988 because that's when the facility originally opened.

14:08:27 12   What I think you'll find in the *Mason* case, I can quote from

14:08:33 13   *Mason*, *Mason* says, "We see no reason to close our eyes to a

14:08:37 14   centuries old inference that a person's residence is

14:08:41 15   presumptively domicile."

14:08:43 16          What happened here is the plaintiffs have now

14:08:45 17   defined a very long time period for its class period.

14:08:49 18   Highly unlikely to be sustained, also has excluded anyone

14:08:54 19   who might have manifested any disease or illness that

14:08:58 20   relates to ethylene oxide.  The definition is still based

14:09:02 21   upon a durable residence in proximity to the facility, so

14:09:02 22   the presumption that you don't have to --

14:09:12 23          THE COURT:  Stop.  The presumption, yeah, you're

14:09:14 24   right, I'm getting hung up on the fact that this period is

14:09:21 25   over such a long period of time.  Because then I don't

14:09:25 1    understand how the presumption necessarily applies to the

14:09:30 2    class numbers.

14:09:33 3         MR. SWEDLOW:  What we know is that the plaintiff

14:09:36 4    class representative is still a resident and citizen of

14:09:40 5    Delaware.  And we don't know of anyone who has actually

14:09:44 6    moved out of the census tracts and nobody has identified for

14:09:48 7    you the fact that this is a transient community, for example

14:09:52 8    an Army base or a college town which is what is discussed in

14:09:56 9    some of the case law.  And I recognize this is a difficult

14:10:00 10   question to base it on evidence when all that you have is

14:10:04 11   the file of a complaint where the plaintiff defined the

14:10:07 12   class but the class is based on the residency.

14:10:11 13        THE COURT:  But the class is based on residency

14:10:14 14   over a period of time.  Here is my question, Mr. Swedlow.

14:10:19 15   I'm the one who has to make a finding here and base it on

14:10:23 16   something, so why shouldn't I say go take some discovery,

14:10:27 17   come up with some statistical evidence, show me that it's

14:10:31 18   not a transient community.  If I have to make a finding of

14:10:35 19   fact, why shouldn't you have to be put to the proof of

14:10:39 20   getting me some facts on which to base it?

14:10:42 21        MR. SWEDLOW:  Well, I mean as of today, we

14:10:44 22   couldn't really be put to the proof because the plaintiffs

14:10:48 23   haven't defined their class and citizenship would require

14:10:52 24   inquiry into an individual's intent, so it could be

14:10:55 25   complicated discovery.  But I understand what you're saying

14:11:00 1    about why don't we find some statistics.

14:11:03 2              I will say that what we're really probably --

14:11:06 3    this complaint was filed after there was an incident that

14:11:11 4    took place in 2018 and it was filed after thirty-plus years

14:11:17 5    of the use of ethylene oxide as permitted at this facility.

14:11:22 6    So what could happen if this case isn't dismissed and sent

14:11:29 7    back to be filed in state court and ultimately what you're

14:11:33 8    going to have is a class period defined by people who now

14:11:37 9    live near the facility.  In other words, there isn't a

14:11:40 10   plausible articulable basis for someone who lived from 1988

14:11:45 11   to 1989 near the facility, there is a point at the end of

14:11:49 12   this, and move away and been gone for thirty-one years, and

14:11:53 13   if they manifested any illness they couldn't be in the class

14:11:56 14   but they have some kind of undefined increased risk.  Is the

14:12:00 15   class defined as people who live near the facility now

14:12:03 16   because they read in the paper about an incident?  Those

14:12:05 17   people are all going to be citizens and because this

14:12:08 18   jurisdiction isn't waivable, there is no jurisdiction.  And

14:12:12 19   then the class will be defined in a way that will send it

14:12:15 20   back to state court.

14:12:16 21             There is jurisdiction in state court now to file

14:12:19 22   this complaint, and there may not be jurisdiction in federal

14:12:22 23   court ever.  And if you made a bunch of rules and then there

14:12:28 24   was no jurisdiction based upon a redefined class, everything

14:12:33 25   you have done would be a nullity.

14:12:35 1             THE COURT:  Yes, I totally understand and that's

14:12:37 2   a question I have for the plaintiffs which is, I mean, we

14:12:40 3   got to do something here because if at any point we realize

14:12:45 4   this class has been defined and includes two-thirds, more

14:12:51 5   than two-thirds or two-thirds of the people, it's gone.

14:12:55 6   Right?  So I have no desire -- and look, I look at this case

14:12:59 7   and I think it belongs in state court, so I agree with you,

14:13:03 8   I just feel like you're giving me very little in the way of

14:13:07 9   fact.  An argument that you're making about the class, you

14:13:12 10  know, that it's improperly defined, what am I supposed to do

14:13:16 11  with that?  Is that an issue that I can deal with if I don't

14:13:21 12  even know if I have subject matter jurisdiction or not?

14:13:27 13            MR. SWEDLOW:  Is that what you're posing to

14:13:31 14  defendant still?

14:13:32 15            THE COURT:  Yes.

14:13:33 16            MR. SWEDLOW:  So I believe that the Court can

14:13:36 17  and should cite the precedent where presumptions regarding

14:13:42 18  residence for citizenship would apply here.  And the Court

14:13:46 19  hasn't been presented with anything, also from plaintiff, to

14:13:50 20  indicate that anyone has moved, ever, other than the --

14:13:54 21            THE COURT:  But Mr. Swedlow, who has the burden?

14:14:01 22  You're throwing burden back at plaintiff.  You're throwing

14:14:04 23  the burden back at plaintiff.  No, with respect to the

14:14:07 24  two-thirds, you're throwing the burden back at plaintiff.

14:14:11 25  As I read the cases, you have the burden to show that the

14:14:13 1    exception applies.

14:14:15 2                 MR. SWEDLOW:  I guess I would state it this way.

14:14:17 3    The plaintiffs have the burden of showing minimal diversity,

14:14:22 4    and the plaintiffs have satisfied that burden by telling you

14:14:25 5    in the complaint that somebody must have moved.  But they

14:14:29 6    haven't established that a single person has moved.  So what

14:14:32 7    they're saying is our class rep is a citizen of Delaware,

14:14:36 8    you as a defendant are a citizen of Delaware.  Somebody in

14:14:41 9    our self-defined census tract must have moved in the last

14:14:45 10   33 years but we don't know that, now you have to prove that

14:14:48 11   the people who have moved are of a certain percentage.  And

14:14:51 12   that's where the burden shifts before it's supposed to,

14:14:54 13   because plaintiffs haven't established anything other than

14:14:58 14   that their class rep is a citizen of Delaware and they have

14:15:03 15   alleged that people have left.

14:15:04 16               Now, it's logical to assume that people have

14:15:07 17   left, but that's not meeting a burden any more than we're

14:15:11 18   meeting the burden.  We identified this real jurisdictional

14:15:16 19   problem, and plaintiff said, you haven't met your burden.  I

14:15:20 20   guess the question is, am I shifting the burden or am I

14:15:22 21   waiting to receive the burden after they meet it?

14:15:26 22               THE COURT:  As I read the papers, I didn't see

14:15:30 23   that there was a real contest or dispute that they met the

14:15:34 24   hundred class member at least 5 million in controversy and

14:15:39 25   minimal diversity.  I didn't see you really challenge that.

14:15:44 1    You were focused on the exceptions to that.  So now it seems

14:15:50 2    like you're saying oh, they haven't even shown that one

14:15:53 3    person is diverse.  So what, we go take some discovery and

14:16:01 4    they go and they say okay, let's talk to the people who live

14:16:05 5    in these areas, let's get a sample.  Look, one of them who

14:16:10 6    lived here two years ago moved.  Then they meet their burden

14:16:15 7    and you have to come forward with something else.

14:16:17 8            What you're saying doesn't make any sense to me.

14:16:20 9    You're asking me to make a logical leap that we're going to

14:16:24 10   have two-thirds of the people who are residents and you're

14:16:27 11   saying but I can't even make a logical leap on the

14:16:31 12   plaintiff's side that one person isn't.

14:16:35 13           Isn't that really what you're suggesting to me,

14:16:39 14   that I could believe you on the two-thirds, but I can't

14:16:44 15   believe them that probably one person moved.

14:16:46 16           MR. SWEDLOW:  I think the reality is you can

14:16:50 17   believe them that probably one person moved, and the

14:16:54 18   two-thirds is -- would make everything into a nullity.  The

14:16:59 19   one-third constitutes a discretionary dismissal where the

14:17:02 20   plaintiffs could have this case be where it belongs which is

14:17:02 21   in state court.  And I don't think that requires anything

14:17:13 22   more than logical inferences, the people who resided for a

14:17:16 23   period of time, long enough to be included in a class in the

14:17:22 24   tract, it's not a college town or Army town, than one-third

14:17:27 25   of those people are citizens who might have a claim, are

14:17:30  1   citizens of Delaware and that inference is not a leap as

14:17:34  2   much as the two-thirds might be.

14:17:36  3               THE COURT:  All right.  Let me hear from the

14:17:39  4   plaintiff.  First of all, I'm not sure why this case is here

14:17:48  5   when we are completely risking that at some point we find

14:17:53  6   out that there is one-third of the folks who are residents

14:17:58  7   and likely find out that two-thirds are, in which case it

14:18:02  8   seems like it could go back to the state court.  And, in

14:18:07  9   fact, I think that it makes the issue of medical monitoring

14:18:11 10   and whether it's a claim in Delaware seems more

14:18:13 11   appropriately put before a Delaware State court.  So why is

14:18:19 12   it not a fair inference that at least one-third of the folks

14:18:26 13   in this class are going to be citizens of Delaware?

14:18:32 14               MR. VALLADARES:  Your Honor, that would be --

14:18:35 15               THE COURT:  I need you -- stop, stop, stop.  I

14:18:38 16   need you to start by giving your name so that my court

14:18:41 17   reporter has it, please.

14:18:42 18               MR. VALLADARES:  Of course.  Marcio Valladares.

14:18:46 19               Your Honor, I would say that with respect to the

14:18:50 20   one-third, that argument by defendant was relegated to a

14:18:54 21   footnote, and it's the interest of justice.  We have

14:19:00 22   articulated in our papers why the interest of justice are

14:19:04 23   not served by that.

14:19:06 24               THE COURT:  Let's say I don't agree with that,

14:19:09 25   let's say I don't agree, you know, looking at does it

14:19:14 1   involve matters of national or interstate interests, whether

14:19:18 2   it's governed by the laws of Delaware, which I think you

14:19:23 3   have a pretty good -- they have good argument on the nexus,

14:19:30 4   the citizens, let's say that I agree that everything kind of

14:19:36 5   favors their position, but I don't have evidence on the

14:19:40 6   one-third, but isn't it a fair inference that at least

14:19:47 7   one-third of the people will be citizens of Delaware?

14:19:49 8          MR. VALLADARES:  I do not, Your Honor, I do not,

14:19:52 9   Your Honor, not as a matter of record, not as a matter of

14:19:55 10  logical conclusion, or --

14:19:57 11         THE COURT:  And let me just understand, then.

14:20:01 12  But you agree, though, that if at any point we -- I

14:20:06 13  determine that two-thirds, greater than two-thirds of the

14:20:11 14  folks in the complaint, in the class are residents -- I'm

14:20:17 15  sorry, are citizens of Delaware, I have to get rid of this

14:20:21 16  case; right?

14:20:23 17         MR. VALLADARES:  Marcio Valladares.

14:20:25 18         Yes, Your Honor.

14:20:26 19         THE COURT:  Okay.  So wait.  Stop.  So if that

14:20:30 20  happens, it doesn't matter what stage we're at, I am getting

14:20:36 21  rid of this case.  So then doesn't it make sense that we get

14:20:41 22  a little bit of evidence as to what we think that number is

14:20:47 23  going to look like?

14:20:49 24         MR. VALLADARES:  Your Honor, we will be

14:20:52 25  susceptible to that.  I think there is case law that talks

14:20:54 1    about that making that presumption -- or I'm sorry, to

14:21:05 2    respond to a request for one of the exceptions to apply, it

14:21:11 3    should not be tremendously difficult for plaintiff to do so.

14:21:16 4    In this case, we would engage in some discovery.  We can

14:21:22 5    talk with counsel about how to do that.  And maybe even

14:21:27 6    looking at, for instance, census data which I think it may

14:21:33 7    surprise the Court, I'm not sure what that is right now, but

14:21:38 8    that would be helpful, for instance.  I think the Court can

14:21:44 9    take judicial notice of the proximity of this plant to major

14:21:49 10   metropolitan areas right around where this plant is.  I know

14:21:53 11   New Castle is a county that's quite small, but the county

14:21:57 12   with the densest population.  And certainly the Court is

14:22:02 13   aware that Delaware, because of loss of industry and such,

14:22:09 14   there is a diaspora to these other cities and space for that

14:22:15 15   matter, not just New Jersey, New York, Baltimore, Maryland,

14:22:21 16   District of Columbia, and I don't mean to suggest that you

14:22:27 17   should do this, but you can Google articles and see that

14:22:31 18   that is the case.  There is a diaspora of people from

14:22:36 19   Delaware leaving the state.

14:22:42 20          MR. SWEDLOW:  Your Honor, this is Stephen

14:22:44 21   Swedlow.  May I be heard on that issue?

14:22:46 22          THE COURT:  Yes.  I'm not going to Google it,

14:22:49 23   Mr. Swedlow, so if you're going to tell me not to do that.

14:22:52 24          MR. SWEDLOW:  No, no, you can Google anything

14:22:56 25   you want.  I'm not going to restrict your computer usage.

14:22:59  1    What I was going to say is the plaintiffs, I have been a

14:23:04  2    plaintiff in class actions as counsel and they strategically

14:23:09  3    decided to complete a thirty-three-year period which

14:23:14  4    includes twenty years before Croda had anything to do with

14:23:17  5    this facility.

14:23:18  6              What I'm worried about for judicial efficiency

14:23:21  7    and the interest of justice, there is no way that this

14:23:24  8    thirty-three-year period is ever going to survive, so when

14:23:27  9    it becomes a one-year or two-year period for everyone who

14:23:31 10    lives there now like it was pled in New Jersey, you won't

14:23:35 11    have jurisdiction again.  So if we do some census work or

14:23:39 12    Google research and there is an argument that it might be

14:23:42 13    less than one-third because this would be a complicated

14:23:45 14    thing that our government can't actually figure out through

14:23:49 15    the census --

14:23:52 16              THE COURT:  Mr. Swedlow, maybe I just missed it,

14:23:56 17    but is this argument about the appropriate class and that it

14:23:59 18    shouldn't be thirty-three years, was that waived

14:24:01 19    substantially in your papers?

14:24:02 20              MR. SWEDLOW:  No, I'm not raising it as a reason

14:24:07 21    we should win now.  What I'm saying is when the Court is

14:24:11 22    determining whether or not to exercise both its discretion

14:24:13 23    and to rely upon the inference of residents, that the Court

14:24:17 24    should consider the downside to being wrong at least at the

14:24:21 25    two-thirds level is that everything that happens is a

14:24:24 1    nullity.  That's my only point, not that we should win

14:24:28 2    because the class period is too long.

14:24:30 3              THE COURT:  I get it.  You don't have to

14:24:32 4    convince me that this could be just a whooping huge waste of

14:24:38 5    my time because I don't have subject matter jurisdiction.

14:24:42 6    Okay?  My problem, Mr. Swedlow, is I feel like you have

14:24:47 7    given me nothing to make a factual determination.  You can

14:24:55 8    say this class isn't going to hold up for thirty-three years

14:25:00 9    and it sounds like you have a good argument.  But you didn't

14:25:03 10   make that argument in the papers on the motion before me and

14:25:08 11   I don't have any basis to say that on the motion to dismiss.

14:25:11 12   You can say even if it does hold up, the likelihood that

14:25:17 13   we're going to hit the one-third in which case you're

14:25:21 14   probably right, I would exercise my discretion and get rid

14:25:25 15   of it, we're probably going to hit that even if we go back

14:25:28 16   thirty-three years, okay, but I don't know what that's based

14:25:31 17   on.  If I need to make a factual finding, I don't have

14:25:35 18   facts.  I have lawyer argument.  Compelling lawyer argument,

14:25:39 19   but it doesn't help me with making a factual finding.

14:25:41 20              That's why I'm trying to figure out rather than

14:25:47 21   go forward in this case on anything substantive where we're

14:25:51 22   just going to risk wasting everyone's time because it's not

14:25:56 23   properly before me, isn't there a way that we can figure out

14:26:00 24   whether the facts support the argument you're making?  And

14:26:05 25   why can't we have a limited period of time where we try and

14:26:10  1    figure that out?

14:26:12  2              MR. VALLADARES:  Your Honor, this is Marcio

14:26:15  3    Valladares.  We're agreeable to that.

14:26:18  4              MR. SWEDLOW:  If I could ask the Court and maybe

14:26:22  5    the plaintiff's counsel, I don't think depositions of the

14:26:25  6    7,000 people who lived or used to live in this census tract

14:26:30  7    makes sense economically.  So I would just inquire as to

14:26:34  8    what quantum of evidence would be satisfactory or

14:26:38  9    informative and probative for the Court, this two-thirds

14:26:42 10    one-third.

14:26:42 11              THE COURT:  Mr. Swedlow, I'm not going to do

14:26:45 12    your job for you.

14:26:47 13              MR. SWEDLOW:  Fair enough.

14:26:48 14              THE COURT:  I'm just going to tell you, look at

14:26:50 15    the case law.  It seems to me that some statistical analysis

14:26:54 16    that someone has a basis for and, you know, it's not just I

14:26:59 17    talked to one person and I extrapolate from one person to

14:27:04 18    7,000.  I mean it seems like there must be some way you can

14:27:08 19    get some statistics that would support the position that

14:27:12 20    you're taking.

14:27:12 21              And I agree, taking depositions of 7,000 people

14:27:18 22    is not required, but what would satisfy me, I guess it

14:27:21 23    depends on how compelling it is what you put in front of me.

14:27:24 24              MR. SWEDLOW:  Fair enough, Your Honor.

14:27:30 25              MR. VALLADARES:  Marcio Valladares, Your Honor.

14:27:32  1          We would just ask if that's the case, of course

14:27:34  2   we're agreeable to it, but perhaps give the parties a chance

14:27:40  3   and defendants first I would suggest to also brief and put

14:27:44  4   that, those facts into context.

14:27:52  5          THE COURT:  I think that's fine.  I just need

14:27:56  6   someone to give me some facts which I can make a factual

14:28:01  7   determination on whether or not it's a factual determination

14:28:04  8   that the exceptions have been met or not met.  But yes, so

14:28:09  9   you can -- I think what I am going to do is deny the motion

14:28:17 10   to dismiss, but do so without prejudice to renewing it after

14:28:27 11   some discovery goes forward in which some factual -- if it's

14:28:33 12   appropriate and you get the factual basis that you believe

14:28:37 13   you need, that you can refile it and, you know, and I'll

14:28:45 14   make a determination.  That's what I am contemplating.  But

14:28:52 15   I think that the period of discovery should be relatively

14:28:56 16   short because having an extended period of excessive

14:29:02 17   discovery seems counterproductive.

14:29:05 18          MR. VALLADARES:  This is Marcio Valladares.

14:29:07 19          We totally agree, Your Honor.

14:29:08 20          THE COURT:  All right.  Mr. Swedlow, so should

14:29:14 21   we discuss the discovery, it seems to me that it's better

14:29:19 22   that you all discuss it with the plaintiff and figure out

14:29:22 23   what makes sense, and what that time period should be, but

14:29:26 24   if you don't think that's going to work, then I'll listen to

14:29:31 25   you.

14:29:32 1                    MR. SWEDLOW:  This is Steve Swedlow.  I have two

14:29:34 2     questions.  One is, if we're calling it discovery, I don't

14:29:38 3     know if we're going to receive information from the

14:29:40 4     plaintiff or if we're conducting public research.  If it's

14:29:45 5     public research, then we would do it and it wouldn't take

14:29:50 6     that long.  If we're waiting for information from the

14:29:53 7     plaintiff, then we would need to do discovery requests.  I

14:29:57 8     don't know if the plaintiff contemplates providing

14:30:01 9     information about the class or not.

14:30:02 10                   THE COURT:  I guess I would like to hear that

14:30:04 11    from the plaintiff because if the plaintiff is not going to

14:30:06 12    provide information, then it seems like the plaintiff might

14:30:09 13    be more hard pressed to complain about the information

14:30:15 14    that's provided if the motion is renewed.

14:30:19 15                   Plaintiff, what are your thought on that?

14:30:21 16                   MR. VALLADARES:  Your Honor, we're committed to

14:30:26 17    engaging with defense counsel in coming up with some

14:30:30 18    reasonable procedural mechanism under the Rules of Civil

14:30:35 19    Procedure and discovery, and whatever else, whether it's the

14:30:38 20    statistical analysis or whatever that would enlighten the

14:30:42 21    Court and all of us on this issue.

14:30:48 22                   MR. SWEDLOW:  Your Honor, this is Steve Swedlow.

14:30:52 23    I'm asking a way more direct question.  If I propound

14:30:55 24    discovery upon plaintiff, then tell me everything you know

14:30:58 25    about the influx and out flux of your purported class

14:31:02 1   members, are they going to answer or are we just going to be

14:31:07 2   looking at public records, both of us?  I don't need to

14:31:11 3   propound discovery on them if they say that's probably

14:31:14 4   available, go find it yourself.

14:31:16 5           MR. VALLADARES:  Your Honor, it's Marcio

14:31:18 6   Valladares.  I think if we sent that request to the

14:31:20 7   defendants, they would say the same thing, we don't know,

14:31:23 8   that's what they're saying now.  I don't understand the

14:31:26 9   asymmetry of that question.

14:31:29 10          MR. SWEDLOW:  And I don't want to respond

14:31:30 11  directly to you, so with the Court's permission.

14:31:33 12          My point in the question is it's not discovery

14:31:37 13  if we're not getting anything from the plaintiffs and if

14:31:39 14  we're not getting anything from the plaintiffs then we can

14:31:42 15  set a time period to file supplemental briefing and we can

14:31:47 16  cite whatever we think would be probative to you, but it's

14:31:51 17  not actually discovery if the plaintiffs aren't going to

14:31:54 18  give us information.

14:31:55 19          THE COURT:  Okay.  I think that -- look, the

14:32:00 20  discovery request that you just suggested, I understand why

14:32:02 21  you say that's probably not terribly useful on both sides.

14:32:12 22  I think you both agree with that because the answer is going

14:32:12 23  to be, we don't know.  So I guess what I say is why don't

14:32:24 24  you go talk about what makes sense and then either -- I

14:32:30 25  don't care if you call it discovery if it's going to be

14:32:33 1    publicly available stuff, I don't care if you call it

14:32:37 2    supplemental -- it's not even supplemental briefing though

14:32:42 3    because the motion is denied.  The motion is off my calendar

14:32:45 4    until you renew it because the motion that I have in front

14:32:49 5    of me was not sufficient.  So I don't care if you call it

14:32:56 6    discovery.  I don't care if you say we're going back and,

14:33:00 7    you know, trying to figure out more facts on the

14:33:02 8    jurisdiction, however you want to call it, I don't care, but

14:33:06 9    the motion is denied subject to being renewed after some

14:33:12 10   additional facts, if they exist, are made to support it.

14:33:23 11          MR. SWEDLOW:  Okay.  And if we determine that

14:33:26 12   these facts are difficult to acquire or they're unconvincing

14:33:32 13   to you, what do we do with all the 12(b)(6) bases, would

14:33:37 14   they be renewed at that time?

14:33:39 15          THE COURT:  I guess you could renew them, yes.

14:33:42 16   I'm not dealing with the failure to state a claim now

14:33:45 17   because it seems pointless for me to do that if I don't have

14:33:48 18   jurisdiction.  So if you determine that we think that I do

14:33:55 19   have jurisdiction, then I guess you can renew on the failure

14:34:01 20   to state a claim.

14:34:02 21          MR. SWEDLOW:  Okay.

14:34:02 22          THE COURT:  But --

14:34:02 23          MR. VALLADARES:  Your Honor, Marcio Valladares.

14:34:14 24   We're fine with that.

14:34:15 25          THE COURT:  So what I would like you to do is to

14:34:17 1   go back and talk, and within a week from today submit to me

14:34:21 2   a joint proposal for going forward.

14:34:30 3                    MR. VALLADARES:  Marcio Valladares.

14:34:31 4                    Very good, Your Honor.

14:34:34 5                    MR. SWEDLOW:  Stephen Swedlow.

14:34:36 6                    Very good, also.

14:34:38 7                    THE COURT:  At least you can say you understand.

14:34:42 8   So I appreciate that, Mr. Swedlow.

14:34:46 9                    Okay.  So with that, the motion is denied as I

14:34:51 10  said a few times already and I look forward to hearing from

14:34:55 11  you all next week.  Have a good weekend.

12                    (Teleconference concluded at 14:34 p.m.)

13

14

15                    I hereby certify the foregoing is a true and
          accurate transcript from my stenographic notes in the proceeding.
16

17                                        /s/ Dale C. Hawkins
                                        Official Court Reporter
18                                        U.S. District Court

19

20

21

22

23

24

25

# MORRIS, NICHOLS, ARSHT & TUNNELL LLP

1201 NORTH MARKET STREET
P.O. BOX 1347
WILMINGTON, DELAWARE  19899-1347
———
(302) 658-9200
(302) 658-3989 FAX

KENNETH J. NACHBAR
(302) 351-9294
(302) 425-3013 FAX
knachbar@morrisnichols.com

August 12, 2021

**VIA ELECTRONIC FILING**

The Honorable Maryellen Noreika
J. Caleb Boggs Federal Building
844 N. King Street, Unit 19, Room 4324
Wilmington, DE 19801-3555

Re:    *Catherine Baker v. Croda Inc.* (20-cv-01108-MN)

Dear Judge Noreika:

As requested by the Court during the August 5, 2021 status conference, Croda has investigated methods and data that may exist to determine the percentage of the class members who are currently citizens of Delaware.  For the reasons described below and based upon the Court's guidance at the August 5, 2021 hearing, Croda does not believe there exists a reliable means of satisfying its burden to establish the percentage of the class members that were considered "citizens" of the putative class at the time the complaint was filed.

As the Plaintiff explained in its opposition brief, an individual is considered a "citizen" of Delaware for the purposes of CAFA jurisdiction if they are "domiciled" there—that is, if they have a present intent to remain there indefinitely. *See* Opposition Br. (Dkt. 14) at 5, *citing In re Sprint Nextel Corp.*, 593 F.3d 669, 674 (7th Cir. 2010) (stating that evidence of class members' phone numbers and mailing addresses was insufficient to establish domicile).

Some courts have made reasonable inferences about residency in a state based on class members' mailing addresses or residency in a state.  *See Kitson v. Bank of Edwardsville*, No. CIV 06-528-GPM, 2006 WL 3392752, at *6 (S.D. Ill. Nov. 22, 2006); *see also Cook v. S.C. Pub. Serv. Auth.*, No. 6:19-CV-03285-TLW, 2020 WL 869741, at *8 (D.S.C. Jan. 21, 2020).  Evidence such as "place of employment, driver's license, automobile registration, bank accounts, tax payments, location of personal property, and voting practices" can inform the question whether a person subjectively intends to maintain their place of residence indefinitely.  *Seventh Circuit in In re Sprint Nextel Corp.*, 593 F.3d 669, 673-76 (7th Cir. 2010).  However, as Plaintiff noted in its opposition brief, other federal courts have held that evidence such as billing addresses on medical records, interviews where class members confirmed their state of residence, or evidence of

The Honorable Maryellen Noreika
August 12, 2021
Page 2

property ownership is not sufficient to meet the burden under CAFA. *See Preston v. Tenet Healthsystem Mem'l Med. Ctr., Inc.*, 485 F.3d 793, 798 (5th Cir. 2007); *Evans v. Walter Indus., Inc.*, 449 F.3d 1159, 1166 (11th Cir. 2006); and *Reece v. AES Corp.*, 638 F. App'x 755, 772 (10th Cir. 2016).

In the present case, Plaintiffs have defined the class as follows:

All natural persons who have resided within census tracts 10003015400, 10003105502 and 10003015802 (the "Class Zone") for a period of one year or more at any time beginning January 1, 1988 and the present (the "Class Period").

Dkt. 1 at ¶ 62. The Complaint then excludes from the class "all persons who have been currently diagnosed with cancer, illness, disease or disease process of the kind caused by EtO." *Id.* ¶ 63. Plaintiff acknowledged at the hearing that counsel does not have class member specific data and does not intend to contact all class members in response to any discovery request.

Therefore, to establish what percentage of the class is "domiciled" in Delaware, Croda would have to: (1) identify all persons who have lived within three census tracts in Delaware for at least a year at any point over the last 32 years, including persons who have moved out of Delaware at any point over the past three decades, (2) determine who is still alive, and (3) determine what percentage of class members currently are citizens of Delaware. Records of home ownership would not capture the entire class, which could include renters, roommates, sublettors, and other persons who may not have left behind a record during their residency for one year or more in Delaware. Voting records would similarly be incomplete, as they would not capture the large percentage of the population who chooses not to vote, or is ineligible to register to vote due to age, criminal history, or their legal status in the United States.

Conducting a poll or other survey of the current residents of the three census tracts at issue would not establish the relevant percentages either. A poll of current residents (to determine which of the current residents are citizens) would exclude information about persons who have lived in those census tracts over the past three decades and who have since moved away.

Data from the Census Bureau also is insufficient. The three census tracts at issue in this case contain a total of 7,740 people according to the most recent U.S. Census. (*See* Exs. A, B, and C.) These census tracts are all located in New Castle County, Delaware. New Castle County contains an estimated 558,753 people according to the most recent U.S. Census. (*See* Ex. D.) The U.S. Census tracks migration patterns on a *county-by-county* basis. (*See* Ex. E.) Undersigned counsel has located the migration outflow data for New Castle County Delaware for the 2014-2018 period, and submits it as Exhibit E. However, this migration data can only show that of the 558,753 people in New Castle County, an estimated 4,144 people moved to a different state each year in the 2014-2018 time period. (*See* Ex. E, Row 20, Column AG.) This estimate has a margin of error of 527. (*Id.*, Row 20, Column AH.) The same dataset shows that in each year, 44,496 people in New Castle County moved to another residence *located in the same county.* (Ex. E, Row 20, Column M.) The 44,496 people who moved within New Castle County each year likely include some persons within the three census tracts at issue, but counsel has no way of reliably

The Honorable Maryellen Noreika
August 12, 2021
Page 3

estimating what portion of those 44,496 people either moved into or out of census tracts
10003015400, 10003105502 and 10003015802.

     Therefore, even if defense counsel attempted to analyze this data through an expert
for each year between 1988 and 2021, the best-available census data is only at a countywide level.
Defense counsel is currently unaware of any annual data on migration patterns at the census tract
level.  Although the U.S. Census tracks migration patterns into and out of a state, that data does
not track whether a *specific person* lived within the three census tracts at issue, and left the county;
if they left the county, whether they left the state; or whether they left the state for a period of time,
and later chose to return.  The census data also does not take into consideration whether any person
migrating out of Delaware lived within the Class Zone for at least one year.

     Census data also fails to capture what percentage of the population of census tracts
10003015400, 10003105502 and 10003015802 is still alive.  Presumably, some percentage of
persons who lived in the Class Zone from 1988 to the present are now deceased, and cannot count
as "natural persons" within the class definition.

     A further conplicating factor is the distinction between residence and citizenship as
identified by Plaintiffs and the Court. Even if Croda can determine residency for this 33 year period
through some representative sample, Croda would have to determine for each representative class
member whether they subjectively intend to remain in Delaware indefinitely (if they currently live
in Delaware) or if they intend to return to Delaware at some point in the future (if they currently
live outside of Delaware).  Croda would also have to inquire into each person's health status to
determine if they have even been diagnosed with a disease "of the kind caused by EtO."  At this
stage of the litigation, the diseases allegedly "caused by EtO" have  not been determined, so Croda
would not have a reliable way of narrowing the class to exclude persons with disqualifying health
conditions.

     As a result of these numerous complicating factors—in particular the difficulty of
locating a population that has migrated in and out of three census tracts over the course of more
than three decades—Croda does not believe it can reliably establish the percentage of the class
that are citizens of Delaware.  Croda does not believe it possible to perform a statistical analysis
that is sufficiently reliable to be the basis for a Court determination as to the percentage of the
class domiciled in Delaware.

### *Next Steps In the Litigation*

    <u>Defendant's Position</u>

     Because the Court previously indicated that current residency is insufficient to
satisfy the burden of proof on citizenship, Croda withdraws its Rule 12(b)(1) jurisdictional motion
and renews and submits its  motion to dismiss for failure to state a claim under Rule 12(b)(6).
Croda proposes that the Court consider the fully briefed 12(b)(6) motion as submitted.

The Honorable Maryellen Noreika
August 12, 2021
Page 4

<u>Plaintiff's Position</u>

        Counsel have conferred on the joint submission of this letter consistent with the Court's August 5th Order. While Plaintiff acknowledges Croda's withdrawal of the 12(b)(1) jurisdictional motion as a representation that it will no longer pursue that relief, she disagrees that the remaining portions of Croda's motion should be deemed renewed, submitted and ready for disposition. Rather, Plaintiff submits that the August 5th Order denied the motion without prejudice in its entirety, and the proper course would be for Croda to file a new motion to dismiss under 12(b)(6) by a date certain. Plaintiff believes this approach would allow the parties to refocus their submissions on the substantive issues without devoting attention to the now-withdrawn 12(b)(1) jurisdictional challenge, as well as refresh any briefing that may have become stale since the briefs were served in the fall of 2020.

Respectfully,

*/s/ Kenneth J. Nachbar*

Kenneth J. Nachbar (#2067)

KJN/wof
Attachments

cc:    Kyle J. McGee, Esquire
       All Counsel of Record (via Electronic Filing)

# Exhibit A



Census Reporter

Search for places, tables, topics, or glossaries    Search

# Census Tract 154, New Castle, DE

Census Tract in: New Castle County, DE, Delaware, United States

**2,757**
Population

**0.9** square miles

**2,912.6** people per square mile

Census data: ACS 2018 5-year unless noted

Find data for this place    Search by table or column name…

Interact with charts and statistics for margins of error and additional information.



| Demographics |
|---|

† Margin of error is at least 10 percent of the total value. Take care with this statistic.

### Age

**36.5**
Median age

a little less than the figure in New Castle County: 38.1

about 90 percent of the figure in Delaware: 40.2

**Population by age range**

20%†    8%†    11%†    14%†    11%†    12%†    11%†    7%†

0-9    10-19    20-29    30-39    40-49    50-59    60-69    70-79

Show data / Embed

**Population by age category**

Under 18
18 to 64
65 and over

18 to 64 **56%†**

Show data / Embed

† Margin of error is at least 10 percent of the total value. Take care with this statistic.

### Sex

Male
Female

Female **66%**

Show data / Embed

### Race & Ethnicity

80%†

2%†    0%    0%    0%    0%    1%†

White    Black    Native    Asian    Islander    Other    Two+

* Hispanic includes respondents of any race. Other categories are non-Hispanic.

Show data / Embed

| Economics |
|---|

Case: 22-1333    Document: 6    Page: 221    Date Filed: 02/22/2022

Census Tract 154, New Castle, DE - Profile data - Census Reporter          Page 2 of 5
Case 1:20-cv-01108-MN    Document 29-1    Filed 08/12/21    Page 3 of 6 PageID #: 267



### Income

$20,520
Per capita income

about three-fifths of the amount in New Castle County: $35,847

about three-fifths of the amount in Delaware: $33,989

$37,679
Median household income

about half the amount in New Castle County: $70,996

about three-fifths of the amount in Delaware: $65,627

**Household income**
59%†    28%†    11%†    2%†
Under $50K    $50K - $100K    $100K - $200K    Over $200K

Show data / Embed

† Margin of error is at least 10 percent of the total value. Take care with this statistic.

### Poverty

25.2%
Persons below poverty line

more than double the rate in New Castle County: 11.4%

more than double the rate in Delaware: 11.9%

**Children (Under 18)**
Poverty 30%†

**Seniors (65 and over)**
Poverty 17%†

Show data / Embed

† Margin of error is at least 10 percent of the total value. Take care with this statistic.

### Transportation to work

21.2 minutes
Mean travel time to work

about 80 percent of the figure in New Castle County: 25.8

about 80 percent of the figure in Delaware: 25.8

**Means of transportation to work**
79%†    6%†    12%†    0%    0%    3%†
Drove alone    Carpooled    Public transit    Bicycle    Walked    Other    Work

* Universe: Workers 16 years and over

Show data / Embed

† Margin of error is at least 10 percent of the total value. Take care with this statistic.



**Families**

### Households

969
Number of households

New Castle County: 203,855

Delaware: 357,765

2.9
Persons per household

about 10 percent higher than the figure in New Castle County: 2.6

about 10 percent higher than the figure in Delaware: 2.6

**Population by household type**
Married couples 42%†

Married couples
Male householder
Female householder
Non-family

Show data / Embed

† Margin of error is at least 10 percent of the total value. Take care with this statistic.



## Marital status

† Margin of error is at least 10 percent of the total value. Take care with this statistic.



Married
**40%†**

Married
Single

**Marital status, by sex**

* Universe: Population 15 years and over

Show data / Embed

Show data / Embed

## Fertility

**N/A**

Women 15-50 who gave birth during past year

**Women who gave birth during past year, by age group**

| 0% | 0% | 0% | 0% | 0% | 0% |
|----|----|----|----|----|----|
| 15-19 | 20-24 | 25-29 | 30-35 | 35-39 | 40-44 |

* Universe: Women 15 to 50 years

Show data / Embed

---



## Housing

### Units & Occupancy

† Margin of error is at least 10 percent of the total value. Take care with this statistic.

**1,107**

Number of housing units

New Castle County: 222,146
Delaware: 428,251

**Occupied vs. Vacant**

Occupied
**88%**

Occupied
Vacant

**Ownership of occupied units**

Owner occupied
**65%†**

Owner occupied
Renter occupied

Show data / Embed

Show data / Embed

### Types of structure

Single unit
**94%†**

Single unit
Multi-unit
Mobile home
Boat, RV, van, etc.

**Year moved in, by percentage of population**

| | 28%† | | 29%† | 28%† | | |
|---|---|---|---|---|---|---|
| | | 11%† | | | 3%† | |
| Before 1990 | 1990s | 2000s | 2010-2014 | 2015-2016 | Sinc |

Show data / Embed

Show data / Embed

### Value

† Margin of error is at least 10 percent of the total value. Take care with this statistic.

**$128,200**

Median value of owner-occupied housing units

about half the amount in New Castle County: $254,500

about half the amount in Delaware: $244,700

**Value of owner-occupied housing units**

| | | 62%† | | | | |
|---|---|---|---|---|---|---|
| 30%† | | | | | | |
| | 8%† | | 0% | 0% | 0% | |
| Under $100K | $100K - $200K | $200K - $300K | $300K - $400K | $400K - $500K | $500K - $1M | Ov |

Show data / Embed



### Geographical mobility

**11.1%**

Moved since previous year

**about 90 percent** of the rate in New Castle County: 12.8%

**about 90 percent** of the rate in Delaware: 12.7%

**Population migration since previous year**

| Same house year ago | From same county | From different county | From different state | From a... |
|---|---|---|---|---|
| 89% | 8%† | 0% | 3%† | 0% |

Show data / Embed



### Social

### Educational attainment

**85.8%**

High school grad or higher

**a little less** than the rate in New Castle County: 91.5%

**a little less** than the rate in Delaware: 89.8%

**14.2%**

Bachelor's degree or higher

**about two-fifths** of the rate in New Castle County: 35.9%

**about half** the rate in Delaware: 31.4%

**Population by minimum level of education**

| No degree | High school | Some college | Bachelor's | Post-gra... |
|---|---|---|---|---|
| 14%† | 45%† | 26%† | 7%† | 7%† |

* Universe: Population 25 years and over

Show data / Embed

### Language

**N/A**

Persons with language other than English spoken at home

**Language at home, children 5-17**

English only **83%†**

English only
Spanish
Indo-European
Asian/Islander
Other

Show data / Embed

**Language at home, adults 18+**

English only **84%**

English only
Spanish
Indo-European
Asian/Islander
Other

Show data / Embed

### Place of birth

**5.5%**

Foreign-born population

**about half** the rate in New Castle County: 11.1%

**about three-fifths** of the rate in Delaware: 9.2%

**Place of birth for foreign-born population**

| Europe | Asia | Africa | Oceania | Latin America | Nor... |
|---|---|---|---|---|---|
| 0% | 0% | 0% | 0% | 100% | |

Show data / Embed

### Veteran status

**11.1%**

Population with veteran status

**about 1.5 times** the rate in New Castle County: 7.1%

**about 25 percent higher** than the rate in Delaware: 9%

**Veterans by wartime service**

| WWII | Korea | Vietnam | Gulf (1990s) | Gulf (2001-) |
|---|---|---|---|---|
| 5† | 6† | 73† | 25† | 43† |

**222** Total veterans
**179** Male
**43** Female

* Civilian veterans who served during wartime only

Show data / Embed

† Margin of error is at least 10 percent of the total value. Take care with this statistic.

Interact with charts and statistics for margins of error and additional information.

**Citation:** U.S. Census Bureau (2018). *American Community Survey 5-year estimates.* Retrieved from *Census Reporter Profile page for Census Tract 154, New Castle, DE* <http://censusreporter.org/profiles/14000US10003015400-census-tract-154-new-castle-de/>

Census terms & definitions         Help & feedback         Email us
Census Reporter on GitHub         @CensusReporter         Census Reporter blog

# Exhibit B





### Income

**$23,674**
Per capita income

about two-thirds of the amount in New Castle County: $35,847

about two-thirds of the amount in Delaware: $33,989

**$42,931**
Median household income

about three-fifths of the amount in New Castle County: $70,996

about two-thirds of the amount in Delaware: $65,627

Household income

59%†  31%†  9%†  1%†
Under $50K   $50K - $100K   $100K - $200K   Over $200K

Show data / Embed

† Margin of error is at least 10 percent of the total value. Take care with this statistic.

### Poverty

**25.4%**
Persons below poverty line

more than double the rate in New Castle County: 11.4%

more than double the rate in Delaware: 11.9%

Children (Under 18)
Poverty **58%†**

Seniors (65 and over)
Poverty **13%†**

Poverty / Non-poverty

Show data / Embed

† Margin of error is at least 10 percent of the total value. Take care with this statistic.

### Transportation to work

**20.8** minutes
Mean travel time to work

about 80 percent of the figure in New Castle County: 25.8

about 80 percent of the figure in Delaware: 25.8

Means of transportation to work

78%   6%†   6%†   0%   4%†   3%†
Drove alone   Carpooled   Public transit   Bicycle   Walked   Other   Work

* Universe: Workers 16 years and over

Show data / Embed

† Margin of error is at least 10 percent of the total value. Take care with this statistic.



| Families |
| --- |
| † Margin of error is at least 10 percent of the total value. Take care with this statistic. |

### Households

**946**
Number of households

New Castle County: 203,855

Delaware: 357,765

**2.9**
Persons per household

about 10 percent higher than the figure in New Castle County: 2.6

about 10 percent higher than the figure in Delaware: 2.6

Population by household type

Female householder **38%†**

Married couples
Male householder
Female householder
Non-family

Show data / Embed







### Geographical mobility

**14.6%**

Moved since previous year

**about 10 percent higher** than the rate in New Castle County: 12.8%

**about 20 percent higher** than the rate in Delaware: 12.7%

**Population migration since previous year**

| Same house year ago | From same county | From different county | From different state | From ab |
|---|---|---|---|---|
| 85% | 12%† | 0% | 0% | 3% |

Show data / Embed

† Margin of error is at least 10 percent of the total value. Take care with this statistic.

---

**Social**

### Educational attainment

**85.8%**

High school grad or higher

**a little less** than the rate in New Castle County: 91.5%

**a little less** than the rate in Delaware: 89.8%

**9.1%**

Bachelor's degree or higher

**about one-quarter** of the rate in New Castle County: 35.9%

**about one-quarter** of the rate in Delaware: 31.4%

**Population by minimum level of education**

| No degree | High school | Some college | Bachelor's | Post-gra |
|---|---|---|---|---|
| 14%† | 51%† | 26%† | 5%† | 4%† |

* Universe: Population 25 years and over

Show data / Embed

† Margin of error is at least 10 percent of the total value. Take care with this statistic.

---

### Language

**N/A**

Persons with language other than English spoken at home

**Language at home, children 5-17**

English only **83%†**

English only
Spanish
Indo-European
Asian/Islander
Other

**Language at home, adults 18+**

English only **93%**

English only
Spanish
Indo-European
Asian/Islander
Other

Show data / Embed        Show data / Embed

† Margin of error is at least 10 percent of the total value. Take care with this statistic.

---

### Place of birth

**12.6%**

Foreign-born population

**about 10 percent higher** than the rate in New Castle County: 11.1%

**about 1.4 times** the rate in Delaware: 9.2%

**Place of birth for foreign-born population**

| Europe | Asia | Africa | Oceania | Latin America | Nor |
|---|---|---|---|---|---|
| 0% | 0% | 4%† | 0% | 96% | |

Show data / Embed

† Margin of error is at least 10 percent of the total value. Take care with this statistic.

**Veteran status**

† Margin of error is at least 10 percent of the total value. Take care with this statistic.

## 6.7%

Population with veteran status

a little less than the rate in New Castle County: 7.1%

about three-quarters of the rate in Delaware: 9%

**Veterans by wartime service**

| WWII | Korea | Vietnam | Gulf (1990s) | Gulf (2001-) |
|------|-------|---------|--------------|--------------|
| 0 | 6† | 47† | 5† | 6† |

**138** Total veterans
**126** Male
**12** Female

* Civilian veterans who served during wartime only          Show data / Embed

Interact with charts and statistics for margins of error and additional information.

**Citation:** U.S. Census Bureau (2018). *American Community Survey 5-year estimates.* Retrieved from *Census Reporter Profile page for Census Tract 155.02, New Castle, DE* <http://censusreporter.org/profiles/14000US10003015502-census-tract-15502-new-castle-de/>

▤ Census terms & definitions            💬 Help & feedback            ✉ Email us
⧉ Census Reporter on GitHub            🐦 @CensusReporter            t Census Reporter blog

# Exhibit C



## Census Tract 158.02, New Castle, DE

Census Tract in: New Castle County, DE, Delaware, United States

**2,266**
Population

**1.4** square miles

**1,666** people per square mile

Census data: ACS 2018 5-year unless noted

**Find data for this place**  Search by table or column name...

Interact with charts and statistics for margins of error and additional information.



### Demographics

† Margin of error is at least 10 percent of the total value. Take care with this statistic.

### Age

**35.3**
Median age

about 90 percent of the figure in New Castle County: 38.1

about 90 percent of the figure in Delaware: 40.2

**Population by age range**

15%† · 15%† · 15%† · 12%† · 11% · 17%† · 9%† · 6%† · 1%

0-9 · 10-19 · 20-29 · 30-39 · 40-49 · 50-59 · 60-69 · 70-79

Show data / Embed

**Population by age category**

Under 18
18 to 64
65 over

**18 to 64**
**62%**

Show data / Embed

† Margin of error is at least 10 percent of the total value. Take care with this statistic.

### Sex

Male
Female

**Male**
**51%**

Show data / Embed

### Race & Ethnicity

41%† · 16%† · 0% · 1%† · 0% · 0% · 4%†

White · Black · Native · Asian · Islander · Other · Two+

* Hispanic includes respondents of any race. Other categories are non-Hispanic.

Show data / Embed

### Economics







† Margin of error is at least 10 percent of the total value. Take care with this statistic.

**Marital status**

Married 45%
Married / Single
*Universe: Population 15 years and over
Show data / Embed

**Marital status, by sex**

| | Never married | Now married | Divorced | Widowed |
|---|---|---|---|---|
| Male | 42%† | 42%† | 11%† | 6%† |
| Female | 26%† | 47% | 12%† | |

Show data / Embed

**Fertility**

**12.7%**
Women 15-50 who gave birth during past year

more than double the rate in New Castle County: 3.9%

more than double the rate in Delaware: 4.7%

**Women who gave birth during past year, by age group**

| 15-19 | 20-24 | 25-29 | 30-35 | 35-39 | 40-44 |
|---|---|---|---|---|---|
| 9%† | 0% | 0% | 55%† | 0% | 0% |

*Universe: Women 15 to 50 years
Show data / Embed

---



**Housing**

**Units & Occupancy**

**792**
Number of housing units

New Castle County: 222,146
Delaware: 428,251

**Occupied vs. Vacant**

Occupied 88%
Occupied / Vacant
Show data / Embed

**Ownership of occupied units**

Owner occupied 76%
Owner occupied / Renter occupied
Show data / Embed

**Types of structure**

Single unit 98%
Single unit / Multi-unit / Mobile home / Boat, RV, van, etc.
Show data / Embed

**Year moved in, by percentage of population**

| Before 1990 | 1990s | 2000s | 2010-2014 | 2015-2016 | Since |
|---|---|---|---|---|---|
| 13%† | 9%† | 42%† | 23%† | 13%† | |

Show data / Embed

**Value**

**$135,600**
Median value of owner-occupied housing units

about half the amount in New Castle County: $254,500

about half the amount in Delaware: $244,700

**Value of owner-occupied housing units**

| Under $100K | $100K - $200K | $200K - $300K | $300K - $400K | $400K - $500K | $500K - $1M | Ov |
|---|---|---|---|---|---|---|
| 18%† | 75%† | 6%† | 1%† | 0% | 0% | |

Show data / Embed

† Margin of error is at least 10 percent of the total value. Take care with this statistic.



### Geographical mobility

## 9%
Moved since previous year

**about two-thirds** of the rate in New Castle County: 12.8%

**about two-thirds** of the rate in Delaware: 12.7%

† Margin of error is at least 10 percent of the total value. Take care with this statistic.

**Population migration since previous year**

91%

7%† — Same house year ago / From same county

1%† — From different county

0%† — From different state

1% — From a...

Show data / Embed



## Social

### Educational attainment

## 76.8%
High school grad or higher

**about 80 percent** of the rate in New Castle County: 91.5%

**about 90 percent** of the rate in Delaware: 89.8%

## 6.9%
Bachelor's degree or higher

**about one-fifth** of the rate in New Castle County: 35.9%

**about one-fifth** of the rate in Delaware: 31.4%

† Margin of error is at least 10 percent of the total value. Take care with this statistic.

**Population by minimum level of education**

54%†

23%† — No degree

16%† — Some college

4%† — Bachelor's

3%† — Post-gra...

High school

* Universe: Population 25 years and over

Show data / Embed

### Language

## N/A
Persons with language other than English spoken at home

† Margin of error is at least 10 percent of the total value. Take care with this statistic.

**Language at home, children 5-17**

Spanish
**52%†**

English only / Spanish / Indo-European / Asian/Islander / Other

Show data / Embed

**Language at home, adults 18+**

English only
**72%**

English only / Spanish / Indo-European / Asian/Islander / Other

Show data / Embed

### Place of birth

## 12.2%
Foreign-born population

**about 10 percent higher** than the rate in New Castle County: 11.1%

**about 1.3 times** the rate in Delaware: 9.2%

† Margin of error is at least 10 percent of the total value. Take care with this statistic.

**Place of birth for foreign-born population**

91%†

5%† — Europe

4%† — Asia

0% — Africa

0% — Oceania

Latin America

No...

Show data / Embed

https://censusreporter.org/profiles/14000US10003015802-census-tract-15802-new-castle-de/    4/10/2020

**Veteran status**

† Margin of error is at least 10 percent of the total value. Take care with this statistic.

**6.2%**
Population with veteran status

about 90 percent of the rate in New Castle County: 7.1%

about two-thirds of the rate in Delaware: 9%

**Veterans by wartime service**

43†

| WWII | Korea | Vietnam | Gulf (1990s) | Gulf (2001-) |
|------|-------|---------|--------------|--------------|
| 0 | 0 | | 3† | 6† |

* Civilian veterans who served during wartime only          Show data / Embed

**102** Total veterans
**102** Male
**N/A** Female

Interact with charts and statistics for margins of error and additional information.

**Citation:** U.S. Census Bureau (2018). *American Community Survey 5-year estimates.* Retrieved from *Census Reporter Profile page for Census Tract 158.02, New Castle, DE* <http://censusreporter.org/profiles/14000US10003015802-census-tract-15802-new-castle-de/>

⊞ Census terms & definitions          ✎ Help & feedback          ✉ Email us
⌂ Census Reporter on GitHub          🐦 @CensusReporter          t Census Reporter blog

# Exhibit D

 Census Reporter

Search for places, tables, topics, or glossaries     Search



# New Castle County, DE

County in: Delaware, United States

## 558,753
Population

**426.3** square miles

**1,310.6** people per square mile

Census data: ACS 2019 1-year unless noted

Leaflet | © Mapbox © OpenStreetMap

**Find data for this place**     Search by table or column name...

Hover for margins of error and contextual data.

| Demographics | Age |
|---|---|

## Age

### 39.1
Median age

**a little less** than the figure in Delaware: 41.4

**about the same as** the figure in United States: 38.5

**Population by age range**



11%  13%  13%  13%  13%  13%  12%  7%

0-9  10-19  20-29  30-39  40-49  50-59  60-69  70-79

Show data / Embed

**Population by age category**



18 to 64
**63%**

Under 18     18 to 64
65 and
over

Show data / Embed

† Margin of error is at least 10 percent of the total value. Take care with this statistic.

## Sex



Female

**52%**

## Race & Ethnicity



White  25%  0%†  5%  0%†  0%†  3%†  10%

White  Black  Native  Asian  Islander  Other  Two+  Hispa

8/6/2021, 11:12 AM

Appx245

New Castle County, DE - Profile data - Census Reporter

https://censusreporter.org/profiles/05000US10003-new-castle-county-de/



Male    Female

Show data / Embed

* Hispanic includes respondents of any race. Other categories are non-Hispanic.

Show data / Embed

---

## Economics

† Margin of error is at least 10 percent of the total value. Take care with this statistic.

### Income

**$39,576**

Per capita income

**about 10 percent higher** than the amount in Delaware: $36,858

**about 10 percent higher** than the amount in United States: $35,672

**$76,328**

Median household income

**about 10 percent higher** than the amount in Delaware: $70,176

**about 20 percent higher** than the amount in United States: $65,712

Household income



31%  32%  27%  10%†

Under $50K | $50K - $100K | $100K - $200K | Over $200K

Show data / Embed

---

† Margin of error is at least 10 percent of the total value. Take care with this statistic.

### Poverty

**10.1%**

Persons below poverty line

**about 90 percent** of the rate in Delaware: 11.3% †

**about 80 percent** of the rate in United States: 12.3%



Children (Under 18)

Poverty
Non-poverty

Poverty
**12%†**

Seniors (65 and over)

Poverty
Non-poverty

Poverty
**7%†**

Show data / Embed      Show data / Embed

---

† Margin of error is at least 10 percent of the total value. Take care with this statistic.

### Transportation to work

**26.6** minutes

Mean travel time to work

**about the same as** the figure in Delaware: 26.7

**a little less** than the figure in United States: 27.6

Means of transportation to work



79%

9%†  3%†  0%†  3%†  1%†  5%†

Drove alone | Carpooled | Public transit | Bicycle | Walked | Other | Worked home

* Universe: Workers 16 years and over

Show data / Embed

---

## Families

### Households

8/6/2021, 11:12 AM

Appx246

New Castle County, DE - Profile data - Census Reporter                    https://censusreporter.org/profiles/05000US10003-new-castle-county-de/

Case 1:20-cv-01108-MN    Document 29-4    Filed 08/12/21    Page 4 of 7 PageID #: 286

**211,592**

Number of households

**Delaware:** 376,239
**United States:** 122,802,852

**2.6**

Persons per household

**about the same as** the figure in Delaware: 2.5

**about the same as** the figure in United States: 2.6

**Population by household type**



57%

Married couples

Married couples
Male householder
Female householder
Non-family

Show data / Embed

---

**Marital status**

† Margin of error is at least 10 percent of the total value. Take care with this statistic.



Married **46%**

Married        Single

* Universe: Population 15 years and over

Show data / Embed

**Marital status, by sex**



| | Never married | | Now married | | Divorced | | Widowed | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Male 40% | Female 35% | Male 48% | Female 43% | Male 10%† | Female 13%† | Male 2%† | Fem 9% |

Show data / Embed

---

**Fertility**

† Margin of error is at least 10 percent of the total value. Take care with this statistic.

**3.7%**

Women 15-50 who gave birth during past year

**a little less** than the rate in Delaware: 4% †

**about three-quarters** of the rate in United States: 5%

**Women who gave birth during past year, by age group**



| 15-19 | 20-24 | 25-29 | 30-35 | 35-39 | 40-44 | 45-50 |
| --- | --- | --- | --- | --- | --- | --- |
| 0% | 4%† | 9%† | 7%† | 4%† | 0%† | 1%† |

* Universe: Women 15 to 50 years

Show data / Embed

---

**Housing**

**Units & Occupancy**

**225,246**

Number of housing units

**Delaware:** 443,764
**United States:** 139,686,209

**Occupied vs. Vacant**

Occupied **94%**

Occupied
Vacant

**Ownership of occupied units**



Owner occupied **66%**

Owner occupied
Renter occupied

Show data / Embed

**Types of structure**

**Year moved in, by percentage of population**

| Before 1990 | 1990s | 2000s | 2010-2014 | 2015-2016 | Since 20 |
| --- | --- | --- | --- | --- | --- |
| 11% | 13% | 23% | 18%† | 12%† | 22% |

Appx247

New Castle County, DE - Profile data - Census Reporter          https://censusreporter.org/profiles/05000US10003-new-castle-county-de/



Single unit
Multi-unit
Mobile home
Boat, RV, van,
etc.

Show data / Embed                                          Show data / Embed

**Value**

† Margin of error is at least 10 percent of the total value. Take care with this statistic.

# $272,600

Median value of owner-occupied housing units

**a little higher** than the amount in Delaware: $261,700

**about 10 percent higher** than the amount in United States: $240,500

Value of owner-occupied housing units



Show data / Embed

**Geographical mobility**

† Margin of error is at least 10 percent of the total value. Take care with this statistic.

# 12.9%

Moved since previous year

**a little higher** than the rate in Delaware: 12.6%

**a little less** than the rate in United States: 13.7%

Population migration since previous year



Show data / Embed

**Social**

† Margin of error is at least 10 percent of the total value. Take care with this statistic.

**Educational attainment**

# 91.5%

High school grad or higher

**about the same as** the rate in Delaware: 90.3%

**a little higher** than the rate in United States: 88.6%

# 36.8%

Bachelor's degree or higher

**about 10 percent higher** than the rate in Delaware: 33.2%

**about 10 percent higher** than the rate in United States: 33.1%

Population by minimum level of education



* Universe: Population 25 years and over  Show data / Embed

**Language**

Appx248

# N/A

Persons with language other than English spoken at home

* ACS 2019 5-year data



**Language at home, children 5-17**

English only 84%

**Language at home, adults 18+**

English only
Spanish
Indo-European
Asian/Islander
Other

English only 85%

English only
Spanish
Indo-European
Asian/Islander
Other

Show data / Embed                    Show data / Embed

---

† Margin of error is at least 10 percent of the total value. Take care with this statistic.

## Place of birth

# 11.9%

Foreign-born population

**about 20 percent higher** than the rate in Delaware: 10%

**about 90 percent** of the rate in United States: 13.7%

**Place of birth for foreign-born population**



| Europe | Asia | Africa | Oceania | Latin America | North Am |
| 9% | 40% | 12%† | 0%† | 38% | 1%† |

* ACS 2019 5-year data                    Show data / Embed

---

† Margin of error is at least 10 percent of the total value. Take care with this statistic.

## Veteran status

# 7%

Population with veteran status

**about 80 percent** of the rate in Delaware: 8.9%

**about the same as** the rate in United States: 6.9%

**Veterans by wartime service**



**30,653** Total veterans
**27,845** Male
**2,808** Female

| WWII | Korea | Vietnam | Gulf (1990s) | Gulf (2001-) |
| 603† | 1,823† | 12,215† | 6,328† | 4,593† |

* Civilian veterans who served during wartime only

Show data / Embed

---

Hover for margins of error and contextual data.

---

*This profile displays data from more than one ACS release. Charts not derived from ACS 2019 1-year data are noted with an *.*

Citation: U.S. Census Bureau (2019). *American Community Survey 1-year estimates.* Retrieved from *Census Reporter Profile page for New Castle County, DE* <http://censusreporter.org/profiles/05000US10003-new-castle-county-de/>

Citation: U.S. Census Bureau (2019). *American Community Survey 5-year estimates.* Retrieved from *Census Reporter Profile page for New Castle County, DE* <http://censusreporter.org/profiles/05000US10003-new-castle-county-de/>

---

Learn about the Census                    Census terms & definitions                    Help & feedback

About Census Reporter                    @CensusReporter                    Census Reporter on GitHub

https://censusreporter.org/profiles/05000US10003-new-castle-county-de/

Census Reporter is a free, open-source project. Your donations help us add new data to the site and keep it running.

Appx250

# Exhibit E

| | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | County of Current Reside Population 1 Year and Over | |
| | Current Residence State Code | Current Residence FIPS County Code | Residence 1 Year Ago State/U.S. Island Area/Foreign Region Code | Residence 1 Year Ago FIPS County Code | State of Current Residence | County of Current Residence | Estimate | MOE |
| 5 | 001 | 069 | 010 | 001 | Alabama | Houston County | 102,842 | 132 |
| 6 | 002 | 016 | 010 | 001 | Alaska | Aleutians West Census Area | 5,738 | 11 |
| 7 | 002 | 020 | 010 | 001 | Alaska | Anchorage Municipality | 294,072 | 458 |
| 8 | 002 | 122 | 010 | 001 | Alaska | Kenai Peninsula Borough | 57,391 | 134 |
| 9 | 004 | 003 | 010 | 001 | Arizona | Cochise County | 124,989 | 243 |
| 10 | 004 | 013 | 010 | 001 | Arizona | Maricopa County | 4,104,987 | 1,606 |
| 11 | 006 | 023 | 010 | 001 | California | Humboldt County | 133,896 | 258 |
| 12 | 006 | 029 | 010 | 001 | California | Kern County | 866,521 | 854 |
| 13 | 006 | 037 | 010 | 001 | California | Los Angeles County | 9,988,370 | 2,053 |
| 14 | 006 | 053 | 010 | 001 | California | Monterey County | 427,228 | 512 |
| 15 | 006 | 059 | 010 | 001 | California | Orange County | 3,120,911 | 1,259 |
| 16 | 006 | 077 | 010 | 001 | California | San Joaquin County | 714,614 | 672 |
| 17 | 006 | 085 | 010 | 001 | California | Santa Clara County | 1,888,980 | 995 |
| 18 | 006 | 095 | 010 | 001 | California | Solano County | 430,673 | 401 |
| 19 | 006 | 097 | 010 | 001 | California | Sonoma County | 496,452 | 497 |
| 20 | 010 | 003 | 010 | 001 | Delaware | New Castle County | 549,015 | 599 |
| 21 | 010 | 005 | 010 | 001 | Delaware | Sussex County | 213,390 | 232 |
| 22 | 011 | 001 | 010 | 001 | District of Columbia | District of Columbia | 662,540 | 676 |

633 1Estimate is movers within the United States for counties or county equivalents in the United States or movers within Puerto Rico for municipios.

634 2Includes Puerto Rico, U.S. Island Areas, and Foreign Countries.

635 Blank cells represent estimates that are not available.

636 MOE - Margin of error based on 90% confidence interval.

637 Source: U.S. Census Bureau, 2014-2018 American Community Survey. For more information, see https://census.gov/acs.

| | Nonmovers | | Movers within United States or Puerto Rico[1] | | Movers within Same County | | Movers from Different County, Same State | | Movers from Different State | |
|---|---|---|---|---|---|---|---|---|---|---|
| nce | Estimate | MOE | Estimate | MOE | Estimate | MOE | Estimate | MOE | Estimate | MOE |
| 5 | 89,695 | 718 | 12,990 | 708 | 8,100 | 597 | 2,202 | 278 | 2,688 | 315 |
| 6 | 4,486 | 137 | 984 | 96 | 453 | 91 | 117 | 30 | 414 | 87 |
| 7 | 235,360 | 2,908 | 55,824 | 2,846 | 37,387 | 2,563 | 5,503 | 1,026 | 12,934 | 1,064 |
| 8 | 47,233 | 801 | 9,948 | 822 | 6,209 | 812 | 1,740 | 295 | 1,999 | 429 |
| 9 | 102,396 | 1,618 | 21,183 | 1,510 | 9,447 | 1,283 | 5,222 | 763 | 6,514 | 688 |
| 10 | 3,383,797 | 9,897 | 693,913 | 9,933 | 512,911 | 8,522 | 37,636 | 2,458 | 143,366 | 4,091 |
| 11 | 107,453 | 1,714 | 26,129 | 1,732 | 16,833 | 1,372 | 6,393 | 735 | 2,903 | 626 |
| 12 | 728,051 | 4,949 | 134,483 | 4,934 | 95,480 | 4,754 | 29,470 | 2,298 | 9,533 | 1,088 |
| 13 | 8,849,567 | 12,645 | 1,062,322 | 12,145 | 851,215 | 11,114 | 110,785 | 2,870 | 100,322 | 3,419 |
| 14 | 375,489 | 2,708 | 48,309 | 2,558 | 25,894 | 2,062 | 13,969 | 1,219 | 8,446 | 708 |
| 15 | 2,709,673 | 8,434 | 384,462 | 7,892 | 273,160 | 6,228 | 76,610 | 2,484 | 34,692 | 2,276 |
| 16 | 605,571 | 4,020 | 105,506 | 3,880 | 70,228 | 3,357 | 28,241 | 2,337 | 7,037 | 967 |
| 17 | 1,613,420 | 5,624 | 239,430 | 5,701 | 159,741 | 5,091 | 45,287 | 2,146 | 34,402 | 1,801 |
| 18 | 363,892 | 2,532 | 64,052 | 2,343 | 36,254 | 2,003 | 21,134 | 1,454 | 6,664 | 800 |
| 19 | 428,638 | 2,498 | 65,829 | 2,536 | 42,027 | 2,189 | 17,299 | 1,487 | 6,503 | 912 |
| 20 | 475,584 | 3,076 | 69,709 | 3,087 | 44,496 | 2,363 | 3,996 | 828 | 21,217 | 1,753 |
| 21 | 189,698 | 1,535 | 23,147 | 1,533 | 11,969 | 1,246 | 2,417 | 438 | 8,761 | 807 |
| 22 | 530,353 | 3,189 | 121,387 | 3,044 | 66,665 | 2,555 | | | 54,722 | 1,970 |
| 632 | | | | | | | | | | |
| 633 | | | | | | | | | | |
| 634 | | | | | | | | | | |
| 635 | | | | | | | | | | |
| 636 | | | | | | | | | | |
| 637 | | | | | | | | | | |

| | S | T | U | V | W | X | Y | Z | AA |
|---|---|---|---|---|---|---|---|---|---|
| 2 | | | | | County of Residence 1 Year Ago | | | | |
| 3 | Movers from Abroad[2] | | State/U.S. Island Area/Foreign Region of Residence 1 Year Ago | County of Residence 1 Year Ago | Population 1 Year and Over | | Nonmovers | | Movers wi... Sta... |
| 4 | Estimate | MOE | | | Estimate | MOE | Estimate | MOE | Estimate |
| 5 | 157 | 46 | Delaware | Kent County | 167,848 | 1,453 | 145,740 | 1,648 | 22,068 |
| 6 | 268 | 133 | Delaware | Kent County | 167,848 | 1,453 | 145,740 | 1,648 | 22,068 |
| 7 | 2,888 | 604 | Delaware | Kent County | 167,848 | 1,453 | 145,740 | 1,648 | 22,068 |
| 8 | 210 | 120 | Delaware | Kent County | 167,848 | 1,453 | 145,740 | 1,648 | 22,068 |
| 9 | 1,410 | 355 | Delaware | Kent County | 167,848 | 1,453 | 145,740 | 1,648 | 22,068 |
| 10 | 27,277 | 1,776 | Delaware | Kent County | 167,848 | 1,453 | 145,740 | 1,648 | 22,068 |
| 11 | 314 | 141 | Delaware | Kent County | 167,848 | 1,453 | 145,740 | 1,648 | 22,068 |
| 12 | 3,987 | 755 | Delaware | Kent County | 167,848 | 1,453 | 145,740 | 1,648 | 22,068 |
| 13 | 76,481 | 2,672 | Delaware | Kent County | 167,848 | 1,453 | 145,740 | 1,648 | 22,068 |
| 14 | 3,430 | 534 | Delaware | Kent County | 167,848 | 1,453 | 145,740 | 1,648 | 22,068 |
| 15 | 26,776 | 2,058 | Delaware | Kent County | 167,848 | 1,453 | 145,740 | 1,648 | 22,068 |
| 16 | 3,537 | 678 | Delaware | Kent County | 167,848 | 1,453 | 145,740 | 1,648 | 22,068 |
| 17 | 36,130 | 2,020 | Delaware | Kent County | 167,848 | 1,453 | 145,740 | 1,648 | 22,068 |
| 18 | 2,729 | 643 | Delaware | Kent County | 167,848 | 1,453 | 145,740 | 1,648 | 22,068 |
| 19 | 1,985 | 403 | Delaware | Kent County | 167,848 | 1,453 | 145,740 | 1,648 | 22,068 |
| 20 | 3,722 | 561 | Delaware | Kent County | 167,848 | 1,453 | 145,740 | 1,648 | 22,068 |
| 21 | 545 | 157 | Delaware | Kent County | 167,848 | 1,453 | 145,740 | 1,648 | 22,068 |
| 22 | 10,800 | 994 | Delaware | Kent County | 167,848 | 1,453 | 145,740 | 1,648 | 22,068 |
| 632 | | | | | | | | | |
| 633 | | | | | | | | | |
| 634 | | | | | | | | | |
| 635 | | | | | | | | | |
| 636 | | | | | | | | | |
| 637 | | | | | | | | | |

| | AB | AC | AD | AE | AF | AG | AH | AI | AJ | AK | AL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | | | | | | | | | | | |
| 3 | thin United tes | Movers within Same County | | Movers to Different County, Same State | | Movers to Different State | | Movers to Puerto Rico | | Movers in County-to-County Flow | |
| 4 | MOE | Estimate | MOE | Estimate | MOE | Estimate | MOE | Estimate | MOE | Estimate | MOE |
| 5 | 1,776 | 13,947 | 1,427 | 4,007 | 832 | 4,114 | 527 | 40 | 63 | 9 | 13 |
| 6 | 1,776 | 13,947 | 1,427 | 4,007 | 832 | 4,114 | 527 | 40 | 63 | 7 | 8 |
| 7 | 1,776 | 13,947 | 1,427 | 4,007 | 832 | 4,114 | 527 | 40 | 63 | 17 | 27 |
| 8 | 1,776 | 13,947 | 1,427 | 4,007 | 832 | 4,114 | 527 | 40 | 63 | 11 | 17 |
| 9 | 1,776 | 13,947 | 1,427 | 4,007 | 832 | 4,114 | 527 | 40 | 63 | 9 | 15 |
| 10 | 1,776 | 13,947 | 1,427 | 4,007 | 832 | 4,114 | 527 | 40 | 63 | 25 | 28 |
| 11 | 1,776 | 13,947 | 1,427 | 4,007 | 832 | 4,114 | 527 | 40 | 63 | 11 | 15 |
| 12 | 1,776 | 13,947 | 1,427 | 4,007 | 832 | 4,114 | 527 | 40 | 63 | 17 | 20 |
| 13 | 1,776 | 13,947 | 1,427 | 4,007 | 832 | 4,114 | 527 | 40 | 63 | 45 | 45 |
| 14 | 1,776 | 13,947 | 1,427 | 4,007 | 832 | 4,114 | 527 | 40 | 63 | 32 | 45 |
| 15 | 1,776 | 13,947 | 1,427 | 4,007 | 832 | 4,114 | 527 | 40 | 63 | 26 | 27 |
| 16 | 1,776 | 13,947 | 1,427 | 4,007 | 832 | 4,114 | 527 | 40 | 63 | 16 | 25 |
| 17 | 1,776 | 13,947 | 1,427 | 4,007 | 832 | 4,114 | 527 | 40 | 63 | 18 | 27 |
| 18 | 1,776 | 13,947 | 1,427 | 4,007 | 832 | 4,114 | 527 | 40 | 63 | 6 | 13 |
| 19 | 1,776 | 13,947 | 1,427 | 4,007 | 832 | 4,114 | 527 | 40 | 63 | 23 | 36 |
| 20 | 1,776 | 13,947 | 1,427 | 4,007 | 832 | 4,114 | 527 | 40 | 63 | 2,888 | 775 |
| 21 | 1,776 | 13,947 | 1,427 | 4,007 | 832 | 4,114 | 527 | 40 | 63 | 1,119 | 314 |
| 22 | 1,776 | 13,947 | 1,427 | 4,007 | 832 | 4,114 | 527 | 40 | 63 | 6 | 9 |
| 632 | | | | | | | | | | | |
| 633 | | | | | | | | | | | |
| 634 | | | | | | | | | | | |
| 635 | | | | | | | | | | | |
| 636 | | | | | | | | | | | |
| 637 | | | | | | | | | | | |

APPEAL

# U.S. District Court
## District of Delaware (Wilmington)
## CIVIL DOCKET FOR CASE #: 1:20-cv-01108-SB

Baker v. Croda Inc.
Assigned to: Judge Stephanos Bibas
Case in other court: Third Circuit, 21-03360
Cause: 28:1331 Fed. Question: Personal Injury

Date Filed: 08/24/2020
Jury Demand: Plaintiff
Nature of Suit: 360 P.I.: Other
Jurisdiction: Federal Question

| Date Filed | # | Docket Text |
|---|---|---|
| 08/13/2021 | 30 | ORAL ORDER re 29 Letter - Having reviewed the parties' letter and the Court's prior ruling denying without prejudice 7 defendant's motion to dismiss, IT IS HEREBY ORDERED that should defendant wish to renew its motion to dismiss, on or before 8/27/2021, it shall file a motion stating such or shall file a new motion. ORDERED by Judge Maryellen Noreika on 8/13/2021. (dlw) (Entered: 08/13/2021) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 02/17/2022 11:29:20 | | |
| **PACER Login:** | Gran0_559 | **Client Code:** 29050 |
| **Description:** | Docket Report | **Search Criteria:** 1:20-cv-01108-SB Start date: 8/13/2021 End date: 8/13/2021 Starting with document: 30 Ending with document: 30 |
| **Billable Pages:** | 1 | **Cost:** 0.10 |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CATHERINE BAKER, individually and on behalf of all others similarly situated | ) ) | |
| | ) | |
| Plaintiff, | ) | Case No. 20-cv-01108-MN |
| | ) | |
| v. | ) | |
| | ) | |
| CRODA INC. f/k/a CRODA, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S RENEWED MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendant Croda Inc. f/k/a Croda, Inc. ("Defendant") moves to dismiss Plaintiff Catherine Baker's Class Action Complaint. The grounds for this motion are set forth more fully in the accompanying opening brief.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

OF COUNSEL:

Stephen Swedlow
Athena Dalton
QUINN EMANUEL URQUHART & SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
(312) 705-7400
stephenswedlow@quinnemanuel.com
athenadalton@quinnemanuel.com

August 27, 2021

*/s/ Kenneth J. Nachbar*
Kenneth J. Nachbar (#2067)
Miranda N. Gilbert (#6662)
1201 North Market Street
Wilmington, DE 19801
(302) 658-9200
knachbar@morrisnichols.com
mgilbert@morrisnichols.com
*Attorneys for Defendant*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CATHERINE BAKER, individually and on behalf of all others similarly situated | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 20-cv-01108-MN |
| CRODA INC. f/k/a CRODA, INC., | ) ) | |
| Defendant. | ) ) | |

## CRODA INC.'S RENEWED MOTION TO DISMISS

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Kenneth J. Nachbar (# 2067)
Miranda N. Gilbert (# 6662)
1201 N. Market Street
Wilmington, DE  19801
(302) 658-9200
knachbar@morrisnichols.com
mgilbert@morrisnichols.com
*Attorneys for Defendant*

OF COUNSEL:

Stephen A. Swedlow
Athena D. Dalton
QUINN EMANUEL URQUHART &
  SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL  60606
(312) 705-7400
stephenswedlow@quinnemanuel.com
athenadalton@quinnemanuel.com

August 27, 2021

# TABLE OF CONTENTS

**Page**

I. Introduction ................................................................................................1

II. Summary of Argument ..............................................................................1

III. FACTUAL BACKGROUND .....................................................................2

IV. LEGAL STANDARD .................................................................................4

V. ARGUMENT ..............................................................................................4

    A.    Delaware Law Governs Plaintiff's Claims ....................................4

    B.    Under Delaware Law, All Claims Should Be Dismissed
    Under Rule 12(b)(6) For Failure to State a Claim ......................6

            1.    All Claims Should Be Dismissed Under Rule
                   12(b)(6) Because Plaintiff Has Not Alleged a
                   Compensable Injury ............................................................8

            2.    Plaintiff Has Not Stated a Medical
                   Monitoring Claim .............................................................10

            3.    Plaintiff Has Not Stated a Claim for Ultrahazardous
                   Activity .............................................................................13

            4.    Plaintiff Has Not Stated a Claim for Public
                   Nuisance and Lacks Standing to Bring the Claim. ..........14

            5.    Plaintiff Has Not Stated a Claim for
                   Private Nuisance ...............................................................15

            6.    Plaintiff Has Not Stated a Claim for Negligence ............17

            7.    Plaintiff Has Not Stated a Claim for Willful or
                   Wanton Conduct ...............................................................17

    C.    Under New Jersey Law, All Claims Should Be Dismissed
    Under Rule 12(b)(6) For Failure to State a Claim ....................18

VI. CONCLUSION ..........................................................................................20

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adkins v. Rumsfeld*,
   450 F. Supp. 2d 440 (D. Del. 2006)........................................................................4

*Alderman v. Clean Earth*,
   2007 WL 1334565 (Del. Super. Ct. Apr. 30, 2007),
   *aff'd sub nom.*, 954 A.2d 909 (Del. 2008) .............................................................11

*Am. Elec. Power Co. v. Connecticut*,
   564 U.S. 410 (2011)...............................................................................................15

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)................................................................................... 15, 17-18

*Ayers v. Jackson Twp.*,
   525 A.2d 287 (N.J. 1987)................................................................................ 19-20

*Baldonado v. Avrinmeritor, Inc.*,
   2014 WL 2116112 (D. Del. May 20, 2014).........................................................18

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007).....................................................................................4, 13, 15

*Brzoska v. Olson*,
   668 A.2d 1355 (Del. 1995) .......................................................................... 1, 9-11

*Cropper v. Rego Distribution Ctr., Inc.*,
   542 F. Supp. 1142 (D. Del. 1982)........................................................................13

*Dayton v. Collison*,
   2019 WL 4668157 (Del. Super. Ct. Sept. 24, 2019)...................................... 14-15

*Hartig Drug Co. v. Senju Pharm. Co.*,
   836 F.3d 261 (3d Cir. 2016).................................................................................4

*Hudson v. Old Guard Ins. Co.*,
   3 A.3d 246 (Del. 2010) ........................................................................................17

*In re Asbestos Litig.*,
   1994 WL 16805917 (Del. Super. Ct. Aug. 5, 1994)..............................................9

*M.G. ex rel. K.G. v. A.I. Dupont Hosp. for Children*,
   393 F. App'x 884 (3d Cir. 2010) .................................................................. 2, 10-12

*Martinez v. E.I. DuPont De Nemours & Co.*,
    82 A.3d 1, 33 (Del. Super. Ct. 2012), *aff'd*, 86 A.3d 1102 (Del. 2014) ....................................5

*Mauro v. Raymark Indus., Inc.*,
    561 A.2d 257 (N.J. 1989)..................................................................................................19

*Mergenthaler v. Asbestos Corp. of Am.*,
    480 A.2d 647 (Del. 1984) .................................................................................... 1, 9-11

*Metro-N. Commuter R. Co. v. Buckley*,
    521 U.S. 424 (1997)........................................................................................ 7, 18-19

*Millison v. E.I. du Pont de Nemours & Co.*,
    545 A.2d 213 (N.J. Super. Ct. App. Div. 1988),
    *aff'd*, 558 A.2d 461 (N.J. 1989)....................................................................................19

*Moore v. Sharp Gas Inc.*,
    1992 WL 147930 (D. Del. June 11, 1992)............................................................13

*Nieves v. Off. of the Pub. Def.*,
    230 A.3d 227 (2020) ...........................................................................................20

*Patton v. Simone*,
    1993 WL 144361 (Del. Super. Ct. Mar. 9, 1993) ...............................................14

*Rainer v. Union Carbide Corp.*,
    402 F.3d 608 (6th Cir. 2005) .................................................................................7

*Reilly v. Ceridian Corp.*,
    664 F.3d 38 (3d Cir. 2011).....................................................................................15

*Sinclair v. Merck & Co.*,
    948 A.2d 587 (N.J. 2008)...................................................................................19

*State ex rel. Jennings v. Purdue Pharma L.P.*,
    2019 WL 446382 (Del. Super. Ct. Feb. 4, 2019)...................................................14

*Theer v. Philip Carey Co.*,
    628 A.2d 724 (1993)...........................................................................................20

*Thomas-Fish v. Avborne Accessory Grp., Inc.*,
    2019 WL 3281273 (D. Del. July 19, 2019) .........................................................17

*Tumlinson v. Advanced Micro Devices, Inc.*,
    2010 WL 8250792 (Del. Super. Ct. July 23, 2010) ..........................................4-5

*United States v. Anderson*,
    669 A.2d 73 (Del. 1995) .......................................................................................9

- iii -

*Willon v. Werb*,
　2019 WL 6705003 (Del. Super. Ct. Dec. 9, 2019) ...................................................17

**Rules and Statutes**

7 *Del. C.* § 6003(a)(1) .................................................................................................16

Federal Employers' Liability Act ............................................................................ 18-19

Federal Rule of Civil Procedure Rule 12(b)(6)................................................... *passim*

Appx262

I.      INTRODUCTION

The Court should dismiss this suit under Rule 12(b)(6) because Plaintiff fails to state a claim. Plaintiff alleges that she and members of the putative class are facing an increased risk of developing a serious disease in the future as a result of decades of alleged potential exposure to trace amounts of ethylene oxide emitted from Croda's facility.  Neither Plaintiff nor any member of the class has actually been diagnosed with an illness related to the claimed exposure—the only injury alleged in the Complaint is an "increased risk" of developing a disease in the future.  In fact, any person with any actual illness associated with exposure is specifically excluded from the class. Every claim asserted in this action fails because the alleged increased risk of developing a disease in the future is not cognizable as pled in Delaware.  Although Delaware law governs here, Plaintiff's claims also fail under New Jersey law, which does not allow medical monitoring based on the allegations pled here.  Therefore, all of Plaintiff's claims must be dismissed under Rule 12(b)(6).

II.     SUMMARY OF ARGUMENT

1.      The Court should dismiss the claims under Rule 12(b)(6) because each one fails to state a claim upon which relief can be granted.

2.      Delaware law controls here because Delaware has the most significant relationship to the parties, claims, and injuries alleged in this litigation.

3.      All of Plaintiff's claims fail under Delaware law because they do not state a compensable injury.  Each claim states that Plaintiff and class members have an increased risk of developing an illness in the future.  However, in Delaware, increased risk without any underlying physical injury is not a cognizable harm.  *See Brzoska v. Olson*, 668 A.2d 1355, 1362 (Del. 1995); *see also Nutt v. A.C.&S., Inc.*, 466 A.2d 18, 26 (Del. Super. Ct. 1983), *aff'd sub nom. Mergenthaler v. Asbestos Corp. of Am.*, 480 A.2d 647 (Del. 1984).  Since neither Plaintiff nor any class member

Appx263

has alleged a present physical injury or current diagnosis, they have failed to allege a cognizable harm. As a result, each claim must be dismissed under Rule 12(b)(6).

4.      Plaintiff's medical monitoring claim fails for the independent reason that Delaware does not recognize medical monitoring as an independent cause of action. *See M.G. ex rel. K.G. v. A.I. Dupont Hosp. for Children*, 393 F. App'x 884, 892 n.6 (3d Cir. 2010) (applying Delaware law).

5.      Plaintiff's other claims fail for the independent reason that Plaintiff has not included sufficient detail to support a cause of action. Plaintiff has merely recited the bare elements of her claims, without sufficient supporting detail to plead her claims.

6.      Finally, Plaintiff's public and private nuisance claims fail because Plaintiff lacks standing to bring these claims.

7.      In the alternative, if the Court finds that New Jersey law applies, Plaintiff's claims fail under that standard as well. New Jersey law requires that plaintiffs seeking recovery for medical monitoring must demonstrate that it is "more likely than not" that they will develop a disease as a result of their exposure, which plaintiffs cannot do.

8.      For these reasons, the Court should dismiss all claims for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).

III.    FACTUAL BACKGROUND

Croda Inc. has produced various specialty chemicals at the Atlas Point complex in New Castle, Delaware since 2006. Prior to Croda's ownership, the Atlas Point facility was operated by Uniqema. (Compl. (D.I. 1) ¶¶ 33-34). Plaintiff and the members of the putative class seek to recover for alleged exposure to ethylene oxide emitted from the Atlas Point facility from 1988 to the present. (*Id.* ¶¶ 63-64). Over the course of more than three decades, the Atlas Point facility

operated within legal and regulatory limits, emitting trace levels of ethylene oxide that were within

state and federal emissions limits.  From 1988 to 2015, the Complaint alleges only minor, technical

violations of state regulations, including "failure to record emissions," failure to maintain "best

management practices," and "failure to make timely permit applications." (Compl. ¶¶ 33-35).  The

Complaint also notes that a "documented unpermitted release" of ethylene oxide occurred in 2008.

(*Id.* ¶ 34).  Croda—and Uniquema—used a legal chemical in their operations for decades and

complied with extensive state and federal regulations over this period.

In 2015, Croda—with all the required state and county approvals—started construction on

a new bio-ethylene oxide plant that would be the first facility in the United States to produce

ethylene oxide using biofuels.  Croda uses the ethylene oxide it produces onsite to make other

products at the Atlas Point facility.  Croda completed construction of its bio-ethylene oxide plant

in late 2018.  Shortly after the plant opened, a gasket installed by a subcontractor that did not meet

the engineering specifications failed, resulting in an ethylene oxide leak.  Croda and first

responders sprayed thousands of gallons of deluge water into the air to quickly dissolve the leaked

ethylene oxide.  (Compl. ¶ 37).

Catherine Baker (a Delaware resident) filed suit against Croda (a Delaware corporation) in

the District of Delaware, alleging that the ethylene oxide emitted from Croda's New Castle facility

caused her and members of the putative class to be at an increased risk of developing cancer or

another illness in the future.  (Compl. ¶¶ 62-63).  In her Complaint, Plaintiff alleges that the

emission of ethylene oxide from the Atlas Point facility has exposed her and Class Members to a

hazardous chemical which increases their risk of developing certain diseases.  (Compl. ¶¶ 1-6).

Plaintiff has asserted claims for ultrahazardous activity/strict liability, public nuisance, private

nuisance, negligence, willful and wanton conduct, and medical monitoring.  (Compl. ¶¶ 73-123).

The Class Members include only persons who have not been diagnosed with cancer or an illness, disease, or disease process of the kind caused by ethylene oxide.  (Compl. ¶ 63).  However, Plaintiff asserts that both she and Class Members "are at an increased risk of illness and disease," and seek the cost of a medical monitoring program to detect for early signs or symptoms of disease as a remedy for each asserted claim.  (Compl. ¶¶ 68).

IV.    LEGAL STANDARD

To withstand a motion to dismiss under Rule 12(b)(6), the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  In deciding a Rule 12(b)(6) motion, a court "must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complaint's claims are based upon these documents." *Hartig Drug Co. v. Senju Pharm. Co.*, 836 F.3d 261, 273 (3d Cir. 2016) (internal citations and quotations omitted).  "The purpose of a motion to dismiss is to test the sufficiency of a complaint." *Adkins v. Rumsfeld*, 450 F. Supp. 2d 440, 444 (D. Del. 2006).  "When considering a motion to dismiss, a court must accept as true all allegations in the complaint and must draw all reasonable factual inferences in the light most favorable to the plaintiff." *Id.*  The Court should dismiss where it appears "that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief." *Id.*

V.    ARGUMENT

A.    Delaware Law Governs Plaintiff's Claims

Delaware law governs the claims at issue in this suit.  Delaware courts apply the "most significant relationship" test to determine which state's laws govern in a tort case. *Tumlinson v. Advanced Micro Devices, Inc.*, 2010 WL 8250792, at *1 (Del. Super. Ct. July 23, 2010) *citing Clinton v. Enterprise Rent–A–Car Co.*, 977 A.2d 892, 895 (Del. 2009).  The contacts that are taken into account include:  "(a) the place where the injury occurred, (b) the place where the conduct

- 4 -

causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." *Tumlinson*, 2010 WL 8250792 at *2. "For personal injury actions, the law of the state where the injury occurred is presumed to control." *Id.*

Here, the alleged injury occurred in Delaware, when individuals who lived near Croda's New Castle facility were allegedly exposed to gas emitted from the Atlas Point plant. The conduct "causing the injury" similarly occurred in New Castle, Delaware. (*See* Compl. ¶¶ 43-45). The plaintiffs in this case are all current or former Delaware residents. (*Id*. ¶ 62). Croda is a Delaware corporation and operates the Atlas Point facility in New Castle. (*Id*. ¶ 9). Finally, to the extent that Croda and class members have any relationship, it is centered in Delaware, where the Atlas Point facility is located and where each purported member of the class experienced that alleged exposure. (*Id.*) Every factor indicates that Delaware law should apply in this case.

In similar cases, Delaware courts have found that the location of the alleged toxic tort is dispositive. For example, in *Tumlinson*, the Delaware court found that a Texas citizen's suit against a manufacturing company for exposure to toxic chemicals at the company's Texas facility should be governed by Texas law, even though the defendant was incorporated in Delaware. 2010 WL 8250792, at *3. Similarly, in *Martinez v. E.I. DuPont De Nemours & Co.*, the court found that the laws of Argentina governed a claim brought by the widow of a worker who died as a result of asbestos exposure at a textile plant in Argentina, even though the parent company was incorporated in Delaware. 82 A.3d 1, 33 (Del. Super. Ct. 2012), *aff'd*, 86 A.3d 1102 (Del. 2014).

Plaintiff's only argument to the contrary rests on the assumption that since Croda's headquarters are located in New Jersey, the "conduct causing the injury" must have occurred in New Jersey. (*See*, *e.g.*, D.I. 14 at 10). This baseless assumption is not sufficient to justify applying

the law of New Jersey to a case involving Delaware residents suing a Delaware corporation for the operations of a Delaware manufacturing facility.  The alleged harm involves the manufacture of ethylene oxide, which occurs only in Delaware, not New Jersey.  (Compl. ¶ 27).  The Complaint identifies a series of events that occurred in Delaware—not New Jersey.  (*Id.* ¶¶ 16, 27, 34-37).  Delaware has the most significant relationship to this case.  Therefore, Delaware law governs.

> B.    Under Delaware Law, All Claims Should Be Dismissed Under Rule
>        12(b)(6) For Failure to State a Claim

All of Plaintiff's claims should be dismissed under Rule 12(b)(6) because the complaint fails to allege a single claim upon which relief can be granted.  Plaintiff's Complaint fails to plead any viable claim because it does not allege that Plaintiff or any Class Member has been diagnosed with cancer or any other illness as a result of living near the Atlas Point facility.  In fact, the putative class specifically excludes "all persons who have been currently been diagnosed with cancer or illness, disease or disease process of the kind caused by EtO[.]"  (Compl. ¶ 63).  Injury is a threshold requirement for each claim, and Plaintiff's only alleged injury is that "Plaintiff and Class Members suffer a present increased risk of illness, disease and disease processes."  (Compl. ¶ 6).  Fear of developing a disease in the future—without any present, underlying physical injury— is not a compensable injury under Delaware law.  Plaintiff also asserts a claim for medical monitoring (Compl. ¶¶ 118-123), which is not recognized as an independent cause of action under Delaware law.  All of Plaintiff's other claims seek an award of the cost of a medical monitoring program as a remedy for various common law torts (Compl. ¶¶ 73-117), which also fail as a matter of law because a plaintiff cannot recover for the costs of medical monitoring without proof of a physical injury under Delaware law.  Notably, <u>no member of the class,</u> by definition, has been diagnosed with cancer or any other illness related to ethylene oxide exposure.  (Compl. ¶¶ 62-63).

As set forth below, Delaware courts do not recognize medical monitoring as either (1) an independent cause of action or (2) a remedy for individuals who have been exposed to hazardous chemicals but have not diagnosed with a related disease.  Even in the few of cases outside of Delaware where damages for medical monitoring have been awarded, those courts "have suggested, or imposed, special limitations on that remedy." *Metro-N. Commuter R. Co. v. Buckley*, 521 U.S. 424, 441 (1997).  Allowing class claims for alleged exposure to legal emissions of regulated chemicals could overwhelm the courts with claims for minimal, speculative future harm. "Based upon the average American's exposure to chemically processed foods, toxic fumes, genetically modified fruits and vegetables, mercury-laden fish, and hormonally treated chicken and beef, this might encompass a very large percentage of the total population." *Rainer v. Union Carbide Corp.*, 402 F.3d 608, 621 (6th Cir. 2005).  The potential tort claims for alleged exposure to minor amounts of legally discharged chemicals "can be perceived to lie around every corner in the modern industrialized world, and their effects on risk levels are at best speculative, the potential tort claims involved are inherently limitless and endless." *Id*.  As a result, placing legal limitations on claims for medical monitoring based upon alleged exposure to potentially hazardous (yet permitted) substances is necessary even in jurisdictions where such a claim may exist.

"[T]ens of millions of individuals may have suffered exposure to substances that might justify some form of substance-exposure-related medical monitoring." *Metro-N. Commuter R. Co. v. Buckley*, 521 U.S. 424, 442 (1997).  "[T]hat fact, along with uncertainty as to the amount of liability, could threaten both a 'flood' of less important cases (potentially absorbing resources better left available to those more seriously harmed[,]) and the systemic harms that can accompany "unlimited and unpredictable liability" (for example, vast testing liability adversely affecting the allocation of scarce medical resources).  *Id.*  Delaware courts have addressed these concerns by

only awarding medical monitoring damages as a remedy where the plaintiff has already suffered an independent, significant harm such as being diagnosed with cancer, or suffering a serious injury as a result of medical malpractice.

As explained in more detail below, each of Plaintiff's claims fail under Delaware law.  Any class member who develops cancer or another illness allegedly related to ethylene oxide exposure may bring claims for their injury.  However, allowing claims *en masse* to a class of healthy persons who do not claim any injury beyond background exposure to legally-emitted ethylene oxide is not permitted under Delaware law.

1.    All Claims Should Be Dismissed Under Rule 12(b)(6) Because Plaintiff Has Not Alleged a Compensable Injury

Plaintiff has not adequately pled claims for strict liability, public nuisance, private nuisance, negligence, willful and wanton conduct, or medical monitoring because she has not alleged any compensable injury.  Plaintiff alleges that as a result of Defendant's negligence, "Plaintiff and the Class Members presently suffer, and will continue to suffer, a present increased risk of illness, disease or disease process, and the resulting present need to incur the cost of reasonably medically necessary diagnostic testing for the early detection of illness."  (Compl. ¶ 80 (Claim 1)).  Plaintiff makes nearly-identical allegations of harm for all other claims.  (*See* Compl. ¶¶ 89, 109, 109, and 177 (identical language for Claims 2 through 5) and Compl. ¶ 121 ("Plaintiff and Class Members have a significantly increased risk of contracting several different types of cancer") (Claim 6)).  In short, the only harm alleged in the Complaint is the "present increased risk of disease."  In Delaware, the increased risk of developing a disease as a result of exposure to a toxin, without more, is not a compensable injury.

The lack of a compensable injury is fatal to Plaintiff's claims.  To prevail on any tort claim, a plaintiff must demonstrate "that the plaintiff has in fact suffered harm of a kind legally

compensable by damages." *In re Asbestos Litig.*, 1994 WL 16805917, at *1 (Del. Super. Ct. Aug. 5, 1994); *see also Brzoska v. Olson*, 668 A.2d 1355, 1362 (Del. 1995) (where plaintiffs "sustained no physical injury . . . they could not recover under a negligence theory."). Fear of developing a disease in the future "without a demonstrable physical change in bodily condition . . . is not compensable." *Nutt v. A.C.&S., Inc.*, 466 A.2d 18, 26 (Del. Super. Ct. 1983), *aff'd sub nom. Mergenthaler v. Asbestos Corp. of Am.*, 480 A.2d 647 (Del. 1984). Similarly, under Delaware law, where "plaintiffs do not have a compensable physical injury, plaintiffs may not recover for the expenses of medical surveillance." *In re Asbestos Litig.*, 1994 WL 16805917, at *2 (denying a request for medical surveillance damages in a negligence case). The Delaware Supreme Court has held that the requirement of a *present* physical injury is an approach adopted to prevent recovery on "speculative claims for future harm." *United States v. Anderson*, 669 A.2d 73, 77 (Del. 1995). "The requirement of a preceding physical injury prohibits plaintiffs from claiming that exposure to toxic substances, for instance, has created an increased risk of harm not yet manifested in a physical disease." *Id.* Thus, Delaware courts have determined—as a matter of public policy—that a present physical injury is a mandatory prerequisite to recovering damages for increased risk of developing a disease in the future.

Plaintiff cannot recover medical surveillance damages by simply alleging that she may have been exposed to a toxin. To recover any damages, she must allege "present physical injury." Plaintiff has not stated a claim upon which relief can be granted because she has not alleged a physical injury resulting from her exposure to ethylene oxide. The Delaware Supreme Court squarely addressed this issue when it affirmed the dismissal of a putative class action seeking medical monitoring for alleged asbestos exposure. *Mergenthaler v. Asbestos Corp. of Am.,* 480 A.2d 647, 649 (Del. 1984). In *Mergenthaler*, the Delaware Supreme Court held that "a claim for

the expenses of medically required surveillance and related mental anguish . . . fails to state a claim upon which relief can be granted *where there is no present physical injury*." *Id.* Where plaintiffs "concede that they have suffered no physical injury due to wrongful [toxin] exposure . . . that concession is dispositive." *Id.* at 651.

Delaware courts have continued to apply the *Mergenthaler* holding that physical injury is required to recover medical surveillance damages.  In *Brzoska v. Olsen*, a class of plaintiffs sued after learning that they had been treated by a dentist who was infected with HIV.  1994 WL 233866, at *1 (Del. Super. Ct. May 2, 1994), *aff'd in part, rev'd in part sub nom. Brzoska v. Olson*, 668 A.2d 1355 (Del. 1995).  Although no plaintiff had tested positive for HIV, plaintiffs sued to recover for the costs of medical monitoring under several theories of liability, including negligence.  *Id.* at *2.  The court ruled that plaintiffs could not "maintain their cause of action for mental distress resulting from fear of disease," and dismissed their negligence claim.  *Id.* at *1.

Plaintiff's class definition specifically excludes anyone that has cancer or another illness as a result of exposure to ethylene oxide.  Plaintiff alleges only that class members are at an increased risk of developing cancer in the future.  (Compl.  ¶¶ 54, 57).  For this reason, every claim brought by Plaintiff and the putative class must be dismissed.  "[D]amages for claims of . . . fear of contracting a disease [ ] are recoverable only if the underlying physical injury is shown," *Brzoska*, 668 A.2d at 1362, *citing Mergenthaler*, 480 A.2d at 651.  Plaintiffs have failed to plead (and have specifically disclaimed by its pleading) any cognizable injury for any of their claims.

### 2.    Plaintiff Has Not Stated a Medical Monitoring Claim

As described above, Plaintiff's medical monitoring claim fails because Plaintiff has not pled a cognizable injury.  Plaintiff's medical monitoring claim should also be dismissed for the independent reason that "[t]he Delaware Supreme Court has not recognized a cause of action for medical monitoring."  *M.G. ex rel. K.G. v. A.I. Dupont Hosp. for Children*, 393 F. App'x 884, 892

n.6 (3d Cir. 2010) (applying Delaware law).  However, even if the Delaware Supreme Court were to recognize a claim for independent medical monitoring, Plaintiff's claim, as pled, would still fail.

Medical monitoring is not an independent cause of action in Delaware.  In the few cases where medical monitoring costs were awarded, they were as part of a *remedy* for an independent tort (most often medical malpractice which resulted in a significant physical injury).  Delaware courts have never "explicitly recognized medical monitoring as a legally cognizable cause of action."  *M.G. ex rel. K.G.*, 393 F. App'x at 891.  A Court sitting in diversity must "predict how the state's supreme court would resolve the issue" by evaluating the decisions of that state's intermediate courts.  *Id.*  Neither the Delaware Supreme Court nor any lower court has ever recognized medical monitoring as an independent tort.  *See Brzoska,* 668 A.2d at 1359 (dismissing a negligence claim that sought medical surveillance as a remedy); *see also Mergenthaler,* 480 A.2d at 651 (denying recovery of medical monitoring expenses where plaintiffs had failed to demonstrate a physical injury); *Alderman v. Clean Earth*, 2007 WL 1334565, at *1 (Del. Super. Ct. Apr. 30, 2007), *aff'd sub nom. Alderman v. Clean Earth, Inc.*, 954 A.2d 909 (Del. 2008) (striking a medical monitoring damages theory where residents claimed they were exposed to contaminated water and sought medical monitoring expenses as damages for their negligence and strict liability claims).

The Third Circuit recently considered whether "the Delaware Supreme Court [would] recognize a medical monitoring cause of action," and "declin[ed] to predict whether the Delaware Supreme Court might acknowledge some variant of a medical monitoring claim."  *M.G. ex rel. K.G.*, 393 F. App'x at 892–93.  In that case, the Third Circuit reversed the District Court's ruling that Plaintiff had a claim for medical monitoring.  In the underlying case, the plaintiff had undergone surgery to implant a "proven and admittedly hazardous" heart stent which "significantly

increased [her] risk of [ ] side effects." 393 F. App'x 884, 891 (3d Cir. 2010). Plaintiff submitted a variety of claims, including an independent claim for medical monitoring. *Id.* Although a Pennsylvania District Court predicted that the Delaware Supreme Court would permit a claim for medical monitoring, the Third Circuit reversed. *Id.* In its opinion, the Third Circuit stated that "[n]either the District Court nor Plaintiff points to any case in this Circuit, let alone in Delaware, in which a free-standing medical monitoring claim has been allowed to proceed although the plaintiff has not demonstrated significant exposure to a toxic (poisonous) or proven hazardous substance." *Id.* at 892. The Court concluded that "the District Court's prediction that the Delaware Supreme Court would permit a claim for medical monitoring on this record requires several 'leaps' from the current state of the law, generally, let alone Delaware law." *Id.* The Third Circuit in the *DuPont Hospital* case ultimately declined to consider whether the Delaware Supreme Court would recognize a medical monitoring claim, finding instead that since the Plaintiff was unable to establish the necessary elements to make out a claim, there was no need to reach the issue of medical monitoring damages. *Id.* at 893.

While Delaware cases recognize medical monitoring as a potential remedy for an independent tort (in inapplicable circumstances where plaintiff has also alleged present physical injury), it has not been recognized as a cognizable standalone claim in Delaware. It also would not make sense to recognize medical monitoring as an independent claim without actual injury when the underlying claims fail under Delaware law for the same lack of actual injury.

- 12 -

### 3. Plaintiff Has Not Stated a Claim for Ultrahazardous Activity

Plaintiff's claim for strict liability/ultrahazardous activity should be dismissed because Plaintiff has failed to state a claim.[1]  "Delaware courts have been hesitant to extend [the] application" of strict liability.  *Cropper*, 542 F. Supp. at 1149.  It is not sufficient to allege that a defendant carried out an activity with risks or "failed to exercise the degree of care commensurate with the danger[] or the activity."  *Id.*  Delaware courts have applied the strict liability theory narrowly—e.g., to "an activity being conducted in an inappropriate location" or an activity "totally lacking in social utility."  *Id.* (collecting cases).  Delaware courts consider the following factors in determining whether an activity is ultrahazardous:

> (a)    existence of a high degree of risk of some harm to the person, land or chattel of others;
>
> (b)    likelihood that the harm that results from it will be great;
>
> (c)    inability to eliminate the risk by the exercise of reasonable care;
>
> (d)    extent to which the activity is not a matter of common usage;
>
> (e)    inappropriateness of the activity to the place where it is carried on; and
>
> (f)    extent to which its value to the community is outweighed by its dangerous attributes.

*Moore v. Sharp Gas Inc.*, 1992 WL 147930, at *2 (D. Del. June 11, 1992) (holding that the transmission of natural gas via pipe is not an ultrahazardous activity).  Plaintiff's strict liability claim includes only "formulaic recitation[s] of the elements of a cause of action" which are insufficient to state a claim under Rule 12(b)(6).  *Twombly*, 550 U.S. at 555.  Plaintiff asserts that

---

[1]    As discussed in Section V.B.1, Plaintiff's ultrahazardous activity claim also fails because Plaintiff has not alleged a cognizable harm.  A plaintiff seeking compensation under an abnormally dangerous activity theory must demonstrate harm.  *Cropper v. Rego Distribution Ctr., Inc.*, 542 F. Supp. 1142, 1149 (D. Del. 1982).  Fear of developing a disease in the future, without any current physical injury, is not a cognizable harm in Delaware.

Croda's ethylene oxide facility is "exceedingly dangerous" and "offer[s] little or no value to the surrounding community." (Compl. ¶ 78). However, Plaintiff has not pled that the manufacturing and use of ethylene oxide "is not a matter of common usage" or that "its value to the community is outweighed by its dangerous attributes." Plaintiff has not included facts supporting her bare claim that the risk of ethylene oxide emissions "cannot be eliminated" or that processing ethylene oxide "cannot be made safe by the exercise of the utmost care." (Compl. ¶¶ 75-76). These are the sort of formulaic allegations which do not meet the pleading standard of Rule 12(b)(6). Plaintiff's ultrahazardous activity claim should be dismissed.

> 4.    Plaintiff Has Not Stated a Claim for Public Nuisance and
>       Lacks Standing to Bring the Claim.

Plaintiff has not stated a claim for public nuisance and lacks standing to assert it. In Delaware, "a public nuisance is [an] activity which produces some tangible injury to neighboring property or persons coming into contact with it and which a court considers to be objectionable under the circumstances." *State ex rel. Jennings v. Purdue Pharma L.P.*, 2019 WL 446382, at *11 (Del. Super. Ct. Feb. 4, 2019). "To have standing to sue on a public nuisance claim, an individual must (1) be capable of recovering damages and (2) have standing to sue as a representative of the public." *Dayton v. Collison*, 2019 WL 4668157, at *3 (Del. Super. Ct. Sept. 24, 2019). A private plaintiff only has standing to bring a public nuisance claim where he or she "suffered injury of a kind different from that suffered by other members of the public." *Patton v. Simone*, 1993 WL 144361, at *1 (Del. Super. Ct. Mar. 9, 1993). Here, Plaintiff has not alleged that she has "standing to sue as a representative of the public," or that she has "suffered a harm of a kind different from that suffered by other members of the public." Rather, Plaintiff alleges that she—and thousands of others who have lived in census tracts 10003015400, 10003105502, and 10003015802 over several decades—were exposed to ethylene oxide sometime between 1988 and the present.

- 14 -

(Compl. ¶ 50-51 ("Plaintiff and Class Members have lived within the vicinity of the Atlas Point plant . . . [and] have inhaled toxic EtO")).  Having failed to plead a special or different kind of injury from other residents, Plaintiff lacks standing to bring a public nuisance claim.

Plaintiff has also failed to plead a viable public nuisance claim under Delaware law.[2] Plaintiff has not alleged a "tangible injury" as required by Delaware law, asserting only an unspecified, future risk of developing a disease.  *See Reilly v. Ceridian Corp.*, 664 F.3d 38, 42 (3d Cir. 2011) (an indefinite risk of future harm is not a cognizable injury injury).  Plaintiff has also failed to meet the pleading standards for a public nuisance claim with her bare recitation of the elements of the claim.  Where, as here, a plaintiff relies on "[t[hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," she has failed to state a claim.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Twombly,* 550 U.S. at 555.

## 5.    Plaintiff Has Not Stated a Claim for Private Nuisance

The Complaint does not state a claim for private nuisance.  Delaware recognizes claims for "a nontrespassory invasion of another's interest in the private use and enjoyment of their land." *Dayton v. Collison*, 2019 WL 4668157, at *5 (Del. Super. Ct. Sept. 24, 2019).  The Complaint alleges that the Atlas Point facility "constitutes an absolute nuisance or nuisance per se." (Compl. ¶ 95).  A claim for nuisance *per se* exists where there has been "1) intentional, unreasonable interference with property rights of another; 2) interference resulting from an abnormally hazardous activity conducted on the person's property; and 3) interference in violation of a statute intended to protect public safety."  *Dayton*, 2019 WL 4668157 at *5.

---

[2]  To the extent that Plaintiff asserts a public nuisance claim under federal common law, that claim is preempted by the Clean Air Act.  *See Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 429 (2011).

Plaintiff has not made out a claim for "intentional, unreasonable . . . interference in violation of a statute intended to protect public safety." The Complaint itself describes the ethylene oxide leak as an "accident," and not an intentional act. (Compl. ¶ 8). Further, all of the statutes that Plaintiff identifies to support its negligence *per se* claim were allegedly violated during the November 25, 2018 accident described in the Complaint. (Compl. ¶¶ 37-39, describing the use of deluge water to disperse leaked ethylene oxide and a subsequent settlement agreement relating to 7 *Del. C.* § 6003(a)(1)). However, Plaintiff asserts that as a result of operating the Atlas Point facility, "EtO ***continuously*** invaded and contaminated the areas surrounding Plaintiff's and Class Members' residences." (Compl. ¶ 101). The statutory violations Plaintiff lists in paragraphs 96, 97, and 98 of the Complaint—including the unpermitted use of deluge water to disperse ethylene oxide in the air—all relate to the November 25, 2018 accident.[3] (Compl. ¶¶ 37-39, describing the use of deluge water to disperse leaked ethylene oxide and a subsequent settlement agreement relating to 7 *Del. C.* § 6003(a)(1)). By definition, a single incident is not a "continuous" invasion of Plaintiff's property.

The Complaint also fails to provide any support for its bare allegation that the operation of the Atlas Point facility was unreasonable. As explained in Section IV.B.3, *supra*, the Complaint has not established the operation of the Atlas Point facility is an "abnormally hazardous activity," and failed to weigh any purportedly dangerous attributes of the facility against its value to the community. The nuisance per se claim has not been properly stated and should be dismissed.

---

[3]   To the extent that Plaintiff states a nuisance *per se* claim at all, it applies only to persons who lived near the Atlas Point facility on November 25, 2018.

Appx278

6.    <u>Plaintiff Has Not Stated a Claim for Negligence</u>

Plaintiff has not pled a claim for negligence.  Under Delaware law, a claim for negligence

must plead (1) duty, (2) breach, (3) causation, and (4) damages.  *Hudson v. Old Guard Ins. Co.*, 3

A.3d 246, 250 (Del. 2010).  As discussed in Section IV.B.1, Plaintiff has failed to allege a

cognizable harm.  In addition, Plaintiff has also failed to meet the pleading standard under *Iqbal*

for the elements of duty, breach, and proximate causation.  A "formulaic recitation of the elements

of a cause of action" is not sufficient to make out a claim.  *Iqbal*, 556 U.S. at 678.

Here, Plaintiff asserts generally that Croda "owed Plaintiff and Class Members a duty to

operate its Atlas Point plant in a manner which would not cause Plaintiff and Class Members injury

or harm," then asserts that this duty was breached by emitting ethylene oxide into the air and failing

"to take steps to minimize or eliminate the release of EtO."  (Compl. ¶¶ 104-05).  This cursory

recitation of the duty and breach elements for negligence is not sufficient to state a claim, and

Plaintiff's negligence claim should be dismissed.

7.    Plaintiff Has Not Stated a Claim for Willful or Wanton
Conduct

Plaintiff has not made out a claim for willful or wanton conduct.  In Delaware, "[t]here is

a clear distinction between wantonness and negligence, as the former term includes the elements

of consciousness of one's conduct, realization of the probability of injury to another, and disregard

of the consequences."  *Willon v. Werb*, 2019 WL 6705003, at *2 (Del. Super. Ct. Dec. 9, 2019).

"In other words, a willful or wanton disregard of a plaintiff's rights—as opposed to negligence—

reflects a 'conscious indifference' or an 'I-don't-care attitude.'"  *Id.*  Allegations that a defendant

acted willfully or with malice must be pled with "factual averments descriptive of conduct" and

not merely recitations of the elements of a claim.  *Thomas-Fish v. Avborne Accessory Grp., Inc.*,

2019 WL 3281273, at *4 (D. Del. July 19, 2019).

- 17 -

Here, Plaintiff has not alleged that Croda acted "with malice" and has not listed any facts demonstrating willful or wanton conduct.  Rather, Plaintiff states only that Croda "owed a duty to refrain from willful and wanton conduct," and that Plaintiff and the class "suffer, and will continue to suffer, a present increased risk of illness" as a "direct and proximate result of Defendant's willful, wanton, reckless and outrageous conduct."  (Compl. ¶¶ 111, 117).  "[T]his was 'precisely the type of vague, 'defendant-unlawfully-harmed me accusation' that the Supreme Court [ ] condemned' in *Iqbal*."  *Baldonado v. Avrinmeritor, Inc.*, 2014 WL 2116112, at *5 (D. Del. May 20, 2014).  Plaintiff's claim for willful and wanton conduct is insufficient and should therefore be dismissed.

      C.      Under New Jersey Law, All Claims Should Be Dismissed Under
             Rule 12(b)(6) For Failure to State a Claim

New Jersey law has recognized medical monitoring, but only in narrow, confined circumstances.  The facts of this case as pled do not meet the narrowly-defined circumstance where a claim for monitoring of increased future risk could be actionable.  As explained in *Metro-N. Commuter R. Co. v. Buckley* "the cases authorizing recovery for medical monitoring in the absence of physical injury do not endorse a full-blown, traditional tort law cause of action for lump-sum damages . . . [r]ather, those courts, while recognizing that medical monitoring costs can amount to a harm that justifies a tort remedy, have suggested, or imposed, special limitations on that remedy." 521 U.S. 424, 440–41 (1997) (applying federal law under the Federal Employers' Liability Act). These limitations are justified in light of the millions of potential claims which "could threaten

both a 'flood' of less important cases . . . and the systemic harms that can accompany 'unlimited and unpredictable liability.'" *Id.*[4]

Under New Jersey law, "recovery for enhanced risk of contracting a disease due to exposure to toxic chemicals is only possible upon proof that it is ***more probable than not*** (the rule of reasonable medical probability) that the plaintiff will develop the disease." *Sinclair v. Merck & Co.*, 948 A.2d 587, 592 (N.J. 2008) (emphasis added); *see also Mauro v. Raymark Indus., Inc.*, 561 A.2d 257, 260 (N.J. 1989) ("[U]nless plaintiff [can] prove to a reasonable degree of medical certainty that cancer was more probable than not, his claim for increased risk of cancer could not be sustained."). This requirement imposes a necessary limitation on pleading claims for increased risk of harm from exposure to a substance.

As the New Jersey Appellate Court recently explained, "[i]n *Ayers*, the [New Jersey Supreme] court refused to recognize a cause of action for the unquantified enhanced risk of a disease which had not occurred, and which might never occur. In so holding, the court distinguished the problem of quantifying an injury for an intentional tort representing an injury that had occurred and could be proven at trial." *Millison v. E.I. du Pont de Nemours & Co.*, 545 A.2d 213, 222 (N.J. Super. Ct. App. Div. 1988), *aff'd*, 558 A.2d 461 (N.J. 1989) (citing *Ayers v. Jackson Twp.*, 525 A.2d 287, 309 (N.J. 1987)).

*Ayers v. Township of Jackson* is one of the few examples in New Jersey where a court allowed medical monitoring claims to go forward after a group of individuals sued for exposure to toxic chemicals released from a government-owned facility. New Jersey courts have noted that the 1987 *Ayers* ruling involved "a unique damage claim [which] must be understood in its narrow

---

[4]   The Supreme Court in *Metro-North Commuter Rail Co.* declined to award medical monitoring or emotional distress damages to a railroad worker who had been exposed to asbestos at work but who had not yet developed any disease. *Id.* at 444.

context." *Nieves v. Off. of the Pub. Def.*, 230 A.3d 227, 236 (2020). In subsequent New Jersey Supreme Court decisions interpreting *Ayers,* the court noted that the remedy in *Ayers* "is not easily invoked" and "was fashioned to help a class or persons who had been victimized by a public entity." *Theer v. Philip Carey Co.*, 628 A.2d 724, 732-33 (1993) (noting that it "becomes increasingly difficult for courts and juries to determine the direct correlation between the indirect exposure and any future risk of injury" for a plaintiff who "has not suffered from any injury or condition relating to [ ] exposure"). The *Ayers* decision "has not been expanded upon since," and the New Jersey Supreme Court "decline[d] the invitation to" expand its holding to other factual contexts in a 2020 decision. *Nieves*, 230 A.3d at 236. Here, Plaintiff has not alleged (and cannot reasonably allege for this class) that it is "more probable than not" that she and class members will develop a disease as a result of exposure to ethylene oxide. Therefore, Plaintiffs' claims must be dismissed under New Jersey law.

VI.    <u>CONCLUSION</u>

     For these reasons, Croda respectfully requests that the Court enter an order to dismiss this case for failure to state a claim under Rule 12(b)(6).

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Kenneth J. Nachbar*
Kenneth J. Nachbar (# 2067)
Miranda N. Gilbert (# 6662)
1201 N. Market Street
Wilmington, DE  19801
(302) 658-9200
knachbar@morrisnichols.com
mgilbert@morrisnichols.com
   *Attorneys for Defendant*

OF COUNSEL:

Stephen A. Swedlow
Athena D. Dalton
QUINN EMANUEL URQUHART &
 SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL  60606
(312) 705-7400
stephenswedlow@quinnemanuel.com
athenadalton@quinnemanuel.com

August 27, 2021

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| CATHERINE BAKER, individually and on behalf of all others similarly situated | ) ) ) | |
| Plaintiff, | ) | Case No. 20-cv-01108-MN |
| v. | ) ) | |
| CRODA INC. f/k/a CRODA, INC., | ) ) | |
| Defendant. | ) | |

**STIPULATION AND [PROPOSED] ORDER SETTING BRIEFING SCHEDULE IN CONNECTION WITH DEFENDANT'S RENEWED MOTION TO DISMISS**

WHEREAS, on August 27, 2021, Defendant, Croda Inc. ("Defendant") filed its Renewed Motion to Dismiss (the "Motion");

IT IS HEREBY STIPULATED AND AGREED, by and among Plaintiff and Defendant, subject to the approval of the Court, that the time for Plaintiff to respond to Defendant's Motion is extended to and including October 1, 2021; and

IT IS FURTHER HEREBY STIPULATED AND AGREED, by and among Plaintiff and Defendant, subject to the approval of the Court, that the time for Defendant to reply to Plaintiff's response is extended to and including October 22, 2021.

GRANT & EISENHOFER P.A.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP


/s/ Kimberly A. Evans
Kimberly A. Evans (#5888)
123 Justison Street
Wilmington, Delaware 19801
(302) 622-7000
kevans@gelaw.com
*Counsel for the Plaintiff and the Putative Class*

/s/ Kenneth J. Nachbar
Kenneth J. Nachbar (# 2067)
Miranda N. Gilbert (#6662)
1201 North Market Street
Wilmington, Delaware 19801
(302) 658-9200
knachbar@morrisnichols.com
mgilbert@morrisnichols.com
*Counsel for Defendant*

Frank Petosa (*Admitted Pro Hac Vice*)
MORGAN & MORGAN,
COMPLEX LITIGATION GROUP
8151 Peters Road Suite 4000
Plantation, FL 33324
(954) 318-0268

Marcio W. Valladares (*Admitted Pro Hac Vice*)
MORGAN & MORGAN,
COMPLEX LITIGATION GROUP
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
(813) 223-5505

Rene F. Rocha (*Admitted Pro Hac Vice*)
MORGAN & MORGAN,
COMPLEX LITIGATION GROUP
3530 Magazine St.
New Orleans, LA 70115
(954) 318-0268
*Counsel for the Plaintiff and the Putative Class*

Stephen A. Swedlow (*Admitted Pro Hac Vice*)
Athena Dalton (*Admitted Pro Hac Vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
(312) 705-7400
stephenswedloe@quinnemanuel.com
athenadalton@quinnemanuel.com
*Counsel for Defendant*

IT IS SO ORDERED this _____ day of September, 2021.

_____

Hon. Maryellen Noreika

Appx285

CM/ECF LIVE - U.S. District Court:ded

**Query     Reports     Utilities     Help     Log Out**

APPEAL

# U.S. District Court
## District of Delaware (Wilmington)
## CIVIL DOCKET FOR CASE #: 1:20-cv-01108-SB

Baker v. Croda Inc.                                         Date Filed: 08/24/2020
Assigned to: Judge Stephanos Bibas                         Jury Demand: Plaintiff
Case in other court: Third Circuit, 21-03360               Nature of Suit: 360 P.I.: Other
Cause: 28:1331 Fed. Question: Personal Injury              Jurisdiction: Federal Question

| Date Filed | # | Docket Text |
|---|---|---|
| 09/03/2021 | | SO ORDERED re 33 Stipulation and Order Setting Briefing Schedule in Connection with Defendant's Renewed Motion to Dismiss (Set Briefing Schedule: re 31 MOTION to Dismiss for Failure to State a Claim - Answering Brief due 10/1/2021. Reply Brief due 10/22/2021). ORDERED by Judge Maryellen Noreika on 9/3/2021. (dlw) (Entered: 09/03/2021) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 12/29/2021 20:52:31 | | | |
| **PACER Login:** | Gran0_559 | **Client Code:** | 29050 |
| **Description:** | Docket Report | **Search Criteria:** | 1:20-cv-01108-SB Start date: 9/3/2021 End date: 9/3/2021 |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |

Appx286

CM/ECF LIVE - U.S. District Court:ded

**Query      Reports      Utilities      Help      Log Out**

APPEAL

# U.S. District Court
## District of Delaware (Wilmington)
## CIVIL DOCKET FOR CASE #: 1:20-cv-01108-SB

Baker v. Croda Inc.                                    Date Filed: 08/24/2020
Assigned to: Judge Stephanos Bibas                     Jury Demand: Plaintiff
Case in other court: Third Circuit, 21-03360           Nature of Suit: 360 P.I.: Other
Cause: 28:1331 Fed. Question: Personal Injury          Jurisdiction: Federal Question

| Date Filed | # | Docket Text |
|---|---|---|
| 09/21/2021 | 34 | ORAL ORDER REFERRING CASE to Magistrate Judge Christopher J. Burke - IT IS HEREBY ORDERED that this case, including the pending 31 Motion to Dismiss, is referred to Magistrate Judge Christopher J. Burke to hear and resolve all pre-trial matters up to and including expert discovery matters (but not including summary judgment motions, Daubert motions, pre-trial motions in limine or the pre-trial conference), subject to 28 U.S.C. § 636(b) and any further Order of the Court. All subsequent filings in this action shall be captioned as follows: Civil Action No. 20-1108-MN-CJB. ORDERED by Judge Maryellen Noreika on 9/21/2021. Motions referred to Christopher J. Burke.(dlw) (Entered: 09/21/2021) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 12/29/2021 20:56:56 | | | |
| **PACER Login:** | Gran0_559 | **Client Code:** | 29050 |
| **Description:** | Docket Report | **Search Criteria:** | 1:20-cv-01108-SB Start date: 9/21/2021 End date: 9/21/2021 Starting with document: 34 Ending with document: 34 |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |

Appx287

# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

|  |  |
|---|---|
| CATHERINE BAKER, individually and on behalf of all others similarly situated,<br><br>     Plaintiff,<br><br>v.<br><br>CRODA INC. f/k/a CRODA, INC.,<br><br>     Defendant. | Case No.:  20-cv-01108-MN |

## ANSWERING BRIEF IN OPPOSITION TO DEFENDANT'S RENEWED MOTION TO DISMISS

Dated:  October 1, 2021

Kelly L. Tucker (#6382)
GRANT & EISENHOFER P.A.
123 Justison Street
Wilmington, Delaware 19801
ktucker@gelaw.com
P: (302) 622-7000
F: (302) 622-7100

T. Michael Morgan*
MORGAN & MORGAN, P.A.
20 N Orange Ave., Suite 1600
Orlando, FL 32801
mmorgan@ForThePeople.com
P: (407) 418-2031
F: (407) 245-3384

Kevin S. Hannon*
MORGAN & MORGAN, COMPLEX
LITIGATION GROUP
1641 N. Downing Street,
Denver, Colorado 80218
khannon@ForThePeople.com
P: (303) 264-1769
F: (303) 264-1795

Marcio W. Valladares*
MORGAN & MORGAN, COMPLEX
LITIGATION GROUP
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
mram@ForThePeople.com
mvalladares@ForThePeople.com
P: (813) 223-5505
F: (813) 223-5402

Rene F. Rocha*
MORGAN & MORGAN, COMPLEX
LITIGATION GROUP
3530 Magazine St.
New Orleans, LA 70115
rrocha@ForThePeople.com
P:  (954) 318-0268
F:  (954) 327-3018

Frank M. Petosa*
MORGAN & MORGAN, COMPLEX
LITIGATION GROUP
8151 Peters Road
Suite 4000
Plantation, FL 33324
fpetosa@ForThePeople.com
P:  (954) 318-0268
F:  (954) 327-3018

*Pro Hac Vice
Attorneys for the Plaintiff and
the Putative Class

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ……………………………………………………………iii

I.    STATEMENT OF THE NATURE AND STAGE OF PROCEEDINGS ..........................1

II.   SUMMARY OF ARGUMENT ...............................................................................1

III.  CONCISE STATEMENT OF FACTS ...............................................................2

IV.   LEGAL STANDARD............................................................................................3

V.    ARGUMENT......................................................................................................4

A.    Defendant's Argument for the Application of Delaware Law is Premature Because Discovery is Needed to Properly Apply the "Most Significant Relationship" Test ........................................................4

B.    The Injury Caused by Exposure to Toxic EtO is a Compensable Injury Under Delaware and New Jersey Law ..........................................6

1.    Plaintiff Alleges a Compensable Injury Under Delaware Law ................................................................................................6

2.    Plaintiff Alleges a Compensable Injury under New Jersey Law ................................................................................................9

C.    Medical Monitoring is a Remedy Under Delaware and New Jersey Law...............9

1.    Medical Monitoring Under Delaware Law...................................9

2.    Medical Monitoring is an Available Remedy Under New Jersey Law ........................................................................................10

3.    Neither Delaware nor New Jersey Law Require Proof of Present Physical Injury to Obtain the Cost of Medical Monitoring as a Remedy ........................................................................................11

D.    Plaintiff Alleges an Ultrahazardous Activity Under Delaware and New Jersey Law ........................................................................................14

E.    Plaintiff Has Standing and Properly Alleges Public Nuisance Under Delaware and New Jersey Law................................................16

F.    Plaintiff Alleges Private Nuisance Under Delaware and New Jersey Law ........................................................................................17

i

      1.      Private Nuisance Under Delaware Law ......................................................17

      2.      Private Nuisance Under New Jersey Law...................................................18

  G.    Plaintiff Alleges Negligence Under Delaware and New Jersey
      Law .............................................................................................................18

  H.    Plaintiff Alleges Willful or Wanton Conduct Under Delaware and
      New Jersey Law .........................................................................................19

      1.      Willful or Wanton Conduct Under Delaware Law ...................................19

      2.      Willful or Wanton Conduct Under New Jersey Law................................20

VI.    CONCLUSION.............................................................................................................20

Appx291

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## Cases

*Alderman v. Clean Earth, Inc.*,
   No. 04C-06-181, 2007 WL 1930664 (Del. Super. Ct. June 26, 2007) .....................................9

*Arçelik A.Ş. v. E. I. du Pont de Nemours & Co.*,
   No. 15-CV-961, 2018 WL 1401327 (D. Del. Mar. 20, 2018) ...................................................5

*In re Asbestos Litig.*,
   No.'s 87C-09-24, 90C-09-79, 88C-09-7B,1994, 1994 WL 16805917 (Del.
   Super. Ct. Aug. 5, 1994) ......................................................................................................8, 9

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ..................................................................................................................3

*Associated Metals & Minerals Corp. v. Dixon Chem. & Research, Inc.*,
   197 A.2d 569 (N.J. Super. Ct. App. Div. 1963) ......................................................................18

*Ayers v. Jackson Tp.*,
   525 A.2d 287 (N.J. 1987) .......................................................................................9, 10, 11, 12

*Ayers v. Jackson Tp.*,
   461 A.2d 184 (N.J. Super. 1983) ....................................................................................7, 8, 11

*Bahrle v. Exxon Corp.*,
   652 A.2d 178 (N.J. Super. Ct. App. Div. 1995) ......................................................................15

*Bailey v. Pennington*,
   406 A.2d 44 (Del. 1979) ..........................................................................................................19

*Betts v. Manville Pers. Injury Settlement Trust*,
   588 N.E.2d 1193 (Ill. Ct. App. 1992) .....................................................................................12

*Biniek v. Exxon Mobil Corp.*,
   818 A.2d 330 (N.J. Super. Ct. 2002) .......................................................................................15

*Birchwood Lakes Colony Club v. Bor. of Medford Lakes*,
   449 A.2d 472 (N.J. 1982) ........................................................................................................18

*Bower v. Westinghouse Elec. Corp.*,
   522 S.E.2d 424 (W. Va. 1999) .....................................................................................12, 13, 14

*Brooks v. Culbreath, C.A.*
   No. 07-CV-758, 2010, 2010 WL 376886 (D. Del. Jan. 28, 2010).............................................4

iii

*Brzoska v. Olson*,
    668 A.2d 1355 (Del. 1995) ............................................................................7, 9

*Burns v. Jaquays Mining Corp.*,
    752 P.2d 28 (Ariz. Ct. App. 1987) ....................................................................12

*Townsend v. Pierre*,
    110 A.3d 52 (N.J. 2015)....................................................................................19

*Cropper v. Rego Distribution Ctr., Inc.*,
    542 F. Supp. 1142 (D. Del. 1982).....................................................................14

*Dayton v. Collison*,
    No. N17C-08-100, 2019 WL 4668157 (Del. Super. Ct. Sept. 24, 2019) ........16, 17

*Exxon Mobil Corp. v. Albright*,
    71 A.3d 30 (Md. 2013) .....................................................................................12

*G.S. v. Dept. of Human Services*,
    723 A.2d 612 (N.J. 1999)..................................................................................20

*Gordon v. Nat'l R.R. Passenger Corp.*,
    No. 10753, 1997 WL 298320 (Del. Ch. Mar. 19, 1997)...................................17

*Graboff v. The Collern Firm*,
    No. 10-CV-1710, 2010 WL 4456923 (E.D. Pa. Nov. 8, 2010) ..........................5

*Hansen v. Mountain Fuel Supply Co.*,
    858 P.2d 970 (Utah 1993)................................................................................14

*Hudson v. Old Guard Ins. Co.*,
    3 A.3d 246 (Del. 2010) ....................................................................................18

*James v. Arms Tech., Inc.*,
    820 A.2d 27 (N.J. Super. Ct. App. Div. 2003)..................................................18

*State ex rel. Jennings v. Purdue Pharma L.P.*,
    No. N18C-01-223, 2019 WL 446382 (Del. Super. Ct. Feb. 4, 2019)..............16

*Johnson v. City of Shelby*,
    574 U.S. 10 (2014)..............................................................................................3

*In re Lead Paint Litig.*,
    924 A.2d 484 (N.J. 2007).............................................................................16, 17

*Maio v. Aetna, Inc.*,
    221 F.3d 472 (3d Cir. 2000)................................................................................3

*Mancari v. A.C. & S., Inc.*,
  670 A.2d 1339 (Del. 1995) ...................................................................................8

*Mauro v. Raymark Indus., Inc.*,
  561 A.2d 257 (N.J. 1989) ..................................................................................10

*McCurdy v. Wright Med. Tech., Inc.*,
  No. 19-CV-1898, 2020 WL 906329 (D. Del. Feb. 25, 2020) ...............................4

*Mergenthaler v. Asbestos Corp. of Am.*,
  480 A.2d 647 (Del. 1984) ............................................................................7, 8, 9

*Meyer v. Fluor Corp.*,
  220 S.W.3d 712 (Mo. 2007) ..........................................................................12, 14

*Moore v. Sharp Gas Inc.*,
  No. 90-CV-504, 1992 WL 147930 (D. Del. June 11, 1992)................................15

*New Jersey Div. of Child Prot. & Permanency v. J.D.*,
  148 A.3d 128 (N.J. Super. Ct. App. Div. 2016)...............................................20

*Nutt v. A.C. & S., Inc.*,
  466 A.2d 18 (Del. Super. Ct. 1983) ...................................................................7

*Patton v. Simone*,
  No. 90C-JA-29, 1992 WL 398478 (Del. Super. Ct. Dec. 14, 1992).....................16

*Pennsylvania Emp., Benefit Trust Fund v. Zeneca, Inc.*,
  710 F. Supp. 2d 458 (D. Del. May 6, 2010) ........................................................4

*Petito v. A.H. Robins Co.*,
  750 So. 2d 103 (Fla. Ct. App. 2000).................................................................12

*Pruett v. Dayton*,
  39 Del. Ch. 537 (1961) ...................................................................................17

*Redland Soccer Club v. Dep't of the Army*,
  696 A.2d 137 (Pa. 1997) .................................................................................12

*Reilly v. Ceridian Corp.*,
  664 F.3d 38 (3d Cir. 2011)..............................................................................16

*Riedel v. ICI Ams. Inc.*,
  968 A.2d 17 (Del. 2009) .................................................................................14

*Sadler v. PacifiCare of Nev., Inc.*,
  340 P.3d 264 (Nev. 2014).........................................................................12, 13

*Sans v. Ramsey Golf & Country Club, Inc.,*
    149 A.2d 599 (N.J. 1959) ............................................................................18

*Sinclair v. Merck & Co. Inc.,*
    948 A.2d 587 (N.J. 2008) .....................................................................10, 11

*Spruill v. Gillis,*
    372 F.3d 218 (3d Cir. 2004) ...........................................................................3

*T & E Indus., Inc. v. Safety Light Corp.,*
    123 N.J. 371 (1991) ......................................................................................18

*United States v. Anderson,*
    669 A.2d 73 (Del. 1995) ..............................................................................8, 9

*Zazzali v. Hirschler Fleischer, P.C.,*
    482 B.R. 495 (D. Del. 2012) ...........................................................................5

**Other Authorities**

Federal Rule of Civil Procedure 12(b)(6) ...........................................................3, 5, 9

Federal Rule of Civil Procedure 12(b)(1) ...................................................................5

*Restatement (Second) of Conflict of Laws.* ..................................................................4

*Restatement (Second) of Torts* .............................................................................. *passim*

I.      **STATEMENT OF THE NATURE AND STAGE OF PROCEEDINGS**

Before the Court is the Renewed Motion to Dismiss ("the Motion") of Defendant Croda Inc. ("Croda" or "Defendant"). Defendant is a Delaware corporation headquartered in New Jersey. This class action litigation arises from Plaintiff and Class Members' exposure to the dangerous amount of toxic ethylene oxide ("EtO") gas emitted by Defendant's Atlas Point facility. EtO is toxic, carcinogenic, and mutagenic. For decades, Defendant's EtO emissions have poisoned one of Delaware's most populous regions. The harm caused by this exposure is not a speculative, future risk of some illness that may develop. Rather, it is an actual loss caused by the present need to incur the cost of medically necessary diagnostic testing for the specific diseases linked to EtO exposure—exposure that makes Plaintiff and Class Members up to four times more likely to develop cancers and other illnesses. Plaintiff and Class Members have already been injured by exposure to Defendant's harmful emissions, which caused a significant increased risk of disease and resultant damages in the form of medically necessary diagnostic testing. Regular testing, or medical monitoring, affords Plaintiff and Class Members the prospect of early disease detection and prevention of fatal outcomes. Contrary to Defendant's Motion, both Delaware and New Jersey law afford Plaintiff and Class Members recourse. Accordingly, the Court should reject Defendant's arguments and deny the Motion in its entirety.

II.     **SUMMARY OF ARGUMENT**

1.      Defendant's argument for the application of Delaware law is premature because discovery is needed to properly apply the "Most Significant Relationship" test.

2.      The harm caused by the Plaintiff and potential Class Members' actual exposure to dangerous amounts of toxic EtO is a compensable injury under Delaware and New Jersey law.

3.      Medical monitoring is clearly a remedy under Delaware law and an independent claim under New Jersey law.

1

4.      Plaintiff alleges an ultrahazardous activity under Delaware and New Jersey law.

5.      Plaintiff has standing and properly alleges public nuisance under Delaware and New Jersey law.

6.      Plaintiff alleges private nuisance under Delaware and New Jersey law.

7.      Plaintiff alleges negligence under Delaware and New Jersey law.

8.      Plaintiff alleges willful or wanton conduct under Delaware and New Jersey law.

## III.   CONCISE STATEMENT OF FACTS

Defendant's Atlas Point plant produces up to 30,000 metric tons of EtO annually, which is used in surfactant production and the creation of ethylene glycol. Complaint ("Compl."), D.I. 1, at ¶ 27. Defendant releases dangerous amounts of EtO gas every year. Compl., at ¶ 27. The release of EtO gas into the air surrounding the Class Zone has been ongoing since at least 1988. Compl., at ¶¶ 27, 62. Throughout, EtO has been known to be a dangerous, carcinogenic, and mutagenic toxin that is readily taken up by the lungs, efficiently absorbed into the blood stream, and easily distributed throughout the human body. Compl., at ¶ 18.

For decades government agencies and health organizations have recognized EtO's toxic effects on humans. Compl, at ¶¶ 18-49. In 1977, the National Institute of Occupational Safety and Health recommended that EtO be considered mutagenic and potentially carcinogenic. Compl., at ¶ 20. In 1994, the World Health Organization categorized EtO as a "Group 1" human carcinogen— its highest risk classification. Compl., at ¶ 24. In 2000, the U.S. Department of Health and Human Services classified EtO as a "known . . . human carcinogen." Compl., at ¶ 24. In 2016, the EPA classified EtO as a human carcinogen. Compl., at ¶ 26.

Defendant nonetheless released tons of EtO into the air of the surrounding community during each year of the Class Period. Compl., at ¶¶ 16, 27. Heavier than air, odorless, colorless, and with an atmospheric half-life of 211 days, the EtO released by Defendant lingered at breathing

level in communities surrounding the Atlas Point facility for prolonged periods, continually exposing Plaintiff and Class Members to an extremely harmful toxin. Compl., at ¶¶ 29-30. Plaintiff and the putative Class have already acquired some of the highest cancer risks in the nation. Compl., at ¶ 40. The EPA estimates that Plaintiff and the putative Class are up to four times more likely to develop cancer than average Americans due to their prolonged, actual exposure to EtO. Compl., at ¶ 5. The increased risk of harm—which is orders of magnitude beyond normal background levels—was visited upon Plaintiff and Class Members almost entirely because of Defendant's EtO emissions at the Atlas Point facility. Compl., at ¶ 41. Consequently, Plaintiff and Class Members have *already* suffered injury in the form of having to undergo and pay for reasonably necessary and costly medical testing and monitoring to detect cancers and other disease processes, so they might have the opportunity to treat these debilitating conditions early. Compl., at ¶¶ 50-60.

## IV.    __LEGAL STANDARD__

Evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) requires the Court to accept as true all material allegations of the complaint. *See Spruill v. Gillis*, 372 F.3d 218, 223 (3d Cir. 2004). The Court may grant such a motion to dismiss only if, after "accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief." *Maio v. Aetna, Inc.*, 221 F.3d 472, 481-82 (3d Cir. 2000) (internal quotation marks omitted). A plaintiff must plead facts sufficient to show that a claim has substantive plausibility. *See Johnson v. City of Shelby*, 574 U.S. 10 (2014). A complaint may not be dismissed, however, for imperfect statements of the legal theory supporting the claim asserted. See id. at 10. A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## V.    <u>ARGUMENT</u>

### A.    Defendant's Argument for the Application of Delaware Law is Premature Because Discovery is Needed to Properly Apply the "Most Significant Relationship" Test

Delaware's choice-of-law rules require a two-pronged approach. *Pennsylvania Emp., Benefit Trust Fund v. Zeneca, Inc*., 710 F. Supp. 2d 458, 466 (D. Del. 2010) (citing *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 358 (3d Cir. 2007)). First, the Court must identify whether an actual conflict exists through "an examination of the competing laws proposed by the parties." *Id*. at 467. Second, if an actual conflict exists, Delaware applies the "most significant relationship" test outlined by the *Restatement (Second) of Conflict of Laws.* When determining which state has the most significant relationship, courts "consider the following contacts and weigh them by their relevance with respect to the issue at hand: (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." *Brooks v. Culbreath, C.A.*, No. 07-CV-758, 2010, WL 376886, at *3 (D. Del. Jan. 28, 2010); *McCurdy v. Wright Med. Tech., Inc*., No. 19-CV-1898, 2020 WL 906329, at *4 (D. Del. Feb. 25, 2020).

There is no genuine conflict between the laws of New Jersey and Delaware for many of the asserted claims and thus no need for choice-of-law analysis. Specifically, as discussed below, Delaware and New Jersey law would produce the same results when analyzing Plaintiff's claims for strict liability, public and private nuisance, negligence, and wanton and willful conduct. The only significant variance may concern Plaintiff's independent claim for medical monitoring, but even then, the remedy would remain the same as both jurisdictions recognize medical monitoring as a remedy in cases such as this. Regardless, where there is a genuine conflict, courts in this District and the Third Circuit routinely defer analysis until they have a more-developed factual

record. *See Arçelik A.Ş. v. E. I. du Pont de Nemours & Co.*, No. 15-CV-961, 2018 WL 1401327, at *9 (D. Del. Mar. 20, 2018) (deferring choice of law analysis where nearly "no discovery has taken place, and the Court would benefit from a more-developed record"); *Zazzali v. Hirschler Fleicsher, P.C.*, 482 B.R. 495, 517 (D. Del. 2012) (delaying choice of law determination "until there is development of a more complete factual record"); *Graboff v. The Collern Firm*, No. 10-CV-1710, 2010 WL 4456923, at *8 (E.D. Pa. Nov. 8, 2010) ("[W]hen confronted with a choice of law issue at the motion to dismiss stage, courts within the Third Circuit have concluded that it is more appropriate to address the issue at a later stage in the proceedings.").

Croda seeks a choice-of-law determination now for one reason: to avoid the discovery of facts supporting the application of New Jersey law. But accepting Defendant's position would require the Court to view well-pleaded, material allegations in Defendant's favor, which could only lead to improper dismissal under Rule 12(b)(6). For example, Defendant's analysis of the Complaint led it to conclude that the "conduct 'causing the injury' [] occurred in New Castle, Delaware." Defendant's Renewed Motion ("Mot.") D.I. 32, at 5. This argument wholly discounts the undisputed allegation that Defendant is headquartered in New Jersey. Compl., at ¶ 9. It is entirely reasonable to infer that Defendant, having its headquarters in New Jersey, exercised control over the Atlas Point facility, and made the decisions with regard to levels of production of EtO and inadequate emissions control from New Jersey. Those decisions were, in large part and as alleged, the conduct causing injury. *See, e.g.*, Compl. at ¶¶ 46-47, 85, 105, 108, 112-116.

Moreover, Defendant continues to argue that this is a case "involving Delaware residents suing a Delaware corporation." Mot., at 11. This is pure conjecture, and it fails even to comport with Defendant's past decision to withdraw its Motion to Dismiss under Rule 12(b)(1). *See* Croda's August 12, 2021 Correspondence to Court, D.I. 29, at 3 ("Croda does not believe it can reliably

establish the percentage of the class that are citizens of Delaware."). Class Members, at some point between 1988 and the present lived near the Atlas Point facility, may presently reside in New Jersey, Delaware, or elsewhere. Compl., at ¶ 62. Defendant can offer nothing more than speculation as to their domicile, residence, and citizenship—all of which are factors that must be considered under the "most significant relationship" test.

B.     **The Injury Caused by Exposure to Toxic EtO is a Compensable Injury Under Delaware and New Jersey Law**

1.     **Plaintiff Alleges a Compensable Injury Under Delaware Law**

Injuries caused by Defendant's release of, and the Class's actual exposure to, toxic EtO are identifiable, appreciable, and cognizable, and are not speculative or mere fear or apprehension. As alleged, EtO is a carcinogen and powerful mutagen that damages DNA rendering exposure unsafe at any level. Compl., at ¶¶ 20-26, 52. Plaintiff and Class Members inhaled this carcinogenic, disease-causing agent, and this actual inhalation caused significant, present risk of illness and disease. Compl., at ¶¶ 50-61. Plaintiff and Class Members are injured by the medically necessary need to incur the cost of diagnostic testing caused by significant exposure to toxic EtO and the resulting increased risk. Compl., at ¶¶ 50-61. These allegations more than meet Plaintiff's burden at the pleadings stage, and while discovery will substantiate Class Members' exposure to EtO, increased risk of illness and disease, and the resultant need for continued diagnostic testing, Defendant's dispute with facts alleged cannot justify dismissal.

There is no legal principle or case cited by Defendant that suggests a plaintiff cannot recover for the present loss caused by actual exposure to a toxin like EtO, and the resulting increased risk of illness or disease, causing the present need to undergo medically necessary diagnostic testing. Therefore, Defendant wrongly attempts to recharacterize the alleged harm as merely the "[f]ear of developing a disease in the 'future without a demonstrable change in bodily

condition. . . .'" Mot., at 14. Plaintiff and Class Members do not seek recovery for "fear," but rather on the Plaintiff's and Class Members' real exposure to toxic EtO and the resulting loss. That, for example, cancer has not become presently manifest does not eliminate the present injury of necessary diagnostic testing to identify latent disease proximately caused by the significantly increased risk of disease or illness.

None of the cases cited by Defendant contradict this position, but instead highlight that dismissal would be error. For example, *Brzoska v. Olson*, 668 A.2d 1355, 1357 (Del. 1995) was brought by plaintiffs who sought recovery for fear due to receiving treatment from a dentist with AIDS. *Brzoska* held that without actual exposure (in contrast to this case), the risk of its transmission is so minute that any fear of contracting AIDS is per se unreasonable. *Id*. at 1363. Yet, even that case proceeded through discovery and ended only at the summary judgment stage, with the benefit of a fully developed factual record. *Id*. at 1363–64. *Brzoska* adopted an "actual exposure" test for a claim based upon fear of contracting disease. *Id*. at 1364. The allegations in this Complaint are that Plaintiff and the Class Members were continually and actually exposed to, and inhaled, Defendant's EtO while residing near the Atlas Point facility. Compl., at ¶ 51.

Similarly, in *Nutt v. A.C. & S., Inc*., 466 A.2d 18, 23 (Del. Super. Ct. 1983), *aff'd sub nom*, *Mergenthaler v. Asbestos Corp. of Am*., 480 A.2d 647 (Del. 1984), plaintiffs brought a direct claim seeking to recover for the "reasonable apprehension" that they would suffer asbestos-related illnesses as the result of contact with asbestos fibers "brought home by their husbands." The Court dismissed because plaintiffs failed to plead any actual exposure, and instead, only pleaded "fear" of exposure. *Id*. at 25. In affirming dismissal, the Delaware Supreme Court distinguished the claims from *Ayers v. Jackson Tp.*, 461 A.2d 184 (N.J. Super. 1983), which permitted medical monitoring where plaintiffs ingested contaminated well water. *Mergenthaler*, 480 A.2d at 651.

The Court held dismissal was proper because, unlike *Ayers*, there was no direct contact with the asbestos, and no evidence suggesting that plaintiffs inhaled asbestos fibers. *Id.* at 654. Directly analogous to *Ayers* and the plaintiffs' ingestion of contaminated well water, the Class Members here actually inhaled EtO-contaminated air. Compl., at ¶ 51.

In the unpublished *In re Asbestos Litig*., No.'s 87C-09-24, 90C-09-79, 88C-09-7B,1994 WL 16805917, at *1-*2 (Del. Super. Ct. Aug. 5, 1994), the plaintiffs alleged pleural thickening of the lungs, but the Court threw out the plaintiffs' expert testimony that linked their symptoms to the inhalation of asbestos fibers. Summary judgment was then granted not for failure to allege lack of injury or harm, but rather the lack of expert testimony establishing causation. *Id*. Notably, this issue was addressed on summary judgment—not a motion to dismiss, and was ultimately reversed and remanded by the Delaware Supreme Court. *Id*. at *1; *see Mancari v. A.C. & S., Inc*., 670 A.2d 1339 (Del. 1995),. Here, Plaintiff need not prove claims with expert testimony in the pleadings. They allege inhalation of toxic EtO, a resultant materially increased risk of disease, and the medically necessary need to incur the cost of continued medical monitoring. Compl. at ¶¶ 13-15, nn.1-5, 51, 53, 57.

Lastly, in *United States v. Anderson*, 669 A.2d 73 (Del. 1995), the Court was tasked only with answering questions of first impression concerning whether a plaintiff may recover damages for an increased risk of harm in a medical negligence action. Contrary to Defendant's Motion, the Court never "held that the requirement of a present physical injury is an approach adopted to prevent recovery on 'speculative claims for future harm,'" but merely discussed that logic in the context of a Connecticut toxic tort opinion. Mot., at 9; *Anderson*, 669 A.2d at 77. The Court found that, in the context of a medical negligence claim, compensating a tort victim for an increase in risk which results from some harm caused by a tortfeasor fits comfortably within traditional

damage calculation methods. *Id*. at 78. *Anderson*'s limited focus centered on damages in medical negligence actions, not that an identifiable harm must be proven at the pleadings stage. *Id*. at 78-79. The section of *Anderson* cited by Defendant in no way supports dismissal under Rule 12(b)(6) because here Plaintiff alleges a present injury (i.e., actual toxic exposure causing an increased present risk of cancer and the resultant need for diagnostic testing). Compl. at ¶¶ 51, 53, 57.

**2.    Plaintiff Alleges a Compensable Injury under New Jersey Law**

The cost of medical surveillance is a compensable item of damages. *Ayers v. Jackson*, 525 A.2d 287, 312 (N.J. 1987). The proofs for the claim do not require proof of present physical injury. *Id*. "In our view, an enhanced risk of disease caused by significant exposure to toxic chemicals is clearly an 'injury.'" *Ayers*, 525 A.2d at 305. Here, Plaintiff and the Class Members, having been continuously exposed to a known carcinogen, seek compensation for loss proximately caused by the resulting increased risk of disease.

**C.    Medical Monitoring is a Remedy Under Delaware and New Jersey Law**

**1.    Medical Monitoring Under Delaware Law**

Whether medical monitoring is an independent cause of action or a remedy under Delaware law is an academic exercise that has no practical effect on the outcome of the Motion. Delaware courts have acknowledged medical monitoring as a remedy to injury in the toxic tort context without expressly addressing its viability as a cause of action. *See Mergenthaler v. Asbestos Corp. of Am.*, 480 A.2d 647, 651 (Del. 1984); *Alderman v. Clean Earth, Inc*., No. 04C-06-181, 2007 WL 1930664, at *3, 2007 (Del. Super. Ct. June 26, 2007); *Brzoska*, 1994 WL 233866, at *3; *In re Asbestos Litig.*, 1994 WL 16805917, at *2. Defendant concedes this point, and Plaintiff pleads medical monitoring as a remedy for underlying torts. Mot. at 12; Compl., at ¶¶ 73, 81, 90, 103, 110.

9

Plaintiff's claims here fit squarely within the traditional paradigm of medical monitoring in toxic tort cases. Plaintiff alleges that as a result of Defendant's unlawful and continuous release of dangerous amounts of carcinogenic EtO around the Atlas Point facility, she and Class Members face the present harm of a significantly increased risk of developing certain cancers, which requires them to undergo prophylactic diagnostic testing. Compl., at ¶¶ 1-13. These allegations are precisely those that support a traditional claim for medical monitoring as acknowledged by Delaware and, as explained *infra* at 12, many other jurisdictions.

### 2.    Medical Monitoring is an Available Remedy Under New Jersey Law

As explained in Section 2(b), *supra* at 9, and conceded by Defendant, New Jersey recognizes the cost of medical monitoring or surveillance as a compensable item of damages. *Ayers*, 525 A.2d at 312. Defendant mischaracterizes New Jersey law, citing *Sinclair v. Merck & Co.Inc.*, 948 A.2d 587 (N.J. 2008) and *Mauro v. Raymark Indus., Inc.*, 561 A.2d 257 (N.J. 1989), to argue Plaintiff must plead it is "more probable than not" she will develop a disease in order to sustain a cause of action for medical monitoring. Mot., at 19. This is not accurate; New Jersey law recognizes separate torts for "enhanced-risk" and "medical surveillance," each with different standards of proof:

> [t]he enhanced risk claim seeks a damages award, not because of any expenditure of funds, but because plaintiffs contend that the unquantified injury to their health and life expectance should be presently compensable, even though no evidence of disease is manifest . . . .  By contrast, the claim for medical surveillance does not seek compensation for an unquantifiable injury, but rather seeks specific monetary damages measured by the cost of periodic medical examinations. The invasion for which redress is sought is the fact that plaintiffs have been advised to spend money for medical tests, a cost they would not have incurred absent their exposure to toxic chemicals.

*Mauro*, 561 A.2d at 262-63 (quoting *Ayers*, 525 A.2d 287). The Supreme Court of New Jersey has further "distinguished between the plaintiff's enhanced-risk claims and claims for medical surveillance, and found that recovery for enhanced risk of contracting a disease to exposure to

toxic chemicals is only possible upon proof that it is more probable than not (the rule of reasonable medical probability) that the plaintiff will develop the disease." *Sinclair*, 948 A.2d at 592 (citing *Mauro*, 561 A.2d at 262-64). By contrast, a plaintiff who is unable to show reasonable medical probability may still recover in a distinct cause of action for medical surveillance provided there is reliable expert testimony as to causation, the severity of illness, and the reasonableness of surveillance. *Id*. at 592 (quoting *Ayers*, 525 A.2d at 287). In other words, " . . . recognition of the medical surveillance claim is not necessarily dependent on recognition of the enhanced risk claim." *Id*.

Despite these clear distinctions, Defendant asks this Court to impose a heightened standard of proof reserved only for "enhanced-risk" claims, which does not comport with the law of medical surveillance in New Jersey or allegations in the Complaint. Plaintiff's claims undoubtedly sound in medical surveillance rather than the separate and distinct tort of "enhanced-risk." *See generally* Compl. Plaintiff alleges that she and Class Members were consistently exposed to dangerous levels of a known carcinogen, which increases the risk of developing certain cancers, and now " . . . seek[s] as damages the costs of a medical monitoring program for such diagnostic testing for the early detection of onset of illness, disease processes or disease and to allow early treatment beneficial to Plaintiff and the Class Members." Compl., at ¶¶ 1-13, 60. Taken as true, these allegations are more than sufficient to meet the standard of proof required in medical surveillance claims under New Jersey law, and thus this Court should deny Defendant's Motion.

### 3.    Neither Delaware nor New Jersey Law Require Proof of Present Physical Injury to Obtain the Cost of Medical Monitoring as a Remedy

*Ayers* recognized that a claim for surveillance, absent present physical injury, does not seek recovery for an unquantifiable injury, but instead asks for specific monetary damages measured by the cost of medical examinations. 525 A.2d at 304, 308-09, 312. *Ayers* identifies the

significance and extent of exposure to chemicals, the toxicity of the chemicals, the seriousness of the diseases for which individuals are at risk, the relative increase in the chance of onset of disease in those exposed, but not the existence of present physical injury as elements of proof. *Id*. at 312.

Three state supreme courts have recently recognized that tort law allows for recovery of medical monitoring costs without proof of physical injury. *Meyer v. Fluor Corp.*, 220 S.W.3d 712, 714, 716 (Mo. 2007) (compensation is based on accepted legal principals); *Exxon Mobil Corp. v. Albright*, 71 A.3d 30, 75-77 (Md. 2013) (exposure itself and the need for medical testing is the compensable injury in a medical monitoring claim); *Sadler v. PacifiCare of Nev., Inc*., 340 P.3d 264, 1270-72 (Nev. 2014) (inquiry is whether the negligent act of the defendant caused the plaintiff to have a medical need to undergo monitoring). Two changed their previous position on the present physical injury requirement. *Exxon Mobil*, 71 A.3d at 80; *Sadler*, 340 P.3d at 1270.

In *Petito*, the court addressed whether Florida recognizes a cause of action for medical monitoring without present identifiable physical injuries. *Petito v. A.H. Robins Co.*, 750 So. 2d 103, 104 (Fla. Ct. App. 2000). The Court reasoned that "[a]lthough it is true that plaintiffs in cases such as these have yet to suffer physical injuries, it is not accurate to say that no injury has arisen at all." *Id*. at 105. Numerous state courts have agreed. *See e.g., Redland Soccer Club v. Dep't of the Army*, 696 A.2d. 137, 145-46 (Pa. 1997); *Burns v. Jaquays Mining Corp*., 752 P.2d 28, 31-33 (Ariz. Ct. App. 1987) (medical monitoring for exposure to asbestos even though no plaintiff had been diagnosed as having asbestosis); *Betts v. Manville Pers. Injury Settlement Trust*, 588 N.E.2d 1193, 1217-18 (Ill. Ct. App. 1992). All are determined under longstanding tort common law.

The very nature of a claim for the cost of diagnostic testing presupposes the absence of a currently identified present physical illness or disease. For example, in *Bower v. Westinghouse Elec. Corp.*, 522 S.E.2d 424 (W. Va. 1999), plaintiffs were exposed to toxic substances released

by defendants; none exhibited symptoms of disease related to the exposure. *Bower*, 522 S.E.2d at

426-27. The West Virginia Supreme Court concluded:

> [i]t is difficult to dispute that an individual has an interest in avoiding expensive
> diagnostic testing just as he or she has an interest in avoiding physical injury. When
> a defendant invades this interest, the injury to which is neither speculative nor
> resistant to proof, it is elementary that the defendant should make the plaintiff
> whole by paying for the examinations.

*Id*. at 430. *Bower* rejected the need to prove present physical injury. *Id*. "The 'injury' that underlies

a claim for medical monitoring . . . is 'the invasion of any legally protected interest.'" *Id*. at 430

(quoting *Restatement (Second) of Torts* § 7(1) (1964)). *Friends For All Children v. Lockheed*

*Aircraft Corp.*, illustrates the tort principle supporting recovery:

> Jones is knocked down by a motorbike which Smith is riding through a red light.
> Jones lands on his head with some force. . . . Jones enters a hospital where doctors
> recommend that he undergo a battery of tests to determine whether he has suffered
> any internal head injuries. The tests prove negative, but Jones sues Smith solely for
> what turns out to be the substantial cost of the diagnostic examinations.

746 F.2d 816, 825 (D.C. Cir. 1984). Thus:

> [i]t is clear that even in the absence of physical injury Jones ought to be able to
> recover the cost for the various diagnostic examinations proximately caused by
> Smith's negligent action. . . . The motorbike rider, through his negligence, caused
> the plaintiff, in the opinion of medical experts, to need specific medical services--
> a cost that is neither inconsequential nor of a kind the community generally accepts
> as part of the wear and tear of daily life.

*Id*. By pleading toxic exposure and cost of diagnostic testing, a cognizable injury is alleged.

In *Sadler*, the Supreme Court of Nevada examined the *Restatement (Second) of Torts* § 7

(1965) in evaluating a claim for medical monitoring without proof of present physical injury. 340

P.3d at 1270-72. The court noted that the section:

> broadly defines an injury for the purpose of tort law as 'the invasion of any legally
> protected interest of another.' Not only is this definition not limited to physical
> injury, the same section separately defines 'harm' as 'the existence of loss or
> detriment in fact of any kind to a person resulting from any cause,' and 'physical

13

harm' as 'the physical impairment of the human body, or of land or chattels.' Thus
. . . the differing definitions indicate that they are not interchangeable, and more,
that injury is generally not limited to physical injury.

*Id*. at 1269.[1]  The court, rejecting a requirement for proof of present physical injury, reasoned that "the Restatement separately defines 'physical harm,' indicating that physical harm is not necessarily implicated by the term 'injury.'" *Id*. at 1270-71. In *Meyer*, the court held that a physical injury requirement is inconsistent with the theory of recovery. 220 S.W.3d at 717. Such a requirement extinguishes the claim and bars the plaintiff from a full recovery, as testing is necessary to detect latent injuries that result from plaintiff's exposure. *Id*. at 718.

Plaintiff and Class Members have suffered the present injury of the cost of needed diagnostic tests which they would not have needed *but for* their past injurious exposure to Croda's toxic EtO. The present burden of the cost of diagnostic testing is no less an invasion of a legally protected interest justifying compensation than is a physical injury. *Hansen v. Mountain Fuel Supply Co.*, 858 P.2d 970, 977 (Utah 1993). Although the obvious manifestations of a toxic exposure may not appear for years, those exposed have suffered legal detriment: the exposure to the toxin itself, the risk of disease and the concomitant cost of the needed medical testing constitute an injury. *Bower*, 522 S.E.2d at 430 (the injury in question is the increase in risk that requires one to incur the cost of monitoring).

### D.    Plaintiff Alleges an Ultrahazardous Activity Under Delaware and New Jersey Law

"One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm." *Cropper v. Rego Distribution Ctr., Inc*., 542 F. Supp. 1142, 1149 (D.

---

[1] Delaware, for example, follows the *Restatement (Second) of Torts.  See, e.g.*, *Riedel v. ICI Ams. Inc.*, 968 A.2d 17, 20 (Del. 2009).

Del. 1982). Delaware and New Jersey have adopted the principles set forth in the *Restatement (Second) of Torts*, which is guided by the following factors: (a) existence of a high degree of risk of harm to the person, land or chattels of others; (b) likelihood that great harm would result therefrom; (c) the inability to eliminate those risks through the exercise of reasonable care; (d) the common usage of the activity; (e) the appropriateness of the activity; and (f) the value of the activity to the community. *Moore v. Sharp Gas Inc.*, No. 90-CV-504, 1992 WL 147930, at *2 (D. Del. June 11, 1992); *see also Bahrle v. Exxon Corp.*, 652 A.2d 178 (N.J. Super. Ct. App. Div. 1995); *Biniek v. Exxon Mobil Corp.*, 818 A.2d 330, 336–37 (N.J. Super. Ct. 2002).

Viewed in the context of the entire Complaint, Plaintiff alleges these elements in a manner sufficient to withstand Defendant's Motion. *See* Compl., at ¶¶ 75-78. It is ironic that Defendant, in arguing for dismissal based on a purported failure to meet the Federal pleading standard, seems to advocate for a Complaint that would merely recite, formulaically, the elements of an ultrahazardous activity claim. Defendant argues that Plaintiff has not "pled the manufacturing of [EtO] 'is not a matter of common usage,'" but ignores that Plaintiff alleges that EtO is only produced at 11 locations in the United States. Mot., at 14; Compl., at ¶ 15. Clearly, given EtO's very limited production, the Court can infer that EtO manufacturing is not a matter of common usage. While it is likewise true that Plaintiff does not state, explicitly, that the risk surrounding emissions cannot be eliminated or that EtO cannot be made safe by the exercise of the utmost care, she does allege that EtO is unsafe at any level and the EPA "considers any exposure, however small, to create a cancer risk." Compl., at ¶ 26. These averments exceed the Federal pleading standard.

15

E.     **Plaintiff Has Standing and Properly Alleges Public Nuisance Under Delaware and New Jersey Law**

Under Delaware law, a public nuisance is "activity which produces some tangible injury to neighboring property or persons coming into contact with it and which a court considers to be objectionable under the circumstances." *State ex rel. Jennings v. Purdue Pharma L.P.*, No. N18C-01-223, 2019 WL 446382, at *11 (Del. Super. Ct. Feb. 4, 2019); *Patton v. Simone*, No. 90C-JA-29, 1992 WL 398478, at *9 (Del. Super. Ct. Dec. 14, 1992). To have standing for a public nuisance claim, an individual must: (1) be capable of recovering damages; and (2) have standing to sue as a representative of the public, "as in a citizen's action or class action." *Dayton v. Collison*, No. N17C-08-100, 2019 WL 4668157, at *3 (Del. Super. Ct. Sept. 24, 2019).

Plaintiff has standing, and the allegations in the Complaint wholly satisfy the elements of a public nuisance claim. Regarding standing: Plaintiff, as the lead individual in a class action, is a representative of the public with standing to bring a lawsuit. . . ." *Id*. at *3. Defendant's dangerous, continuous, and unlawful release of EtO constitutes an objectionable danger to every individual that lived in the Class Area surrounding the Atlas Point facility during the relevant period. As explained above, Defendant's activity—the emission of EtO—resulted in a tangible injury to Plaintiff and Class Members. Unlike *Reilly v. Ceridian Corp*., 664 F.3d 38, 42 (3d Cir. 2011), which concerned a data breach where there was no evidence that the data had been misused and thus no evidence of a tangible injury, this case involves allegations that Plaintiff and the Class were harmed by the actual and continuous inhalation of toxic EtO.

There is no conflict when applying New Jersey law. The *Restatement (Second) of Torts* defines a public nuisance as "an unreasonable interference with a right common to the general public." *Restatement (Second) of Torts*, § 821B; *see also In re Lead Paint Litig*., 924 A.2d at 497 (adopting Section 821B in New Jersey). Like Delaware, New Jersey allows a class representative

to bring a public nuisance claim. *See In re Lead Paint Litig.*, 924 A.2d 484, 497–98 (N.J. 2007). Defendant has interfered with the general public's (i.e., everyone who lives, or has lived, in census tracts 10003015400, 10003105502, and 10003015802) right to safe and clean air by emitting dangerous EtO.

### F.      Plaintiff Alleges Private Nuisance Under Delaware and New Jersey Law

### 1.      Private Nuisance Under Delaware Law

There are two types of private nuisance recognized in Delaware: nuisance per se and nuisance-in-fact. A claim for nuisance per se exists in three types of cases: (1) intentional, unreasonable interference with property rights of another; (2) interference resulting from an abnormally hazardous activity conducted on the person's property; and (3) interference in violation of a statute intended to protect public safety. A claim for nuisance-in-fact exists when the defendant, although acting lawfully on his own property, permits acts or conditions that "become nuisances due to circumstances or location or manner of operation or performance." *Dayton* 2019 WL 4668157, at *5.

Private nuisance is defined as "a civil wrong arising from an unreasonable, unwarranted or unlawful use of one's property producing material annoyance, inconvenience, discomfort or hurt to another in the use of his property." *Gordon v. Nat'l R.R. Passenger Corp.*, No. 10753, 1997 WL 298320, at *10 (Del. Ch. Mar. 19, 1997). "[P]laintiffs must clearly establish the nuisance and the injury must not be trivial or temporary." *Pruett v. Dayton*, 39 Del. Ch. 537, 541 (1961). The court in *Gordon* recognized this cause of action in the context of toxic exposure, and further stated that plaintiff's claims for nuisance, if true, "would warrant an award of equitable relief." *Gordon*, 1997 WL 298320, at *10. Here, Plaintiff and Class Members were exposed to toxic EtO by Defendant, which emitted the gas in one of Delaware's most populous regions in clear violation of law and, at all times, causing harm to Plaintiff and Class Members in the use of their property. Compl., at

¶¶ 35-38. The injuries sustained are neither trivial nor temporary, as Plaintiff and Class Members are up to four times more likely to develop cancer and require ongoing diagnostic testing as a result. Compl., at ¶¶ 5-6, 50-61.

### 2.    Private Nuisance Under New Jersey Law

A cause of action for private nuisance derives from the defendant's "unreasonable interference with the use and enjoyment" of the plaintiff's property. *Sans v. Ramsey Golf & Country Club, Inc*., 149 A.2d 599 (N.J. 1959); *James v. Arms Tech., Inc*., 820 A.2d 27 (N.J. Super. Ct. App. Div. 2003). When analyzing nuisance claims, New Jersey courts are guided by the principles set forth in the *Restatement (Second) of Torts*. *See Birchwood Lakes Colony Club v. Bor. of Medford Lakes*, 449 A.2d 472 (N.J. 1982). Under section 822 of the *Restatement (Second) of Torts*, liability for private nuisance may be imposed if the nuisance arose from intentional and unreasonable conduct. *See, e.g.*, *Associated Metals & Minerals Corp. v. Dixon Chem. & Research, Inc.*, 197 A.2d 569 (N.J. Super. Ct. App. Div. 1963). Even in the absence of evidence of the defendant's fault, strict liability may be imposed in a private nuisance claim if the defendant is engaged in an abnormally dangerous activity. *See T & E Indus., Inc. v. Safety Light Corp.*, 123 N.J. 371, 394–95 (1991) (holding that "defendant's processing, handling, and disposal" of radium in urban setting is "abnormally-dangerous activity" subject to strict liability).

Defendant's EtO emissions here have interfered with the use and enjoyment of Plaintiff and Class Members' properties. Compl., at ¶¶ 92. Further, Defendant is engaged in an abnormally dangerous activity for which strict liability may be imposed. Compl., at ¶¶ 73-80.

### G.    Plaintiff Alleges Negligence Under Delaware and New Jersey Law

The elements of negligence are the same in both Delaware and New Jersey. To sustain a cause of action for negligence, a plaintiff must establish four elements: (1) a duty of care, (2) a breach of that duty, (3) proximate cause, and (4) harm. *Hudson v. Old Guard Ins. Co*., 3 A.3d 246,

250 (Del. 2010) (requiring duty, breach, causation and harm); *c.f. Townsend v. Pierre*, 110 A.3d 52, 61 (N.J. 2015) (requiring duty, breach, causation, and actual damages). Here, as explained above and contrary to Defendant's argument, Plaintiff exceeds the pleading requirement with specific allegations in the context of a detailed complaint. Compl., at ¶¶ 108-109. Defendant owed Plaintiff and the Class Members a reasonable duty to maintain and operate the Atlas Point facility in a safe manner. Compl., at ¶¶ 104-106. Defendant's actions and inactions, which among other things, led to the unlawful release of toxic EtO, breached that duty. Compl., at ¶¶ 103-109. Defendant's conduct is the direct and proximate cause of the injury and need for ongoing diagnostic testing. Compl., at ¶ 109.

### H.  Plaintiff Alleges Willful or Wanton Conduct Under Delaware and New Jersey Law

### 1.  Willful or Wanton Conduct Under Delaware Law

Delaware's Supreme Court stated that "[t]here is a clear distinction between wantonness and negligence, as the former term includes the elements of consciousness of one's conduct, realization of the probability of injury to another, and disregard of the consequences." *Bailey v. Pennington*, 406 A.2d 44, 46 (Del. 1979), In other words, a "[w]illful or wanton disregard of a plaintiff's rights—as opposed to negligence—reflects a 'conscious indifference' or an 'I-don't-care attitude.'" *Id*. Although discovery will reveal the depths of Defendant's conscious indifference, Plaintiff articulates a plausible claim at the motion to dismiss stage of this litigation. This is especially true where the Complaint, viewed in its entirety, suggests that Defendant knew of the risk posed by EtO for decades and chose to turn a blind eye while it continued to poison the surrounding community. Compl., at ¶¶ 18-30.

19

**2.       Willful or Wanton Conduct Under New Jersey Law**

The essence of willful or wanton conduct is that it "implies that a person has acted with reckless disregard for the safety of others." *G.S. v. Dept. of Human Services*, 723 A.2d 612 (N.J. 1999) (citations omitted). Further, willful or wanton conduct is that which is "done with the knowledge that injury is likely to, or probably will, result[,]" and "can apply to situations ranging from 'slight inadvertence to malicious purpose to inflict injury.'" *Id*. at 612 (citations omitted). However, if the act or omission is intentionally done, "whether the actor actually recognizes the highly dangerous character of her conduct is irrelevant," and "[k]nowledge will be imputed to the actor." *Id*.; *New Jersey Div. of Child Prot. & Permanency v. J.D.*, 148 A.3d 128, 136 (N.J. Super. Ct. App. Div. 2016). The reasons that support finding willful or wanton conduct under Delaware law are equally applicable under New Jersey law. Given that Defendant knowingly produced up to 30,000 metric tons of EtO annually and knew of or recklessly disregarded the well-studied, toxic nature of EtO, Defendant's conduct can only be described as a wanton or willful disregard of the risk of injury to Plaintiff and the Class Members. Compl., at ¶¶ 18-30.

**VI.      CONCLUSION**

For these reasons, the Court should issue an Order denying Defendant's Motion in its entirety, and issuing such other, further and different relief as the Court deems just and proper.

Respectfully submitted,

*/s/ Kelly L. Tucker*
Kelly L. Tucker (#6382)
GRANT & EISENHOFER P.A.
123 Justison Street
Wilmington, Delaware 19801
ktucker@gelaw.com
P: (302) 622-7000
F: (302) 622-7100

T. Michael Morgan*
MORGAN & MORGAN, P.A.
20 N Orange Ave., Suite 1600
Orlando, FL 32801
mmorgan@ForThePeople.com
P: (407) 418-2031
F: (407) 245-3384

Kevin S. Hannon*
MORGAN & MORGAN, COMPLEX
LITIGATION GROUP
1641 N. Downing Street,
Denver, Colorado 80218
khannon@ForThePeople.com
P: (303) 264-1769
F: (303) 264-1795

Marcio W. Valladares*
MORGAN & MORGAN, COMPLEX
LITIGATION GROUP
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
mram@ForThePeople.com
mvalladares@ForThePeople.com
P: (813) 223-5505
F: (813) 223-5402

Rene F. Rocha*
MORGAN & MORGAN, COMPLEX
LITIGATION GROUP
3530 Magazine St.
New Orleans, LA 70115
rrocha@ForThePeople.com
P:  (954) 318-0268
F:  (954) 327-3018

Frank M. Petosa*
MORGAN & MORGAN, COMPLEX
LITIGATION GROUP
8151 Peters Road
Suite 4000
Plantation, FL 33324
fpetosa@ForThePeople.com
P:  (954) 318-0268
F:  (954) 327-3018

Appx316

*Pro Hac Vice*
*Attorneys for the Plaintiff and*
*the Putative Class*

Date:  October 1, 2021

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

————————————————

CATHERINE BAKER

V.

CRODA INC.

Civil Action No. 1:20-CV-01108

————————————————

**DESIGNATION OF CIRCUIT JUDGE
TO HOLD A DISTRICT COURT WITHIN THE CIRCUIT**

————————————————

Pursuant to 28 U.S.C. § 291(b), and finding that it is in the public interest to do so,

I hereby designate and assign the Honorable Stephanos Bibas of the Court of Appeals for

such a period as is necessary for the disposition of the above-entitled matter.

s/ D. Brooks Smith
D. Brooks Smith, Chief Judge
United States Court of Appeals
For the Third Circuit

Dated:  October 1, 2021

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CATHERINE BAKER, individually and<br>on behalf of all others similarly situated | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:20-cv-01108-SB |
| v. | ) | |
| | ) | |
| CRODA INC. f/k/a CRODA, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## <u>STIPULATION AND [PROPOSED] ORDER STAYING DISCOVERY</u>

IT IS HEREBY STIPULATED AND AGREED, by and through the undersigned counsel for Plaintiff Catherine Baker and Defendant Croda Inc. f/k/a Croda, Inc. (collectively the "Parties"), subject to the approval of the Court, that the discovery in this case shall be stayed pending the Court's resolution of Defendant's pending Renewed Motion to Dismiss Plaintiff's Complaint (D.I. 31) (the "Motion").

IT IS HEREBY FURTHER STIPULATED AND AGREED, by and through the undersigned counsel for the Parties, subject to the approval of the Court, that this stay of discovery shall automatically terminate upon resolution of the Motion, and the Parties shall exchange initial disclosures pursuant to Fed. R. Civ. P. 26(a) within fourteen (14) days of the same.

GRANT & EISENHOFER P.A.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

/s/ Kimberly A. Evans
Kimberly A. Evans (#5888)
123 Justison Street
Wilmington, Delaware 19801
(302) 622-7000
kevans@gelaw.com
Attorney for Plaintiff
*Counsel for the Plaintiff and the Putative Class*

/s/ Kenneth J. Nachbar
Kenneth J. Nachbar (#2067)
Miranda N. Gilbert (#6662)
1201 North Market Street
Wilmington, Delaware 19801
(302) 658-9200
knachbar@morrisnichols.com
mgilbert@morrisnichols.com
*Attorneys for Defendant*

OF COUNSEL:

OF COUNSEL:

Frank Petosa (*Admitted Pro Hac Vice*)
MORGAN & MORGAN,
COMPLEX LITIGATION GROUP
8151 Peters Road Suite 4000
Plantation, FL 33324
(954) 318-0268

Stephen A. Swedlow (*Admitted Pro Hac Vice*)
Athena Dalton (*Admitted Pro Hac Vice*)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
(312) 705-7400
stephenswedloe@quinnemanuel.com
athenadalton@quinnemanuel.com

Marcio W. Valladares (*Admitted Pro Hac Vice*)
MORGAN & MORGAN,
COMPLEX LITIGATION GROUP
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
(813) 223-5505

Rene F. Rocha (*Admitted Pro Hac Vice*)
MORGAN & MORGAN, ,
COMPLEX LITIGATION GROUP
3530 Magazine St.
New Orleans, LA 70115
(954) 318-0268
*Counsel for the Plaintiff and the Putative Class*

October 20, 2021

IT IS SO ORDERED this_____day of October, 2021.

_____
Honorable Stephanos Bibas

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CATHERINE BAKER, individually and on behalf of all others similarly situated | ) ) ) | |
| Plaintiff, | ) ) | Case No. 20-cv-01108-SB |
| v. | ) ) | |
| CRODA INC. f/k/a CRODA, INC., | ) ) | |
| Defendant. | ) ) | |

**REPLY BRIEF IN SUPPORT OF
CRODA INC.'S RENEWED MOTION TO DISMISS**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Kenneth J. Nachbar (# 2067)
Miranda N. Gilbert (# 6662)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
knachbar@morrisnichols.com
mgilbert@morrisnichols.com
*Attorneys for Defendant*

OF COUNSEL:

Stephen A. Swedlow
Athena D. Dalton
QUINN EMANUEL URQUHART &
 SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL  60606
(312) 705-7400
stephenswedlow@quinnemanuel.com
athenadalton@quinnemanuel.com

October 22, 2021

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................... ii

I.    DISCOVERY IS NOT NECESSARY TO DETERMINE THAT DELAWARE
      LAW GOVERNS PLAINTIFF'S CLAIMS. ..........................................................1

II.   PLAINTIFF'S CLAIMS FAIL UNDER DELAWARE LAW ...........................................4

III.  PLAINTIFF'S CLAIMS FAIL UNDER NEW JERSEY LAW ........................................7

CONCLUSION........................................................................................10

Appx322

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Alsteen v. Wauleco, Inc.,*
    335 Wis.2d 473, 802 N.W.2d 212 (App. 2011) ........................................................... 6

*Arcelik A.S v. E. I. du Pont De Nemours & Co.,*
    2018 WL 1401327 (D. Del. Mar. 20, 2018) ............................................................ 2

*Ayers v. Jackson Twp.,*
    106 N.J. 557 (1987) ........................................................................................... 8

*Ball v. Joy Techs., Inc.,*
    958 F.2d 36 (4th Cir. 1991) ............................................................................... 6

*Caronia v. Philip Morris USA, Inc.,*
    22 N.Y.3d 439 (2013) ....................................................................................... 6

*City of Philadelphia v. Beretta U.S.A. Corp.,*
    277 F.3d 415 (3rd Cir. 2002) ........................................................................... 7

*CLEAResult Consulting, Inc. v. EnerNOC, Inc.,*
    2017 WL 4638592 (D. Del. Oct. 16, 2017) ........................................................ 1

*Clinton v. Enter. Rent-A-Car Co.,*
    977 A.2d 892 (Del. 2009) ................................................................................. 3

*Curl v. Am. Multimedia, Inc.,*
    187 N.C.App. 649, 654 S.E.2d 76 (2007) .......................................................... 6

*Graboff v. The Collern Firm,*
    2010 WL 4456923 (E.D. Pa. Nov. 8, 2010) ...................................................... 2

*Henry v. Dow Chem. Co.,*
    473 Mich. 63 (2005) ......................................................................................... 5

*In re Asbestos Litig.,*
    2017 WL 3600418 (Del. Super. Ct. Aug. 18, 2017) .......................................... 7

*Integral Res. (PVT) Ltd. v. Istil Grp., Inc.,*
    2004 WL 2758672 (D. Del. Dec. 2, 2004) ........................................................ 1

*Lowe v. Philip Morris USA, Inc.,*
    344 Or. 403, 183 P.3d 181 (2008) .................................................................... 6

*M.G. ex rel. K.G. v. A.I. DuPont Hosp. for Children,*
    393 F. App'x 884 (3d Cir. 2010) ...................................................................... 6

*Mauro v. Raymark Indus., Inc.,*
    116 N.J. 126, 561 A.2d 257 (1989) .................................................................. 9

*Mergenthaler v. Asbestos Corp. of Am.*,
  480 A.2d 647 (Del. 1984) ........................................................................... 6

*Metro-N. Commuter R. Co. v. Buckley*,
  521 U.S. 424 (1997) ................................................................................... 4

*Nutt v. A.C. & S., Inc.*,
  466 A.2d 18 (Del. Super. Ct. 1983) ........................................................... 6

*Parker v. Brush Wellman, Inc.*,
  377 F. Supp. 2d 1290, 1302 (N.D. Ga. 2005) ........................................... 5

*Paz v. Brush Engineered Materials, Inc.*,
  949 So.2d 1 (Miss. 2007) ........................................................................... 5

*Pennsylvania Emp., Benefit Tr. Fund v. Zeneca, Inc.*,
  710 F. Supp. 2d 458 (D. Del. 2010) .......................................................... 1

*Schweitzer v. Consolidated Rail Corp.*,
  758 F.2d 936 (3rd Cir. 1985) ..................................................................... 4

*Sinclair v. Merck & Co.*,
  195 N.J. 51, 948 A.2d 587 (2008) ............................................................. 8

*Sinnott v. Thompson*,
  32 A.3d 351 (Del. 2011) ............................................................................ 3

*Theer v. Philip Carey Co.*,
  133 N.J. 610, 628 A.2d 724 (1993).................................................... 8, 9, 10

*Tumlinson v. Advanced Micro Devices, Inc.*,
  2010 WL 8250792 (Del. Super. Ct. July 23, 2010) ................................... 1

*Wood v. Wyeth-Ayerst Lab'ys, Div. of Am. Home Prod.*,
  82 S.W.3d 849 (Ky. 2002) ......................................................................... 5

*Zazzali v. Hirschler Fleischer, P.C.*,
  482 B.R. 495 (D. Del. 2012) ...................................................................... 2

## Statutory Authorities

La. Civ. Code Ann. Art. 2315(B)................................................................... 5

I.    DISCOVERY IS NOT NECESSARY TO DETERMINE THAT DELAWARE LAW
      GOVERNS PLAINTIFF'S CLAIMS

As discussed in Croda's opening brief, Delaware law governs Plaintiff's claims because

Delaware has the "most significant relationship" to this dispute.  (Mot. at 4-6.)  Delaware courts

conduct a two-part test for determining choice of law.  First, the court must consider whether an

actual conflict of law exists. *Tumlinson v. Advanced Micro Devices, Inc.*, 2010 WL 8250792, at

*1 (Del. Super. Ct. July 23, 2010).  Plaintiff concedes that there may be at least one "significant

variance" between Delaware and New Jersey law in the states' approach to medical monitoring

claims.  (Opp. at 4.)  Where—as is the case here—a conflict exists, the court then applies the "most

significant relationship" test to determine which state's law applies in a tort case, taking into

account: "(a) the place where the injury occurred, (b) the place where the conduct causing the

injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of

business of the parties, and (d) the place where the relationship, if any, between the parties is

centered." *Tumlinson*, 2010 WL 8250792, at *1.

In its opposition brief, Plaintiff argues that discovery is needed to apply the "most

significant relationship test."  (Opp. at 4.)  This is incorrect; discovery is not justified here.  The

allegations in the complaint and any additional "facts" relevant to the choice of law analysis are

straightforward and not reasonably in dispute.  Courts routinely make choice of law decisions at

the motion to dismiss stage.  *See, e.g., Pennsylvania Emp., Benefit Tr. Fund v. Zeneca, Inc.,* 710

F. Supp. 2d 458, 478 (D. Del. 2010) (determining which substantive law applies to each claim

before reaching the merits of the motion to dismiss); *CLEAResult Consulting, Inc. v. EnerNOC,

Inc.*, 2017 WL 4638592, at *4 (D. Del. Oct. 16, 2017) (same); *Integral Res. (PVT) Ltd. v. Istil

Grp., Inc.*, 2004 WL 2758672, at *2 (D. Del. Dec. 2, 2004), *aff'd,* 155 F. App'x 69 (3d Cir. 2005)

(determining choice of law before addressing the sufficiency of a complaint).

- 1 -

Discovery is only allowed for choice of law at the motion to dismiss stage when the claims and choice of law analysis require it based upon choice of law factual complexity—not present here. In *Graboff v. The Collern Firm*, 2010 WL 4456923, at *8 (E.D. Pa. Nov. 8, 2010), cited by Plaintiffs, the court recognized that in those particular circumstances, the "choice of law analysis is fact-intensive and context specific." Similarly, in *Zazzali v. Hirschler Fleischer, P.C.*, the court deferred making a choice of law decision "[d]ue to the complexity of the analysis[.]" 482 B.R. 495, 517 (D. Del. 2012). The allegations in *Zazzali* involved a bankruptcy trustee for a group of real estate investment firms filing claims for civil RICO, fraud, and conspiracy against an investment firm and unidentified John Does 1-10. *Id.* The corporations involved—and investors who were allegedly defrauded—were scattered throughout the U.S. *Id.* at 517. Finally, Plaintiff cited *Arcelik A.S v. E. I. du Pont De Nemours & Co.*, as an example of a case where the court ordered discovery before deciding choice of law. (Opp. at 5.) In *Arcelik*, the Plaintiff (a Turkish company) asserted claims against DuPont (a Delaware corporation) and its subsidiaries in India and China for a series of fires caused by dryers used in consumers' homes worldwide. 2018 WL 1401327, at *1 (D. Del. Mar. 20, 2018). In *Arcelik,* the court allowed discovery to inform the choice of law between countries because the disputed facts were unquestionably more complex than the "facts" related to choice of law question presented here. *Arcelik*, 2018 WL 1401327, at *9.

Here, the facts related to choice of law are not reasonably in dispute and, as a consequence, the choice of law analysis is straightforward. The injury alleged in the Complaint is exposure to EtO in New Castle, Delaware. (Compl. ¶¶ 1, 4.) Every member of the class was exposed to EtO *in Delaware* when they lived near Croda's Atlas Point plant. (*Id.* ¶¶ 8, 62.) The place where the conduct causing the alleged injury occurred was also in Delaware, as the EtO was emitted from a

Delaware plant.  (Compl. ¶ 28.)  Croda is incorporated in Delaware, Plaintiff Baker is a Delaware citizen, and all class members must have resided in Delaware for at least one year as defined by the Plaintiff in the Complaint to qualify as a class member.  (Compl. ¶¶ 8, 9, 62.)  Although some of the class members have moved out of Delaware during the decades-long class period, the relationship between Croda and every class member is defined by Plaintiffs in the complaint as taking place only in Delaware.  *See Sinnott v. Thompson*, 32 A.3d 351, 354 (Del. 2011) (noting that the place where the relationship between the parties is centered receives "particular weight" in a choice of law analysis).  Plaintiff argues in its Opposition brief that it is "pure conjecture" to say that this is a case involving Delaware residents suing a Delaware corporation.  (Opp. at 5.) However, Plaintiff chose to bring a Class Action on behalf of current and former Delaware residents—the class definition itself limits class members to persons who have resided in Delaware for at least one year.  (Compl. ¶ 62.)

Plaintiff asserts that since Croda has its corporate offices in New Jersey, "[i]t is entirely reasonable to infer that Defendant, having its headquarters in New Jersey, exercised control of the Atlas Point facility, and made the decisions with regard to levels of production of EtO and inadequate emissions control from New Jersey."  (Opp. at 5).  These made up facts, even taken as true, would not change the outcome of the multi-factor choice of law test, because all the actual factors weigh in favor of applying Delaware law.  In any case, "[f]or personal injury actions, the law of the state where the injury occurred is presumed to control[.]"  *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009).  Any injury from exposure to EtO occurred in Delaware, and should therefore be evaluated under Delaware law.  This is not a close or even realistically disputed factual issue.

- 3 -

II.     PLAINTIFF'S CLAIMS FAIL UNDER DELAWARE LAW

All of Plaintiff's claims fail under Delaware law because Delaware does not recognize exposure to a toxic substance, without more, as an actionable injury.[1]  Plaintiff argues that the harm caused by exposure to EtO is a compensable injury because Plaintiff and Class Members have a current, higher risk of disease.  (Opp. at 6)  As discussed in Croda's opening brief, Delaware has not recognized exposure to a toxic substance—without developing any related disease—as an actionable injury.  (Mot. at 8-12.)  In its opposition, Plaintiff did not identify any Delaware cases where exposure without disease qualified as an actionable injury.

Plaintiff seeks to avoid application of Delaware law leading to dismissal by pointing to three states that have allowed recovery of medical monitoring costs without proof of physical injury.  (Opp. at 12).  As a threshold matter, other states' decisions are not controlling or precedential as to whether Delaware allows plaintiffs to recover medical monitoring costs without proof of an underlying injury.  Further, these three states are actually outliers.  Most jurisdictions that have considered the issue do not permit recovery of medical monitoring damages unless actual injury—such as symptoms or disease—has already been established.  *See, e.g., Metro-N. Commuter R. Co. v. Buckley*, 521 U.S. 424, 438 (1997) ("an exposed plaintiff can recover related reasonable medical monitoring costs if and when he develops symptoms"); *see also  Schweitzer v. Consolidated Rail Corp.,* 758 F.2d 936, 942 (3rd Cir. 1985) (holding "that subclinical injury resulting from exposure to [toxins] is insufficient to constitute the actual loss or damage to

---

[1] Plaintiff's independent claim for medical monitoring fails for the same reason.  Plaintiff asserts that "[w]hether medical monitoring is an independent cause of action or remedy under Delaware law is an academic exercise that has no practical effect on the outcome of the Motion." (Opp. at 9.)  This is simply incorrect: Claim No. VI in the Complaint is an independent claim for medical monitoring.  Delaware does not recognize medical monitoring as an independent cause of action (*see* Mot. at 10-12), and Claim No. VI therefore fails under Delaware law.

plaintiff's interest required to sustain a cause of action under generally applicable principles of tort law"). This is also the right outcome because it permits those with an injury from exposure to file suit but prevents class cases (such as this one) from proceeding based on nothing more than the existence or the use of a substance permitted under regulatory law that has exposure risk.

For example, in 2005 the Michigan Supreme Court declined to permit an award of medical monitoring damages for a class of plaintiffs who had not "suffered any present physical harm" as a result of exposure to dioxin, emphasizing that determining eligibility for participation in a medical monitoring program "involves the consideration of a number of practice questions and the balancing of a host of competing interests—a task more appropriate for the legislative branch than the judiciary." *Henry v. Dow Chem. Co.*, 473 Mich. 63, 91 (2005). In 2002, the Supreme Court of Kentucky considered, and rejected, a claim for medical monitoring for a plaintiff who had been exposed to asbestos, but had not developed symptoms of a related disease. *Wood v. Wyeth-Ayerst Lab'ys, Div. of Am. Home Prod.*, 82 S.W.3d 849, 859 (Ky. 2002). The Kentucky Supreme Court in *Wood* stated that "having weighed the few potential benefits against the many almost-certain problems of medical monitoring, we are convinced that this Court has little reason to allow such a remedy without a showing of present physical injury." *Id.* "Traditional tort law militates against recognition of such claims, and we are not prepared to step into the legislative role and mutate otherwise sound legal principles." This is consistent with the holding of many other states that have determined that exposure without actual injury is not sufficient to support a claim for medical monitoring damages. *See, e.g., Parker v. Brush Wellman, Inc.,* 377 F. Supp. 2d 1290, 1296, 1302 (N.D. Ga. 2005) (plaintiffs who claimed only "subclinical" and "cellular" effects from beryllium exposure did not plead "actionable injuries under applicable tort doctrine . . . [and] failed to state a claim"); La. Civ. Code Ann. Art. 2315(B); *Paz v. Brush Engineered Materials, Inc.*, 949 So.2d

1, 3 (Miss. 2007); *Caronia v. Philip Morris USA, Inc.*, 22 N.Y.3d 439 (2013); *Curl v. Am. Multimedia, Inc.*, 187 N.C.App. 649, 654 S.E.2d 76, 81 (2007); *Lowe v. Philip Morris USA, Inc.*, 344 Or. 403, 183 P.3d 181, 183 (2008); *Ball v. Joy Techs., Inc.*, 958 F.2d 36, 39 (4th Cir. 1991) (applying Virginia law); *Alsteen v. Wauleco, Inc.*, 335 Wis.2d 473, 802 N.W.2d 212, 218–19 (App. 2011).

The fact remains that Delaware has not recognized claims or damages for medical monitoring without an independent physical injury. In 1984, Delaware's Supreme Court affirmed a decision to dismiss a claim for medical monitoring where the spouses of workers who had developed asbestosis alleged that they had been exposed to asbestos fibers when they laundered their husbands' work clothes. *Nutt v. A.C. & S., Inc.*, 466 A.2d 18, 25 (Del. Super. Ct. 1983), *aff'd sub nom, Mergenthaler v. Asbestos Corp. of Am.*, 480 A.2d 647 (Del. 1984). The plaintiffs in *Nutt* claimed "a physical nexus with asbestos fiber through the handling of their husband's clothing." *Id.* Even though their complaint alleged physical exposure to asbestos fibers, the court did not allow their claim to move forward since the plaintiffs did not present "a demonstrable physical change in bodily condition." *Nutt*, 466 A.2d at 26. On appeal, the Delaware Supreme Court affirmed that "a claim for the expenses of medically required surveillance . . . fails to state a claim upon which relief can be granted ***when there is no present physical injury***." *Mergenthaler*, 480 A.2d at 649. More recently, the Third Circuit considered whether the Delaware Supreme Court would recognize an independent claim for medical monitoring and concluded that such holding "requires several 'leaps' from the current state of the law generally, let alone Delaware law." *M.G. ex rel. K.G. v. A.I. DuPont Hosp. for Children,* 393 F. App'x 884, 891 (3d Cir. 2010).

Here, all class members by definition cannot be ill or have any disease process associated with EtO exposure. (Compl. ¶¶ 62-63, stating that "all persons who have been currently diagnosed

- 6 -

with cancer or illness, disease or disease process of any kind caused by EtO" are excluded from the Class.)  Class-wide fear or risk of developing a disease in the future is simply not actionable under Delaware law.  If any class member has developed or later develops a "disease or disease process of any kind caused by EtO", that individual can bring a claim at that time.  *See, e.g.*, *In re Asbestos Litig.*, 2017 WL 3600418, at *1 (Del. Super. Ct. Aug. 18, 2017) (a person who *develops an injury* as a result of exposure to a toxic substance can bring a claim "when the plaintiff is chargeable with knowledge that his condition is attributable to [toxic] exposure.").  Plaintiffs' medical monitoring damages theory based on *exposure* would be an impermissible expansion of Delaware state law, and cannot properly be reached by this Court.  *See City of Philadelphia v. Beretta U.S.A. Corp.,* 277 F.3d 415, 421 (3rd Cir. 2002) ("it is not the role of a federal court to expand state law in ways not foreshadowed by state precedent").  This Court should therefore dismiss all of Plaintiff's claims for failure to state a claim under Delaware law.

III.    PLAINTIFF'S CLAIMS FAIL UNDER NEW JERSEY LAW

Plaintiff's claims also fail under New Jersey law because they do not plead the prerequisites to recover for either medical surveillance or enhanced risk.  While New Jersey law does permit medical monitoring damages as a remedy when actual injury exists (in certain narrow cases), it does not recognize medical monitoring (as pled here) as an independent cause of action.  Plaintiff asserts in its Opposition that "medical surveillance" and "enhanced risk" are distinct claims and remedies under New Jersey law.  (Opp. at 10.)  Although the Complaint is vague about whether it seeks recovery for "medical surveillance" or "enhanced risk,"[2] Plaintiff's claims fail under both the "medical surveillance" or the "enhanced risk" standard in New Jersey.

---

[2] Each Count of the Complaint alleges that Plaintiff and Class Members "presently suffer, and will continue to suffer, a present ***increased risk*** of illness, disease or disease process, and the resulting present need to incur the cost of reasonably medically necessary diagnostic testing . . .

(Continued . . .)

Plaintiff has not stated a claim for "enhanced risk" because the Complaint does not allege that Plaintiff and Class Members are more likely than not to develop disease as a result of EtO exposure. In New Jersey, "recovery for enhanced risk of contracting a disease due to exposure to toxic chemicals is only possible upon proof that it is more probable than not (the rule of reasonable medical probability) that the plaintiff will develop the disease." *Sinclair v. Merck & Co.,* 195 N.J. 51, 60, 948 A.2d 587, 592 (2008). As discussed in Croda's opening brief, the Complaint fails to allege that Plaintiff and Class Members are more likely than not to develop a disease associated with EtO exposure, and their claims therefore fail. (Mot. at 18-20.)

To the extent that Plaintiff seeks recovery for "medical surveillance," those claims fail for lack of an underlying injury. "In New Jersey, "medical surveillance damages" are available as "a special compensatory remedy" that "is not easily invoked." *Theer v. Philip Carey Co.*, 133 N.J. 610, 627, 628 A.2d 724, 733 (1993). Although medical surveillance damages were once awarded in a mass action to plaintiffs "who had been victimized by a public entity" in the 1987 decision *Ayers v. Jackson Twp.*, 106 N.J. 557, 605 (1987), the *Ayers* holding has been limited by subsequent case law. *See Sinclair v. Merck & Co.*, 195 N.J. 51, 61 (2008). The Supreme Court of New Jersey in *Sinclair* recognized that medical surveillance damages—such as those awarded in *Ayers*—were available "to plaintiffs who have suffered increased risk of cancer when directly exposed to a defective or hazardous product like asbestos, ***when they have already suffered a manifest injury or condition caused by that exposure***, and whose risk of cancer is attributable to that exposure." *Sinclair*, 195 N.J. at 61 *citing Theer*, 133 N.J. at 626. In short, the New Jersey Supreme Court

---

for the early detection of illness[.]" (*See, e.g.*, Compl ¶¶ 80, 89, 102, 109, 117, 121.) Count VI of the Complaint, titled "Medical Monitoring, seeks an award of "the quantifiable costs of [ ] a ***monitoring regime,***" including "[m]onitoring procedures that makes early detection of [ ] cancers possible and beneficial." (Dkt. 1 ¶¶ 118-123.) Further, the Request for Relief includes a fund to pay medical monitoring costs. (*Id.* at 25-26.)

- 8 -

has limited medical surveillance damages to cases where plaintiffs **have already suffered a manifest injury** separate and apart from their exposure to a toxin.

Exposure alone is not sufficient to support medical surveillance damages under New Jersey law. An analysis of two asbestos cases in New Jersey makes this distinction clear. In *Mauro v. Raymark Indus., Inc.*, a worker who had been exposed to asbestos fibers at work sued for medical surveillance damages. 116 N.J. 126, 129, 561 A.2d 257, 259 (1989). The record showed that he had developed pleural thickening of his lungs, a physical condition "that was directly caused by asbestos." *Id.* at 129-30. The New Jersey Supreme Court in *Mauro* held that:

> [W]e need not and do not reach the question whether exposure to toxic chemicals without physical injury would sustain a claim for emotional-distress damages based on a reasonable fear of future disease, such a damage claim is clearly cognizable where, as here, plaintiff's exposure to asbestos has resulted in physical injury.

*Mauro*, 116 N.J. at 137. In a subsequent case, *Theer v. Philip Carey Co.*, a woman alleged that she had been exposed to asbestos by handling her husbands' work clothes containing asbestos fibers. *Theer v. Philip Carey Co.*, 133 N.J. 610 (1993). The plaintiff in *Theer* sought medical surveillance damages for diseases linked to asbestos exposure. *Id.* at 627–28. The New Jersey Supreme Court rejected the plaintiff's medical surveillance damages, stating that "[i]f a plaintiff is exposed to a [toxin] in an indirect manner, **and, further, has not suffered from any injury or condition relating to that exposure**, it becomes increasingly difficult for courts and juries to determine the direct correlation between the indirect exposure and any future risk of injury." *Id.* at 627 (emphasis added). "Plaintiff did not suffer from any injury or condition clearly related to asbestos exposure, "and "was a heavy smoker." *Id.* "Thus, there may be multiple factors that contribute to any future injuries that she may have." *Id.* "The New Jersey Supreme Court in *Theer* then declined Plaintiff's claim for medical surveillance damages, holding that "[w]e . . . conclude that medical surveillance damages are not available for plaintiffs who have not experienced direct

and hence discrete exposure to a toxic substance ***and who have not suffered an injury or condition resulting from that exposure***." *Theer*, 133 N.J. at 628.

The New Jersey Supreme Court was presented with two medical surveillance claims just four years apart. In *Mauro*, where the plaintiff had manifested symptoms caused by exposure (*i.e.*, pleural thickening), the court awarded medical surveillance damages. In *Theer*, where the plaintiff did not have any current physical injury, the court declined to award medical surveillance damages. The New Jersey Supreme Court explicitly held that exposure without actual injury is not enough to recover medical surveillance damages—rather, the direct exposure must be coupled with "an injury or condition resulting from that exposure." *Theer* at 133 N.J. at 628. The Complaint specifically excludes any Class Members that may have suffered any "injury or condition resulting from [their] exposure" to EtO. Thus, their claims for medical surveillance fail under New Jersey law.

<u>CONCLUSION</u>

For these reasons, Croda respectfully requests that the Court enter an order to dismiss this case for failure to state a claim under Rule 12(b)(6).

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Kenneth J. Nachbar*
Kenneth J. Nachbar (# 2067)
Miranda N. Gilbert (# 6662)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
knachbar@morrisnichols.com
mgilbert@morrisnichols.com
*Attorneys for Defendant*

- 10 -

OF COUNSEL:

Stephen A. Swedlow
Athena D. Dalton
QUINN EMANUEL URQUHART &
 SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL  60606
(312) 705-7400
stephenswedlow@quinnemanuel.com
athenadalton@quinnemanuel.com

October 22, 2021

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CATHERINE BAKER, individually and on behalf of all others similarly situated | ) ) ) | |
| Plaintiff, | ) ) | Case No. 1:20-cv-01108-SB |
| v. | ) ) | |
| CRODA INC. f/k/a CRODA, INC., | ) ) | |
| Defendant. | ) | |

## APPLICATION FOR ORAL ARGUMENT

Pursuant to Local Rule 7.1.4, Defendant Croda Inc., f/k/a Croda, Inc. ("Defendant"), hereby respectfully requests that the Court hear oral argument on Defendant's Renewed Motion to Dismiss (D.I. 32) (the "Motion"), filed on August 27, 2021. Plaintiff Catherine Baker filed her answering brief in opposition to the Motion on October 1, 2021 (D.I. 37). Defendant served its reply brief in support of the Motion (the "Reply Brief") on October 22, 2021 (D.I. 41). The Motion is now fully briefed and this application for oral argument is timely made within seven days of service of the Reply Brief.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Kenneth J. Nachbar*
Kenneth J. Nachbar (# 2067)
Miranda N. Gilbert (# 6662)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
knachbar@morrisnichols.com
mgilbert@morrisnichols.com
*Attorneys for Defendant*

OF COUNSEL:

Stephen A. Swedlow
Athena D. Dalton
QUINN EMANUEL URQUHART & SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL  60606
(312) 705-7400
stephenswedlow@quinnemanuel.com
athenadalton@quinnemanuel.com

October 25, 2021

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| CATHERINE BAKER, individually and on behalf of all others similarly situated | ) ) ) | |
| Plaintiff, | ) | Case No. 1:20-cv-01108-SB |
| v. | ) ) | |
| CRODA INC. f/k/a CRODA, INC., | ) ) | |
| Defendant. | ) | |

## STIPULATION AND ORDER STAYING DISCOVERY

IT IS HEREBY STIPULATED AND AGREED, by and through the undersigned counsel for Plaintiff Catherine Baker and Defendant Croda Inc. f/k/a Croda, Inc. (collectively the "Parties"), subject to the approval of the Court, that the discovery in this case shall be stayed pending the Court's resolution of Defendant's pending Renewed Motion to Dismiss Plaintiff's Complaint (D.I. 31) (the "Motion").

IT IS HEREBY FURTHER STIPULATED AND AGREED, by and through the undersigned counsel for the Parties, subject to the approval of the Court, that this stay of discovery shall automatically terminate upon resolution of the Motion, and the Parties shall exchange initial disclosures pursuant to Fed. R. Civ. P. 26(a) within fourteen (14) days of the same.

GRANT & EISENHOFER P.A.

/s/ Kimberly A. Evans
Kimberly A. Evans (#5888)
123 Justison Street
Wilmington, Delaware 19801
(302) 622-7000
kevans@gelaw.com
Attorney for Plaintiff
*Counsel for the Plaintiff and the*
*Putative Class*


OF COUNSEL:

Frank Petosa (*Admitted Pro Hac Vice*)
MORGAN & MORGAN,
COMPLEX LITIGATION GROUP
8151 Peters Road Suite 4000
Plantation, FL 33324
(954) 318-0268

Marcio W. Valladares (*Admitted Pro Hac Vice*)
MORGAN & MORGAN,
COMPLEX LITIGATION GROUP
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
(813) 223-5505

Rene F. Rocha (*Admitted Pro Hac Vice*)
MORGAN & MORGAN, ,
COMPLEX LITIGATION GROUP
3530 Magazine St.
New Orleans, LA 70115
(954) 318-0268
*Counsel for the Plaintiff and the Putative*
*Class*

October 20, 2021

MORRIS, NICHOLS, ARSHT &
TUNNELL LLP

/s/ Kenneth J. Nachbar
Kenneth J. Nachbar (#2067)
Miranda N. Gilbert (#6662)
1201 North Market Street
Wilmington, Delaware 19801
(302) 658-9200
knachbar@morrisnichols.com
mgilbert@morrisnichols.com
*Attorneys for Defendant*


OF COUNSEL:

Stephen A. Swedlow (*Admitted Pro Hac Vice*)
Athena Dalton (*Admitted Pro Hac Vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
191 N. Wacker Drive, Suite 2700
Chicago, IL 60606
(312) 705-7400
stephenswedloe@quinnemanuel.com
athenadalton@quinnemanuel.com


IT IS SO ORDERED this 27th day of October, 2021.


_____
Honorable Stephanos Bibas

# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

CATHERINE BAKER, individually and on behalf of all others similarly situated,

                    Plaintiff,

v.

CRODA INC. f/k/a CRODA, INC.,

                    Defendant.

Case No.:  20-cv-01108-SB

## <u>APPLICATION FOR ORAL ARGUMENT</u>

Pursuant to Local Rule 7.1.4, Plaintiff, Catherine Baker, individually and on behalf of all others similarly situated, hereby requests oral argument on Defendant Croda Inc.'s Renewed Motion to Dismiss (D.I. 32).

Respectfully submitted,

<u>/s/ Kelly L. Tucker</u>
Kelly L. Tucker (#6382)
GRANT & EISENHOFER P.A.
123 Justison Street
Wilmington, Delaware 19801
ktucker@gelaw.com
P: (302) 622-7000
F: (302) 622-7100

*Attorney for the Plaintiff and*
*the Putative Class*

Date: October 28, 2021

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

CATHERINE BAKER, individually and on
behalf of all others similarly situated,

        *Plaintiff,*

v.

CRODA INC. f/k/a CRODA, INC.,

        *Defendant.*

No.  1:20-cv-01108-SB

---

**NOTICE OF INTENT TO STAND ON THE COMPLAINT**

Plaintiff, Catherine Baker, having reviewed this Court's November 23, 2021 Order [Docket No. 47] dismissing Plaintiff's Complaint [Docket No. 1] without prejudice and affording Plaintiff 30 days to file an amended complaint, hereby elects to stand on the Complaint.

Accordingly, Plaintiff requests that the Court enter a Final Order of dismissal with prejudice.

Respectfully submitted,

*/s/ Kelly L. Tucker*
Kelly L. Tucker (#6382)
GRANT & EISENHOFER P.A.
123 Justison Street
Wilmington, Delaware 19801
ktucker@gelaw.com
P: (302) 622-7000
F: (302) 622-7100

T. Michael Morgan*
MORGAN & MORGAN, P.A.
20 N Orange Ave., Suite 1600
Orlando, FL 32801
mmorgan@ForThePeople.com
P: (407) 418-2031
F: (407) 245-3384

Kevin S. Hannon*
MORGAN & MORGAN, COMPLEX
LITIGATION GROUP
1641 N. Downing Street,
Denver, Colorado 80218
khannon@ForThePeople.com
P: (303) 264-1769
F: (303) 264-1795

Marcio W. Valladares*
MORGAN & MORGAN, COMPLEX
LITIGATION GROUP
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
mram@ForThePeople.com
mvalladares@ForThePeople.com
P: (813) 223-5505
F: (813) 223-5402

Rene F. Rocha*
MORGAN & MORGAN, COMPLEX
LITIGATION GROUP
3530 Magazine St.
New Orleans, LA 70115
rrocha@ForThePeople.com
P:  (954) 318-0268
F:  (954) 327-3018

Frank M. Petosa*
MORGAN & MORGAN, COMPLEX
LITIGATION GROUP
8151 Peters Road
Suite 4000
Plantation, FL 33324
fpetosa@ForThePeople.com
P:  (954) 318-0268
F:  (954) 327-3018

*Pro Hac Vice
Attorneys for the Plaintiff and
the Putative Class

Date:  February 17, 2022

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

CATHERINE BAKER, individually and on
behalf of all others similarly situated,

              **P**

v.

CRODA INC. f/k/a CRODA, INC.,

              **D    d**

No.  1:20-cv-01108-SB

---

## [PROPOSED] FINAL ORDER

1.      WHEREAS, on November 23, 2021, the Court **GRANTED** Defendant's motion to dismiss [Docket No. 47];

2.      WHEREAS, the Court's dismissal was without prejudice and afforded Plaintiff 30 days to amend the complaint;

3.      WHEREAS, the 30-day period for amendment has lapsed, and Plaintiff has noticed her intention to stand on the complaint [Docket No. __];

It is hereby **ORDERED** this ___ day of _____ 2022 that, for the reasons set forth in the Court's November 23, 2021 Memorandum Opinion [Docket No. 46], the Complaint is **DISMISSED WITH PREJUDICE**.

`

_____

## CERTIFICATE OF SERVICE & CM/ECF FILING

**21-3360**              *Catherine Baker v. Croda Inc*

I hereby certify that I caused the foregoing Joint Appendix, Volume II of II to be served on counsel for Defendant-Appellee via Notice of Docket Activity generated by the Court's electronic filing system (i.e. CM/ECF) and via electronic mail pursuant to Local Appellate Rules 31.1 (d) and 113.4(a):

Kenneth J. Nachbar
Miranda N. Gilbert
MORRIS NICHOLS ARSHT
& TUNNELL, LLP
1201 North Market Street, 16th Floor
Wilmington, Delaware 19899
(302) 658-9200

Stephen A. Swedlow
Athena D. Dalton
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
191 North Wacker Drive, Suite 2700
Chicago, Illinois 60606
(312) 705-7400

*Attorneys for Defendant-Appellee*

I certify that an electronic copy was uploaded to the Court's electronic filing system on February 22, 2022. Four hard copies of the foregoing Joint Appendix, Volume II of II were sent to the Clerk's Office by Federal Express Next Business Day Delivery to:

Clerk of Court
United States Court of Appeals for the Third Circuit
601 Market Street
Philadelphia, PA 19106
(215) 597-2995

on this 23rd day of February 2022.

/s/ Vittorio Virili
Vittorio Virili